Interference 105,114

Hu 11 hybrid cells were transformed to G418 resistance by pΔβ117 cut with BstXI using electroporation as described in Table 1. . . . .

Smithies expressly concludes, "The experiments reported here establish that the planned modification of a specific human gene can be accomplished in mammalian cells by homologous recombination without detectably affecting other parts of the genome" (Exh. 2010, p. 234).

### Findings based on Smithies's teachings

Genesys has not shown that Smithies teaches "activating a predetermined normally transcriptionally silent gene within the genome of a cell line so as to enable said cell line to express the product of said gene," as Claim 1 of ARS's '071 patent requires.

Genesys has not shown that Smithies teaches "modifying the expression characteristics of a predetermined gene within the genome of a cell line," as Claims 2 and 3 of ARS's '071 patent require.

Genesys has not shown that Smithies teaches insertion into a predetermined cell line of "a DNA regulatory segment capable of modifying the expression characteristics of genes in the host cell line," as Claim 26 of ARS's '071 patent requires.

Genesys has not shown that Smithies teaches inserting into a predetermined cell line "an expressible, amplifiable gene capable

-61-

Interference 105,114

of modifying the expression characteristics of genes in the host cell line," as required by Claim 26 of ARS's '071 patent.

Genesys has not shown that Smithies teaches "a cell capable of expressing a gene product by a predetermined normally transcriptionally silent gene within the genome of said cell line," as Claim 18 of ARS's '071 patent requires.

Genesys has not shown that Smithies teaches "a cell capable of enhanced expression of a gene product compared to the cell line from which it is derived, said gene product being the expression product of a predetermined endogenous gene," as Claim 19 of ARS's '071 patent requires.

Nor has Genesys shown that Smithies describes a genome of a cell line[, i.e., Hu 11 hybrid cells] . . . having a regulatory segment, i.e., sequences of the second element of the pΔβ117 test plasmid, that specify the neo gene and exogenous associated transcriptional signals (Exh. 2010, p. 231, col. 1, second full para.), operatively linked with a predetermined naturally occurring β-globin gene at an insertion site characterized by a predetermined DNA sequence. While the first element of the pΔβ117 test plasmid comprises "4.6 kilobases (kb) of the DNA from the human β-globin locus, including the 5' part of the adult human β-globin gene," it lacks the second intervening sequence (IVS-2) and the remaining 3' portion of the gene, i.e., it is not

-62-

Interference 105,114

a naturally occurring β-globin gene.  While this DNA to be inserted provides replacement sequences in the incoming test plasmid that can recombine with homologous target sequences in the β-globin locus of the recipient cell to accomplish the planned modification by homologous recombination]" (Exh. 2010, p. 231, col. 1, first full para.), the DNA insert is not operatively linked to a naturally occurring β-globin gene. Moreover, Smithies' concludes that "[t]he experiments reported here establish that the planned modification of a specific human gene can be accomplished in mammalian cells by homologous recombination without detectably affecting other parts of the genome" (Exh. 2010, p. 234).  Accordingly, we find that Smithies neither describes, nor reasonably would have suggested, subject matter encompassed by Claim 17 of ARS's '071 patent.

However, Smithies describes, and/or reasonably would have suggested, subject matter encompassed by Claims 105, 110, 111 and 112 of Genesys's Application 08/102,390.

Smithies describes, or reasonably would have suggested, a mammalian Hu 11 hybrid host cell that expresses a gene product encoded by the exogenous target neo gene which is not normally expressed within the genome of the cell line, said genome having inserted therein a heterologous regulatory sequence operatively associated with said exogenous target neo gene, so that the Hu 11

-63-

Interference 105,114

hybrid host cell expresses the product encoded by the exogenous
target neo gene (Exh. 2010, p. 231, col. 1, second full para.);
i.e., subject matter within the scope of Claim 105 of Genesys's
Application 08/102,390. As previously noted, Genesys's
Application 08/102,390 expressly states that the "target gene may
be any gene of interest . . ." (Exh. 2047, p. 5, l. 24-25).

Smithies also describes, or reasonably would have suggested,
a Hu 11 hybrid cell capable of expressing a neo gene not normally
expressed by that cell comprising an heterologous regulatory
sequence, i.e., transcriptional signals associated with said neo
gene, inserted by homologous recombination in said cell's genome
in a region in the vicinity of said neo gene, whereby the gene
may be expressed (Exh. 2010, pp. 231-233). The cell Smithies
describes is encompassed by Claims 110 and 112 of Genesys's
Application 08/102,390.

Smithies also describes, or reasonably would have suggested,
a Hu 11 hybrid cell capable of expressing a neo gene at higher
levels than normally expressed by that cell, comprising an
heterologous regulatory sequence, i.e., transcriptional signals
associated with said neo gene, inserted in said cells genome in a
region in the vicinity of said neo gene whereby the gene may be
expressed (Exh. 2010, pp. 231-233). The cell Smithies describes
is encompassed by Claim 111 of Genesys's Application 08/102,390.

-64-

Interference 105,114

Therefore:

Claims 105 and 110-112 of Genesys's Application 08/102,390 are unpatentable under 35 U.S.C. § 102(b) over subject matter described by Smithies, or under 35 U.S.C. § 103 in view of the teaching of Smithies.

(5)  Cid (Exh. 2013)

Cid's teachings

Cid teaches (Exh. 2013, p. 105, col. 2; citations omitted; emphasis added):

> As a first step in our mutational analysis of the yeast ATPase, the gene was cloned and a large deletion was shown to be lethal.  In this work we have replaced the constitutive promoter of the ATPase gene by a galactose-dependent promoter.  The physiological consequences of removing galactose from the growth medium are consistent with the essential role of the enzyme and with its participation in proton and amino acid transport.

According to Cid, "transformation must occur by integration into the yeast genome resulting from homologous recombination" (Exh. 2013, p. 106, col. 2).  Cid describes its integration method as follows (Id., citations omitted; emphasis added):

> In order to target the recombination to the ATPase sequences we treated the plasmid with XbaI, which cuts within the ATPase fragment, because restriction enzyme digestion within the region of homology greatly enhances the efficiency of integration.  Integration at the ATPase locus results in a constitutive promoter in front of a truncated coding region and the galactose-dependent promoter in front of a complete coding region.

Interference 105,114

### Findings based on Cid's teachings

Genesys has not shown that Cid describes, or reasonably would have suggested, activating a predetermined normally transcriptionally silent gene within the genome of a cell line or modifying the expression characteristics of a predetermined gene within the genome of a cell line by inserting an amplifiable gene capable of amplifying the predetermined gene, or enhancing the expression characteristics of a predetermined gene within the genome of a cell line, as Claims 1, 3, 18, 19 and 27 of ARS's '071 patent.

However, we find that Cid describes, or reasonably would have suggested, a method for modifying the expression characteristics of the endogenous target ATPase gene in an eukaryotic yeast cell by inserting a galactose-dependent promoter operatively linked to the endogenous ATPase gene. The galactose-dependent promoter is inserted into the yeast cell genome by homologous recombination within ATPase fragments, thereby replacing the constitutive promoter of the ATPase gene with an operable galactose-dependent promoter. The DNA construct comprising a DNA regulatory segment is capable of modifying the expression characteristics of the ATPase gene. While Cid's method reduced the natural expression characteristics of the ATPase gene and yeast growth using a DNA construct comprising a

-66-

Interference 105,114

new galactose-dependent DNA regulatory segment, the new regulatory segment was operatively linked to the ATPase gene and did not terminate expression of the ATPase gene. ARS's '071 patent specification defines "[t]he term 'modification of expression' as used throughout the specification and claims, . ... as excluding termination of expression by inserting by homologous recombination . . . to prevent the product of interest from being expressed" (ARS's '071 patent, col. 24, l. 6-12; emphasis added). Accordingly, Cid describes, or reasonably would have suggested, subject matter encompassed by Claims 2, 17 and 26 of ARS's '071 patent.

Cid does not appear to describe, or reasonably suggest, subject matter defined by any of Claims 105-109 of Genesys's Application 08/102,390. The host cell transformed in accordance with Genesys's Claims 105-109 is mammalian, not merely eukaryotic yeast. However, while the expression characteristics of the target ATPase gene of Genesys's Claims 110-112 are neither activated from silence nor enhanced, the exogenous yeast URA3 and ampicillin resistance marker genes inserted via the pRS-61 plasmid into the yeast cells by homologous recombination, genes not normally expressed by the yeast cell, are newly expressed by the yeast cell line. The exogenous URA3 and ampicillin resistance marker genes, which Cid reports to have inserted by

-67-

Interference 105,114

homologous recombination into the genome of yeast cells via the
pRS-61 plasmid (Exh. 2013, p. 105, col. 2, Plasmids, last
sentence; Exh. 2013, p 106, col. 2, Results), are expressed in
the yeast cells. Therefore, Cid describes, or reasonably would
have suggested subject matter encompassed by Claims 110-112 of
Genesys's Application 08/102,390.

Therefore:

Claims 2, 17, and 26 of ARS's '071 patent are unpatentable
under 35 U.S.C. § 102(b) over subject matter described by Cid, or
under 35 U.S.C. § 103 in view of the teaching of Cid.

Claims 110-112 of Genesys's Application 08/102,390 are
unpatentable under 35 U.S.C. § 102(b) over subject matter
described by Cid, or under 35 U.S.C. § 103 in view of the
teaching of Cid.

(6)  Thomas (Exh. 2011)

Thomas's teachings

Thomas generally states (Exh. 2011, p. 503, col. 1, first
para.; citations omitted):

Gene targeting-the homologous recombination of DNA
sequences residing in the chromosome with newly introduced
DNA sequences-provides a means for systematically altering
the mammalian genome.

Here, Thomas extends what appears to be a conventional gene
targeting procedure "by using an endogenous gene as the target
and by using embryo-derived stem (ES) cells as the recipient

-68-

Interference 105,114

cell line" (Exh. 2011, p. 503, col. 2, first full para.). "The
target gene is hypoxanthine phosphoribosyl transferase (Hprt)"
(Exh. 2011, p. 503, col. 2, second full para.). "ES cells were
chosen for these experiments because, following inactivation of a
chosen gene by gene targeting, they should provide the means to
generate mice with the desired mutation" (Exh. 2011, p. 503,
col. 2, third full para.).

Thomas more particularly describes the "site-directed
inactivation of the endogenous Hprt gene in male ES cells by gene
targeting" (Exh. 2011, pp. 503-504, col. 2, bridging para.) as
follows:

> In Figure 1 we illustrate our strategies for inactivating
> the Hprt gene.  The eight exon in a cloned fragment of
> Hprt is disrupted by inserting the neo gene.  Following
> introduction of this DNA onto ES cells, homologous
> recombination transfers this disruption into the endogenous
> Hprt gene, rendering the cells neo-Hprt⁻ and therefore
> resistant to the drug G418 and the base analog 6-TG.
>
> Using gene targeting in yeast as a paradigm, we
> constructed two classes of vectors that we believed would
> disrupt the Hprt gene either by replacing endogenous
> sequences or by inserting into the endogenous sequences.
> We termed these recombinant neo-Hprt⁻ vectors replacement
> vectors (RV) and insertion vectors (IV).  [(Exh. 2011,
> p. 504, col. 2, first two para.; citations omitted);]
>
> In the schemes outlined in Figure 1 for site-specific
> mutagenesis of the Hprt gene, the neo genes were used both
> to disrupt the coding sequence of the target gene and as a
> tag to monitor the integration of the newly introduced DNA
> into the recipient genome.  Effective use of the neo gene
> as a tag requires expression of the gene in the Hprt locus.
> In general, if the neo gene is to be used in a similar
> fashion to inactivate other genes, it must be expressed

-69-

Interference 105,114

in as many chromosomal sites as possible. [(Exh. 2011,
p. 504, col. 2, third para.).]

Thomas "redesigned the neo gene to optimize expression in
ES cells while maintaining it size at a minimum" (Exh. 2011,
p. 504, col. 2, to p. 505, col. 1, bridging para.).  The
redesigned neo gene is designated pMC1Neo.

The structural and control elements of pMC1Neo are described
in Figure 2 and are said to comprise (Exh. 2011, p. 504, col. 2,
to p. 505, col. 1, bridging para. including Figure 2; citations
omitted):

> The neomycin protein coding sequence (d)[, the neo
> structural gene,] is from the bacterial transposon Tn5.
> The promoter (b) that drives the neo gene is derived from
> the herpes simplex virus thymidine kinase gene (HSV-tk).
> This promoter appears to be effective in embryonal carcinoma
> (EC) cells.  To increase the efficiency of the tk promoter,
> we introduced a duplication of a synthetic 65 bp fragment
> (a) derived from the PyF441 polyoma virus enhancer.

Thomas explains:

> We have used electroporation to introduce the neo-Hprt
> recombinant vectors into ES cells. . . . Of a dozen G418
> cell lines analyzed by Southern transfer, each contained
> a single copy of pMC1Neo integrated in the mouse genome
> . . . [(Exh. 2011, p. 505, col. 2, Second full para.)].

> In all vectors, the 1 kb neo cassette from pMC1Neo has
> been inserted into the eighth exon of the Hprt gene. . . .
> [(Exh. 2011, p. 506m col. 1, first sentence)].

> Sequence replacement vectors were designed such that
> upon linearization, the vector Hprt sequences would remain
> colinear with the endogenous Hprt sequences.  In other
> words, the 5' and 3' ends of the vector would correspond
> to the 5' and 3' extents of sequence homology with the

-70-

Interference 105,114

endogenous gene . . . . [(Exh. 2011, p. 506, col. 1, first full para.)].

To show that the G418, 6-TG phenotypes were the result of gene-targeting events, the Hprt genes from 23 independently isolated G418, 6-TG cell lines were characterized by Souther analysis.  In every instance (23/23) the cells were shown to contain a single copy of the Hprt gene harboring the neo gene in exon 8. . . . Also, as expected, Hprt enzymatic activity could not be detected in these cell lines. . . . [(Exh. 2011, p. 507, col. 1, second full para.)].

According to Thomas:

We have analyzed 38 independent G418, 6-TG ES cell lines. Each of these cell lines was shown to have arisen from inactivation of the endogenous Hprt gene by homologous recombination with the introduced neo-Hprt fragment. . . . [(Exh. 2011, p. 510, col. 1, first full para.)].

. . . The parameters that we believe influenced the success of these experiments include using a neo gene that is efficiently expressed in ES cells, maintaining the size of the neo gene at a minimum, [and] using extensive homology between the homing sequence and the target sequence . . . . [(Exh. 2011, p. 510, col. 1, third full para.)].

Thomas concludes (Exh. 2011, pp. 510, concluding para.):

We have demonstrated that we can inactivate by gene targeting a specific locus in the mouse genome.  The protocol we have developed to inactivate the endogenous Hprt gene should be adaptable to other genes as well. . . . It is hoped that this combination of using ES cells as the recipient cell line and site-specific mutagenesis achieved by gene targeting will provide the means for generating mice of any desired genotype.

<u>Findings based on Thomas's teachings</u>

Genesys has not shown that Thomas describes, or reasonably would have suggested, "activating a predetermined normally transcriptionally silent gene within the genome of a cell line,"

-71-

Interference 105,114

as Claims 1 and 18 and claims dependent on Claims 1 and 18 of ARS's '071 patent require.

Genesys has not shown that Thomas describes, or reasonably would have suggested, "modifying the expression characteristics of a predetermined gene within the genome of a cell line" by inserting a DNA construct "comprising an expressible, amplifiable gene capable of amplifying said gene," as Claims 3 and 27 and claims dependent on Claims 3 and 27 of ARS's '071 patent require.

Genesys has not shown that Thomas describes, or reasonably would have suggested, "modifying the expression characteristics of a predetermined gene within the genome of a cell line, comprising inserting a DNA construct into said genome . . . wherein said construct is inserted such that said regulatory segment is operatively linked to said gene of interest," as Claim 2 of ARS's '071 patent and all claims dependent thereon require.

Genesys has not shown that Thomas describes, or reasonably would have suggested, a cell line "capable of enhanced expression of a gene product compared to the cell line from which it is derived" as Claim 19 of ARS's '071 patent and all claims dependent thereon require.

Furthermore, Genesys has not shown that Thomas describes, or reasonably would have suggested, a genome of a cell line

-72-

Interference 105,114

comprising a DNA regulatory segment unnaturally located in the
genome which is operatively linked with a predetermined naturally
occurring gene.  Genesys has not shown that the neo gene and
associated promoter within the neo-Hprt insert which replaces
the endogenous Hprt gene is operably linked with the
predetermined naturally occurring Hprt gene or any other gene
naturally occurring in the genome of the cell line, as Claim 17
of ARS's '071 patent requires.

On the other hand, Thomas describes, or reasonably would
have suggested, a mammalian host cell (mouse ES cells) that
expresses a neo structural gene not normally expressed within the
genome of the cell line operatively associated with a
heterologous HSV-tk promoter as a pMC1Neo insert within Hprt.
While the Hprt-inactive neo-Hprt insert replaces the active Hprt
gene, the exogenous structural neo gene insert is active in the
cell line operably associated with the exogenous HSV-tk promoter.
Thus, Thomas describes, or reasonably would have suggested,
subject matter encompassed by Claim 105 of Genesys's Application
08/102,390.

Thomas does not describe, and reasonably would not have
suggested, a mammalian cell expressing a gene "of that cell's
genome" encoding a protein not normally produced, or produced at

-73-

Interference 105,114

levels higher than normal, as Claims 107-109 of Genesys's Application 08/102,390 require.

Thomas does not describe, and reasonably would not have suggested, the transformed human 293 embryonal kidney cell defined by Claim 106 of Genesys's Application 08/102,390.

However, Thomas describes mammallian cells with an heterologous HSV-tk promoter inserted in the cell's genome though homologous recombination in the vicinity of, and operably linked to express a structural neo gene, i.e., a mammalian cell line having pMC1Neo neo gene within Hprt inserted into mouse ES cells by homologous recombination. The subject matter Thomas describes, or reasonably would have suggested, is encompassed by Claims 110-112 of Genesys's Application 08/102,390.

Therefore:

Claims 105 and 110-112 of Genesys's Application 08/102,390 are unpatentable under 35 U.S.C. § 102(b) over subject matter described by Thomas, or under 35 U.S.C. § 103 in view of the teaching of Thomas.

(7) Japan 1-215280 (Exh. 3010; Exh. 2016)

Japan's teachings

Our study of Japan's teachings relies on, and refers to, the certified English translations of Japanese Patent publication No. 1-215280, published August 29, 1989, of record; one submitted

-74-

Interference 105,114

by ARS (Exh. 3010) and the other submitted by GENESYS

(Exh. 2016).  Japan generally describes its invention as follows:

> The present inventors . . . discovered that a microorganism capable of efficiently producing a specific target substance is obtained by introducing a powerful promoter capable of enhancing the expression of a gene concerned in the production of the target substance in the chromosome of a microorganism already containing the gene.  The present invention has been perfected as a result.

(Exh. 3010, p. 5, para. 3);

> [T]he inventors discovered that by introducing powerful promoters that could increase the expression of genes related to the production of specific desired substances into microbial chromosomes already containing said genes, microbes capable of producing the desired substances efficiently were obtained, thus completing the invention.

(Exh. 2016, p. 4, para. 1);

> This invention . . . is aimed at providing an improved microorganism which has an expression regulatory sequence for a gene concerned in the production of a target substance introduced in the chromosome of a microorganism possessing the chromosome containing the gene at a position and in a direction such that the expression of the gene is enabled to be controlled[;] a method for the production of the microorganisms; and a method for the production of a useful substance, characterized by culturing the organism[,] thereby yielding a product concerned in the gene and collecting the product.

(Exh. 3010, p. 5, para. 4);

> [T]his inventions presents: improved microbes that have chromosomes containing genes related to the production of desired substances wherein expression-controlling sequences for said genes have been introduced into said microbial chromosomes at positions and in directions that enable the control of expression of said genes; methods for producing said microbes; as well as methods for producing useful substances characterized by the fact that said microbes are

-75-

Interference 105,114

cultured to produce products related to said genes, and said products are harvested.

(Exh. 2016, p. 4, para. 2).

More specifically, Japan discloses:

This invention can be applied to a microorganism which already possesses a gene concerned in the production of a target substance in the chromosome thereof and exhibits the ability to produce the target substance and to a microorganism which already possesses a gene concerned in the production of a target substance in the chromosome thereof and nevertheless fails to produce substantially the target substance and derives an ability to produce the target substance from externally introducing anew an expression regulatory gene.

(Exh. 3010, p. 6, para. 1).

This invention can be used either on microbes that have chromosomes containing genes related to the production of desired substances on their chromosomes and can produce said desired substances, or on microbes that already have genes related to the production of desired substances on their chromosomes although practically speaking, cannot produce said desired substances, but become able to produce said desired substances by newly introducing exogenous expression-controlling genes.

(Exh. 2016, p. 4, third para.).

According to Japan, the target genes may encode, and be made to express, enzymes such as protease, amylase, glucose isomerase, cellulase, and tryptophan synthetase; hormones such as insulin, growth hormones, encephalin, and somatostatin; antigens for hepatitis, polio, and herpes; and lymphokines such as interferon and interleucine (Exh. 3010, p. 6, para. 2; Exh. 2016, p. 4, para. 4). As does Genesys (Exh. 2047, p. 5, l. 24-25), Japan

-76-

Interference 105,114

appears to broadly define a target gene as any gene of interest.

In that regard, Japan states:

> The gene which is concerned in the production of such target substance may be <u>a gene which inherently exists in the chromosome of a host microorganism or a gene which has been artificially inserted in advance in the chromosome of a host microorganism</u>. The former gene possesses an expression regulatory series naturally attendant on the gene and, on being furnished with an additional, expression regulatory sequence to be inserted therein by the method of this invention, acquires an ability to enhance the production of the substance by a host. It is otherwise capable of conferring an ability to produce the target substance [by] a host which has been inherently incapable of producing substantially, the target substance. The latter gene in most cases possesses an expression regulatory domain attendant on the structural gene thereof and, on being furnished with a powerful expression regulatory sequence to be introduced by the method of this invention, acquired such effect as mentioned above.

(Exh. 3010, pp. 6-7, bridging para.; emphasis added);

> <u>Genes related to the production of such desired substances can be genes that naturally exist on the chromosome of the host microbe or can be genes that have been inserted artificially into the host microbe chromosome beforehand.</u> The former genes have expression-controlling sequences that are attached to these genes naturally. By inserting additional expression-controlling sequences in addition to these, production of the desired substance by the host can be increased or the ability to produce the desired substance can be given to hosts that essentially did not produce the desired substance naturally. In the latter case as well, there are often expression-controlling regions attached to the structural genes, and by introducing the powerful expression-controlling sequences of the methods of this invention, effects like those mentioned above can be obtained.

(Exh. 2016, pp. 4-5, bridging para.; emphasis added).

-77-

Interference 105,114

Japan's "expression regulatory sequences" (Exh. 3010, p. 7, last complete sentence) or "expression-controlling sequences" (Exh. 2016, p. 5, first full para., first sentence thereof) may be promoters, terminators, SD sequences or operators. The means for inserting the expression regulatory or expression-controlling sequences is described as follows:

> Generally, the expression regulatory domain to be inserted is introduced either by a plasmid capable of being amplified in a host microorganism or in the form of a cyclic or linear DNA incapable of being amplified in the host microorganism.

(Exh. 3010, p. 8, first full para.);

> The expression-controlling region to be inserted is normally inserted using plasmids that can be amplified in the host microbe or as a cyclic or linear DNA that cannot be amplified in the host microbe.

(Exh. 2016, p. 5, second full para.).

Most importantly, Japan teaches that the expression regulating or expression-controlling sequences are inserted by homologous recombination:

> As a means for integrating an expression regulating sequence such as a promoter with the chromosome of a host microorganism, the so-called homologous crossing-over is adopted. For this purpose, the regulatory sequence to be inserted is preferred to be furnished at one terminal or both terminals thereof with a DNA sequence which is homologous with the DNA sequence of a gene already existing in the relevant chromosome and concerned in the formation of the target product.

(Exh. 3010, p. 8, second full para.; emphasis added);

-78-

Interference 105,114

So-called homologous exchange is commonly used as the
method for integrating expression-controlling sequences such
as promoters into host microbe chromosomes. For this
reason, it is preferable that controlling sequences to be
inserted have, at one or both ends, DNA sequences that are
homologous to the DNA sequences of the genes related to
production of the desired products already present on the
chromosomes.

(Exh. 2016, pp. 5-6, bridging para.).

In its examples, Japan targets genes encoding tryptophan and

utilizes promoters derived from Bacillus amyloliquefaciens or the

SPO2 phage which infects Bacillus subtilis (Exh. 3010, pp. 8-9,

bridging para.; Exh. 2016, pp. 8-9, bridging para.), and marker

genes imparting resistance to chloramphenicol, ampicillin, and

tetracycline (Exhs. 3010 and 2016, Examples 1-3). Japan also

employs radioactive markers (Exhs. 3010 and 2016, Example 6).

### Findings based on Japan's teachings

Having concluded that a "cell line" of Claims 1, 2, 3, 17,

18, 19, 26, and 27 of ARS's patent reads on microorganisms, we

find that Japan describes an invention of Claims 1, 2, 5, 17, 18,

19, 20, 22, 26, 28, 52, 53, 54, and 56 of ARS's '071 patent,

and/or conclude that an invention of Claims 1, 2, 5-7, 13-20, 22,

23, 26, 28-30, 36-39, 52-54, 56 and 57 of ARS's '071 patent

reasonably would have been obvious to persons having ordinary

skill in the art in light of Japan's teachings.

Furthermore, we find that Japan describes an invention of

Claims 110-112 of Genesys's Application 08/102,390 and/or

-79-

Interference 105,114

conclude that an invention of Claims 110-112 of Genesys's Application 08/102,390 reasonably would have been obvious to persons having ordinary skill in the art in light of Japan's teachings.

### The parties' claims directed to eukaryotic cell lines

Claims 105 and 107-109 of Genesys Application 08/102,390 and Claims 9-12, 25, and 32-35 of ARS's '071 patent differ from the inventions described by, or obvious in view of, Japan itself in the eukaryotic cell line.  Compare the cell lines of, and the related genomes, DNA constructs and methods encompassed by, the parties' claims relative to the cell lines of Japan's claims:

| Cell line | Genesys | ARS | Japan |
|-----------|---------|-----|-------|
| Prokaryotic | yes | yes | yes |
| bacteria | yes | yes | yes |
| Eukaryotes | yes | yes | no |
| yeast | yes | yes | no |
| plants | yes | yes | no |
| mammals | yes | yes | no |

The significant issue for our consideration is whether persons having ordinary skill in the art would have been led by the methods described in Japan (for activating a prokaryotic microorganism to express a gene of its genome encoding a protein not normally expressed by said prokaryotic microorganism, and/or for increasing the level of expression of a gene of a prokaryotic microorganism's genome encoding a protein normally expressed by said prokaryotic microorganism) to activate an

-80-

Interference 105,114

eukaryotic cell line to express a gene of its genome encoding a protein not normally expressed by said eukaryotic cell line, and/or for increasing the level of expression of a gene of a eukaryotic cell line's genome encoding a protein normally expressed by said eukaryotic cell line, with reasonable expectation of success. More specifically, would persons having ordinary skill in the art have been led by the methods described by Japan (for activating a prokaryote to express a gene of its genome encoding a protein not normally expressed by said prokaryote, and/or for increasing the level of expression of a gene of a prokaryote's genome encoding a protein normally expressed by said prokaryote) to use the same type of procedure to activate an eukaryotic cell line, most especially a differentiated mammalian cell line, to express a gene of its genome encoding a protein not normally expressed by said eukaryotic or differentiated mammalian cell line, and/or increase the level of expression of a gene of an eukaryotic or differentiated mammalian cell line's genome encoding a protein normally expressed by said eukaryotic or differentiated mammalian cell line, with reasonable expectation of success. We look to all the evidence of record for the answers.

We consider first the prior art cited by the parties as evidence of the state of the art at the time the parties first

-81-

Interference 105,114

filed their patent applications. We find this pre-litigation evidence to be the most credible characterization of the knowledge and skill in the art at the pertinent time; far more credible than the subsequent views of persons said to be skilled in the art which were entered of record in this interference a decade later.

First, Japan is not only concerned with stimulating or enhancing expression of target genes endogenous to the genome of prokaryotes but also instructs that expression of target genes exogenous to the genome of prokaryotes which encode foreign proteins can be stimulated or enhanced by inserting exogenous expression regulatory sequences in operable proximity to the exogenous target gene inserts by homologous recombination (Exh. 3010, pp. 6-7, bridging para.). As examples of target genes, Japan names target genes which encode both plant and animal proteins, including human proteins (Exh. 3010, p. 6, second para.):

> The target substances which are produced by the method of this invention can be proteins or polypeptides such as, for example, varying species of enzymes such as, for example, protease, amylase, glucose isomerase, cellulase, tryptophan synthetase which are products of direct expression of genes; various species of peptide-like hormones such as, for example, insulin, growth hormones, encephalin, and somatostatin; various species of antigens such as, for example, hepatitis vaccine, polio vaccine, and Herpes vaccine; and various species of lymphokine such as, for example, interferon and interleucine.

-82-

Interference 105,114

In that light, we recall the teaching of Kaufman I

(Exh. 3007; Exh. 2014), cited by both parties in support of

their preliminary motions under 37 CFR § 1.633(a)(Paper No. 63,

pp. 1, 7-8 and 10-14).  Kaufman I teaches (Exh. 3007; Exh. 2014):

> [I]t should now be possible to synthesize large
> quantities of these proteins in surrogate cell systems.
> For a variety of reasons, including the glycosylation
> patterns and the secondary structures of some of these
> proteins, synthesis in a mammalian cell expression
> system is highly preferable.

Kaufman II (Exh. 3015, cited by ARS to demonstrate that

"[e]ukaryotic cells have the ability to synthesize and secrete

proteins that are folded properly, modified, and biologically

active" (ARS's Motion 4 (Paper No. 48), p. 9, para. (35)),

further explains (Exh. 3015, p. 155):

> Although a variety of eukaryotic and prokaryotic host
> systems is available for the expression of a particular
> gene, the focus of this chapter is on the various
> approaches to the high level expression of heterologous
> genes in mammalian.
>
>     The advantages of using mammalian cells as a host for
> the expression of a gene obtained from a higher eukaryote
> stem from experience that the signals for synthesis,
> processing, and secretion of these proteins are usually
> properly and efficiently recognized in mammalian cells.
> It has been found that:  1) proteins can be readily
> synthesized and secreted into the growth medium;
> 2) protein folding and disulfide bond formation are
> usually like that of the natural protein, and therefore,
> the proteins are usually produced in a functional form
> resistant to degradation;  3) glycosylation, both N- and
> O-linked, often occurs at normal positions;  4) other
> post-translational modifications can occur, e.g., the
> proteolytic processing of propeptides, the gamma-
> caboxylation of glutamic acid residues, and the sulfation

-83-

Interference 105,114

of tyrosine residues; and 5) multimeric proteins can be correctly assembled.

Japan and Kaufman I/II together provide ample motivation for persons having ordinary skill in the art to insert a DNA construct comprising an exogenous promoter or other expression regulating sequence capable of stimulating or enhancing the expression of an endogenous or exogenous target mammalian or other eukaryotic gene within flanking sequences homologous to a region of the genome of a host mammalian or other eukaryotic cell line in the vicinity of the target gene into the genome of the host mammalian or other eukaryotic cell line by homologous recombination in order to stimulate or enhance expression of the target gene and production of the protein the target gene encodes by the host mammalian or other eukaryotic cell line. However, there remains the question whether persons having ordinary skill in the art reasonably would have expected success in so doing. We look to the teachings of Thomas (Exh. 2011) and Smithies (Exh. 2010) for that answer.

Thomas (Exh. 2011) was published November 6, 1987. In its Introduction (Exh. 2011, p. 503, col. 1, para. 1, and cols. 1-2, bridging para.), Thomas positively states:

> Gene targeting-the homologous recombination of DNA sequences residing in the chromosome with newly introduced DNA sequences-provides a means for systematically altering the mammalian genome (Smithies et al., 1985[Exh. 2010]; Thomas et al., 1986; Thomas and Capecchi, 1986). A desired

-84-

Interference 105,114

> alteration would first be introduced into a cloned DNA
> sequence, and the gene targeting would then transfer the
> alteration into the genome.  Gene targeting should be
> equally effective for correcting or mutating the desired
> chromosomal locus.
>
> . . . The transfer of information by homologous
> recombination allows one to mutate or correct the desired
> chromosomal locus in a defined manner. . . . .

Thomas evaluated the level of success which could be
expected using mammalian stem cells (Exh. 2011, pp. 503-504,
bridging para.):

> Under optimal conditions, we find that 1/1000 cells
> transformed by exogenous DNA can undergo a gene-targeting
> event.  The advantage of . . . gene targeting compared
> with random mutagenic methods such as chemical mutagenesis
> or retroviral DNA insertion is twofold.  First, the
> nature of the mutant allele is at the discretion of the
> experimenter, and second, unlike random mutagenic events,
> the frequence of the targeting events is efficiently high
> to make the procedure applicable to non-detectable genes.

Thomas concludes (Exh. 2011, pp. 510, col. 2, Conclusion):

> We have . . . shown that ES [(mouse embryo-derived stem)]
> cells are a suitable host for gene-targeting experiments.
> It is hoped that this combination of using ES cells as the
> recipient cell line and site-specific mutagenesis achieved
> by gene targeting will provide the means for generating
> mice of any desired genotype.

Smithies, cited in Thomas as "Smithies et al., 1985,"
anticipated the frequency of success in transforming mammalian
stem cells that Thomas would later predict (Exh. 2010, p. 230,
col. 1, para. 2):

> The series of experiments reported here shows that
> homologous recombination between exogenous DNA and a
> chromosomal gene does occur in cultured mammalian cells

-85-

Interference 105,114

and can allow the stable insertion of defined DNA
sequences into the human β-globin locus in a predictable
fashion.  Although the frequency of success (~10⁻³ of the
transformed cells) is at present modest, the data show
unequivocally that the planned modification of a specific
human gene is possible in vivo.

Moreover, Smithies indicates that much of the rationale employed

in applying homologous recombination techniques to host mammalian

cells is "derived from experiments in yeast in Hinnen et al.

showing that recombination between incoming DNA sequences and

homologous sequences within the genome can direct the exogenous

DNA to the desired locus (Exh. 2010, p. 230, col. 1, para. 4;

citation omitted).  Smithies concluded in 1985 that (Exh. 2010,

p. 234, col. 1-2):

The experiments reported here establish that the planned
modification of a specific human gene can be accomplished
in mammalian cells by homologous recombination without
detectably affecting other parts of the genome. . . .
[I]t is evident that extensions of the principles we have
used here to other genes in complex eukaryotes should
permit new approaches to many problems in molecular
genetics.

Based on the aforementioned prior art teachings, we find

that persons having ordinary skill in the art would have been

motivated to make and use inventions encompassed by Claims 1, 2,

5-7, 9-20, 22, 23, 25, 26, 28-30, 32-39, 52-54, 56 and 57 of

ARS's '071 patent and Claims 105 and 107-112 of Genesys's

Application 08/102,390 with reasonable expectation of success.

Therefore, we conclude that subject matter defined by Claims 1,

-86-

Interference 105,114

2, 5-7, 9-20, 22, 23, 25, 26, 28-30, 32-39, 52-54, 56 and 57 of

ARS's '071 patent and Claims 105 and 107-112 of Genesys's

Application 08/102,390 prima facie would have been obvious to

persons having ordinary skill in the art and unpatentable under

35 U.S.C. § 103 in view of the combined teachings of Japan,

Kaufman I, Thomas and Smithies, optionally further in view of

Kaufman II.[5]

_____

[5]    We have considered ARS'S REQUEST FOR A TELECONFERENCE
TO DISCUSS FILING A 37 CFR 1.635 MOTION FOR PERMISSION TO FILE A
POST-HEARING MEMORANDUM CONCERNING NEW ISSUE RAISED AT HEARING
(Paper No. 170).   Genesys is said to oppose ARS's request (Paper
No. 170, p. 2, para. 5).  ARS's request is DENIED.   ARS argued:

> During the hearing, the panel inquired whether the
> claims of ARS's patent are obvious over a combination of
> Kaufman, Exhibit 3015, and JP '280, Exhibit 3010 (English
> translation).
> Inasmuch as the panel's sua sponte inquiries during
> the oral hearing were directed to a new issue that had not
> previously appeared in the record, ARS would like to be
> given a fair opportunity to respond to those specific
> questions.
> ARS's memorandum will clearly explain why ARS believes
> that the Kaufman 3015 reference cannot be properly combined
> with the JP '280 reference because it does not state what
> it was asserted to state during the oral hearing.

On this record, ARS first cited Kaufman II (Exh. 3015) to
demonstrate that "[e]ukaryotic cells have the ability to
synthesize and secrete proteins that are folded properly,
modified, and biologically active" (ARS's Motion 4 (Paper
No. 48), p. 9, para. (35)).   Kaufman II is ARS's own reference.
ARS cannot have been surprised by its teaching.  It is not unfair
to ARS to rely upon the disclosure of a reference ARS brought
to the Board's attention.  Moreover, though less comprehensive,
a like disclosure by Kaufman I was relied upon by both ARS
(Exh. 3007) and Genesys (Exh. 2014) as basis for rejecting and
responding to proposed rejections of the claims before us.

-87-

Interference 105,114

## Genesys's rebuttal and/or showing

Even presuming Japan to be prior art under 35 U.S.C.
§ 102(a) with respect to the subject matter of Claims 105-112 of
Genesys's Application 08/102,390, we nevertheless conclude that
the combined teachings of Japan, Kaufman I, Thomas and Smithies,
optionally further in view of Kaufman II, do not establish a
prima facie case of obvious under 35 U.S.C. § 103 for the
invention of Genesys's Claim 106. We agree with Genesys's view
that "Claim 106 . . . recites specific provisions that are
nowhere found in the prior art" (Paper No. 63, p. 23, para. 1).

While "Claims 105, 107, 108 and 109 are directed to methods
of treatment of mammalian cells, by incorporation, through
homologous recombination, of an amplifiable gene into proximity
of the target gene to be expressed" and "Claims 110-112 are
directed to the cell that results from the homologous
recombination process of Claims 105 and 107-109" (Paper No. 63,
p. 23, para. 1), Genesys does not deny that subject matter
encompassed by Claims 105 and 107-112 of Genesys's Application
08/102,390 would have been obvious in view of the combined prior
art teachings including Japan. Note Genesys's Preliminary
Motion 2 regarding the patentability of claims directed to the
same patentable invention in ARS's '071 patent (Paper No. 63,

-88-

Interference 105,114

pp. 12-14 and 21-22). More specifically, Genesys argues that
Japan (Paper No.63, p. 21):

> . . . advised those skilled in the art that foreign
> regulatory elements, promoters, amplifiable genes and
> the like, could be inserted into a genome through
> homologous recombination to enhance expression in native
> genes. While the specific example was a microorganism,
> E. coli, all but a handful of the '071 patent claims
> embrace this teaching. The only claims that are not
> anticipated thereby are Claims 9-12, 32-35 and 44-47.
> These claims escape specific anticipation because the
> Kokai suggest [sic], but does not provide an example,
> that the techniques taught therein could be applied to
> eukaryotes, including mammals, plants and the like. Yet,
> the art from 1980 to 1989 had demonstrated the power of
> homologous recombination was applicable to any genome, using
> regulatory elements, independent of the identity of the
> genome. While not every gene in every call [sic-cell]
> could be activated this way, the art had clearly taught
> that the teachings of the Kokai were equally applicable
> to plants, animals and in particular, mammals.

Throughout its Preliminary Motion 2, Genesys cites the
Declaration of Nickoloff (Exh. 2029) in support of its arguments
(Paper No. 63, pp. 2-16). Our own analysis of the same prior
art teachings led to the conclusion that not only ARS's claims
but also corresponding Claims 105 and 107-112 of Genesys's
involved application are unpatentable under 35 U.S.C. § 103.

Rather than deny the obviousness of Genesys's Claims 105 and
107-112, presumably drawn to the same patentable invention as
Claims 1-58 of ARS's '071 patent, Genesys submitted evidence of
record in support of its argument that Japan is not available as
prior art over which the patentability of the subject matter

-89-

Interference 105,114

Genesys's claims may be rejected.  Genesys argues first that it is entitled to benefit under 35 U.S.C. § 120 of the November 6, 1989, filing date of its parent Application 07/432,069.  Thus, Genesys claims to antedate Japan.  To that end, it is said that the Declaration of Bertram I. Rowland (Exh. 2054) and supporting evidence (Exh. 2054, Exhibits A-E) under 37 CFR § 1.131(a) remove Japan as prior art available against its claims.  Cell Genesys's Preliminary Motion 2 explains (Paper No. 63, p. 24, para. 1):

> CGI recognizes that the filing date of November, 1989 is not sufficient to antedate Exhibit 2016, the Japanese Kokai.  CGI relies on the Declaration of Rowland, Exhibit 2054, to demonstrate possession of the invention in advance of the publication date of Exhibit 2016, the Japanese Kokai.  Specifically, Rowland provides testimony, independent of the inventor Skoultchi, that Skoultchi had possession of the invention no later than July 24, 1989, as reflected by contemporaneous documents.  Exhibit 2054, ¶2, which refers to Exhibit A, which is Exhibit 2040. There can be no question that CGI did anything but to pursue the invention diligently, and take action to make it available to the public, by preparing and filing a parent application.  The application was worked on throughout August, September and October of 1989, Exhibit 2054, ¶¶ 3 and 4, Exhibits 2042 and 2043, leading to the filing on November 6, 1989, Exhibit 2054, ¶5, and Exhibit 2044.  As Exhibit 2016 is art available against CGI only under 35 U.S.C. § 102(a), and CGI demonstrates possession of the invention prior to August, 1989, neither the '313 patent, nor the Japanese Kokai is applicable to CGI's claims.  The rest of the prior art . . . [provides] no teaching that directs one skilled in the art to use the many techniques and observations arrived at to insert, through homologous recombination, an amplifiable gene into a mammalian cell for the purpose of enhancing expression.

-90-