Interference 105,114

Moreover, in its reply to ARS's Preliminary Motion 5 (Paper No. 49), Genesys explained:

Cell Genesys, Inc. (hereafter "CGI") opposes herewith ARS Preliminary Motion 5 seeking entry of judgment that Claims 110-112 of CGI are unpatentable as anticipated by Japanese Patent Publication HIE. 1-215280(JP280). CGI opposes on the grounds that the reference is not prior art as to CGI.

(Paper No. 99, p. 1, para. 1);

CGI does not disagree that JP280 is a potent reference, teaching much of the subject matter embraced in Claims 110-112 of the CGI '390 application. Indeed, CGI maintains in its Preliminary Motion 2 that in fact JP280 is art that renders the '071 patent claims unpatentable under 35 U.S.C. §102 or §103. Instead, CGI . . . submits that it is entitled to the benefit of its '069 priority case of November, 1989, less than a year subsequent to the publication of JP280, and has demonstrated possession of the invention in advance of the publication date of the JP280. Simply, it is not prior art with respect to CGI.

(Paper No. 99, pp. 6-7, bridging para.);

Having removed JP280 as prior art under 35 U.S.C. §102(b), it is incumbent on CGI to demonstrate prior possession of the invention. This CGI does, with the Declaration testimony of a corroborator, Rowland.

(Paper No. 99, p. 7, last full para.); and

ARS Preliminary Motion 5 assumes . . . that JP280 is §102(b) prior art against the '390 application. In fact, it is art available under 35 U.S.C. §102(a). GCI has presented compelling evidence, against the total absence of evidence to the contrary, that it had possession of the invention well prior to the publication date of JP280, and moved diligently to the preparation and filing of the application that is a constructive reduction to practice of the Count. Under these circumstances, the reference is not applicable against CGI Claims 110-112.

-91-

Interference 105,114

In response to ARS's preliminary motion for judgment under 37 CFR § 1.633(a) that its claims are unpatentable under 35 U.S.C. § 102 and/or § 103 based on prior art under 35 U.S.C. § 102(a), Genesys could have elected either to (1) ask the Board defer the opponent's Rule 633(a) motion to the priority phase of the proceedings or (2) antedate the § 102(a) reference, here Japan, under 37 CFR § 1.131.  See LeVeen v. Edwards, 57 USPQ2d 1416, 1420-21 (Bd. Pat. App. & Int. 2000)(footnotes omitted):

> When (1) a preliminary motion for judgment under 37 CFR § 1.633(a) against an opponent relies on a § 102(a) or § 102(e) reference and (2) the opponent alleges in its preliminary statement a date of invention prior to the prior art dates of the reference, the opponent will be given two choices.
>
> A first choice will be for the opponent to call attention to its preliminary statement and ask that a decision on the preliminary motion be deferred to the priority phase of the interference. . . . .
>
> A second choice is for the opponent to present proofs under 37 CFR § 1.131 together with its opposition.
>
> Each choice has advantages and disadvantages. . . . .
>
> . . . . .
>
> . . . Our decision leaves the opponent to sort out the advantages and disadvantages in a particular case and for the opponent to make an election.  If the opponent elects to present a Rule 131 showing, and it is not successful, its claims may be held to be unpatentable and any necessary adjustment to the count will be made. Whether the opponent with no patentable claims should then be allowed to put on a priority case to defeat the moving party, and what the count should be for that purpose, are matters which we leave for another day.

-92-

Interference 105,114

Genesys elected to antedate Japan by presenting the Declaration Bertram I Rowland and supporting evidence under 37 CFR § 1.131.  Rule 131 reads, in pertinent part:

§ 1.131  Affidavit or declaration of prior invention.

(a) When any claim of an application . . . is rejected, the inventor of the subject matter of the rejected claim . . . may submit an appropriate oath or declaration to establish invention of the subject matter of the rejected claim prior to the effective date of the reference or activity on which the rejection is based. . . . .

(b) The showing of facts shall be such, in character and weight, as to establish reduction to practice prior to the effective date of the reference, or conception of the invention prior to the effective date of the reference coupled with due diligence from prior to said date to a subsequent reduction to practice or to the filing of the application.  Original exhibits of drawings or records, or photocopies thereof, must accompany and form part of the affidavit or declaration or their absence satisfactorily explained.

We shall presume that the Rowland Declaration and accompanying exhibits constitute "an appropriate oath or declaration" to establish invention of the subject matter of the rejected claim prior to the August 29, 1989, publication date of Japan. Accordingly, we shall proceed to consider the merits of Genesys's showing.

First, we find of record, and all the panel members have viewed, the VHS video labeled:

Bertrand Roland // Tape 1
October 1st, 2003
TRT: 43 min[.]

-93-

Interference 105,114

Based on Rowland's Rule 131 declaration (Exh. 2054), including video-cross-examination, Exhibits A-E attached to Rowland's Rule 131 declaration, and the Transcription of the Testimony of Bertram Rowland, dated October 1, 2003 (Exh. 2055), we find generally that Rowland's testimony is not particularly credible.

The Declaration of Bertram Irwin Rowland dated August 12, 2003, and attached Exhibits A-E (Exh. 2054), constitute Genesys's direct showing under Rule 131. Rowland declared that he was a patent attorney providing legal services to Cell Genesys, Inc. (Genesys) "during the period June of 1989 - February of 1990" (Exh. 2054, page 2, para. 1). Because Rowland's testimony is critical to its case, we quote from that testimony rather than paraphrase it. Rowland declared (Exh. 2054, pp. 2-3, para. 2):

> I have a current recollection of a meeting I attended at Cell Genesys, Inc. on or about July 24, 1989. The meeting was attended by Dr. Arthur Skoultchi and others of Cell Genesys, Inc. ("CGI" herein). Attached hereto as Exhibit A is a copy of notes of that meeting, which reflect three issues or areas of concern being addressed at CGI. Among the issues discussed at the meeting, later identified as issue or matter 3, was the problem that CGI, then in a start-up phase, wanted to work with a variety of proteins the recombinant forms of which and the isolated nucleic acids encoding them, were already patented. There were discussions of various proteins of interest, together with a discussion of how the patents of third parties might be avoided. Arthur Skoultchi ("Skoultchi" herein) suggested that the third party patents might be avoided if homologous recombination were used to alter cells to enhance expression of wild-type proteins encoded by the cells or to express genes that were not normally expressed. I observed that most of the patents I was familiar with would not cover such a process, or the product of the

-94-

Interference 105,114

resulting gene expression. Skoultchi noted that the easiest way to produce more product was to introduce an amplifiable gene through homologous recombination in the proper location with respect to the gene the expression of which was desired. When the amplifiable gene was amplified, the gene of interest would be as well, generating multiple copies and increased expression. A decision was made to move forward and file a parent application on two alternative forms of the idea of Skoultchi, including expressing a gene in the cells that had received the amplifiable gene through homologous recombination and the transfer of the amplified gene to secondary expression host cells and expressing the amplified gene in such secondary host cells.

While we will assume that the Declaration of Bertram I. Rowland and attached exhibits constitute "an appropriate oath or declaration" to establish invention of the subject matter of the rejected claim prior to the August 29, 1989, publication date of Japan, we cannot help but note that paragraph 2 of Rowland's declaration, quoted above, is replete with references to inventor Skoultchi's ideas, suggestions and statements. There is no testimony by Dr. Skoultchi of record. Nor is there any explanation why Dr. Skoultchi could not have testified. In this respect, Rule 131 indicates that inventor testimony is necessary. Nevertheless, Exhibit A, not Rowland's declaration, appears to be the main course of Genesys's showing.

Exhibit A to Rowland's declaration carries the heading (Exh. 2054, Exhibit A, p. 1):

CELL GENESYS, INC.
Minutes, SAB Meeting
July 24 and 25, 1989[.]

-95-

Interference 105,114

At Oral Hearing on February 26, 2004, we asked Genesys's counsel to point to those specific portions of Exhibit A which establish the inventor's conception of the invention of the subject matter defined by Claims 105-112 of Genesys's Application 08/102,390, dated prior to August 29, 1989 (TP (Paper No. 171), p. 43, l. 7, to p. 47, l. 8). Counsel directed our attention (TP, p. 47, l. 9, to p. 50, l. 15) to the following information for meeting held on "July 24" (Exh. 2054, Exhibit A, pp. 5-6) and "July 25" (Exh. 2054, Exhibit A, p. 8):

(Exh. 2054. Exhibit A, pp. 5-6 ("July 24"))

REVIEW MHC

1. Short bridge to market

2. UD - high profile financing clinic
   other people's technology

3. Promoter for: dystrophin - superdystrophin

4. Replica culture - preserve cell doubling

5. Do fibroblasts fuse? (could express dystrophin?)

MORE DATA

   HR efficiency is problem $2^{20}$ used

   Law, Partridge, Worton

A. Call Hillman re: MyoGenica

   Go into more detail with H. Blau

Ron Worton

TRANSGENICS

-96-

Interference 105,114

<u>Art</u>  HR – substitute another protein for lactoglobulin

Can you do HR in germ-line of other species

E.S. isolation is key  (mouse)  only
(hamster)

Something like secretory factor in nursing mother's milk for IgA or ? other proteins.

Not now – think about collaboration.

Counsel for Genesys argued at oral hearing that the term "HR" in the portion of Exhibit A reproduced above meant "homologous recombination" (TP p. 47, l. 9-12). Even if we accept Genesys's argument, we find no statement of an invention encompassed by Claims 105-112 of Genesys's Application 08/102,390 on pages 5-6 of Exhibit A to Rowland's declaration (Exh. 2054, Exhibit A, pp. 5-6).

<u>(Exh. 2054, Exhibit A, p. 8 ("July 25"))</u>

At oral hearing, counsel for Genesys directed the Board's attention (TP (Paper No. 171), p. 47, l. 21, to p. 50, l. 15) to page 8 of Exhibit A to Rowland's declaration (Exh. 2054, Exhibit A, p. 8), particularly the copy of handwriting in association with what is said to be a hand drawn genetic map of a plasmid, which indicate potential sites for insertion of DNA segments. Both the handwriting and hand drawn genetic map of what is said to be a plasmid appear on page 8 of Exhibit A under the heading "<u>Art</u>" (<u>Art</u> presumably referring to inventor Arthur

-97-

Interference 105,114

Skoultchi). We shall attempt to translate the plasmid map and the indicated sites for potential inserts without redrawing the original at the top of page 8 of Exhibit A.

Above the hand drawn genetic map indicated to be a "plasmid" there is handwritten the following:

Protein production in mammalian cells. S cloning tPA gene.
(Focus: Known Therapeutic Proteins
Key: Sidesteps Patents) < Burt
case by c
CAN DO

The "plasmid" depicted appears to include a dihydrofolate reductase mutant (DHFR$^{mut}$) gene segment with a neo gene segment and tk promoter segment upstream of the DHFR$^{mut}$ gene segment. Downstream of the DHFR$^{mut}$ gene segment there is depicted a human tissue-type plasminogen activator (tPA) gene segment from human diploid fibroblasts. There is an arrow from the term "eNh" pointing to an area between the neo gene segment and the tk promoter of the "plasmid". An arrow pointing toward the term "eNh" leads the phrase "Can Put eNhancer here. for ^ expression". To the lower-right of the "plasmid" there is handwritten "Vector To go upstream or downstream from tPA gene". There is an arrow leading from the "plasmid" toward the lower-left where the is handwritten "Transfer into CHO (Chinese Hamster Ovary)" and another arrow leading further from the "plasmid" toward the lower-left where there is written:

-98-

Interference 105,114

> Methotrexate
> ^conc => amplification of
> DHFR (and nearby tPA gene) [.]

At the bottom of the handwriting and hand drawing, there is written: "Need To Know upstream or downstream sequences".

At oral hearing, counsel for Genesys argued (TP (Paper No. 171), p. 48, l. 15, to p. 49, l. 12) that persons skilled in the art would not have needed to know upstream and downstream sequences unless they intended, as inventor Skoultchi is said to have intended, to insert DNA sequences into the genome of CHO cells by homologous recombination. Moreover, the references to "HR" on pages 5-6 of Exhibit A to Rowland's declaration are said to be consistent with Genesys's argument.

In our view, Exhibit A to Rowland's declaration, with or without the corroboration and explanation provided by Mr. Rowland's declaration, does not establish that Genesys conceived of an invention within the scope of any one of Claims 105-112 of Genesys's Application 08/102,390, not to mention the full scope of the subject matter claimed, prior to the August 29, 1989, publication date of Japan. Nowhere in Exhibit A to Rowland's declaration (Exh. 2054) is "HR" defined. Even if "HR" would have been understood to mean homologous recombination, the relationship between the references to "HR" on page 6 of Exhibit A to Rowland's declaration showing the minutes of a

-99-

Interference 105,114

meeting on July 24, 1989, and the handwritten and hand drawn
portion on page 8 of Exhibit A to Rowland's declaration showing
the minutes of a meeting on July 25, 1989, is unclear.  There
appears to be no connection between page 6 of the minutes of Cell
Genesys, Inc.'s SAB Meeting on July 24 and the handwriting and
hand drawings on page 8 of the minutes of the meeting dated
July 25 (Exhibit A, p. 1 (July 24); p. 7 (July 25)).

On the other hand, Genesys urged that the handwritten and
hand drawn portions of the minutes of the July 25 meeting
presented on page 8 of Exhibit A inherently portray a method of
enhancing production of a target protein such as t-PA in mammals
by inserting an amplification sequence or a DNA expression
enhancer such as DHFR into the genome of a mammal cell line in
the vicinity of the gene encoding the target protein by
homologous recombination (TP (Paper No. 171), p. 48, l. 15,
to p. 49, l. 12).  In our view, the evidence does not establish
that insertion of foreign DNA by homologous recombination is
inherently described in the minutes of the July 25 meeting.  We
find that persons skilled in the art could interpret the
handwritten and hand drawn portions of page 8 of Exhibit A as a
method for inserting foreign DNA into the genome of the cell line
by techniques other than homologous recombination, e.g., by
random recombination or by point specific insertion techniques.

-100-

Interference 105,114

If knowledge of sequences upstream or downstream of the target
DNA segment in the genome of the cell line or upstream or
downstream of any other exogenous or endogenous DNA sequence
described in the handwritten and hand drawn portions of page 8 of
Exhibit A is, or may be, needed to insert a foreign DNA
amplification or expression enhancer sequence into the genome of
CHO cell line in operable vicinity of the target gene by
techniques other than homologous recombination, then the
handwritten and hand drawn portions of page 8 of Exhibit A to
Rowland's declaration would not necessarily, and accordingly,
does not inherently describe a method for inserting foreign DNA
into the genome of a cell line in operable vicinity of a target
gene by homologous recombination.  See Langer v. Kaufman,
465 F.2d 915, 918, 175 USPQ 172, 174 (CCPA 1972):

> To prove inherency, the burden is . . . to show that
> the "necessary and only reasonable construction to be
> given the disclosure by one skilled in the art is one
> which will lend clear support to . . . [this] positive
> limitation in the interference count." . . . (quoting
> Binstead v. Littmann, 242 F.2d 766, 770, 113 USPQ 279,
> 282 (CCPA 1957).

See also Kennecott Corp. v. Kyocera Intl., Inc., 835 F.2d 1419,
1423, 5 USPQ2d 1194, 1198 (Fed. Cir. 1987).

Of record in this interference, we find Kaufman, R., et al.
(Kaufman I), "Coamplification and Coexpression of Human Tissue-
Type Plasminogen Activator and Murine Dihydrofolate Reductase

-101-

Interference 105,114

Sequences in Chinese Hamster Ovary Cells," <u>Molecular and Cellular Biology</u>, Vol. 5, No. 7, pp. 1750-1759 (July 1985)(Exh. 3007; Exh. 2014). Kaufman I teaches (Exh. 2014, p. 1757-58, Discussion; emphasis added; citations omitted):

> [A] <u>cotransfection method was used which yields cells containing the t-PA sequences closely linked to the DHFR sequences</u>. . . . The DHFR transcription unit was constructed without an enhancer element. As a result, transformation of DHFR-deficient CHO cells to a DHFR⁺ phenotype was inefficient with this DNA alone. However, cotransfection of the DHFR unit with a t-PA transcription unit containing an enhancer dramatically increased the efficiency of DHFR transformation. This appeared to occur by in vivo ligation of the two separate transcription units, resulting in the enhancement of DHFR expression by the t-PA-associated enhancer element. Efficient DHFR expression was thus dependent on continued association with the enhance from the t-PA transcription unit.

> . . . These results are consistent with the existence of a gradient of DNA amplification . . . . Under this hypothesis, transfected DNA sequences at the center of the gradient would be frequently amplified in all MTX-resistant clones, whereas more distal transfected DNA sequences would be less likely to be amplified.

> . . . Since the continued presence of the enhancer element from the t-PA cDNA gene was necessary for efficient DHFR expression, a high percentage of this subset is expected to have coamplified t-PA sequences and to thus express t-PA at high levels. Our results are consistent with this scheme.

> . . . CHO cells clearly have the capacity to accommodate the synthesis, glycosylation, and secretion of much larger quantities of protein than they do normally; this is substantiated by the fact that gene amplification has been used to obtain cell lines which express high levels of gamma interferon, beta interferon, hepatitis B surface antigen, and now human t-PA. . . . .

Interference 105,114

A limited analysis of the t-PA synthesized by CHO cells shows that it has approximately the same activity as native t-PA and is glycosylated in a similar but not identical manner. . . . .

Comparing the cotransfection method described in Kaufman I to the method described by the handwritten and hand drawn information on page 8 of Exhibit A to Rowland's declaration (Exh. 2054; Exhibit A (Exh. 2040), p. 8), we find that the methods described in Rowland's Exhibit A do not exclude methods described by Kaufman I. Kaufman I appears to describe the method depicted on page 8 of Exhibit A to Rowland's declaration (Exh. 2054; Exhibit A (Exh. 2040), p. 8), including the "need to know upstream or downstream sequences" (Exh. 2054, Exhibit A, p. 8 (also Exh. 2040)); e.g., the t-PA cDNA sequence including the t-PA enhancer must be closely linked to the mutant DHFR sequence. Kaufman I shows that the method depicted on page 8 of Exhibit A to Rowland's declaration is not necessarily a method whereby foreign DNA was inserted into the genome of CHO cells by homologous recombination. We find, therefore, that the evidence to which Rowland points in support of his declaration, as a whole, does not establish that insertion by homologous recombination is the necessary and only reasonable construction one skilled in the art would have given to the method depicted on page 8 of Exhibit A of Rowland's declaration.

-103-

Interference 105,114

Genesys would have us consider Rowland's declaration (Exh. 2054), testimony (Exh. 2055) and Video Tape 1 thereof in conjunction with the original draft of its patent application (Exhibit B to Rowland's declaration (Exh. 2054)) and debit notes (Exhs. C, D and E) relating to the drafting and November 6, 1989, filing of Genesys's parent U.S. Application 07/432,069 (Exh. 2028). We proceed to do so. In paragraphs 3, 4-3, 4-4 and 5 of his declaration, Rowland declared (Exh. 2054, pp. 3-4, para. 3-5):

> 3. . . . I worked on the CGI matter number 3 during the month of August, and prepared an initial draft application for review by the inventor, and completion by CGI. Attached hereto as Exhibit B is a copy of a draft application so prepared. This application was forwarded to CGI for additional information and review.

> 4. . . . Exhibit C is a copy of a debit note issued to CGI for the [monthly] period ending September 25, 1989. On page 3 the debit note reflects three entries in connection with the matter designated Cell-3, the application directed to the production of proteins using homologous recombination. The entries reflect that I drafted the application and claims in August, 1989, and that the application was reviewed and revised approximately a week later.

> 4. . . . Exhibit D is a copy of a debit note issued to CGI for the [monthly] period ending October 25, 1989. On page 2 there is an item for "review and revise application" with the matter designated Cell-3, the application directed to the production of proteins using homologous recombination. The application had been drafted in August, 1989, following the July meeting, and the line item included reflects revision of that application.

Interference 105,114

    5.  Exhibit E is a copy of a debit note . . . for the period ending November 25, 1989.  This debit note reflects three entries in connection with the matter designated Cell-3, the application directed to the production of proteins using homologous recombination.  The entries reflect that I reviewed and revised the application, I spoke with inventor Skoultchi by telephone, and filed the application on November 6, 1989.  That application was given Serial Number 07/432,069. . . . The exhibits hereto reflect a progression of about three months from identification of invention to filing of a patent application directed thereto, which is consistent with my memory of my general working practices at the time period. I worked on the application with due diligence and attention, to the best of my recollection.

Exhibit B to Rowland's declaration (Exh. 2054) consists of two documents.  The first document is a hand-edited and annotated, printed draft of an incomplete, non-final specification for a patent application entitled "Production Of Proteins Using Homologous Recombination" (Exhibit B, p. 1, top-center) and claims identified as follows (Exhibit B, p. 1, top-right):

27949/CELL-3
08/29/89:APP:slb[.]

The printed date "08/29/89" which is original to the document does not establish that the printed subject matter thereof was invented prior to the August 29, 1989, publication date of Japanese Patent Publication 1-215280 (Exh. 3009; Exh. 3010; and Exh. 2016).  Moreover, Rowland declared "that the [annotated and edited copy of the] application was reviewed and revised approximately a week later" (Exh. 2054, p. 3, para. 4).  The

-105-

Interference 105,114

second document is labeled "Experimental" and introduced by the

following handwritten identification (Exhibit B, last three

pages):

      Protein Patent    10/30/89              Nora    2309[.]

     Exhibit C to Rowland's declaration (Exh. 2054) is a copy of

INVOICE # 95853 from Leydig, Voit & Mayer, LTD. to Cell Genesys

dated September 25, 1989, "For Professional Services Rendered

Through September 25, 1989 In Connection With The Following

Matters -":

```
    MATTER NUMBER - 27949
          CELL-3
          U.S. Patent Application
          Production of Proteins Using Homologous Recombination
          Skoultchi

    8/25/89    BIR        Drafting application.
    8/29/89    BIR        Draft application and claims.
    9/06/89    BIR        Review and revise.
```

     PROFESSIONAL SERVICES              1,485.00

     MATTER TOTAL                       1,485.00[.]

     Exhibit D to Rowland's declaration (Exh. 2054) is a copy of

INVOICE # 717 from Leydig, Voit & Mayer, LTD. to Cell Genesys

dated October 25, 1989, "For Professional Services Rendered

Through October 25, 1989 In Connection With The Following

Matters -":

Interference 105,114

> MATTER NUMBER - 27949
> CELL-3
> U.S. Patent Application
> Production of Proteins Using Homologous Recombination
> Skoultchi et al

9/05/89    ES          Review and revise application.

> PROFESSIONAL SERVICES                150.00

> MATTER TOTAL                         150.00[.]

Exhibit E to Rowland's declaration (Exh. 2054) is a copy of INVOICE # 5484 from Leydig, Voit & Mayer, LTD. to Cell Genesys dated November 25, 1989, "For Professional Services Rendered Through November 25, 1989 In Connection With The Following Matters -":

> MATTER NUMBER - 27949
> CELL-3
> U.S. Patent Application
> Production of Proteins Using Homologous Recombination
> Skoultchi et al

11/01/89    BIR        Review and revise.
11/03/89    BIR        Telecon Skoultchi.
11/06/89    BIR        Filing application.

> PROFESSIONAL SERVICES                385.00

> COSTS ADVANCED

> Postage                              11.05
> Photocopies                          25.00
> Patent and Trademark Office Fees    502.00

> TOTAL COSTS ADVANCED                 538.05

> MATTER TOTAL                         923.05[.]

-107-

Interference 105,114

Having considered the Declaration of Bertram Irwin Rowland (Exh. 2054) and attached Exhibits A-E, we find that the evidence as a whole does not establish that Genesys either reduced to practice the invention of Claims 105-112 (to the extent they require insertion of heterologous DNA into the genome of a mammalian cell through homologous recombination) of Genesys's Application 08/102,390 prior to the August 29, 1989, publication date of Japan, or conceived of the invention of Claims 105-112 (to the extent they require insertion of heterologous DNA into the genome of a mammalian cell through homologous recombination) of Genesys's Application 08/102,390 prior to the August 29, 1989, publication date of Japan, coupled with due diligence from a time prior to said date to a subsequent reduction to practice or to the November 6, 1989, filing date of Genesys's Application 08/102,390.  See In re Gosteli, 872 F.2d 1008, 1012, 10 USPQ2d 1614, 1617 (Fed. Cir. 1989)(emphasis omitted):

> Rule 131 requirements are quite specific.  To antedate a prior art reference, the applicant submits an oath or declaration alleging acts that establish a completion of the invention . . . before the effective date of the prior art.  37 C.F.R. § 1.131(a).

We need not consider whether the same evidence (Exh. 2054) is sufficient to antedate Japan's August 29, 1989, publication date for the invention of Claims 105 and 110 to 112 (to the extent they do not require insertion of heterologous DNA into the

-108-

Interference 105,114

genome of a mammalian cell through homologous recombination) of
Genesys's Application 08/102,390.  We have concluded that the
subject matter of Claims 105 and 110-112 is unpatentable over
subject matter described and/or taught by Section 102(b) prior
art of record.

Additionally, each member of this panel has independently
reviewed the written Transcript of the Testimony of Bertram
Rowland dated October 1, 2003 (Exh. 2055) in conjunction with the
video tape thereof of record.  We are as impressed, if not more
impressed, by Rowland's lapses of memory as we are impressed by
Rowland's memory.  We are especially impressed by the complexity
of the subject matter Rowland seems to recall (Exh. 2055: "DHFR"
and "homologous recombination" in the para. bridging pp. 35-36; )
in comparison to facts relating to the meeting and attendees
thereof which he cannot recall (Exh. 2055; the "Art" mentioned
in Exhibit A "probably is" Arthur Skoultchi (p. 9, l. 9-22);
"I don't recall specifically" who or what "Nussenblatt" is
(p. 10, l. 1-18); "I don't personally remember Mark" (p. 12,
l. 19); "I don't remember [Tom Wakeman]" (p. 14, l. 10-18);
"I have no recollection of Ron Worton" (pp. 14-15); "I believe
I was not the author of this document" (pp. 15-16)).  When asked
whether he took notes at the meeting, Rowland testified, "I have
no specific recollection, although that would have been my habit"

-109-

Interference 105,114

(Exh. 2055, p. 20, l. 1-3). When asked whose file the document came from, Rowland said he didn't know (Exh. 2055, p. 19, l. 4-9). Rowland did not recall the name of any persons at Leydig, Voit or Cell Genesys who worked with, or for, him on Cell Genesys's Cell-3 applications (Exh. 2055, pp. 24-26). When asked about the initials "E.S." in Exhibit D, Rowland couldn't recall (Exh. 2055, pp. 27-28). There were many, many basic facts regarding Exhibits A-E (Exh. 2054) that Rowland simply could not recall. On redirect examination by counsel for Genesys and further examination by counsel for ARS, Mr. Rowland provided the following explanation why he remembered the agenda of, and specifics of the complex technology discussed at, CGI's meeting on July 24-25, 1989 (Exh. 2055, pp. 34-36):

> Q. During the discussion with Chico, he asked you about a variety of names, many of which you couldn't recall the identity of the person or the initials.
>
> Do you recall that conversation?
>
> A. Yes.
>
> Q. In paragraph 2 of your declaration, you indicate that you have a current recollection of a meeting that you attended. How is it that you have such a clear—I'm sorry.
>
> How is it that you have a current recollection of that meeting but there are many names and individuals reflected there that you have no recollection of?
>
> A. Well, I was extraordinarily impressed by Dr. Skoultchi's coming up with this idea. And in my career, that spans some 30 years—at that time about 30 years—I had never heard a conception that I believed was also a

-110-

Interference 105,114

reduction of practice, that it was so clear that it would work.

And I have always used Skoultchi as the one exception that one can have an idea which is obviously going to work and there was no reason to believe it could not be executed.

. . . . .

I had quite a bit of dealings with DHFR in a number of contexts, one.

Two, with Oliver Smithies and Kuchlerapati and readings Capcchi, C-A-P-C-C-H-I, papers, because of the work that CGI was doing, it was pretty self-evident that one could introduce the DHFR gene in proximity to a target gene and that one would get the desired amplification/ identification of homologous recombination. So I felt that all the pieces were there.

. . . . .

I believe that once you had the idea, all the enabling technology was available.

Rowland's testimony does not remedy the deficiencies in Rowland's declaration and supporting exhibits (Exh. 2054). Moreover, we are not satisfied with Rowland's explanations why he could recall the complex technology discussed at CGI's meetings on July 24-25, 1989, many years later (Exh. 2055, pp. 34-36). Most importantly, Rowland's declaration (Exh. 2054, pp. 2-3, para. 2) that Dr. Skoultchi conceived of the invention of Claims 106-109 of Genesys's Application 08/102,390 at the time of CGI's meetings on July 24, 1989, and July 25, 1989, is not consistent with the recorded minutes of CGI's July 24-25, 1989, meeting (Exh. 2054, Exhibit A). Moreover, Rowland has not

-111-

Interference 105,114

explained how and when the handwritten entries in the recorded
minutes of CGI's July 24-25, 1989, meeting (Exh. 2054, Exhibit A)
became part of the document.

Genesys had the burden to antedate Japan.  Genesys elected
to do so under 37 CFR § 1.131.  In our view, Genesys's evidence
does not establish that it either reduced to practice, or
conceived of, the invention of Claims 105-112 (to the extent the
claims require insertion of heterologous DNA into the genome of a
mammalian cell through homologous recombination) prior to the
August 29, 1989, publication date of Japan.  Accordingly, Japan
is prior art to Genesys's Claims 106-109, and Claims 107-109
appear to be unpatentable under 35 U.S.C. § 103 in view of the
combined prior art teachings of record, including that of Japan.

<u>ARS's rebuttal and/or showing</u>

Having considered the whole of ARS's primary case to the
contrary, we concluded that the subject matter defined by
Claims 1, 2, 5-7, 9-20, 22, 23, 25, 26, 28-30, 32-39, 52-54, 56
and 57 of ARS's '071 patent is unpatentable under 35 U.S.C. § 103
as having been obvious in view of prior art including Japan.
However, ARS claims benefit under 35 U.S.C. § 120 of the
December 22, 1989, filing date of its parent Application
07/454,783 (ARS's '783 application), from which continuation-in-
part Application 07/893,447 (ARS's '447 application), filed

-112-

Interference 105,114

December 21, 1990, now U.S. Patent 5,272,071, issued December 21, 1993. If the full scope of the subject matter claimed in ARS's '447 application is entitled to the December 22, 1989, filing date of ARS's '783 application under 35 U.S.C. § 120, then Japan, which was published August 29, 1989, is prior art under 35 U.S.C. § 102(a), but it is not prior art under 35 U.S.C. § 102(b). Prior art under 35 U.S.C. § 102(a) may be antedated either by establishing prior invention under 37 CFR § 1.131 or otherwise. Prior art under 35 U.S.C. § 102(b) may not be antedated. Presuming ARS is entitled the an effective filing date of December 22, 1989, for the full scope of its claims corresponding to the count, ARS did not elect to antedate Japan under 37 CFR § 1.131 or otherwise. Whether of not ARS may yet antedate Japan primarily depends upon the effective filing date accorded the full scope of the invention defined by ARS's claims under 35 U.S.C. § 120. Should we conclude that the full scope of the inventions defined by ARS's claims corresponding to the count is not entitled to the effective filing date of December 22, 1989, the filing date of ARS's parent '783 application, then Japan is prior art under 35 U.S.C. § 102(b), and ARS may not antedate it.

With the foregoing issue in mind, ARS's Preliminary Motion 7 (Paper No. 50) is somewhat confusing. Therein ARS's asks for

-113-

Interference 105,114

benefit under 35 U.S.C. § 120, yet the motion focuses on the
interference count, i.e., it is a motion under 37 CFR § 1.633(f)
to be accorded benefit of the filing date of the earlier filed
application alleging that the earlier application constitutes a
constructive reduction to practice of the count in accordance
with 37 CFR § 1.637(f)(3). However, ARS's asks for the following
relief (Paper No. 50, p. 1, para. 1):

> [ARS] requests, under 35 USC 120 and 35 USC 363, that
> it be accorded the benefit of the filing dates of its
> parent application 07/454,783, filed December 22, 1989,
> . . . with regard to Count 1.

Count 1 of this interference is directed to "[a] method of
claim 2 or claim 3 of ARS's U.S. Patent No. 5,272,071" (Paper
No. 50, p. 2). ARS shows that "[t]he '783 application was
abandoned on September 11, 1992, for failure to pay the issue fee
required in the notice of allowability issued on June 11, 1992.
[Exhibits 3020 and 3021.]" (Paper No. 50, pp. 4). ARS then
states that original Claim 21 of ARS's '783 application
substantially corresponded to Claim 2 of the '071 patent (Paper
No. 50, pp. 5-6). Thereafter, ARS states (Paper No. 50, p. 7,
para. 15 and 17):

> (15) Detailed descriptions of the preferred
> embodiments are disclosed in the '783 application
> beginning at page 11 line 7 through page 30, including
> at page 24 line 3 through page 26 line 13 specific
> detailed instructions with regard to a specific
> embodiment using GH cell lines for activating a silent
> gene in that cell. Exhibit 3002 ¶ 476.

-114-

Interference 105,114

. . . . .

(17) Claim 21 of the '447 application as filed is
identical to claim 21 of the '783 application. Thus,
it describes the invention of the count (claim 2) for
the reasons set forth above with regard to the '783
application. The '071 patent provides detailed
disclosures of the invention at columns 6 line 62
through column 26. Exhibit 3002 ¶ 477.

ARS acknowledged that it, as moving party, bears the burden

of proof that its motion should be granted (Paper No. 50, p. 7,

last para.). Accord 37 CFR § 1.637(a). To that end, ARS's

entire argument consists of the following (Paper No. 50,

pp. 8-9):

The '783 application provides a constructive
reduction of the invention defined by the first
alternative to count 1 (i.e., claim 2 of the '071 patent)
because that application contains a written description
of the invention and the method of carrying out the
invention, as set forth in the facts recited in the
foregoing section.

As noted in the foregoing section, the first
alternative to count 1 is essentially a verbatim copy of
claim 21 of the '783 application. The differences in
the two claims involve simply (1) a recitation of
"predetermined gene" in claim 2, which is a necessarily
implicit limitation in claim 21 of the '783 application,
(2) the interchangeable use of "native" and "existing" in
describing the DNA regulatory segment of the constructs,
and (3) a difference in scope ("cell lines or
microorganisms" and "cell lines," both of which are well
supported by the disclosure of the '783 application).

Thus, ARS has met its burden of establishing by a
preponderance of the evidence that its '783 application
serves a constructive reduction to practice of the invention
defined by count 1. Cf. Fiers v. Revel, 984 F.2d 1164,
1171-72, 25 USPQ2d 1601, 1607 (Fed. Cir. 1993).

-115-

Interference 105,114

However, if ARS cannot establish an effective date of December 22, 1988, for the full scope of its claims under 35 U.S.C. § 120 by showing it is entitled to benefit of the December 22, 1988, for the count, its motion under 37 CFR § 1.633(f) serves no purpose. If ARS cannot establish an effective date of December 22, 1988, for the full scope of its claims under 35 U.S.C. § 120, then Japan is prior art under 35 U.S.C. § 102(b) and, as such, it cannot be antedated for the full scope of the invention ARS claims by any means, including a preliminary motion under 37 CFR § 1.633(f) for benefit of an earlier filing date for the invention defined by the count or any other showing of priority with regard to the count.

Therefore, we proceed to consider first ARS's request for an effective filing date under 35 U.S.C. § 120 of December 22, 1989, the filing date of its parent application, for the full scope of the subject matter of ARS's claims designated as corresponding to the count.

The issue whether claimed subject matter is entitled to benefit under 35 U.S.C. § 120, as opposed to benefit solely for purpose of priority, is normally presented when a patent applicant or patentee alleges that the subject matter it claims is entitled to an effective filing date which antedates the effective date of a prior art reference. To be entitled to

-116-

Interference 105,114

benefit under 35 U.S.C. § 120 of the December 22, 1989, filing

date of its parent '783 application, ARS must show that all the

requirements of 35 U.S.C. § 112, first paragraph, have been

satisfied for the full scope of the subject matter it now claims.

See In re Scheiber, 587 F.2d 59, 61-62, 199 USPQ 782, 784-185

(CCPA 1978)(footnotes omitted)(citations omitted):

> "Invention," as used in 35 USC 120, refers to the
> claimed invention in a continuing application.  In re
> Lukach, 58 CCPA 1233, 1235, 442 F.2d 967, 968, 169 USPQ
> 795, 796 (1971). . . . .
>
> The operation of § 120 differs from the operation
> of . . . Rule 131 (37 CFR 1.131).  The latter provides
> an applicant a mechanism for overcoming specific prior
> art references predating his effective filing date.
> The applicant need show priority with respect to only
> so much of the claimed invention as the references
> disclose, . . . , or only so much as render the claimed
> invention obvious. . . . Section 120, on the other hand,
> concerns only an applicant's effective filing date.
> Unlike Rule 131, § 120 operates independently of the
> prior art, of which it makes no mention, and it
> expressly requires an earlier application to disclose
> the claimed subject matter in compliance with 35 U.S.C.
> § 112, first paragraph.  Thus it is entirely appropriate
> that the showing required under § 120 differs from that
> required under Rule 131.
>
> . . . [A]lthough . . . claims are rejected on
> references that teach no more than is disclosed in his
> earlier applications, that circumstance does not entitle
> him to claim his earlier filing date under § 120 for
> claims not supported in those applications. . . .
> The court noted that "the description of a single
> embodiment of broadly claimed subject matter constitutes
> a description of the invention for anticipation purposes
> . . . whereas the same information in a specification
> might not alone be enough to provide a description of
> the invention for purposes of adequate disclosure" under

-117-

Interference 105,114

the first paragraph of 35 USC 112. In re Lukach, supra at 1236, 442 F.2d at 970, 169 USPQ at 797.

Accord In re Gosteli, 872 F.2d 1008, 1011, 10 USPQ2d 1614, 1616-1617 (Fed. Cir. 1989).

If ARS claims benefit of an earlier-filed application under 35 U.S.C. § 120 for the full scope of the subject matter it later claims, ARS must show that its earlier-filed application complies with 35 U.S.C. § 112, first paragraph, for the full scope of the subject matter of ARS's later claims. This is true whether or not ARS's motion under 37 CFR § 1.633(f) for benefit of its earlier filing date with respect to the interference count is granted. See Utter v. Hiraga, 845 F.2d 993, ___, 6 USPQ2d 1709, 1713 (Fed. Cir. 1988):

> A party who . . . relies on an earlier-filed application under 35 U.S.C. §§ 119 or 120 has the burden to show that the foreign or parent application supports later added claims under 35 U.S.C. § 112 ¶ 1, regardless of whether the party is the junior or senior party in an interference.

Here, the evidence shows that the specification supporting the claims of ARS's '071 patent provides a considerable amount of teaching and examples which were not presented in ARS's parent application. See Exh. 2046 which has colored the subject matter new to ARS's '071 patent specification, including Figures 5-15; col. 5, l. 48, to col. 6, l. 4, relating to the invention defined by Claims 2 and 3 of the patent; col. 12, l. 56, to col. 13, l. 7, relating to the invention defined by Claims 2 and 3 of the

-118-

Interference 105,114

patent; the examples at col. 14, l. 34, to col. 22, l. 31;
col. 24, l. 6-24, adding new definitions for the term
"modification of expression" designed to exclude methods
described in art published in "1990"; and the Sequence Listing at
bridging cols. 23-26 describing DNA SEQ ID NOS: 1-3. We find
that the information disclosed in ARS's '071 specification which
is not presented in its parent is both considerable in amount and
new in scope. More importantly, the amount, kind and scope of
new information, definitions, and sequences added to ARS's '071
patent specification in support of the scope and content of the
inventions therein claimed are such that, absent a satisfactory
explanation why they are not necessary to describe and enable the
full scope of ARS's '071 patent claims, they reasonably suggest
that ARS's parent specification would not itself have supported
the breadth of subject matter later claimed in ARS's '071 patent.

It being impossible not to notice the wealth of new
information disclosed in ARS's '071 patent specification relative
to its parent specification and the relatively broader scope of
the inventions claimed in ARS's '071 patent, an explanation is in
order. ARS has provided little or no explanation. Rather,
ARS filed its Preliminary Motion 7 under 37 CFR § 1.633(a)
incorrectly requesting benefit of the filing date of its parent
application under 35 U.S.C. § 120 with respect to the invention

-119-

Interference 105,114

defined by the count, not with respect to the full scope of the
subject matter of the claims designated as corresponding to the
count as required.

It is axiomatic that where, as here, ARS's '071 patent
claims are directed to new and diverse biological materials and
methods for their production and use, and the claims are broad in
scope:

> [T]o be enabling, the specification of a patent must
> teach those skilled in the art how to make and use
> the full scope of the claimed invention without "undue
> experimentation." In re Vaeck, 947 F.2d [488] at 495,
> 20 USPQ2d [1438] at 1444 [(Fed. Cir. 1991)]; [In re]
> Wands, 858 F.2d [731] at 736-37, 8 USPQ2d [1400] at 1404
> [(Fed. Cir. 1988)]; In re Fischer, 427 F.2d 833, 839,
> 166 USPQ2d 18, 24 (CCPA 1970)(the first paragraph of
> section 112 requires that the scope of protection sought
> in a claim bear a reasonable correlation to the scope of
> enablement provided by the specification).

In re Wright, 999 F.2d 1557, 1561, 27 USPQ2d 1510, 1513 (Fed.
Cir. 1993). We understand that nothing more than objective
enablement is required and that "it is irrelevant whether this
teaching is provided through broad terminology or illustrative
examples." Id. Nevertheless, where as here, there are
sufficient reasons to suspect that the scope of the subject
matter for which protection is sought is not adequately described
or enabled by the description of the invention provided in the
specification of ARS's parent application, an explanation is in
order. ARS provides no explanation. To the contrary, ARS

-120-