

**A**



■ News

Press Release
Archives

SEARCH



CONTACT
Jennifer Cook Williams
Associate Director
Corporate Communications
650-425-4542

## Cell Genesys Licenses Gene Activation Intellectual Property to TKT for Certain Therapeutic Proteins

FOSTER CITY, CA, June 10, 2002—Cell Genesys, Inc. (Nasdaq: CEGE) today announced the completion of a worldwide licensing agreement under which Cell Genesys has exclusively licensed to Transkaryotic Therapies, Inc. (Nasdaq: TKTX) intellectual property relating to its gene activation technology for certain therapeutic proteins. In exchange, Cell Genesys will receive an up-front license fee of $26 million comprised of $11 million in cash and $15 million in shares of TKT common stock. In addition, Cell Genesys could receive additional payments upon the completion of certain patent-related milestones. Up to 15 proteins are included in the agreement for a variety of disorders including Fabry disease and Gaucher disease. No royalty payments will be made by TKT to Cell Genesys.

"We are pleased to make our gene activation intellectual property available to TKT, a company committed to bringing important therapeutic protein products to the market," stated Stephen A. Sherwin, M.D. chairman and chief executive officer of Cell Genesys. "This agreement is another example of how Cell Genesys can leverage its diversified business assets—in this case technology outside of our core focus in cancer therapy—to increase value for our stockholders."

Early in Cell Genesys' history, the company developed an approach to the production of therapeutic proteins which it referred to as "gene activation." Beginning in 1994, Cell Genesys has signed licensing agreements with companies using this technology to produce therapeutic protein products, an area not being pursued by Cell Genesys. These agreements, not including the TKT license agreement announced today, have brought in more than $25 million to date. One such license agreement in this area, signed in 1997, is with Aventis Pharmaceuticals for gene-activated erythropoietin (EPO). This agreement could provide Cell Genesys with future royalty payments on the sale of gene-activated EPO anywhere in the world.

Gene activation involves the insertion of genetic regulatory elements at specific sites in chromosomes in proximity to a human gene responsible for the expression of a therapeutic protein. Subsequently, the gene-activated protein can be produced in a cell-based production system. Gene activation is an alternative to the process of cloning human genes for the production of therapeutic proteins.

Cell Genesys is focused on the development and commercialization of innovative therapeutic products for cancer based on gene therapy technologies. The company is pursuing three cancer product platforms—GVAX® cancer vaccines, oncolytic virus therapies and *in vivo* cancer gene therapies. Clinical trials of GVAX® vaccines are under way in lung cancer, prostate cancer, pancreatic cancer, leukemia and myeloma. Clinical trials of oncolytic virus therapies include CG7060 and CG7870 in prostate cancer. Preclinical stage programs include oncolytic virus therapies and gene therapies for multiple types of cancer. Cell Genesys' majority-owned subsidiary, Ceregene, is focused on gene therapies for neurologic disorders. Cell Genesys also continues to hold approximately nine million shares of common stock in its former subsidiary, Abgenix, an antibody products company. Cell Genesys is headquartered in

Foster City, CA and has manufacturing operations in San Diego, CA, Hayward, CA and Memphis, TN. For additional information, please visit the company's website at www.cellgenesys.com.

Statements made herein about Cell Genesys and its subsidiaries, other than statements of historical fact, including statements about the progress and reports of clinical trials and progress and reports of preclinical programs, marketability and success of potential products and nature of product pipelines, licensing agreements and intellectual property are forward-looking statements and are subject to a number of uncertainties that could cause actual results to differ materially from the statements made, including risks associated with the success of research and development programs, the success and results of clinical trials, the regulatory approval process, competitive technologies and products, patents and additional financings. For information about these and other risks which may affect Cell Genesys, please see the company's Annual Report on Form 10-K dated April 1, 2002 as well as Cell Genesys' reports on Form 10-Q and 8-K and other reports filed from time to time with the Securities and Exchange Commission.

BACK TO LIST                                                                     BACK TO TOP

About Us | Product Progress | Patient Information | Investor's Corner | Career Opportul
) 2005 Cell Genesys, Inc. | Home | Search | Contact Us

**B**

NOTE: Information in this document marked with an "[*]" has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

# LICENSE AGREEMENT

**between**

**TRANSKARYOTIC THERAPIES, INC.**

**and**

**CELL GENESYS, INC.**

[*] Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

# LICENSE AGREEMENT

This **LICENSE AGREEMENT** (the "**Agreement**"), effective as of June 7, 2002 (the "Effective Date"), is between **TRANSKARYOTIC THERAPIES, INC.**, a corporation organized and existing under the laws of Delaware and having its principal place of business at 195 Albany Street, Cambridge, MA 02139 ("**TKT**"), and **CELL GENESYS, INC.**, a corporation organized and existing under the laws of Delaware and having its principal place of business at 342 Lakeside Drive, Foster City, CA 94404 ("**CELL GENESYS**"). TKT and CELL GENESYS are sometimes hereinafter referred to each as a "Party" and collectively as the "Parties."

## WITNESSETH:

**WHEREAS**, CELL GENESYS has certain Patent Rights (as hereinafter defined);

**WHEREAS**, TKT desires to obtain a license under the CELL GENESYS Patent Rights upon the terms and conditions set forth herein, and CELL GENESYS desires to grant such a license;

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual covenants herein contained, and intending to be legally bound, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Unless specifically set forth to the contrary herein, the following terms, whether used in the singular or plural, shall have the respective meanings set forth below:

**1.1** "**Affiliate**" shall mean, with respect to a particular Party, a person, corporation, partnership, or other entity that controls, is controlled by or is under common control with such Party. For the purposes of the definition in this Section 1.1, the word "control" (including, with correlative meaning, the terms "controlled by" or "under the common control with") means the actual power, either directly or indirectly through one or more intermediaries, to direct or cause the direction of the management and policies of such entity, whether by the ownership of at least fifty percent (50%) of the voting stock of such entity, or by contract or otherwise.

**1.2** "**Designated Protein**" shall mean one of the [*] proteins (as may be adjusted pursuant to Section 2.3 hereof), [*] thereof that have [*], as described in or determined by the provisions set forth in the letter dated June 7, 2002 from Robert H. Tidwell of CELL GENESYS to Michael J. Astrue of TKT (the "Side Letter"), and subject to Sections 2.2 and 2.3 hereof.

**1.3** "**Gene Therapy**" shall mean the treatment or prevention of a disease by means of Ex Vivo or In Vivo delivery (via viral or nonviral gene transfer systems) of compositions comprising either (a) [*] Designated Protein, wherein such Designated Protein [*] in the treatment or prevention of such disease, (b) [*] Designated Protein, wherein such composition

[*] Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

## ARTICLE II

## LICENSE GRANT

2.1 **License Grant.** Subject to the terms and conditions of this Agreement, CELL GENESYS grants to TKT (i) an exclusive (even as to CELL GENESYS), worldwide, fully paid license (with the right to sublicense) under the Patent Rights to make, have made, use, sell, offer for sale and import [*] Licensed Products, and (ii) a non-exclusive, worldwide, fully paid license (with the right to sublicense) under the Patent Rights to make, have made, use, and import [*] Licensed Products solely for use to produce [*] Licensed Products. For clarity, TKT shall obtain no license or other rights under the Patent Rights for Gene Therapy purposes.

2.2 **Identification of Designated Proteins.** TKT shall designate in writing each additional protein that TKT desires to designate as a Designated Protein pursuant to the Side Letter (up to the maximum number and within the timeframes set forth therein), but subject to the following. Until such time as TKT's rights to designate additional Designated Proteins as provided in this Agreement have terminated, CELL GENESYS shall [*] of any protein.

2.3 **Substitution of Designated Proteins.** Notwithstanding Section 1.2, Section 2.2 and the Side Letter, if, on the [*] of the Effective Date, CELL GENESYS has [*] then TKT shall have the right to designate an [*] as Designated Proteins [*] Designated Proteins): (i) a method or composition for, or including, the activation of a gene that is [*], (ii) a composition or a gene activation method that does [*] and (iii) a method or composition for or including gene activation which does [*]. Such additional [*] shall be identified on or before[*].

## ARTICLE III

## CONFIDENTIALITY/PRESS RELEASES

3.1 **Nondisclosure Obligation.** All proprietary or confidential information disclosed by or on behalf of one Party (the "Disclosing Party") to the other Party (the "Receiving Party") hereunder in writing and marked "Confidential" or the equivalent (the "Proprietary Information") shall be maintained in confidence by the Receiving Party and shall not be disclosed to a Third Party or used for any purpose whatsoever except as set forth herein without the prior written consent of the Disclosing Party. All information disclosed by CELL GENESYS or TKT pursuant to the Binding Letter of Intent dated April 21, 2002 (the "LOI") shall be deemed Proprietary Information of CELL GENESYS or TKT, as the case may be, and shall be subject to the terms of this Article 3. For purposes of clarity, it is the intent of the Parties that general financial terms may be disclosed but that the number of Licensed Products and the nature and category of proteins which may be designated under this Agreement, as well as the nature of the milestones herein shall be considered Proprietary Information of both Parties. The identity of the Licensed Products and Designated Proteins shall be TKT Proprietary Information. However, the foregoing obligations shall not apply to particular Proprietary Information solely to the extent that the receiving Party can demonstrate with written evidence that such information:

[*] Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

Notwithstanding the foregoing, neither Party shall submit a confidentiality request for this Agreement or the agreements or letters referred to herein without providing the other Party with an opportunity for prior review and comment on such confidentiality request. The filing Party shall reasonably consider and attempt to accommodate any such comments by such other Party in submitting such confidentiality request.

## ARTICLE IV

## PAYMENTS

**4.1 Upfront Fees.** In consideration for the license granted to TKT by CELL GENESYS under Section 2.1 and CELL GENESYS's fulfillment of its other obligations and undertakings under this Agreement, within [*] of the Effective Date, TKT shall make a cash payment to CELL GENESYS of Eleven Million U.S. Dollars (US $11,000,000), less the credit provided for in Section 4.2, and shall issue and transfer to CELL GENESYS three hundred sixty six thousand nine hundred twenty eight (366,928) shares of TKT common stock (the "Shares") pursuant to an executed Stock Purchase Agreement in the form attached hereto as Exhibit A (the "Stock Purchase Agreement").

**4.2 Cash Payment Credit.** The cash payment of Three Million U.S. Dollars (US $3,000,000) paid by TKT pursuant to the LOI between the Parties effective April 21, 2002 shall be credited towards the upfront cash fee of Eleven Million U.S. Dollars (US $11,000,000), thereby reducing the payment required pursuant to Section 4.1 to Eight Million U.S. Dollars (US $8,000,000).

**4.3 Milestone Payments.** In further consideration for the license granted to TKT by CELL GENESYS under Section 2.1 and CELL GENESYS's fulfillment of its other obligations and undertakings under this Agreement, TKT shall make cash and stock payments to CELL GENESYS in the respective amounts set forth below upon attainment of the respective milestone events set forth below:

| <u>EVENT</u> | <u>AMOUNT</u> |
|---|---|
| [*] | [*] |
| [*] | [*] |

[*] Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

**5.5 Indemnification Procedure.** The Party seeking indemnification under this Section 5 (the "Indemnified Party") shall (i) give prompt written notice to the other Party (the "Indemnifying Party") of any Third Party Claim for which indemnification is sought, (ii) permit the Indemnifying Party to assume full responsibility to investigate, prepare for, defend against and/or compromise or settle (subject to the provisions set forth below) the Third Party Claim and (iii) if the Indemnifying Party assumes responsibility under clause (ii), reasonably assist the Indemnifying Party, at the Indemnifying Party's reasonable expense, in the investigation of, preparation for and defense of such Third Party Claim. If the Indemnifying Party assumes control of the defense of a Third Party Claim, the Indemnifying Party shall not be liable for any litigation costs or expenses incurred by the Indemnified Party. If the Indemnifying Party does not assume control of the defense of the Third Party Claim, the Indemnified Party shall control such defense. The Indemnifying Party shall not compromise or settle such Third Party Claim without the Indemnified Party's prior written consent if the compromise or settlement does not include a complete and unconditional release of the Indemnified Party from all liability with respect thereto or if the compromise or settlement imposes any liability or obligation on the Indemnified Party. The Indemnified Party shall not agree to any settlement of such action, suit, proceeding or claim without the prior written consent of the Indemnifying Party. The Indemnified Party shall have the right to participate, at its own expense and with counsel of its choice, in the defense of any claim or suit the defense of which has been assumed by the Indemnifying Party.

**5.6 LIMITATION OF LIABILITY.** EXCEPT FOR OBLIGATIONS UNDER SECTIONS 5.3 AND 5.4 OR IN CASE OF BREACH OF SECTION 3.1, IN NO EVENT SHALL EITHER PARTY, ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR AFFILIATES BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, WHETHER BASED UPON A CLAIM OR ACTION OR CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHER TORT, OR OTHERWISE, ARISING OUT OF THIS AGREEMENT.

**5.7 Limited Warranty.** Except for the warranties provided by CELL GENESYS in Section 5.1 AND TKT IN SECTION 5.2, EACH PARTY disclaims all other warranties, express or implied, and specifically, without limitation, any warranty of merchantability, fitness for a particular purpose or any warranty that exercise by TKT of its rights under the Patent Rights will not infringe any intellectual property rights of third parties.

## ARTICLE VI

## INTELLECTUAL PROPERTY PROVISIONS

**6.1** Filing, Prosecution and Maintenance of Patents.

**(a)** Subject to Section 6.1(b) below, CELL GENESYS agrees to file, prosecute and maintain all Patent Rights [*] and shall provide TKT with copies of all documentation and correspondence related to the Patent Rights. To the extent that such documents pertain to Licensed Products, CELL GENESYS shall give TKT an opportunity to

[*] Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

comment on any official communication related to the Patent Rights before filing, shall consider TKT's comments in good faith, and shall consult with TKT thereon. CELL GENESYS shall comply with any applicable duty to disclose information relevant to the Patent Rights as required by the United States Patent and Trademark Office during the prosecution of any of the Patent Rights. CELL GENESYS shall consult with TKT and consider in good faith TKT's comments related          to          the          scope          of          appropriate          disclosure.

**(b)** In the event that CELL GENESYS elects not to file, prosecute or maintain any patent or patent application involving a particular patent or application in the Patent Rights, then CELL GENESYS shall give TKT at least [*] notice thereof and TKT shall have the right to elect to undertake such prosecution and maintenance. In such case, CELL GENESYS shall, [*], either (i) assign such patent or application (including any patent or application to which such patent or application claims priority) to TKT, or (ii) allow TKT to prosecute and maintain such patent in CELL GENESYS's name, and grant TKT an exclusive (subject to the following), worldwide, sublicenseable license thereto in all fields. TKT shall, [*], file, prosecute and maintain such patent or application (including any priority patent or patent application) in the Patent Rights. CELL GENESYS shall execute such documents and perform such acts as may be reasonably necessary to effect an assignment or transfer of power of attorney to such Patent Rights to allow TKT to continue in a timely manner such filing, prosecution or maintenance. Upon completion of such assignment or transfer of power of attorney, TKT shall be deemed automatically to have granted CELL GENESYS a worldwide, fully paid, non-sublicenseable and non-exclusive license under such assigned Patent Rights [*]. Further, TKT agrees that it shall, upon CELL GENESYS's request, negotiate in good faith with any Third Party to grant a license on commercially reasonable terms under such Patent Right to the extent needed for such Third Party to practice license rights granted to it by CELL GENESYS under the Patent Rights prior to CELL GENESYS's election not to file, prosecute or maintain such Patent Right, *provided that* (a) such license rights do not include any right to make, have made, use, sell, offer for sale or import any Licensed Products, and (b) such Third Party is not, as of the date such election is made by CELL GENESYS not to file, prosecute or maintain such Patent Right, [*]. CELL GENESYS shall give notice to TKT as soon as practicable in advance of the grant, lapse, revocation, surrender, invalidation or abandonment of any CELL GENESYS Patent Right being prosecuted by CELL GENESYS.

**6.2**     Opposition, Reexamination and Reissue.

**(a)** CELL GENESYS shall notify TKT, within [*] of learning of, and in any case, prior to public disclosure of, any request for, or filing or declaration of, any interference, opposition, reexamination, or the foreign equivalent of any of the foregoing involving the Patent Rights.

**(b)** CELL GENESYS shall not initiate any reexamination, interference or reissue proceeding involving Patent Rights without the prior written consent of TKT, which consent shall not be unreasonably withheld.

In connection with any interference, opposition, reissue, or reexamination proceeding (or the

[*]  Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

foreign equivalent of any of the foregoing) involving the Patent Rights, CELL GENESYS agrees to give TKT an opportunity to provide comments on any official communication related to such interference, opposition, reissue, or reexamination proceeding (or the foreign equivalent of any of the foregoing) before filing, shall consider TKT's comments in good faith, and shall consult with TKT thereon. Additionally, CELL GENESYS shall [*], and [*], including to the extent permissible by law and contracts, the [*]. Notwithstanding the foregoing, CELL GENESYS shall not be required to make any disclosure of any communication or other information that would destroy either the attorney/client privilege or attorney work product privilege protecting such communication or other information, provided that if such communication or other information is material to TKT's interests under this Agreement, CELL GENESYS shall, in good faith, use reasonable efforts to facilitate disclosure without destroying any such privilege.

**6.3 Enforcement and Defense.**

**(a)** Each Party shall give the other Party notice of any unauthorized making, using, selling, offering for sale or importing of a Licensed Product that may come to such Party's attention (a "Field Infringement"). Each Party shall have the right to bring suit against such alleged infringer in a Field Infringement, [*], and either Party may [*]; provided, however, that in the event that TKT brings a suit against an alleged infringer as the result of a possible Field Infringement, but in its sole reasonable discretion believes that CELL GENESYS is or may be a necessary or indispensable party under the applicable law, CELL GENESYS agrees to become a party in such action, and shall execute all documents and take all steps reasonably necessary to enable TKT to initiate, prosecute and/or maintain such action, or for TKT to defend any declaratory judgment action brought by the alleged infringer. Each Party shall be entitled in any such action [*] to assert its own claims for damages and to defend it interests in the Patent Rights. For any infringement of the Patent Rights other than a Field Infringement, CELL GENESYS shall have the sole and exclusive right to bring an action against the infringer.

**(b)** Each Party shall [*] pursuant to an action brought under subclause (a) above.

**(c)** Each Party shall notify the other of any certification regarding any Patent Rights which it has received pursuant to 21 U.S.C. §§355(b)(2)(A)(iv) or (j)(2)(A)(vii)(IV) or its successor provisions or the foreign equivalent thereof and shall provide the other with a copy of such certification within five (5) days of receipt. CELL GENESYS's and TKT's rights with respect to the initiation and prosecution of any legal action (or the defense of any such legal action) as a result of such certification or any recovery obtained as a result of such legal action shall be as defined above; provided, however, that if either Party shall exercise its first right to initiate and prosecute any action or to control the defense of any such action, such Party shall notify the other Party of such decision within ten (10) days of receipt of the certification.

**(d)** If any Licensed Product becomes the subject of a Third Party claim, or there is the potential for a claim of patent infringement related to TKT's development, use, sale, offer for sale or import of Licensed Products, TKT shall defend against such claim [*]. CELL GENESYS and TKT shall fully cooperate and provide assistance to each other, [*], with respect

[*] Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

to any proceeding related to gene activation patents owned or licensed by a Third Party and asserted, or threatened to be asserted, by such Third Party, including without limitation, [*].

6.4 **Third Party License; Settlement.** Except as otherwise provided herein, CELL GENESYS shall [*] that [*] under the Patent Rights [*].

## ARTICLE VII

## TERM AND TERMINATION

7.1 **Term and Expiration.** This Agreement shall be effective as of the Effective Date and, unless terminated earlier pursuant to the provisions of Section 7.2 below, shall continue until the expiration of the last-to-expire Patent Right.

7.2 **Termination by Either Party for Cause.** This Agreement may be terminated by written notice by either Party at any time during the term of this Agreement if the other Party is in breach of a material obligation hereunder and has not cured such breach within ninety (90) days after notice requesting cure of the breach. If TKT terminates this Agreement pursuant to this Section 7.2, then: (a) the license granted pursuant to Section 2.1 shall survive such termination (subject to all applicable terms of such license except Section 4), and provided that Sections 1.2, 2.2 and 2.3 shall survive such termination, and (b) in addition, TKT shall have (i) a non-exclusive, worldwide, fully paid license (with the right to sublicense) under the Patent Rights to make, have made, use, sell, offer for sale and import non-cellular protein products other than [*] Licensed Products and (ii) a non-exclusive, worldwide, fully paid license (with the right to sublicense) under the Patent Rights to make, have made, use, and import [*] products other than [*] Licensed Products, *but excluding* from the foregoing rights any license rights under the Patent Rights that have been exclusively granted to a Third Party prior to the date of breach.

7.3 **Survivals.** Termination or expiration of this Agreement shall not relieve either Party of any obligation of such Party accrued prior to such termination or expiration. Any termination or expiration of this Agreement shall be without prejudice to the rights of either Party against the other accrued under this Agreement prior to termination or expiration hereof. The provisions of Articles 1, 3, 5, and 7 shall survive the termination or expiration of this Agreement. Notwithstanding the termination of this Agreement pursuant to this Article VII, any sublicenses of Patent Rights granted by TKT hereunder prior to such termination shall survive such termination. In such event, CELL GENESYS shall have the right to receive directly from the sublicensee any payments or other consideration otherwise payable to TKT as the sublicensor under such sublicense, and to otherwise exercise all of the rights of TKT as the sublicensor under such sublicense; provided however that CELL GENESYS shall not assume, and shall not be responsible for, any representations, warranties, promises or obligations of TKT to any sublicensees other than the licenses under such sublicenses.

## ARTICLE VIII

## MISCELLANEOUS

[*] Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

C

**The following file represents the Securities & Exchange Commission Filing on the TKT transaction from the SEC web site.**

Exhibit 99.1

# STOCK REPURCHASE AND AMENDMENT AGREEMENT

  **This Amendment Agreement** (the "*Amendment*") is made and entered into as of January 17, 2003 (the "Amendment Effective Date"), by and between Transkaryotic Therapies, Inc., a Delaware corporation ("*TKT*"), and Cell Genesys, Inc., a Delaware corporation ("*CELL GENESYS*"). TKT and CELL GENESYS may be referred to herein as a "Party" or, collectively, as "Parties".

  **A.** CELL GENESYS and TKT are party to that certain License Agreement dated June 7, 2002 pursuant to which CELL GENESYS licensed to TKT rights to certain technology (the "*License Agreement*") and that certain Stock Purchase Agreement dated June 7, 2002 (the "*Stock Purchase Agreement*").

  **B.** In partial consideration for the license granted to TKT by CELL GENESYS, TKT issued to CELL GENESYS Three-Hundred Sixty Six Thousand Nine Hundred Twenty Eight (366,928) shares of TKT Common Stock, subject to adjustment in accordance with the terms of the Stock Purchase Agreement (the "*Upfront Shares*").

  **C.** The number of Upfront Shares was calculated to give effect to the agreement of the parties that the value of the Upfront Shares would equal $15,000,000.

  **D.** Pursuant to the Stock Purchase Agreement, TKT agreed to use commercially reasonable efforts to register the Upfront Shares under the Securities Act of 1933, as amended, but such shares are not yet registered. In addition, the number of Upfront Shares is subject to adjustment at the time of registration based on the average closing price of TKT common stock for a specific time period, as provided in the Stock Purchase Agreement.

  **E.** The Parties desire to effect a rescission of the obligation by TKT to issue the Upfront Shares, and replace such obligation with a cash payment by TKT to CELL GENESYS. In connection therewith, the Parties desire that (i) CELL GENESYS sell to TKT and TKT repurchase from CELL GENESYS the Upfront Shares, and (ii) the terms of the License Agreement and of the Stock Purchase Agreement be amended, as provided herein, to eliminate the requirement to register the Upfront Shares and adjust the number of Upfront Shares, all for aggregate consideration of $15,000,000.

## AGREEMENT

  In consideration of the mutual covenants contained in this Amendment and for other good and valuable consideration, the receipt of which is hereby acknowledged, CELL GENESYS and TKT hereby agree as follows:

### SECTION 1. Amendment of the Stock Purchase Agreement

  TKT shall have no further obligation under the Stock Purchase Agreement to (i) issue any shares of its common stock pursuant to the adjustment provisions of Section 1.2 or (ii) register the Upfront Shares. In connection with the repurchase of the Upfront Shares, the Parties hereby agree that the terms of the Stock

Purchase Agreement are hereby amended as provided below, to eliminate the requirement that the Upfront Shares be adjusted under certain circumstances and to eliminate TKT's obligation to register the Upfront Shares To the extent that the Stock Purchase Agreement is explicitly amended by this Amendment, the terms of the Amendment will control where the terms of the Stock Purchase Agreement are contrary to or conflict with the following provisions. Where the Stock Purchase Agreement is not explicitly amended, the terms of the Stock Purchase Agreement will remain in force.

Capitalized terms used in this Amendment that are not otherwise defined herein shall have the same meanings given them in the Stock Purchase Agreement.

**1.1 Amendment of Section 1.1(a) of the Stock Purchase Agreement.** The words "subject to adjustment pursuant to Section 1.2" are hereby deleted from Section 1.1(a) of the Stock Purchase Agreement.

**1.2 Deletion of Section 1.2.** Section 1.2 of the Stock Purchase Agreement is hereby deleted in its entirety.

**1.3 Amendment of Section 8.1(a) of the Stock Purchase Agreement.** Section 8.1(a) of the Stock Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"`Registrable Shares'* shall mean all Shares issued pursuant to this Agreement (which, for greater certainty, shall include the First Milestone Shares and the Second Milestone Shares, when issued) and any other shares of Common Stock issued or issuable in respect to the Shares (because of stock splits, stock dividends, reclassifications, recapitalizations, adjustments pursuant to this Agreement or similar events), *provided, however,* that `Registrable Shares' shall not include the Up Front Shares;"

**1.4 CELL GENESYS' Authority to Sell the Upfront Shares.**

(a) CELL GENESYS has good and marketable title to the Upfront Shares which are to be transferred to TKT by CELL GENESYS pursuant hereto, free and clear of any and all covenants, conditions, restrictions, voting trust arrangements, liens, charges, encumbrances, options and adverse claims or rights whatsoever, other than those existing under the terms of the Stock Purchase Agreement.

(b) CELL GENESYS has the full right, power and authority to enter into this Agreement and to transfer, convey and sell to TKT at the Closing the Upfront Shares to be sold hereunder and, upon consummation of the purchase contemplated hereby, TKT will acquire from CELL GENESYS good and marketable title to such Upfront Shares, free and clear of all covenants, conditions, restrictions, voting trust arrangements, liens, charges, encumbrances, options and adverse claims or rights whatsoever, other than those existing under the terms of the Stock Purchase Agreement.

**SECTION 2. Amendment of the License Agreement**

In connection with the repurchase of the Upfront Shares and the amendments to the Stock Purchase Agreement contemplated by Section 1 hereof, the Parties hereby agree that TKT shall have no further obligation to issue any shares of its

common stock as the initial license fee under Section 4.1 of the License Agreement or make any other payments as the initial license fee under Section 4.1 of the License Agreement and that the terms of the License Agreement are hereby amended as provided below, to delete the references therein to the Upfront Shares, the requirement that the Upfront Shares be adjusted under certain circumstances and the obligation of TKT to register the Upfront Shares. To the extent that the License Agreement is explicitly amended by this Amendment, the terms of the Amendment will control where the terms of the License Agreement are contrary to or conflict with the following provisions. Where the License Agreement is not explicitly amended, the terms of the License Agreement will remain in force.

**2.1 Amendment of Exhibit A to the License Agreement.** Exhibit A to the License Agreement is hereby amended to give affect to the amendments to the Stock Purchase Agreement described in Section 1 hereof.

**SECTION 3.  Repurchase of Upfront Shares**

**3.1 Purchase and Sale.** TKT will repurchase from CELL GENESYS, and CELL GENESYS will sell to TKT, all of the Upfront Shares, comprised of Three-Hundred Sixty Six Thousand Nine Hundred Twenty Eight (366,928) shares of TKT Common Stock, par value $0.01 per share, and CELL GENESYS will agree to the amendment of the Stock Purchase Agreement and the License Agreement, as set forth herein, for aggregate consideration of Fifteen Million Dollars ($15,000,000) paid by TKT to CELL GENESYS (the "*Repurchase Price*").

**3.2 Closing.** The closing of the repurchase and sale of the Upfront Shares pursuant to this Amendment shall be held at the offices of Hale and Dorr LLP, 60 State Street, Boston, Massachusetts, 02109, on the Amendment Effective Date (such date is hereinafter referred to as the "Repurchase Closing").

**3.3 Delivery.** At the Repurchase Closing, subject to the terms and conditions hereof, CELL GENESYS will deliver the stock certificate or certificates representing the Upfront Shares, against payment of the Repurchase Price therefore by wire transfer of immediately available funds to CELL GENESYS.

**SECTION 4. Release and Waiver**

**4.1 Release by CELL GENESYS.** Effective upon completion of the Repurchase Closing, CELL GENESYS, on behalf of itself and its affiliates, assigns, agents and shareholders, releases and forever discharges TKT and its officers, directors, shareholders, agents, affiliates, attorneys and employees from any claims, causes of actions, damages, losses, or liabilities (collectively, the "*Claims*") of any kind or nature, known or unknown, direct, indirect, or derivative, accrued or unaccrued, that CELL GENESYS or any of its affiliates, assigns, agents, or shareholders had, have, or hereafter may have concerning, arising from or in any way related to the Upfront Shares, including without limitation, any Claims

concerning, arising from or in any way related to Sections 1.1(a), 1.2 and 8.2 of the Stock Purchase Agreement.

**4.2 Waiver and Release by TKT.** Effective upon the Repurchase Closing, TKT waives all restrictions on Transfer of the Upfront Shares imposed by the Stock Purchase Agreement. Effective upon completion of the Repurchase Closing, TKT, on behalf of itself and its affiliates, assigns, agents and shareholders, releases and forever discharges CELL GENESYS and its officers, directors, shareholders, agents, affiliates, attorneys and employees from any Claims of any kind or nature, known or unknown, direct, indirect, or derivative, accrued or unaccrued, that TKT or any of its affiliates, assigns, agents, or shareholders had, have, or hereafter may have concerning, arising from or in any way related to the Upfront Shares, including without limitation, any Claims concerning, arising from or in any way related to Sections 4.2 and 4.3 of the Stock Purchase Agreement, to the extent related to the Upfront Shares.

**SECTION 5. Miscellaneous.**

**5.1 Waivers and Amendments.** Neither this Amendment nor any provision hereof may be changed, waived, discharged, terminated, modified or amended except upon the written consent of the Parties.

**5.2 Headings.** The headings of the various sections of this Amendment have been inserted for convenience of reference only and shall not be deemed to be part of this Amendment.

**5.3 Severability.** If any provision hereof should be held invalid, illegal or unenforceable in any respect, then, to the fullest extent permitted by law, (a) all other provisions hereof shall remain in full force and effect and shall be liberally construed in order to carry out the intentions of the Parties as nearly as may be possible and (b) the parties shall use their best efforts to replace the invalid, illegal or unenforceable provision(s) with valid, legal and enforceable provision(s) which, insofar as practical, implement the purposes of such provision(s) in this Amendment.

**5.4 Governing Law.** This Amendment shall be governed by and construed in accordance with the laws of the State of Delaware as applied to contracts entered into and performed entirely in the State of Delaware by Delaware residents, without regard to conflicts of law principles.

**5.5 Counterparts.** This Amendment may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument, and shall become effective when one or more counterparts have been signed by each party hereto and delivered to the other parties.

[Signature page follows.]

**In Witness Whereof**, the Parties hereto have executed this Amendment in duplicate originals by their authorized officers as of the Amendment Effective Date.

**Transkaryotic Therapies, Inc.**          **Cell Genesys, Inc.**

By: /s/ Richard F. Selden          By: /s/ Robert H. Tidwell

Name: Richard F. Selden                     Name: Robert H. Tidwell

Title: President                            Title: Senior Vice President

# D





- News

Press Release
Archives

CONTACT
Jennifer Cook Williams
Associate Director
Corporate Communications
650-425-4542

SEARCH

### Cell Genesys Receives $15 Million From TKT For Remainder of License Fee in Gene Activation License Agreement

FOSTER CITY, CA, January 22, 2003—Cell Genesys, Inc. (Nasdaq: CEGE) today announced that it has received $15 million in cash from Transkaryotic Therapies, Inc. (Nasdaq: TKTX)—a payment that was originally expected to be received in the form of TKT common stock. In June 2002, Cell Genesys announced the completion of a worldwide licensing agreement under which Cell Genesys exclusively licensed to TKT intellectual property relating to its gene activation technology for certain therapeutic proteins. In exchange, Cell Genesys received an up-front license fee of $26 million, which was to have been comprised of $11 million in cash and $15 million in shares of TKT common stock, with the number of shares to be determined upon the effective date of a registration statement filed with the SEC covering the resale of the shares. Since a registration statement has not yet been declared effective, the companies mutually agreed to an amendment to the original license agreement substituting a cash payment of $15 million in lieu of the TKT stock.

Under the gene activation license agreement, Cell Genesys could receive additional payments up to an aggregate amount of $17 million upon the completion of certain patent-related milestones. Up to 15 proteins are included in the agreement for a variety of disorders including Fabry disease and Gaucher disease. No royalty payments will be made by TKT to Cell Genesys.

Early in Cell Genesys' history, the company developed an approach to the production of therapeutic proteins which it referred to as "gene activation." Beginning in 1994, Cell Genesys has signed licensing agreements with companies using this technology to produce therapeutic protein products, an area not being pursued by Cell Genesys. These agreements, including the TKT license agreement, have brought in more than $50 million to date.

Cell Genesys is focused on the development and commercialization of innovative therapeutic products for cancer based on gene therapy technologies. The company is pursuing three cancer product platforms—GVAX® cancer vaccines, oncolytic virus therapies and *in vivo* cancer gene therapies. Clinical trials of GVAX® vaccines are under way in prostate cancer, lung cancer, pancreatic cancer, leukemia and myeloma. Clinical programs of oncolytic virus therapies include CG7870 for prostate cancer. Preclinical studies are in progress for other oncolytic virus therapies and gene therapies for multiple types of cancer. Cell Genesys' majority-owned subsidiary, Ceregene, Inc., is focused on gene therapies for neurologic disorders. Cell Genesys also continues to hold approximately 8.7 million shares of common stock in its former subsidiary, Abgenix, Inc., an antibody products company. Cell Genesys is headquartered in Foster City, CA and has manufacturing operations in San Diego, CA, Hayward, CA and Memphis, TN. For additional information, please visit the company's website at www.cellgenesys.com.

Statements made herein about Cell Genesys and its subsidiaries, other than statements of historical fact, including statements about the progress and reports of clinical trials and progress and reports of preclinical programs, marketability and success of potential

products and nature of product pipelines, licensing agreements and intellectual property are forward-looking statements and are subject to a number of uncertainties that could cause actual results to differ materially from the statements made, including risks associated with the success of research and development programs, the success and results of clinical trials, the regulatory approval process, competitive technologies and products, patents and additional financings. For information about these and other risks which may affect Cell Genesys, please see the company's Annual Report on Form 10-K dated April 1, 2002 as well as Cell Genesys' reports on Form 10-Q and 8-K and other reports filed from time to time with the Securities and Exchange Commission.

BACK TO LIST                                                    BACK TO TOP

About Us | Product Progress | Patient Information | Investor's Corner | Career Opportu
) 2005 Cell Genesys, Inc. | Home | Search | Contact Us

# E

The opinion in support of the decision being
entered today is not binding precedent of the Board.

Paper 172

Filed by:    Motions Panel
             Mail Stop Interference                    Filed:
             P.O. Box 1450                             22 June 2004
             Alexandria, VA 22313-1450
             Tel:  703-308-9797
             Fax:  703-305-0942

         UNITED STATES PATENT AND TRADEMARK OFFICE

```
                                        ┌──────────────────────┐
                                        │       MAILED         │
       BEFORE THE BOARD OF PATENT APPEALS_                      │
              AND INTERFERENCES          │     JUN 2 2 2004     │
                                        │   PAT. & T.M. OFFICE  │
                                        │ BOARD OF PATENT APPEALS│
                                        │   AND INTERFERENCES   │
                                        └──────────────────────┘
```

         APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.
                      Junior Party,
                 (U.S. Patent 5,272,071)

                            v.

                   CELL GENESYS, INC.
                      Junior Party,[1]
                 (U.S. Application 08/102,390)


                   Interference 105,114


               DECISION ON PRELIMINARY MOTIONS


Before TEDDY S. GRON, Administrative Patent Judge,
FRED E. McKELVEY, Senior Administrative Patent Judge and
JAMES T. MOORE Administrative Patent Judge.

─────────────────────

    [1]    The NOTICE REDECLARING INTERFERENCE NO. 103,737 (Paper
No. 1) accorded both parties junior party status due to disputes
relating to the scope of the interference count and the parties'
priority benefit dates.

Interference 105,114

of the subject matter of Genesys's Claim 106, and we find enough

support for that claim in Genesys's disclosure to require ARS to

establish that the subject matter thereof is unpatentable to

Genesys. As for the subject matter of Claims 3, 4, 8, 21, 24,

27, 31, 40-51, 55 and 58 of ARS's '071 patent, having considered

all the evidence of record, we conclude that Genesys's arguments,

evidence and testimony against the patentability of ARS's

patentable claims are no less complete, comprehensive and

convincing than ARS's contravening arguments, evidence and

testimony. Accordingly, Genesys has not met its burden to show

that it is entitled to the relief it seeks against Claims 3, 4,

8, 21, 24, 27, 31, 40-51, 55 and 58 of ARS's '071 in Preliminary

Motion 3 (Paper No. 64), and ARS has not satisfied its burden to

show that it is entitled to the relief it seeks against Claim 106

of Genesys's Application 08/102,390. Therefore, the motions are

dismissed-in-part and denied-in-part.

Dismissed-in-part; Denied-in-part.

    E.    Miscellaneous Motions

        (1)    ARS's Motion To Suppress the Declaration of

Dr. Michael Heartlein (Exh. 2031) under 37 CFR § 1.635/1.656

(Paper No. 147) is dismissed. ARS acknowledges that "CG

submitted Dr. Heartlein's declaration, Exhibit 2031, in support

of its preliminary motion 3" (Paper No. 147, p. 1, III(1)).

-140-

Interference 105,114

Having considered all the pertinent evidence of record, we dismissed-in-part and denied-in-part Genesys's Preliminary Motion 3 (Paper No. 64). Accordingly, ARS's motion to suppress Heartlein's declaration is moot. <u>Dismissed</u>.

(2) ARS's Motion To Suppress (CG's Exhibit 2040 and Portions of Exhibit 2054)(Paper No. 147) is dismissed. Genesys submitted the Declaration of Bertram I. Rowland and supporting exhibits under 37 CFR § 1.131(a) which ARS here seeks to suppress to establish invention of the subject matter of Genesys's claims corresponding to the interference count prior to the effective date of Japanese Patent Publication No. 1-215280, published August 29, 1989. Herein we have concluded that Genesys's showing under 37 CFR § 1.131(a), including the Declaration of Bertram I. Rowland and supporting exhibits ARS seeks to suppress, does not establish that Genesys invented the subject matter defined by Genesys's claims corresponding to the interference count prior to August 29, 1989. Accordingly, ARS motion to suppress the Declaration of Bertram I. Rowland and supporting exhibits is moot. <u>Dismissed</u>.

(3) Genesys's Motion To Suppress Evidence And Impose Sanctions pursuant to 37 CFR § 1.656(h)(Paper No. 149) relates to declaratory and testimonial evidence filed in support of ARS's Preliminary Motions 1 (Paper No. 45) and 2 (Paper No. 46). After

-141-