**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| CELL GENESYS, INC., | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-12448-MLW |
| | ) | |
| APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V. | ) | |
| | ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |
| | ) | |
| APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-11810-MLW |
| | ) | |
| CELL GENESYS, INC. and TRANSKARYOTIC THERAPIES, INC. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**ARS'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS CGI'S**
**COUNTERCLAIM COUNTS II AND III**

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................... 1

II.   ARGUMENT .............................................................................................................. 2

      A.    CGI cannot raise issues in this § 146 action that it could have, but did not,
            raise during the '114 Interference ........................................................................ 2

            1.    CGI's reasons for raising its new arguments are not true ........................... 5

            2.    CGI could have raised the inequitable conduct issue and sought
                discovery thereon during the '114 Interference ......................................... 6

            3.    CGI misrepresents Dr. Chappel's testimony about his purported
                "best mode" .............................................................................................. 8

            4.    The necessary evidence about the "mutant DHFR gene" was
                available to CGI during the '114 Interference ......................................... 10

            5.    The patent application that CGI says Dr. Chappel wrongly
                withheld from the PTO was available during the '114 Interference ........ 11

            6.    The Court should dismiss CGI's allegation in Count III that ARS
                misrepresented the contents of its patent applications to the PTO ........... 13

      B.    The court should strike CGI's antitrust allegation in counterclaim count IV ....... 16

IV.   CONCLUSION ......................................................................................................... 19

# TABLE OF AUTHORITIES

## Cases

*Associated General Contractors Of California, Inc. v. California State Council Of Carpenters*, 459 U.S. 519 (1983) .......................................................... 17, 18

*Bio-Technology General v. Novo Nordisk*,
No. 02-235-SLR, 2004 WL 1739722 (D. Del. August 3, 2004) .................................... 4, 5

*Brunswick Corp. v. Riegel Textile Corp.*,
627 F. Supp. 147 (N.D. Ill. 1985) .................................................................... 15

*Conservolite v. Widmayer*,
21 F.3d 1098 (Fed. Cir. 1994) ................................................................ passim

*Dance v. Seifert*,
No. 103,379, 1999 WL 33446701,
(Bd. Pat. App & Interf., October 5, 1999) .......................................................... 7

*Estée Lauder v. L'Oreal*,
129 F.3d 588 (Fed. Cir. 1997) ....................................................................... 4

*General Instrument Corp. v. Scientific-Atlanta*,
995 F.2d 209 (Fed. Cir. 1993) ....................................................................... 2

*In re Klein*,
1930 C.D. 2, 393 O.G. 519 (Comm'r Pat. 1930) ............................................... 13

*Insituform Gulf South, Inc. v. Cat Contracting, Inc.*,
113 F.3d 1258, 1997 WL 244328 (Fed. Cir. 1997) .......................................... 15

*Nobelpharma AB v. Implant Innovations, Inc.*,
141 F.3d 1059 (Fed. Cir. 1998) .................................................................... 17

*Seed Lighting Co. v. Home Depot*,
Case No.  04-2291, 2005 WL 1861852 (N.D. Cal. August 3, 2005) ................................ 15

*Springs Window Fashions, LP v. Novo Industries, L.P.*,
323 F.3d 989 (Fed. Cir. 2003) ...................................................................... 15

*Sullivan v. Tagliabue*,
25 F.3d 43 (1st Cir. 1994) ........................................................................... 18

*Tropix, Inc. v. Lumigen, Inc.*,
53 U.S.P.Q.2d 2018 (Bd. Pat. App. & Interf. 2000) ........................................... 8

*Velsicol Chem. Corp. v. Monsanto Co.*,
579 F.2d 1038 (7th Cir. 1978) .......................................................... 12, 15, 16

**Statutes**

35 U.S.C. § 146............................................................................................ passim

**Other Authorities**

1132 Official Gazette of U.S. Patent & Trademark Office 33 (Nov. 19, 1991)
  "*Consideration of Fraud and Inequitable Conduct in Patent Interferences Cases*" .......... 8

1133 Official Gazette of U.S. Patent & Trademark Office 21 (Dec. 10, 1991)
  "*Interference Practice: Consideration of Fraud and Inequitable Conduct*" ..................... 8

Manual of Patent Examining Procedure (MPEP), 8th Ed., Vol. 1 (U.S. Dept. Commerce,
  Patent and Trademark Office 2005).................................................................... 13

**Rules**

37 C.F.R. § 1.601 ............................................................................................. 6

37 C.F.R. § 1.633 ............................................................................................. 6

37 C.F.R. § 1.635 ............................................................................................. 6

37 C.F.R. § 1.639 ............................................................................................. 6, 7

37 C.F.R. § 1.645 ............................................................................................. 6

37 C.F.R. § 1.687 ............................................................................................. 7

Fed. R. Civ. P. 9 .............................................................................................. 17

Fed. R. Civ. P. 12 ............................................................................................ 1

## I.    Introduction

Plaintiff Applied Research Systems ARS Holding, N.V. ("ARS") submits this Memorandum in support of its motion under Fed. R. Civ. P. 12(b)(6) and 35 U.S.C. § 146 to dismiss Counts II and III, and under Fed. R. Civ. P. 12(f) to strike paragraph 43, in "Defendant Cell Genesys Inc.'s Answer to Plaintiff's First Amended Complaint and Cell Genesys's Counterclaims" filed on February 3, 2006 (hereinafter "CGI Answer and Counterclaims").

In its counterclaim Counts II and III, CGI alleges, for the first time ever, that the '071 patent-in-suit is "void and unenforceable." Specifically, CGI accuses Dr. Scott Chappel (who invented the products and methods claimed in the '071 patent) and/or ARS with committing inequitable conduct by (i) failing to disclose the "best mode" for practicing at least one of the inventions claimed in the '071 patent (CGI Answer and Counterclaims at ¶¶ 18-23); (ii) withholding a concurrently-pending but unrelated patent application listing Dr. Chappel as a co-inventor (*id*. at ¶¶ 24-26); and (iii) misleading the Examiner about the contents of Dr. Chappel's continuation-in-part application filed in December 1990 (*id*. at ¶¶ 27-32).

The Court should dismiss these counterclaim counts because CGI could have, but did not, raise these allegations in the '114 Interference from which this § 146 appeal is taken. CGI therefore waived its right to pursue them, and is estopped from raising them here.

The law is clear that where the evidence on which a party relies to raise an issue in a 35 U.S.C. § 146 appeal of an interference decision was available to the party during the interference, and the party did not raise that issue during the interference, the party cannot raise that issue for the first time in the § 146 action.

Here, to the extent that CGI is able to point to any actual evidence which it can try to use to support its arguments that Dr. Chappel or ARS did something wrong while prosecuting the '071 patent, all of that evidence was available to CGI during the '114 Interference. The only

other "evidence" on which CGI relies to support these new allegations consists of its misrepresentations of Dr. Chappel's testimony during his recent deposition, which should be disregarded.

Consequently, because CGI could have, but did not, raise any of the allegations in its counterclaim Counts II and III during the '114 Interference, and because these allegations are based on evidence that was available during the interference, CGI has waived and is estopped from raising these claims, and the Court should dismiss Counts II and III.

In its counterclaim Count IV, specifically in ¶ 43, CGI accuses ARS of violating the antitrust laws by attempting to enforce the '071 patent against TKT. Because CGI has failed to adequately plead a cause of action under antitrust law, and in any event has no standing to bring such a cause of action, the Court should strike ¶ 43 of CGI's counterclaim Count IV.

## II.    Argument

### A.    CGI cannot raise issues in this § 146 action that it could have, but did not, raise during the '114 Interference

CGI's failure to raise the issue of inequitable conduct during the '114 Interference is fatal to its attempt to raise that issue here. As the Federal Circuit made clear in the *General Instrument* case, a party is barred from raising an issue in a § 146 appeal action that it could have raised, but did not, in the underlying interference:

> For the most part, parties should raise issues in the manner clearly specified in the PTO's interference regulations, that is through preliminary motions, motions to correct inventorship, belated motions delayed for good cause or opposition to these motions.

> Short of such compliance with the regulations, issues may only be deemed raised for § 146 purposes if the record clearly demonstrates that the issue was undeniably placed before the examiner-in-chief, and one or more parties insisted that the issue be resolved in the process of deciding which of the parties was entitled to priority.

*General Instrument Corp. v. Scientific-Atlanta*, 995 F.2d 209, 214 (Fed. Cir. 1993).

The Federal Circuit further clarified this prohibition on raising new issues in § 146 actions in the *Conservolite* case:

> The fact that Conservolite did not contest that the parties were claiming the same patentable invention by way of a suitable motion not only precluded Conservolite from doing so at the Board's final hearing, it also precluded Conservolite from raising this issue in an action brought pursuant to § 146.
>
> Judicial review of the Board's determinations in an interference is provided for by 35 U.S.C. § 146. While § 146 provides that the administrative record developed at the PTO may be admitted "without prejudice to the right of the parties to take further testimony," the right to offer new evidence is not unlimited. Rather, an action under § 146 is essentially a proceeding to review the action of the Board. While the expression "de novo" is often used to describe a § 146 action, the statute does not use this language or state that new issues can freely be raised. Section 146 authorizes the district court on review to accept new testimony, but normally only as to issues raised by the parties during the proceedings below or by the Board's decision. *Case v. CPC Int'l, Inc.*, 730 F.2d 745, 752, 221 U.S.P.Q. 196, 202 (Fed. Cir.), cert. denied, 469 U.S. 872, 105 S. Ct. 223, 83 L. Ed. 2d 152, 224 U.S.P.Q. 736 (1984). Thus, the parties to an interference must make a complete presentation of the issues at the Board level so that the interference is efficient and not wasteful of administrative and judicial resources. . . . A proceeding under § 146 is not a chance for a party to reconstruct its case, based on a new litigation strategy, leapfrogging the administrative process in the PTO.

*Conservolite v. Widmayer*, 21 F.3d 1098, 1102 (Fed. Cir. 1994).

Because a district court's review of an interference decision under § 146 is an equitable remedy, district courts can, in rare cases, admit testimony on issues that were not before the Board. *Id*. However, the *Conservolite* court held that a party can only raise such a new issue in the district court if it can establish that there were "compelling circumstances" that prevented it from procuring the supporting evidence or raising the issue during the underlying interference:

> [W]e do not hereby hold that no new issues can be raised in an action under § 146, only that the right to raise such issues is limited to ***compelling circumstances***, which have not been shown to exist here.

*Id*. at 1103 (emphasis added).

The Federal Circuit reconfirmed this "compelling circumstances" standard in the *Estée Lauder* case:

- 3 -

> Whether Estee Lauder was the first to conceive the invention and was reasonably diligent in reducing it to practice is not before us because Estee Lauder failed to raise this issue before the board or on appeal.  The only issue before the board was priority of reduction to practice. Therefore, although the district court did not abuse its discretion in allowing Estee Lauder to introduce evidence of the BRD 497-500 tests insofar as this evidence was relevant to its reduction to practice, *Case*, 730 F.2d at 752, 221 U.S.P.Q. at 202, the district court could not examine, absent ***compelling circumstances***, whether this evidence established any other issue not raised before the board, such as priority based on prior conception coupled with diligent reduction to practice.

*Estée Lauder v. L'Oreal*, 129 F.3d 588, 592 (Fed. Cir. 1997) (citing *Conservolite*) (emphasis added).

Here, because CGI failed to raise (or even mention) any issue of inequitable conduct during the '114 Interference, CGI bears the burden to establish that "compelling circumstances" justify permitting it to raise that issue at this late date. In the *Conservolite* case cited above, the Federal Circuit noted some factors that courts had used for considering whether a party could raise a new issue in a § 146 action, including (i) whether the evidence was reasonably unavailable during the interference, (ii) whether the party seeking to raise the new issue exercised due diligence in identifying and procuring the evidence, and (iii) whether the issue could be raised more conveniently in another judicial proceeding. *Conservolite*, 21 F.3d at 1102.

The previous unavailability of the evidence on which a party relies to support a new argument is critical to a court's decision to permit the party to raise that argument in a § 146 action. For example, in *Conservolite*, the Federal Circuit held that it was an abuse of discretion for the District Court to have permitted Conservolite to raise a new issue because "Conservolite had before it Widmayer's complete application and had opportunity to present its contentions" during the underlying interference. *Conservolite*, 21 F.3d at 1102. In contrast, in *Bio-Technology General v. Novo Nordisk*, No. 02-235-SLR, 2004 WL 1739722 (D. Del. August 3, 2004), the district court allowed the plaintiff to raise issues of inventorship and inequitable conduct which had not been raised during the interference only because the underlying evidence had not existed

during the interference. *Id.* at *26 ("BTG discovered new evidence concerning Novo's development efforts during the 1982-1986 time period and Novo's statements to foreign patent offices. BTG also uncovered new evidence concerning Example 1 in the 1983 PCT application and the 1984 U.S. application, namely, that it was a paper example and did not represent actual experimental results.").

Like the plaintiff in *Conservolite*, and unlike the plaintiff in *Bio-Technology General*, CGI has not and cannot establish any "compelling circumstances" that might justify permitting it to belatedly raise its inequitable conduct arguments here. The evidence upon which CGI relies to support its inequitable conduct allegations was available during the '114 Interference. Because CGI failed to present this evidence or to even mention the issue of inequitable conduct during the '114 Interference, and because the only "new" evidence upon which CGI relies consists of its misrepresentations of Dr. Chappel's deposition testimony, there is no good reason, and certainly no "compelling circumstances," that would justify permitting CGI to raise the issue here.

### 1.    CGI's reasons for raising its new arguments are not true

CGI implies that it did not raise its new inequitable conduct arguments during the '114 Interference because it "had no opportunity to compel a deposition of [Dr.] Chappel during the '114 Interference" (because "the interference rules do not provide for wide ranging discovery") and because its new allegations are based on statements by Dr. Chappel during his deposition in this action. *See* CGI Answer and Counterclaims at ¶ 18. These assertions are simply not true. CGI could have raised the inequitable conduct issue during the interference. It could have sought discovery about that issue during the interference. The documents on which it now relies were available during the interference, and there is no new testimonial evidence that supports CGI's arguments (during his deposition Dr. Chappel did not say what CGI says he did).

### 2.    CGI could have raised the inequitable conduct issue and sought discovery thereon during the '114 Interference

CGI could have raised its inequitable conduct allegations and sought discovery thereon during the '114 Interference. In an interference, parties raise issues by submitting written motions to the Board. During the '114 Interference (which was conducted in 2003 and 2004), both CGI and ARS submitted many such motions, and the Board considered those motions and the issues raised therein according to the rules set forth in 37 C.F.R. § 1.601 *et seq.* (*see* Exhibit A to Declaration of Matthew C. Nielsen ("Nielsen Decl.") submitted herewith) (these rules have since been superceded) and in the Board's Standing Order governing the interference (*see* Exhibit B to Nielsen Decl., Standing Order of September 20, 2000). Pursuant to those rules, the Board decided which of the parties' motions it would consider, and decided those motions following an oral hearing. *See* Exhibit 1 to ARS's First Amended Complaint (Board Decision of June 22, 2004 in '114 Interference).

The parties filed their "preliminary" motions for judgment within time periods prescribed by the Administrative Patent Judge ("the APJ"). *See* 37 C.F.R. § 1.633(a) (Exhibit A to Nielsen Decl.). The parties could also have filed so-called "miscellaneous" motions for judgment, such as a motion alleging inequitable conduct, outside of the prescribed periods, if the movant showed good cause for not timely filing the motion. *See* 37 C.F.R. §§ 1.635 and 1.645(b) (Exhibit A to Nielsen Decl.).

The interference rules required the parties to file and serve any evidence supporting their arguments along with the motion. *See* 37 C.F.R. § 1.639(a) (Exhibit A to Nielsen Decl.). However, if a party thought it needed additional evidence to support its motion, such as witness testimony from its opponent or a third party, the party could have filed a request to obtain that evidence, in which it had to "explain the evidence sought, what it will show, and why it is

needed." 37 C.F.R. § 1.639(f) (Exhibit A to Nielsen Decl.). If the APJ agreed that such testimony was needed to decide the motion, the APJ could "enter an order authorizing the taking of testimony and deferring a decision on the motion to final hearing." § 1.639(c) (Exhibit A to Nielsen Decl.). A party could also seek the "production of documents and things" to support a motion, and the APJ could "order additional discovery, as to matters under the control of a party within the scope of the Federal Rules of Civil Procedure, specifying the terms and conditions of such additional discovery." 37 C.F.R. § 1.687(c) (Exhibit A to Nielsen Decl.).

Consistent with the foregoing rules, section 26(g) of the Board's Standing Order specifically contemplated that a party could file a motion for judgment based on inequitable conduct, provided that the movant presented a *prima facie* case of inequitable conduct in the motion. The Standing Order further provided that the party could move for additional discovery, including deposition testimony, in order to supplement the *prima facie* case presented in the motion. *See* Exhibit B to Nielsen Decl. (Standing Order of September 20, 2000) at p. 22, § 26(g).

The interference rules and the Board's Standing Order allowed CGI to raise the issue of inequitable conduct during the '114 Interference, to request judgment against ARS on that basis, and to seek leave to procure whatever additional evidence CGI believed might be available to support its arguments (such as a deposition of Dr. Chappel). Consequently, CGI's assertion that it "had no opportunity" to take Dr. Chappel's deposition during the '114 Interference because "the rules do not provide for wide ranging discovery" is not true. *See, e.g., Dance v. Seifert*, No. 103,379, 1999 WL 33446701, at * 10 (Bd. Pat. App & Interf., October 5, 1999) ("This description of PTO practice ignores the fact that the *inter partes* nature of interference proceedings currently permits the Board to consider fraud and inequitable conduct issues raised during an interference."); *Consideration of Fraud and Inequitable Conduct in Patent*

*Interferences Cases*, 1132 Official Gazette of U.S. Patent & Trademark Office 33 (Nov. 19, 1991) ("Effective immediately, fraud and inequitable conduct issues will be considered when properly raised *inter partes* in patent interference cases."); *Interference Practice: Consideration of Fraud and Inequitable Conduct*, 1133 Official Gazette of U.S. Patent & Trademark Office 21 (Dec. 10, 1991) (same); *Tropix, Inc. v. Lumigen, Inc.*, 53 U.S.P.Q.2d 2018, 2021 (Bd. Pat. App. & Interf. 2000) ("In this case, we are inclined to authorize a preliminary motion based on inequitable conduct to be filed, if at all, no earlier than a date after a decision on preliminary motions. Accordingly, there is no need to authorize discovery or testimony on the issue of inequitable conduct at this time.").

### 3.    CGI misrepresents Dr. Chappel's testimony about his purported "best mode"

CGI alleges that Dr. Chappel committed inequitable conduct during prosecution of the '071 patent by purportedly withholding his "best mode" for practicing his claimed inventions. *See* CGI Answer and Counterclaims at ¶¶ 18-23. CGI says that Dr. Chappel's best mode for practicing his claimed inventions required the use of a "genetically altered mutant DHFR gene" (*id*. at ¶ 20), even though most of those claims do not mention or require the use of any such gene. As its sole support for this accusation, CGI says that "to conduct experiments directed to allegedly demonstrating the feasibility of the practice of the subject matter claimed in the '071 patent," Dr. Chappel used a particular "in-house mutated DHFR gene as both a selectable marker and an expressible, amplifiable gene" (*id*. at ¶ 19), and that during his deposition in this case, Dr. Chappel "testified that the use of the genetically altered mutant DHFR gene in his laboratory in connection with the work done with respect to the subject matter claimed in the '071 patent offered an advantage over the use of other commercially available non-mutated genes" (*id*. at ¶ 20).

Dr. Chappel never said any such thing. It is noteworthy that in making these accusations, CGI never quotes or cites any portion of the transcript of Dr. Chappel's deposition. In reality, during his deposition, Dr. Chappel was asked if there was a particular selectable and amplifiable marker gene that he preferred to work with. *See* Transcript of Deposition of Scott C. Chappel, Ph.D. (Exhibit C to the Nielsen Declaration submitted herewith) at p. 21, lines 11-15. Contrary to CGI's paraphrasing, Dr. Chappel actually said "I didn't prefer to work with any selectable marker -- amplifiable marker. Selectable, we had to. We used [a] dihydrofolate reductase gene." *Id*. at p. 21, lines 16-19.

CGI says that Dr. Chappel withheld his belief that this so-called "in-house" DHFR gene "conferred a commercial advantage on the user." CGI Answer and Counterclaims at ¶¶ 20 and 22. Dr. Chappel never said any such thing. The homologous recombination-mediated gene activation experiments exemplified in the '071 patent did not use a DHFR gene, or any other amplifiable gene. *See* '071 Patent, Exhibit 1 to ARS's First Amended Complaint, at, *e.g.*, col. 13, lines 58-61. Those experiments, which were the gene activation experiments Dr. Chappel's group had conducted before he filed his continuation-in-part patent application in 1990, utilized a "rat GH3 pituitary cell line." (*Id*. at, *e.g.*, col. 13, line 25 and col. 16, lines 37-47.) When asked whether the "in-house" DHFR gene could serve as an effective amplifiable gene in these "GH3" cells, Dr. Chappel testified that he didn't know. Exhibit C (Chappel Depo. Tr.) at p. 88, line 18 to p. 89, line 5.

CGI never asked Dr. Chappel anything about whether this "in-house" DHFR gene "conferred a commercial advantage on the user." The only question CGI asked Dr. Chappel related to this issue was whether that gene "provide[d] some degree of utility." Exhibit C (Chappel Depo. Tr.) at p. 90, lines 1-4. Dr. Chappel said that it did. *See id*. at lines 5-11. This is

not an admission that the use of this DHFR gene "conferred a commercial advantage on the user," and it is certainly not evidence that the use of this gene constituted Dr. Chappel's "best mode." Apparently desperate to come up with some "new" evidence that might help justify raising its inequitable conduct allegations in this Court, CGI has misrepresented Dr. Chappel's testimony.

> ### 4. The necessary evidence about the "mutant DHFR gene" was available to CGI during the '114 Interference

In its counterclaims, CGI implies that it was not aware of the "mutant DHFR gene" that it alleges was required for Dr. Chappel's "best mode" until it took Dr. Chappel's deposition in this case. That is not true. In his deposition, Dr. Chappel testified that long before he conceived the inventions claimed in the '071 patent, he and his coworkers had used a "mutant DHFR gene" as part of their experiments directed to expressing gonadotropins such as Follicle Stimulating Hormone ("FSH"). *See* Exhibit C (Chappel Depo. Tr.) at p. 32, line 9 to p. 33, line 24. Dr. Chappel testified that in those previous experiments, he and his co-workers had used standard recombinant DNA techniques, well-known in the art, to insert genes such as the FSH gene into cells. *See* Exhibit C (Chappel Depo. Tr.) at p. 30, line 15 to p. 32, line 21. In order to increase the expression of such inserted genes, Dr. Chappel and his colleagues also inserted an amplifiable DHFR gene. *Id.* The DHFR gene they used in those earlier experiments contained a mutation that altered its function. *See id.* at p. 32, line 9 to p. 33, line 24.

In its counterclaim Count II, CGI implies that it was surprised by Dr. Chappel's testimony that he had used this "mutant DHFR gene" in those earlier recombinant DNA experiments. *See* CGI Answer and Counterclaims at ¶¶ 19-20. But as CGI's counsel made clear during Dr. Chappel's deposition, CGI was already aware that Dr. Chappel's previous recombinant DNA work using that "mutant DHFR gene" was described in a patent application

filed by Dr. Chappel and his coworkers in June 1989 (U.S. Application No. 07/368,628) that

issued as U.S. Patent No. 5,240,832 on August 31, 1993 (Exhibit D to Nielsen Decl.) (the same

patent on which CGI bases one of its other accusations of inequitable conduct, as discussed

below). *See* Exhibit C (Chappel Depo. Tr.) at p. 112, lines 2-11 and p. 117, line 24 to p. 118, line

5. That '832 patent refers specifically to the DHFR gene that Dr. Chappel spoke of in his

deposition, and cites two scientific publications which describe that DHFR gene in great detail.

See Exhibit D at column 3, lines 14-20; column 12, lines 7-13. This '832 patent from 1993

listing Dr. Chappel as an inventor was obviously available to CGI during the '114 Interference in

2003 and 2004. Nothing prevented CGI from looking at the '832 patent, seeing its description of

the DHFR gene, and raising the allegation it now brings about Dr. Chappel's use of that DHFR

gene, nor from seeking discovery on that issue, as described above. Because CGI chose not to do

any of these things, it should not be permitted to raise this issue now.

### 5.    The patent application that CGI says Dr. Chappel wrongly withheld from the PTO was available during the '114 Interference

CGI alleges that during prosecution of the '071 patent, Dr. Chappel and ARS wrongly

withheld from the PTO the previously-filed '628 patent application (discussed above) that listed

Dr. Chappel as a co-inventor with two of his co-workers. *See* CGI Answer and Counterclaims at

¶¶ 24-26.

First, CGI's accusation that Dr. Chappel or ARS should have submitted this pending

application to the Patent Office during prosecution of the '071 patent is not true. As Dr. Chappel

testified during his deposition in this action, the standard recombinant DNA-related inventions

described and claimed in the '628 application and the '832 patent, upon which CGI bases this

accusation, had nothing to do with the homologous-recombination-mediated gene-activation

inventions claimed in the '071 patent. *See* Exhibit C (Chappel Depo. Tr.) at p. 115, lines 17-23

- 11 -

("This ['832] patent has nothing to do with homologous recombination or endogenous gene activation. This is explaining -- in fact, what this is explaining is taking cDNA vectors and improving expression following random integration. It's got nothing to do with homologous recombination."). Thus, neither Dr. Chappel nor ARS had any reason or duty to draw the examiner's attention to the '628 application or the '832 patent during prosecution of the '071 patent.

But even if the '628 application or the '832 patent had some relevance to the inventions claimed in the '071 patent, those documents were obviously available to CGI during the '114 Interference. The prosecution history of the '071 patent (which also issued in 1993) was also publicly available during the '114 Interference. So during the '114 Interference, CGI knew (or should have known) of the '628 application and the '832 patent, and that the '628 application and the '832 patent had not been submitted to the PTO during prosecution of the '071 patent. CGI did not need the deposition of Dr. Chappel, or any other discovery in this § 146 action, to determine what was or was not disclosed during the prosecution of the '071 patent. It simply needed to look at the publicly available prosecution history for this information. It did not need discovery to identify Dr. Chappel's other patents or to determine if they were material to the inventions claimed in the '071 patent. All of that information was publicly available.

If CGI believed that the '628 application or the '832 patent should have been submitted to the Patent Office, and that the failure to do so constituted inequitable conduct, nothing stopped CGI from raising this issue during the '114 Interference and seeking discovery thereon. Consequently, CGI should not be permitted to raise the issue here for the first time. *Velsicol Chem. Corp. v. Monsanto Co.*, 579 F.2d 1038, 1046 (7th Cir. 1978) (To trigger the exclusion of a

new issue, it is not "necessary that the evidence have been in the exclusive control and possession of [CGI], as long as it was procurable by him.").

> **6.      The Court should dismiss CGI's allegation in Count III that ARS misrepresented the contents of its patent applications to the PTO**

CGI accuses ARS of committing inequitable conduct by "deliberately misl[eading] the Examiner into believing the CIP application did not introduce new matter, or new claims, as a method of securing an allowance of the CIP application without substantive examination." CGI Answer and Counterclaims at ¶ 31. First, CGI's allegation that ARS somehow tried to convince the Examiner that Dr. Chappel's continuation-in-part application did not add any information to his original application is ludicrous. By definition, a continuation-in-part application adds information to the application from which it is derived, as counsel for CGI acknowledged during Dr. Chappel's deposition. *See* Exhibit C (Chappel Depo. Tr.) at p. 145, line 19 to p. 146, line 1 (Mr. Kelber: "A continuation-in-part application includes at least some of an earlier application, and it may include additional information, it may eliminate information that was in the original, or it may do both, add some information and remove some of the original information. That's generally referred to as a continuation in part. . . ."); *see also* Exhibit E to Nielsen Decl. (Manual of Patent Examining Procedure (MPEP), 8th Ed., Vol. 1, Rev. 3 at 200-52, §201.08 (U.S. Dept. Commerce, Patent and Trademark Office 2005)) ("A continuation-in-part is an application filed during the lifetime of an earlier non-provisional application, repeating some substantial portion or all of the earlier non-provisional application and *adding matter not disclosed* in the said earlier non-provisional application.") (citing *In re Klein*, 1930 C.D. 2, 393 O.G. 519 (Comm'r Pat. 1930)).

Second, CGI's assertion that Dr. Chappel did not intend to claim the invention recited in claim 3 of the '071 patent (*see* CGI Answer and Counterclaims at ¶ 28) ("He did not intend to

- 13 -

claim this invention.") is belied by Dr. Chappel's actual testimony at his deposition (*see* Exhibit

C (Chappel Depo. Tr.) at p. 131, lines 16-21) ("Q. When you originally filed your patent

application in 1989, you didn't intend to claim that [*i.e.*, claim 3], did you? A. I think I did intend

to claim that. Q. I'm sorry. A. I think I did intend to claim that.")

Third, CGI's assertion that Dr. Chappel's continuation-in-part application "provided, for

the first time, a claim corresponding to claim 3 of the '071 patent asserted by ARS herein" (CGI

Answer and Counterclaims at ¶ 30) is also not true. Such a claim was submitted during

prosecution of the original application, and had been allowed by the Examiner. *See* Exhibit F to

Nielsen Decl. (Amendment filed September 20, 1991) at pp. 3-4, claim 22, and Exhibit F (Notice

of Allowance issued June 11, 1992) at p. 1.

But the Court should dismiss this aspect of CGI's counterclaim for a much simpler

reason: CGI is once again improperly attempting to raise an issue in this action that it could have

raised in the '114 Interference.

As support for its argument, CGI necessarily points to Dr. Chappel's original application,

to his continuation-in-part application, and to the statements that were made during prosecution

about the content of these applications (*see* CGI Answer and Counterclaims at ¶¶ 29-31). But

each of these documents to which CGI points to support its argument are in the file history of the

'071 patent. This file history was publicly available from the time the '071 patent issued in 1993.

Thus, there can be no dispute that this evidence was available to CGI during the '114

Interference.

This kind of attempt to raise a new issue based on documents that were available during

the underlying interference was rejected in *Conservolite*, where the Federal Circuit excluded a

new issue because "Conservolite had before it Widmayer's complete application and had

- 14 -

opportunity to present its contentions" during the underlying interference. *Conservolite* at 1102. The same reasoning applies here to bar CGI's counterclaims. *See also Brunswick Corp. v. Riegel Textile Corp.*, 627 F. Supp. 147, 151-152 (N.D. Ill. 1985) ("As to Brunswick's claim that Riegel committed fraud on the Patent Office, that claim is not properly before this court. The Board did not address whether Riegel had committed the acts charged by Brunswick. . . . The evidence which [Brunswick] relies upon for his fraud allegation was known to him prior to the declaration of this interference . . . .").

Because CGI failed to present this argument based on available evidence during the '114 Interference, it should not be permitted to raise it as a counterclaim in this action. *See Velsicol Chemical Corp. v. Monsanto Corp.*, 579 F.2d 1038, 1046 (7th Cir. 1978) (excluding evidence regarding new issue where "a reasonably diligent preparation of the proponent's case before the Board would have led to the discovery of the existence of the evidence and its production.").

Courts have little sympathy for parties that fail to take discovery with due diligence. For example, the Federal Circuit has stated, "[w]hen a party fails to secure discoverable evidence due to his own lack of diligence, it is not an abuse of discretion for the trial court to refuse to grant a continuance to obtain such information." *Springs Window Fashions, LP v. Novo Industries, L.P.*, 323 F.3d 989, 997 (Fed. Cir. 2003). *See also Insituform Gulf South, Inc. v. Cat Contracting, Inc.*, 113 F.3d 1258, 1997 WL 244328 at **3 (Fed. Cir. 1997) (unpublished) ("Inliner had not exercised due diligence and had not reasonably explained why it did not conduct sufficient investigation prior to trial, especially in light of the fact that both Ott and Rust were referenced in pre-trial depositions as knowledgeable persons."); *Seed Lighting Co. v. Home Depot*, Case No. 04-2291, 2005 WL 1861852 at *10-11 (N.D. Cal. August 3, 2005) (denying plaintiff leave to file supplemental response to motion for summary judgment, in part because plaintiff "failed to

demonstrate why it was not able to obtain the relevant discovery at an earlier date through the exercise of diligence.").

All of the actual evidence (as opposed to CGI's mischaracterizations of Dr. Chappel's deposition testimony) on which CGI now relies to support its accusations of inequitable conduct was available to CGI during the '114 Interference, so there is no excuse for CGI to not to have brought a motion for judgment based on this issue during the '114 Interference. *See Velsicol Chemical* at 1048 ("Velsicol's belief at the time that their testimony was not needed does not justify the failure.").

Taken in total, CGI's excuses for why it failed to raise its newly-minted inequitable conduct arguments while it was contesting the '114 Interference fail to rise to the level of "compelling circumstances" required by the Federal Circuit in cases like *Estee Lauder*. The documents on which CGI now relies were obviously available during the interference, CGI certainly knew of Dr. Chappel, the sole inventor listed on the '071 patent, during the interference, and, as discussed above, CGI had the opportunity to seek to depose him. Having failed to do any of these things, CGI has waived any right it may have had to raise the issue of inequitable conduct, and is estopped from raising it here. Accordingly, the Court should dismiss Counts II and III in CGI's Answer and Counterclaims.

**B.      The Court should strike CGI's antitrust allegation in counterclaim count IV**

CGI alleges in its counterclaim count IV that ARS is attempting to enforce a patent secured by inequitable conduct in violation of the antitrust laws. *See* CGI Answer and Counterclaims at ¶ 43. This accusation is frivolous and should be stricken.

CGI asserts that "enforcement of a patent secured by inequitable conduct is recognized as an anti-trust violation." (CGI Answer and Counterclaims at ¶ 43.) In actuality, inequitable conduct is insufficient to support a finding of antitrust liability. Rather, antitrust liability requires

proof that a patent being asserted in an infringement action was obtained through a knowing and willful fraud on the Patent Office. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070 (Fed. Cir. 1998) ("A patentee who brings an infringement suit may be subject to antitrust liability . . . if the alleged infringer (the antitrust plaintiff) proves (1) that the asserted patent was obtained through ***knowing and willful fraud*** . . . .") (emphasis added).

Here, CGI fails to adequately plead fraud, which of course must be pled with particularity. *See* Fed. R. Civ. P. 9(b). Further, CGI fails to allege the additional elements of an antitrust violation, such as the definition of the market. *See Nobelpharma*, 141 F.3d at 1070 (citing *Walker Process*, 382 U.S. at 178). In short, CGI's attempt to plead an antitrust violation falls so woefully short of the requirements that it is fatally defective and should be stricken.

Even if the Court were to consider the antitrust claim, CGI lacks standing to bring that claim. CGI alleges that ARS has expanded this § 146 action by asserting claims of patent infringement. But ARS's patent infringement claims are directed to TKT, not to CGI. *See* Count II in ARS's First Amended Complaint. CGI is forced to allege that ARS's lawsuit against TKT, in which it asserts its legitimate rights under certain claims of the '071 patent (claims already reviewed and found patentable by the Board despite CGI's best efforts), has increased the cost of this § 146 action. But in the action against CGI, ARS is not seeking to "enforce" the '071 patent against CGI; ARS is seeking a reversal of the Board's decision regarding patentability of certain claims in the '071 patent (and in CGI's '390 application). The action against CGI cannot constitute an antitrust violation. *See Associated General Contractors Of California, Inc. v. California State Council Of Carpenters*, 459 U.S. 519, 528 (1983) ("Even though coercion directed by defendants at third parties in order to restrain the trade… may have been unlawful, it

does not, of course, necessarily follow that still another party… is a person injured by reason of a violation of the antitrust laws.").

In the *Associated General Contractors* case, the Supreme Court outlined several factors courts should use to determine if a complainant has standing to bring an antitrust suit, including: the nature of the plaintiff's alleged injury, *i.e.*, whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); the directness with which the alleged market restraint caused the asserted injury; the speculative nature of the damages; and the risk of duplicative recovery or complex apportionment of damages. *See Sullivan v. Tagliabue*, 25 F.3d 43, 50 (1st Cir. 1994).

The "injury" alleged by CGI is not an antitrust injury. The First Circuit extends antitrust standing to parties who can establish that their injury was a "necessary step" and the "means" employed by the conspirators to achieve their illegal ends, regardless of the parties' direct market participation. *Sullivan v. Tagliabue*, 25 F.3d 43, 50 (1st Cir. 1994). This lawful review of a decision by the Board is completely unnecessary for and unrelated to what CGI alleges is anticompetitive behavior: ARS filing its lawsuit against TKT.

The alleged market restraint, the lawsuit against TKT, has nothing to do with any purported increase in the costs of this litigation. Further, there is a far more direct complainant if there was to be an antitrust suit: TKT, the defendant in the lawsuit. "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party... to perform the office of a private attorney general." *Associated General Contractors Of California, Inc. v. California State Council Of Carpenters*, 459 U.S. 519, 542 (1983).

CGI has failed to properly plead an actual antitrust violation, and in any event it has no standing to bring such an action. Paragraph 43 of its Answer and Counterclaims, alleging an antitrust violation, should therefore be stricken from its counterclaims.

### III.    Conclusion

In its counterclaim counts II and III, CGI attempts to raise issues in this § 146 action that it could have raised, but did not raise, in the '114 Interference from which this appeal is taken, based on evidence that was available during that interference. Under controlling Federal Circuit law, that is not permitted, and CGI's counterclaim counts II and III should therefore be dismissed. CGI has also included a frivolous allegation of antitrust liability in ¶ 43 of its counterclaim count IV. Because this allegation is inadequately pleaded and because CGI lacks standing to bring it, this paragraph (and CGI's request for trebled costs and attorneys' fees in section H of its Requests for Relief) should be stricken from CGI's Answer and Counterclaims.

Respectfully submitted,


__/s/ Kevin M. Flowers_____

Dated: February 23, 2006          NIXON PEABODY LLP
Fred A. Kelly, Jr.
BBO No. 544046
100 Summer Street
Boston, MA 02110
Tel: (617) 345-1000
Fax: (617) 345-1300

MARSHALL, GERSTEIN & BORUN LLP
Kevin M. Flowers (*pro hac vice*)
Matthew C. Nielsen (*pro hac vice*)
6300 Sears Tower
233 S. Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448

Attorneys for Plaintiff
Applied Research Systems ARS Holding, N.V