Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

Page 1

Volume I, Pages 1-179

Exhibits: 2079-2087

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Cell Genesys, Inc.

          Plaintiff

vs.                        Docket No. 04-01407 (JDB)

Applied Research Systems

ARS Holding N.V.

          Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF SCOTT C. CHAPPEL, PH.D.

Thursday, January 19, 2006, 9:00 a.m.

Donnelly, Conroy & Gelhaar, LLP -- Conference Center

One Beacon Street

Boston, Massachusetts


-------Reporter:  Joan M. Cassidy, RPR, CRR-------

jcassidy@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  Fax 617.728.4403



FARMER ARSENAULT BROCK LLC

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

Page 18

1    Q.  And the CHO cells were such a host?
2    A.  Yes.
3    Q.  And in fact, the CHO cell lines had been
4  established as good secretory lines prior to --
5  prior to your selection of them in this project,
6  right?
7    A.  Yes.
8    Q.  Did you also develop in the course of this
9  work supported by Serono a specific vector system
10 for the CHO cells?
11      MR. FLOWERS:  Objection, lack of
12 foundation.
13   A.  Each laboratory around the world or even
14 within Integrated Genetics developed their own
15 expression plasmid depending upon what it was, what
16 project they were working on and what their needs
17 were to accomplish the goal.  So we, our little
18 group, built our own expression system.  And in
19 fact, we built many different expression systems --
20 expression plasmids, sorry -- because it wasn't
21 known at the time how to create a system that would
22 be optimally expressing particular protein, in this
23 case a dimeric protein, so we tried many different
24 methods.

Page 19

1    Q.  *Did you, in this group that you've
2  referred to, ultimately develop a framework for a
3  plasmid that you thought was reasonably optimal for
4  working with the cells that you had selected?
5      MR. FLOWERS:  Could you read that
6  question back.
7      *(Question read.)
8      MR. FLOWERS:  Objection, vague and
9  ambiguous.
10   A.  We developed an expression vector that was
11 superior to the BPV C127 expression system.
12   Q.  Do you recall today what the elements of
13 that expression vector were?
14   A.  In general terms, I think that the
15 contribution that we made had to do with converting
16 the cDNAs that we used into partial genomic clones.
17 That was Feature No. 1.  Feature No. 2 was that the
18 two different subunits were on separate plasmids
19 instead of a single plasmid.  And Feature No. 3 was
20 that each separate expression of plasmid had a
21 separate selectable and amplifiable marker.  Those
22 were the three features that provided improved
23 expression of gonadotropins compared to the BPV C127
24 system.

Page 20

1    Q.  Now, these three elements or specific
2  aspects of improvement that you have identified,
3  those three elements had been the subject of
4  publications in the art for other proteins prior to
5  your selection of those features; isn't that right?
6    A.  Certainly selectable markers were known.
7  I'm trying to recall whether anyone knew prior to
8  19 -- anyone had published prior to 1989 that
9  partial genomic sequences improved expression of
10 gonadotropins.  There were not that many people
11 working in that area, so I don't know.  The idea of
12 putting -- creating two separate expression vectors
13 and cotransfecting.  Also, there weren't that many
14 people who were working on -- using recombinant
15 technology to express dimeric glycoproteins in a
16 mammalian system, but maybe, maybe there were.
17   Q.  Antibodies are multimeric proteins, aren't
18 they?
19   A.  Yes, they are.
20   Q.  And those had been expressed recombinantly
21 prior to 1989, hadn't they?
22   A.  Certainly making hybridomas was known at
23 that time.  Whether -- the details of how antibodies
24 are -- were produced by recombinant DNA technology

Page 21

1  and when that occurred, I don't know.
2    Q.  You mentioned that each vector had a
3  selectifiable -- selectable, sorry, and amplifiable
4  gene.  Then you indicated that -- as a marker.  And
5  then you indicated that selectable markers were
6  known previously, right?
7    A.  Yes.
8    Q.  Were selectable and amplifiable marker
9  genes known previously for this kind of work?
10   A.  Yes.
11   Q.  In the plasmids -- in the vectors, sorry,
12 that you optimized for the work in the CHO cells for
13 the expression of gonadotropins, was there a
14 particular selectable and amplifiable marker gene
15 that you preferred to work with?
16   A.  *There was one that we did work with.  I
17 didn't prefer to work with any selectable marker --
18 amplifiable marker.  Selectable, we had to.  We used
19 dihydrofolate reductase gene.
20      MR. KELBER:  Can I hear that answer
21 back.
22      *(Answer read.)
23   Q.  Why did you not prefer to work with any
24 amplifiable gene?

FARMER ARSENAULT BROCK LLC

7df5ca20-b83f-4cd3-9c87-e652585792b1

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

Page 30

1  taken up the DNA, but you don't amplify the DNA --
2  the DNA amplification is a much longer process.
3      Q. I was going to ask you that because the
4  exposure to MTX using DHFR to -- as a selection
5  marker only is limited in time so that no
6  amplification occurs; is that right?
7      A. Yes.
8      Q. Did you continue to work with the gene
9  plus -- gene plus DHFR plasmid after joining Serono?
10     A. That was part of our genetic armamentarium.
11     Q. Okay. Did you ever overcome the problems
12  that you identified in using DHFR as an amplifiable
13  as opposed to a selection marker?
14     A. Could you repeat that.
15     Q. Well, you identified for me some problems
16  using DHFR in an amplifiable context as opposed to
17  the selectable marker, and you described for me how
18  to -- how you used DHFR as a selectable marker
19  without amplification. During the work you did at
20  Serono before leaving for Diacrin, did you work with
21  DHFR in the context of it being an amplifiable
22  selectable marker? Did you deliberately use it to
23  amplify the gene?
24     A. Yes.

Page 31

1      Q. And did that work successfully result in
2  increasing levels of expression of whatever was
3  amplified with the DHFR?
4      A. Increase prior to --
5      Q. Let me try and break it down because I'm
6  probably -- most usually get it wrong from your
7  answers. But as I understand it, you transfect the
8  cell with a gene that is accompanied by the gene for
9  DHFR, and each gene has its promoter. You can
10  select for the uptake of that vector by brief
11  passage through an MTX medium without inducing
12  amplification.
13     A. Correct.
14     Q. And at that point if the uptake has been a
15  successful -- has been achieved in such a way that
16  the gene of interest is being produced, there will
17  be a given expression level of that gene. Call it
18  Expression Level 1. Did you subsequently amplify
19  DHFR and whatever associated with it to get a higher
20  expression level than the Expression Level 1?
21     A. Yes.
22     Q. Sorry for the long question, Doctor. With
23  what types of proteins were you successful in that
24  endeavor?

Page 32

1      A. FSH, LH.
2      Q. Did you ever work with Art Skoultchi at
3  Integrated Genetics?
4      A. No.
5      Q. You were aware he was there at the time you
6  were there?
7      A. He was a member of the scientific advisory
8  board.
9      Q. In addition to FSH and LH, any other
10  proteins that you successfully increased the
11  expression level through amplification of DHFR and
12  accordingly the gonadotropin?
13         MR. FLOWERS: Objection, vague and
14  ambiguous as to the time frame. Are you asking --
15     Q. During your work prior to leaving Serono
16  for Diacrin.
17     A. No.
18     Q. But the two events, FSH and LH protein
19  expression increases through amplification, those
20  were prior to your departure for Diacrin?
21     A. Yes.
22     Q. We talked a little bit about CHO cells.
23  Did you use DHFR as a selectable marker for any
24  other types of cells? Again, let me confine the

Page 33

1  time period to prior to the time you left for
2  Diacrin.
3      A. DHFR -- the DHFR gene was used primarily
4  for the CHO cell expression work, but -- and it was
5  used also -- you asked what other cell types?
6      Q. Yes, sir.
7      A. Besides CHO it was used in the GH3 cell work
8  for endogenous gene activation studies.
9      Q. Were the CHO cells that were used for DHFR
10  deficient strains?
11     A. They were not.
12     Q. It would have made life easier if they
13  were, wouldn't it?
14     A. Well, that's what some people thought;
15  however, the DHFR -- as I recall, the DHFR gene that
16  we used had been genetically modified so that it
17  was -- the protein and the enzyme that was created
18  was less sensitive to methotrexate, so cells that
19  hadn't taken up our gene would only have the
20  endogenous gene which was very sensitive to
21  methotrexate. So there was a -- sort of a genetic
22  insulation between the endogenous -- there were at
23  the time DHFR- CHO cell lines that we could have
24  used but we didn't.

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

Page 86

1    Q.  How did you and your laboratory ultimately
2  handle the problem of false positives that is
3  referred to in the first paragraph on the first --
4  on the page bearing Production No. 1491?
5    A.  I believe it was handled by what's referred
6  to on the second page, and that is to depend more on
7  the selection system.
8    Q.  Did you work in connection with GF 4300
9  with a dominant amplifiable marker other than DHFR?
10  And when I say "you" in this context, Doctor, I mean
11  your laboratory.  I appreciate you didn't do the
12  laboratory work.
13    A.  To the best of my knowledge, no.
14    Q.  Do you see where it indicates that -- well,
15  the first two sentences under "Selection of a
16  dominant amplifiable marker gene" -- summarizing,
17  that this portion of the project has been a source
18  of some frustration?  Does that reflect your
19  recollection of events as well?
20    A.  Scientific research is 95 percent
21  frustration.
22    Q.  This one was particularly frustrating to
23  whoever wrote this; is that also your memory?
24    A.  No.

Page 87

1    Q.  You don't recall there being a particular
2  problem with the use -- the selection of a dominant
3  amplifiable marker gene?
4    A.  There were problems each step along the way
5  as in any other research project.
6    Q.  Is it your practice in the laboratory
7  always to turn to Celltech for assistance?
8    A.  No.
9    Q.  Is it your practice to turn to NIH for
10  assistance?
11    A.  The scientific community, to -- these are
12  making requests to receive other selectable markers,
13  and it's easier to --
14    Q.  Well, not just selectable, but amplifiable
15  as well, right?
16    A.  Correct.
17    Q.  And that was because the DHFR that was
18  being used in your laboratory was proving
19  intractable; is that right?
20    A.  No.
21    Q.  Why look elsewhere?
22    A.  We tried many different things.
23    Q.  Did you try using many different
24  amplifiable and selectable markers?

Page 88

1    A.  We tried obtaining others.
2    Q.  You tried obtaining others when the
3  specific DHFR marker that you were working with
4  proved intractable in this particular project,
5  right?
6    A.  If you look on the second page, the
7  sentence after "We therefore were forced to
8  discontinue our consideration of the glutamine
9  synthetase systems," it says, "The DHFR system,
10  which is already in-house, is being tested for use
11  in GH3 cells by the tissue culture group.  The
12  results are not encouraging."  That means that
13  projects were ongoing, we hadn't come to any
14  conclusion.
15    Q.  "The results are not encouraging" is not a
16  positive progress report, is it?
17    A.  No.
18    Q.  Did you know in 1991 whether the DHFR
19  marker that you were working with would work in GH3
20  cells?
21    A.  I do recall there were experiments to show
22  that it did work, it was effective in selecting
23  cells in -- GH3 cells.  The exact date I don't
24  recall.

Page 89

1    Q.  Was it effective in amplifying DNA in the
2  GH3 cells?
3    A.  I don't know.
4    Q.  You don't remember seeing that?
5    A.  No.
6    Q.  If that were to have been done in your
7  laboratory, you would have seen it, though?
8    A.  Yes.
9    Q.  In fact, that's something you wanted to
10  happen as part of this project, right, amplification
11  of the DNA in GH3 cells through the use of DHFR?
12    A.  Yes.
13    Q.  The DHFR that is referred to on the second
14  page of Exhibit 2082 as in-house, I think is the
15  language, already in-house, is that the one that you
16  described for me before that has the mutation in the
17  enzyme?
18    A.  It has mutation in the DNA.
19    Q.  And I apologize for retreading some ground,
20  but in this context of using it as a selectable
21  amplifiable marker, why use that particular DHFR
22  with respect to that mutation?
23    A.  Because the host cells contained an
24  endogenous copy of wild type DHFR.

23  (Pages 86 to 89)

7df5ca20-b83f-4cd3-9c87-e652585792b1

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

Page 90

1    Q. If you could expand your answer. Why did
2  having the gene for DHFR with the mutation provide
3  some degree of utility because the host cell had an
4  endogenous copy of DHFR?
5    A. Yes. I lectured on that earlier today, and
6  I'll try and be more clear. The endogenous DHFR is
7  more sensitive to methotrexate than the engineered
8  version of DHFR. Therefore, you don't have to find
9  cells that are deficient in DHFR; you can select
10  between those that have taken up your copy of DHFR
11  in the presence of having an endogenous enzyme.
12    Q. Would the endogenous DHFR gene work as an
13  amplifiable marker in GH3 cells, perhaps not a
14  dominant one, but an amplifiable marker nonetheless?
15    A. Are you asking, the DHFR that is part of
16  the normal genome of a GH3 cell, could you amplify
17  that gene?
18    Q. Let's go with that.
19    A. I don't know.
20    Q. You needed the distinct form, the form with
21  the mutation, in order to be certain of that?
22    A. No.
23    Q. Could you use the mutated form to be
24  amplified -- amplifiable, sorry?

Page 91

1    A. That's what we were doing.
2    Q. Yes. Was it successful?
3    A. Were we successful in demonstrating that
4  you could amplify the transgene version of DHFR in
5  the presence of wild type endogenous DHFR? Yes.
6    Q. Were you able to amplify the gene of
7  interest through that technique?
8    A. Yes.
9    Q. And were you able to obtain an increase in
10  protein expression through that amplification?
11    A. Yes.
12    Q. What was the protein that you expressed in
13  that way?
14    A. FSH.
15    Q. Did you try the same thing with TSH?
16    A. No.
17    Q. Did you see any documents at any time in
18  reviewing for your -- reviewing with your attorneys
19  for this deposition some sort of documentation that
20  reflected your success with FSH in amplification of
21  the gene encoding the FSH subunit?
22    A. No.
23    MR. KELBER: Has that been produced
24  counsel? The reason I ask is in the documents that

Page 92

1  you just gave us just yesterday, which appear to be
2  relevant, you've cut out the FSH part, which is GF
3  14 -- 4493. Are you taking the position that --
4    MR. FLOWERS: We produced the documents
5  that we believe are potentially relevant to the
6  issues in this case.
7    A. May I make a comment?
8    Q. Yes.
9    A. This is the receptor. This is not FSH.
10  This is FSH receptor.
11    Q. No, I understand that. Would the work that
12  you did in successfully demonstrating FSH, the
13  subunit's amplification and increased protein
14  expression, if all that we got were reports on GF
15  4300, would you expect it to be in there, a report
16  on the increased protein production and
17  amplification of the FSH subunit?
18    A. Would I -- I don't understand the question.
19    Q. Well, you achieved the desired result of
20  increasing protein production simply by
21  amplification of the mutant DHFR gene with respect
22  to FSH, right?
23    A. Yes.
24    Q. You didn't -- in connection with that, you

Page 93

1  didn't insert a promoter for the FSH subunit itself,
2  right? It was just the DHFR gene?
3    A. No, that's not correct.
4    Q. Oh, I'm sorry, my mistake. So that was
5  with a promoter for FSH and a promoter for DHFR and
6  the DHFR gene; is that right?
7    A. Yes.
8    Q. But you didn't add another FSH gene; it was
9  the promoter plus the DHFR and the DHFR promoter,
10  right?
11    MR. FLOWERS: Sorry. Could you repeat
12  that?
13    Q. In the plasmid that you used to achieve
14  this amplification of the FSH gene and therefore the
15  production, there was a promoter for FSH, there was
16  a promoter for DHFR and DHFR, correct?
17    A. Correct, and a gene for FSH.
18    Q. So you inserted a gene for FSH as well?
19    A. Yes.
20    Q. Is that endogenous activation?
21    A. No.
22    Q. Ah.
23    MR. FLOWERS: I wondered why you were
24  spending time on this.

FARMER ARSENAULT BROCK LLC

7df5ca20-b83f-4cd3-9c87-e652585792b1

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

Page 110

1    Q. Was there, to the best of your knowledge, a
2  project commissioned to determine whether protein
3  was produced?
4    A. No.
5    Q. Prior to the time that you arrived at
6  Serono, you had developed an assay to detect the
7  presence of the protein TSH beta subunit in -- or
8  obtained from transfected cells, right?
9    A. No.
10    Q. You didn't have an assay for doing that?
11    A. For a TSH beta subunit?  No.
12    Q. For THS?
13    A. TSH.
14    Q. Sorry, TSH.
15    A. Yes.
16    Q. You did have an assay?
17    A. Yes.
18    Q. Would it have been difficult to use that
19  assay in the context of the work you did on GF 4300
20  had you been interested in doing that?
21    A. Would it have been difficult.  No, but it
22  would have been a waste of time.
23    Q. Why is that?
24    A. Because the TSH assay that's used only

Page 111

1  recognizes dimer; and in fact, the TSH beta subunit
2  is not expressed by itself.  Would it have been
3  difficult?  No.
4    Q. The experiment that you performed with FSH
5  that we discussed a little bit ago where you also
6  practiced amplification -- scratch that.  Why select
7  GH3 cells for your work -- I'm sorry -- for your
8  work in connection with GF 4300?
9    A. The reason was that we already had all of
10  the genetic tools and the laboratory methods to
11  clone and express TSH.  That was a program that was
12  ongoing.  And so the goal of the project was not
13  necessarily -- the goal of the project really had
14  nothing specifically to do with TSH -- mouse TSH or
15  rat TSH, we didn't care -- but we wanted to activate
16  an endogenous gene.  We had all the tools for TSH.
17        And in the strategy to identify and
18  clone human TSH, we -- the sequence was known for
19  rat, so we first got the rat clone, then used that
20  to get a human clone, again for a project having
21  nothing to do with this.  So we had all the rat
22  tools.  And we knew from the literature, and we
23  found out ourselves, that TSH was nonexpressed in
24  rat GH3 cells, GH3 cells available from ATCC, so

Page 112

1  that's how we selected those.
2    MR. KELBER:  Would you mark this 2084.
3    (Marked, Exhibit 2084, U.S. Patent
4  5,240,832.)
5    Q. Dr. Chappel, I think you are holding before
6  you Exhibit 2084, which is U.S. Patent 5,240,832; is
7  that right?
8    A. (Witness reviews document.) Yes.
9    Q. And you are one of the coinventors named in
10  that patent, right?
11    A. Yes.
12    Q. Does this patent reflect -- I think you
13  referred to moments ago that you had all the genetic
14  tools for the cloning expression of TSH.  Does this
15  patent reflect those genetic tools?  Does it reflect
16  a discussion of them?
17    A. (Witness reviews document.) The reason that
18  I am looking so carefully at this is because of the
19  fact that this describes cloning expression of FSH,
20  LH, and TSH, but this is human TSH; so the tools
21  that were used for Green Form 4300 were rat tools.
22  We used rat tools to get to this, but this -- your
23  question was, was this -- did this patent
24  specifically provide all of the tools for Green Form

Page 113

1  4300, as I understand it; and so no, it doesn't, but
2  those tools were used for the creation of this work.
3    Q. The tools that were later used in the
4  context of the GF 4300 were also used to arrive at
5  the subject matter of Exhibit 2084 as far as it goes
6  to TSH?
7    A. Yes.
8    Q. Other than -- and I'm not discounting it as
9  unimportant.  But other than the change from human
10  to rat TSH, is there any -- do the procedures --
11  strike that.  What else would be different, as far
12  as cloning and expression of TSH, other than the
13  difference between rat and human that you referred
14  to earlier and what is reflected in 2084?
15    MR. FLOWERS:  Objection, vague and
16  ambiguous.
17    Q. What you used in GF 4300 was rat?
18    A. Yes.
19    Q. And one of the reasons for picking TSH and
20  GH3 cells was that you already had the genetic tools
21  to clone and express TSH?
22    A. Yes.
23    Q. Other than changing the sequence, rat to
24  human or human to rat, whichever, did the rest of

29  (Pages 110 to 113)

7df5ca20-b83f-4cd3-9c87-e652585792b1

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

Page 114

1  the genetic tools for cloning and expressing TSH
2  beta remain the same for GF 4300 and the '832
3  patent?
4      A.  Genetic tools, yes.
5      Q.  Would it have made a difference in
6  providing satisfactory evidence, in your opinion, of
7  the activation of a -- strike that.  You selected
8  GH3 cells because you were aware from the literature
9  confirmed by your own work that they did not express
10 TSH beta, correct?
11     A.  Correct.
12     Q.  If a similar -- if a cell was available to
13 work with that was similarly silent with respect to
14 human TSH, so a human cell was available, would it
15 have been suitable for use in the same way that you
16 used GH3 using human TSH beta?
17     A.  Yes.
18     Q.  Other than an available cell line with a
19 silent TSH beta gene and the use of homologous
20 recombination targeting rather than random
21 integration, does the '832 patent provide the
22 experimenter all you need to know to achieve gene
23 activation of TSH?
24         MR. FLOWERS:  Having just been presented

Page 115

1  with the document, I caution the witness not to
2  speculate.
3      A.  Provide you all you need to know?
4      Q.  What else would you need to know, Doctor?
5  I mean, you're not speculating.  You are the
6  inventor of gene activation for Serono using TSH.
7  You are the inventor for Genzyme, the predecessor
8  company, for the expression -- cloning and
9  expression of TSH in random integration.
10         Other than knowing, recognizing the
11 utility of random -- sorry -- of homologous
12 recombination for targeting instead of integrating
13 the entire exogenous gene, what would you need to
14 know in addition to the '832 patent disclosure to do
15 the work embraced in GF 4300?
16         MR. FLOWERS:  Same objection.
17     A.  This patent has nothing to do with
18 homologous recombination or endogenous gene
19 activation.  This is explaining -- in fact, what
20 this is explaining is taking cDNA vectors and
21 improving expression following random integration.
22 It's got nothing to do with homologous
23 recombination.
24     Q.  I understand that, Doctor, but it's got all

Page 116

1  the genetic tools necessary to clone and express TSH
2  beta of some mammalian species, right?
3         MR. FLOWERS:  Objection to the question
4  as asked and answered.
5      A.  It doesn't.
6      Q.  What's missing?
7      A.  In terms of tools, the tools that were
8  generated here do not include the targeting
9  sequence, so they're not all included here.
10     Q.  I'm sorry, I didn't hear you.
11     A.  So they're not all included.
12     Q.  Okay.  Anything else, sir?
13         (Pause.)
14     Q.  Anything else?
15     A.  Again, I think I'm having trouble
16 understanding what the -- what your question is.
17     Q.  Let me ask you to turn to Figure 2 of
18 Exhibit 2084, the '832 patent.  Figure 2, '832.
19 That vector that's there, because there are some
20 options, who developed that?
21         MR. FLOWERS:  Objection, vague and
22 ambiguous as to the word "developed."
23     Q.  Who invented it?
24     A.  I don't know.

Page 117

1      Q.  Are you confident it was developed by one
2  of Kelton, Nugent, and Chappel?
3      A.  It was made by Kelton, Nugent, or Chappel.
4  Invented?  This pML is a commercially available
5  backbone vector.  Metallothionein promoter is known.
6  Cloning site is, you know, potential space for
7  something.  SV40 promoters, origins, or replication,
8  poly (A) sequences, those were all used routinely at
9  Integrated Genetics.  They weren't invented.
10     Q.  And the use of DHFR ODC or tPA?  Do you see
11 the asterisk at the bottom?
12     A.  Yes.
13     Q.  That was routine as well?
14     A.  Again, tPA is tissue plasminogen activator
15 that is used as a marker.  DHFR, ODC are selectable
16 markers or amplifiable markers.
17     Q.  And that all was customary and usual at
18 Integrated Genetics, the use of any one of those as
19 a selectable marker?
20     A.  They were all available.  They weren't used
21 customarily.
22     Q.  Was DHFR customary?
23     A.  It was used, yes.
24     Q.  In the work that you did that is reflected

30  (Pages 114 to 117)

7df5ca20-b83f-4cd3-9c87-e652585792b1

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

Page 118

1  in the '832 patent together with Kelton and Nugent,
2  did you use the same mutated DHFR that showed a
3  lower resistance to MTX -- I'm sorry, that showed
4  the reduced MTX influence?
5      A.  Yes.
6      Q.  Did you tell the Patent Office about the
7  '832 patent while you were filing for your own
8  application on homologous recombination?
9      A.  Did I?
10     Q.  Yes, sir.
11     A.  No.
12         MR. KELBER:  Let's take just a short
13 break, a couple minutes.  Is that okay?
14         THE WITNESS:  Sure.
15         MR. KELBER:  We'll go off the record.
16         (Recess.)
17 BY MR. KELBER:
18     Q.  With a cell line having the variability of
19 GH3 cells, how, in terms of -- I'm sorry -- how do
20 you confirm that you're avoiding false positives,
21 genomic DNA or some type of phenotype change in the
22 clones that you pull off in -- or that you did pull
23 off in GF 4300?
24         (Pause.)

Page 119

1      Q.  Let me try it a different way.  Isn't it
2  necessary to test the subclones to be certain you
3  are not seeing a change in the GH3 cell itself
4  rather than something due to the activation, if you
5  are working with a TSH beta?
6      A.  First, I'm not sure what you mean by
7  variability in the GH3 cells.  What do you mean by
8  "variability"?
9      Q.  Let me try and do that one.  You mentioned
10 that you looked at the literature for GH3 and you --
11 they were available from the ATCC, right?
12     A.  Yes.
13     Q.  In looking at that, you undoubtedly noticed
14 that the chromosome counts for those cells were all
15 over the board, up to as high as 73, right?
16     A.  I didn't know that.
17     Q.  Prior to making the decision on GH3 cells,
18 did you have anybody look at the stability of those
19 cells?
20     A.  Genetic stability?
21     Q.  Yes, sir.
22     A.  No.
23     Q.  How about phenotypic stability?
24     A.  Phenotype could be anything.  I don't know

Page 120

1  what you mean.
2      Q.  Well, it was important to you in the
3  context of TSH beta, right?  Wouldn't the lack of
4  expression of mRNA --
5      A.  Routinely what was done was when a clone --
6  when a cell line came in from ATCC or any source, it
7  was subcloned by limiting dilution, and we created
8  our stock, and we did all the experiments on
9  those -- on that stock.  So we were not concerned
10 with any kind of variation because we were dealing
11 with a clone that was expanded and then frozen down.
12     Q.  So you would grow up a single colony from
13 whatever came in, then expand that single colony,
14 and freeze it down to assure yourself of a
15 constant stock?
16     A.  Yes, for several reasons, not just to
17 assure ourselves of constant stock, but also the big
18 concern, and one of the other reasons that we used
19 GH3, was concern about importing cells that harbored
20 an infectious agent, because we were dealing with
21 lots of cells.  So there was a lot of concern,
22 especially with human cell lines, because they
23 weren't readily available.  So that was one of the
24 reasons we picked GH3.

Page 121

1          So when we'd get the culture from ATCC,
2  those are grown and then cloned by limiting
3  dilution, picking several subclones, looking for
4  growth characteristics and other -- whatever
5  phenotype that we were particularly looking for,
6  expanding up the population, and then freezing those
7  down; and that becomes the master cell bank and
8  working cell bank.
9      Q.  Would there be -- would that work be
10 reflected in the context of these particular GH3
11 cells in Serono notebooks?
12     A.  I'm boring you with these details.  There
13 is a -- there was a laboratory within Serono that
14 was so-called -- it was like an exploratory
15 laboratory where any new cell lines that came in
16 were -- went into this laboratory.  They were tested
17 for infection, for sterility, and all the other
18 tests we did routinely before they went back into
19 the laboratories.
20          So this was not part of real exploratory
21 research; it was sort of a -- like a facility that
22 all incoming cells, tissues, went into.  And this
23 was a routine thing, sort of like making solutions.
24 There was an SOP -- there may have been an SOP, but

31  (Pages 118 to 121)

7df5ca20-b83f-4cd3-9c87-e652585792b1

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

Page 130

1 gene, right?
2        MR. FLOWERS:  Asked and answered.
3     Q.  To change the expression of -- let me get
4 the exact language.  Let me withdraw that.
5        In order to modify the expression
6 characteristics of a predetermined gene the way you
7 defined that in the '071 patent, you can
8 successfully do that by targeting for homologous
9 recombination that predetermined gene with an
10 expressible amplifiable gene, of which DHFR is an
11 example, and nothing more, right?
12        MR. FLOWERS:  Asked and answered.
13        THE WITNESS:  I'm sorry?
14        MR. FLOWERS:  Asked and answered,
15 objection.
16     A.  Amplifiable -- expressible amplifiable gene
17 and a DNA targeting sequence to modify the
18 expression of an endogenous gene, yes.
19     Q.  And DHFR is an example of an expressible
20 and amplifiable gene, right?
21     A.  Yes.
22     Q.  And isn't that the thing you told me you'd
23 need to see data on to see if it worked just a
24 little bit ago?

Page 131

1        MR. FLOWERS:  Objection to the extent it
2 mischaracterizes previous testimony.
3        (Pause.)
4     Q.  Isn't that what you told me you'd need to
5 see data on to be convinced that it worked?
6        MR. FLOWERS:  Same objection.
7     A.  Yes.
8     Q.  And isn't that the thing you told me you
9 had never seen in the literature, a report of
10 successful increase of expression using just that
11 vector?
12     A.  Yes.
13     Q.  And you never intended to claim just that
14 as your invention, did you?
15     A.  I don't understand.  "Just that"?
16     Q.  When you originally filed your patent
17 application in 1989, you didn't intend to claim
18 that, did you?
19     A.  I think I did intend to claim that.
20     Q.  I'm sorry.
21     A.  I think I did intend to claim that.
22     Q.  Let me hand you that application.
23        MR. KELBER:  Can we mark this as 2085.
24        (Marked, Exhibit 2085, '89 patent

Page 132

1 application, Bates Nos. ARS 000001-000041.)
2     Q.  Take your time to look at 2085.
3     A.  (Witness reviews document.)
4     Q.  Is that your '89 application, sir?
5     A.  Yes.
6     Q.  Did you review this document with your
7 attorneys prior to today's deposition?
8     A.  Yes.
9     Q.  And in fact, you're aware that throughout
10 the document, when it talks about the use of an
11 expressible amplifiable gene, it talks about it as
12 an optional addition to the insertion of a
13 regulatory segment to express the gene of interest;
14 isn't that right?
15     A.  Say that again.
16     Q.  You know that already, that everywhere your
17 1989 application refers to the use of an expressible
18 amplifiable gene, it does so as a useful addition to
19 the vector that already includes the regulatory
20 segment to express the gene of interest?
21        MR. FLOWERS:  Are you asking him if he
22 knows that to be the case?
23        MR. KELBER:  I think he heard the
24 question.

Page 133

1     A.  This says "in another embodiment."
2     Q.  Uh-huh, yes, go on.
3     A.  "The construct includes an expressible
4 amplifiable gene."
5     Q.  Is it limited to that?  Let me do this
6 differently.  Which page are you reading from?
7     A.  9.
8     Q.  Do you see "therefor, is also disposed
9 between the two targeting regions"?
10     A.  Yes, "also disposed."
11     Q.  And what else is there besides that?  Take
12 a look at Claim 3 -- I'm sorry, Claim 5 as this case
13 was originally filed.  Again, feel free to look at
14 anything else.  But in fact I believe Claim 5 is the
15 first claim that mentions an expressible amplifiable
16 gene.
17     A.  Uh-huh.
18     Q.  Do you see that?  Claim 5 is on page 32.
19 Do you see that it depends from Claim 1?
20     A.  Yes.
21     Q.  You've gotten enough patents to know that
22 that means Claim 5 includes recitations of Claim 1,
23 right?
24     A.  Claim 5 is a dependent of Claim 1.

34  (Pages 130 to 133)

7df5ca20-b83f-4cd3-9c87-e652585792b1

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

Page 142

1  using. As I just mentioned, for instance, as an
2  example, you may want to turn on a gene that
3  provides some kind of selection in a selectable
4  media where if the gene isn't turned on, all cells
5  will die; so therefore you wouldn't need an
6  amplifiable or selectable marker.
7      Q. So the way it's written here on page 29
8  that we were just -- oh, before I do that, I think
9  we're talking about the same thing, but when I say
10 page number I'm referring to the page number of the
11 application, not the Bates number at the bottom,
12 production number. Okay?
13     A. Yes.
14     Q. They're one off. So the way it's written
15 here in Exhibit 2085 is exactly accurate. You may
16 or may not need that amplifiable selectable marker,
17 depending on what it is you are seeking to express,
18 right?
19         MR. FLOWERS: Objection, vague and
20 ambiguous.
21     A. This document was drafted by me as an
22 instruction manual for using this technology for
23 applications that I maybe wouldn't even think of
24 because they're some other use that I wasn't

Page 143

1  specifically thinking about. So this is describing
2  the different possibilities that could result. You
3  may need it to practice the invention. Depending
4  upon the specific use, you may not need it.
5      Q. And I think you captured that, Doctor. Let
6  me ask you to turn to page 16 of the exhibit that is
7  Exhibit 2085. There's a paragraph that runs from
8  lines 15 to 25 that I think captures the idea that
9  you just expressed, but if you could read it to
10 yourself, sir, and tell me if that in fact captures
11 the idea that you just expressed.
12     A. (Witness reviews document.)
13     Q. Does that paragraph capture that idea
14 fundamentally?
15     A. Yes.
16     Q. I'm not trying to put words in your mouth;
17 but as you understand your invention as one of skill
18 in the art would have understood it in 1989, is that
19 paragraph generally accurate, that paragraph on page
20 16, lines 15 to 25?
21         MR. FLOWERS: Objection, compound.
22 Which question do you want him to answer?
23         MR. KELBER: Sorry?
24         MR. FLOWERS: Which question do you want

Page 144

1  him to answer? Do you want him to answer it as he
2  sits here today or one of ordinary skill of the art
3  back then? It's a compound question.
4      Q. Did you understand my question?
5      A. As I understood the question, it was as one
6  skilled in the art back at the time this was
7  written --
8      Q. Yes.
9      A. -- was this -- does this paragraph describe
10 the concept that you and I were just discussing?
11     Q. Let's treat it just that way?
12     A. Yes.
13     Q. Were you involved in the prosecution of
14 your patent application that matured into the '071
15 patent before the Patent Office?
16     A. I don't recall.
17     Q. Were you aware that the Patent Office
18 indicated in 1990 that your patent application was
19 allowable?
20         (Pause.)
21     Q. Let me ask it a different way. Did anybody
22 tell you that your first application, the one that
23 was filed in 1989, which is Exhibit 2085, got a
24 notice of allowance from the Patent Office in 1990?

Page 145

1      A. I don't recall.
2      Q. Were you aware that the application was
3  refiled as a continuation-in-part application?
4      A. I'm sorry, I don't remember.
5      Q. You have Exhibit 2001 up there someplace.
6  If you would look at the face page, the front page,
7  in the left-hand column there's a bracket around the
8  63; do you see that?
9      A. Yes.
10     Q. Do you see how it indicates a continuation
11 in part of Serial No. 454,783?
12     A. Yes.
13     Q. Do you know what a continuation in part is?
14     A. Maybe you could tell me.
15     Q. I'm sorry?
16     A. Maybe you could tell me.
17     Q. I'll do my best.
18     A. Okay.
19     Q. A continuation-in-part application includes
20 at least some of an earlier application, and it may
21 include additional information, it may eliminate
22 information that was in the original, or it may do
23 both, add some information and remove some of the
24 original information. That's generally referred to

FARMER ARSENAULT BROCK LLC

7df5ca20-b83f-4cd3-9c87-e652585792b1

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

Page 146

1  as a continuation in part.  Does that refresh your
2  recollection at all as to whether you were aware
3  that your original application was abandoned in
4  favor of a continuation-in-part application?
5      A.  No.
6      Q.  Were you asked -- were you involved in the
7  preparation of the PCT application that corresponds
8  to your patent application?
9      A.  I don't remember.
10     Q.  Do you recall -- let me ask it this way:
11 If you look through Exhibit 2085, which is your 1989
12 filing, one of the things that shows up in the '071
13 patent that's not in Exhibit 2085 is the example,
14 activation of TSH beta gene in rate -- or rat
15 pituitary gene cells.  So just so that you can
16 verify for yourself, the example I'm referring to
17 begins on Column 14 of your '071 patent.
18     A.  Okay.
19     Q.  That's not in your original application,
20 correct?
21     A.  Yes.
22     Q.  And that's because that hadn't been done
23 when your original application was filed, right?
24     A.  Correct.

Page 147

1      Q.  Were you aware that your original
2  application was abandoned in favor of an application
3  that included that example?
4      A.  No.
5      Q.  Did you have any hand in drafting the
6  application that includes the example?
7      A.  Yes.
8      Q.  And what did you do in -- with respect to
9  that?
10     A.  Well, I was responsible for writing the
11 patent except for the example, and the claims were
12 written by a patent attorney.
13     Q.  Were you responsible for changing the
14 indication that the amplifiable and selectable
15 marker genes were an optional addition to the
16 construct that had the regulatory segment to an
17 alternative to the regulatory segment in this '071
18 patent?
19     A.  Where?  What are you referring to in the
20 patent?
21     Q.  Well, let's take it from Step 1.  Were you
22 responsible for writing the description that
23 corresponds to Claim 3 as you described it?
24     A.  So Claim 3.  (Witness reviews document.)

Page 148

1      Q.  Maybe I can make this easier for you.  Take
2  a look at Column 4 of the '071 patent, lines 19
3  through 23.  Do you see how it indicates provide a
4  method of regulation and/or amplification?
5      A.  Yes.
6      Q.  Now, without leaving this column of the
7  '071 patent, take a look at page 4 of your
8  application that is Exhibit 20 -- sorry, page 7 of
9  your application that is Exhibit 2085.  If you
10 compare under "Summary of the Invention" the second
11 paragraph on page 7 of Exhibit 2085 with the second
12 paragraph in Column 4 of the '071, do you see the
13 difference that -- in the original application you
14 wrote, "It is another option of the present
15 invention to provide a method of regulation of gene
16 expression" and in the '071 patent it is written "to
17 provide a method of regulation and/or
18 amplification"; do you see that difference?
19     A.  Yes.
20     Q.  Did you write that in the '071 application?
21 Were you responsible for that addition?
22     A.  I don't recall.
23     Q.  If you would drop down another couple of
24 lines to line 20 -- line 18 -- sorry -- on page 7 of

Page 149

1  Exhibit 2085.  Do you see it says, "It is still
2  another object of the present invention... by
3  inserting DNA regulatory segments"?
4      A.  Yes.
5      Q.  Now, in the '071 patent, the same passage
6  reads "inserting DNA regulatory segments and/or
7  amplifying segments"; do you see that?
8      A.  What line are you on?
9      Q.  I'm sorry, Column 4, line -- the paragraph
10 appears at lines 32 through 38.
11     A.  (Witness nods.)
12     Q.  Did you change the application to read that
13 way?
14     A.  I don't recall.
15     Q.  That's not your idea at all, is it?
16         MR. FLOWERS:  Objection, vague and
17 ambiguous.
18     A.  It was my idea.  The idea is included in
19 the initial -- I think the idea of amplification and
20 use of, for instance, DHFR is included in the first
21 submission.
22     Q.  As an alternative to a regulatory segment?
23     A.  It could -- as an alternative to a
24 regulatory segment?

38  (Pages 146 to 149)

7df5ca20-b83f-4cd3-9c87-e652585792b1

## Scott C. Chappel, Ph.D.
## Volume 1 - January 19, 2006

Page 174

1  I'm going to object and instruct the witness not to
2  answer on the basis of attorney/client privilege and
3  work product.
4      Q.  Have you provided Mr. Flowers' firm with
5  advice under your consultant contract on any subject
6  other than this deposition?
7          MR. FLOWERS:  You can answer that
8  question.
9      A.  On any subject -- you're asking on any
10 subject contained within this --
11     Q.  Within your consulting agreement but
12 unrelated to your deposition.
13     A.  Unrelated to the deposition...  No.
14     Q.  To date, how many hours have you devoted to
15 working under the consulting agreement,
16 approximately?
17     A.  Approximately 14.
18     Q.  Does that include today?
19     A.  Okay, including today, today would be from
20 9:00 to 5:00, so eight.  About 20, 21.
21     Q.  Do you receive compensation of any type for
22 the '071 -- from -- by reason of the existence of
23 the '071 patent?
24     A.  No.

Page 175

1          MR. KELBER:  I have nothing further.
2          MR. FLOWERS:  Nothing further at this
3  time.
4          MR. KELBER:  The only thing I have to do
5  is to thank you, sir, for your patience and
6  attendance.  It's not an easy thing.
7          THE WITNESS:  Thank you.
8          (Whereupon the deposition was adjourned
9  at 5:10 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 176

1          CERTIFICATE OF COURT REPORTER
2          I, Joan M. Cassidy, Registered
3  Professional Reporter and Certified Realtime
4  Reporter, do certify that the deposition of Scott C.
5  Chappel, Ph.D., in the matter of Cell Genesys, Inc.
6  v. Applied Research Systems, etc., on January 19,
7  2006, was stenographically recorded by me; that the
8  witness provided satisfactory evidence of
9  identification, as prescribed by Executive Order 455
10 (03-13) issued by the Governor of the Commonwealth
11 of Massachusetts, before being sworn by me, a Notary
12 Public in and for the Commonwealth of Massachusetts;
13 that the transcript produced by me is a true and
14 accurate record of the proceedings to the best of my
15 ability; that I am neither counsel for, related to,
16 nor employed by any of the parties to the above
17 action; and further that I am not a relative or
18 employee of any attorney or counsel employed by the
19 parties thereto, nor financially or otherwise
20 interested in the outcome of the action.
21
22 1/24/06    _____
23              Joan M. Cassidy, RPR, CRR
24

Page 177

1              I N D E X
2
3          EXAMINATIONS
4  Scott C. Chappel, Ph.D.
5      BY MR. KELBER           4
6      BY MR. FLOWERS          170
7      BY MR. KELBER           173
8
9          EXHIBITS MARKED
10     2079, Witness's resume from Website    7
11 gonadotropin.org, no Bates numbers
12     2080, Green Form 4300, Bates Nos. ARS   51
13 001480-001481
14     2081, Memo from S. Bettelli to S.       61
15 Chappel dated 11/7/89 plus
16 attachments, Bates ARS 001482-001490
17     2082, Part of report, Bates Nos. ARS    67
18 001491-001492
19     2083, Final report on Green Form 4300   99
20 dated January 1992, Bates Nos. ARS
21 001515-001119
22     2084, U.S. Patent 5,240,832           112
23     2085, '89 patent application, Bates    131
24 Nos. ARS 000001-000041

45 (Pages 174 to 177)

7df5ca20-b83f-4cd3-9c87-e652585792b1