# Exhibit A, Part I

Volume I, Pages 1-179

Exhibits: 2079-2087

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Cell Genesys, Inc.

                    Plaintiff

vs.                              Docket No. 04-01407 (JDB)

Applied Research Systems

ARS Holding N.V.

                    Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF SCOTT C. CHAPPEL, PH.D.

Thursday, January 19, 2006, 9:00 a.m.

Donnelly, Conroy & Gelhaar, LLP -- Conference Center

One Beacon Street

Boston, Massachusetts


- - - - - - -Reporter:  Joan M. Cassidy, RPR, CRR- - - - - - -

jcassidy@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   Fax 617.728.4403

2 (Pages 2 to 5)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

|  | 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | Merchant & Gould |
| 4 | Steven B. Kelber, Esq. |
| 5 | Sue Jensen, M.D., Esq. |
| 6 | 901 Fifteenth Street, N.W. -- Suite 850 |
| 7 | Washington, D.C. 20005 |
| 8 | 202-326-0300  Fax: 202-326-0778 |
| 9 | skelber@merchant-gould.com |
| 10 | sjensen@merchant-gould.com |
| 11 | for Plaintiff |
| 12 | |
| 13 | Marshall, Gerstein & Borun LLP |
| 14 | Kevin M. Flowers, Ph.D., Esq. |
| 15 | Matthew C. Nielsen, Esq. |
| 16 | 233 South Wacker Drive |
| 17 | 6300 Sears Tower |
| 18 | Chicago, Illinois 60606-6257 |
| 19 | 312-474-6300  Fax: 312-474-0448 |
| 20 | kflowers@marshallip.com |
| 21 | mnielsen@marshallip.com |
| 22 | -and- |
| 23 | |
| 24 | |

|  | 3 |
|---|---|
| 1 | Nixon Peabody LLP |
| 2 | Fred A. Kelly, Jr., Esq. |
| 3 | 100 Summer Street |
| 4 | Boston, Massachusetts  02110-2131 |
| 5 | 617-345-1000  Fax: 866-947-1649 |
| 6 | fkelly@nixonpeabody.com |
| 7 | -and- |
| 8 | Serono Research Institute |
| 9 | Jill E. Uhl, Esq., Patent Counsel |
| 10 | Steven A. Bossone, Ph.D., Senior Patent Attorney |
| 11 | One Technology Park |
| 12 | Rockland, Massachusetts  02370 |
| 13 | 781-681-2648  Fax: 781-681-2946 |
| 14 | jill.uhl@serono.com |
| 15 | steve.bossone@serono.com |
| 16 | -and- |
| 17 | Serono International S.A. |
| 18 | Charlotte Retzler, Ph.D., Patent Attorney |
| 19 | 12, chemin des Aulx |
| 20 | 1228 Plan-les-Ouates |
| 21 | Geneva, Switzerland |
| 22 | +41 22 706 93 18  Fax: +41 22 706 91 23 |
| 23 | charlotte.retzler@serono.com |
| 24 | for Defendants |

|  | 4 |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | Scott C. Chappel, Ph.D., Sworn |
| 3 | DIRECT EXAMINATION |
| 4 | BY MR. KELBER: |
| 5 | Q. Good morning, Dr. Chappel. How are you? |
| 6 | A. Fine, thank you. |
| 7 | Q. My name is Steve Kelber. With me today is |
| 8 | Dr. Sue Jensen. Have you been deposed before? |
| 9 | A. Yes. |
| 10 | Q. So you know this is actually not an |
| 11 | endurance contest. If you need a break at any time |
| 12 | for any reason or no reason at all, just let me |
| 13 | know, and we'll take that break. |
| 14 | A. Thank you. |
| 15 | Q. The other item that you obviously are |
| 16 | familiar with is your answer to a question needs to |
| 17 | be audible. A shake of the head or a nod won't be |
| 18 | picked up by the reporter. Is that all right? |
| 19 | A. Yes. |
| 20 | Q. I understand that you had a visit with the |
| 21 | dentist this morning. Is there any reason owing to |
| 22 | that or any other condition that you might not be |
| 23 | able to answer questions put to you today? |
| 24 | A. No. |

|  | 5 |
|---|---|
| 1 | Q. I'm going to hand you a stack of documents |
| 2 | that are numbered ARS 001474 through 1561. I |
| 3 | believe that that is inclusive. Any time I hand you |
| 4 | a document during today's deposition, please feel |
| 5 | free to take as much time as you need to to review |
| 6 | the entire document or any portions of the document |
| 7 | you want to. I will typically direct you to |
| 8 | specific portions of the document. But with respect |
| 9 | to the production set 1474 through 1561 that is |
| 10 | before you, have you seen that before? |
| 11 | A. (Witness reviews document.) Have I seen |
| 12 | this top document before or all of it? |
| 13 | Q. Well, let's start with the top page, yeah. |
| 14 | Have you seen that? |
| 15 | A. No. |
| 16 | Q. Let me ask you to turn to 1517. You can |
| 17 | see the production numbers in the lower right-hand |
| 18 | corner. Have you seen that page, 1517, before? And |
| 19 | you may want to look at the following pages just to |
| 20 | give it some context. |
| 21 | MR. FLOWERS: I'll just say for the |
| 22 | record, I think these may have been stapled or |
| 23 | clipped. |
| 24 | MR. KELBER: If they're stapled or |

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

---

6

1  clipped, that's how they were produced to us.
2      MR. FLOWERS:  And I'm not suggesting
3  that you stapled or clipped them wrong.  They may
4  have been stapled or clipped wrong in the originals
5  we gave you, but I believe that 1513, 1515 and 1516
6  go with 1517 in the remainder of that document.
7      MR. KELBER:  Okay.
8      Q.  If you've had a chance to look at 1517 and
9  the pages behind it, Dr. Chappel, do you recognize
10  those?
11      A.  No, I don't.
12      Q.  Let me follow up on Mr. Flower's
13  suggestion.  It's not a bad one.  Would you look at
14  1516.  Is that your signature at the bottom?
15      A.  Yes, it is.
16      Q.  Let me ask you then to turn back to 1515.
17  Having seen your signature on it, does that refresh
18  your recollection as to having seen this collection
19  of documents previously?
20      A.  I don't recall having seen it.  Obviously,
21  this is my signature.  But I have to think about
22  when I left Serono 'cause I'm almost positive I was
23  gone by January 1992.  So someone may have asked me
24  to sign it, but I believe that I left -- I'm sorry.

---

7

1  I don't recall the exact date I left Serono, but
2  obviously this is my signature.
3      Q.  Okay.  Do you know what generally that
4  document is intended to be, the collection of pages
5  from 1516 forward?
6      A.  Yes, I do.
7      Q.  And what is that, sir?  Can you tell me
8  what that is, sir?
9      A.  Yes.  Green forms were forms that were used
10  to capture work projects from start to finish, and
11  this is a final report of Green Form 4300.
12      Q.  Was that final report ever submitted to a
13  journal for the purposes of securing publication?
14      MR. FLOWERS:  Objection to the extent
15  that the witness has testified he's never seen the
16  document before.
17      A.  To the best of my knowledge, it has not.
18      MR. KELBER:  I'm going to ask the
19  reporter to mark as 2079, Exhibit 2079, a four-page
20  document.
21      (Marked, Exhibit 2079, Witness's resume
22  from Website gonadotropin.org, no Bates numbers.)
23      Q.  Dr. Chappel, obviously this was a document
24  obtained from a Website, but is it nonetheless

---

8

1  reasonably accurate as to your appointments from
2  1978 through 2003?
3      A.  (Witness reviews document.) Yes.
4      Q.  Does that help you to recall when you left
5  Serono?
6      A.  According to this, I did leave in 1992 and
7  began work at Diacrin in 1992, but -- so it was
8  right around the same time.
9      Q.  Was Diacrin related in any way to Serono?
10      A.  No.
11      Q.  And when you refer to Serono, is that, in
12  your mind, the same company as ARS?
13      A.  No.  I never referred to Serono as ARS.
14      Q.  You returned to Serono in 1995; is that
15  right?
16      A.  That's correct.
17      Q.  Can you tell me the circumstances of your
18  originally joining Serono in 1989?
19      A.  Prior to 1989 I was working at Integrated
20  Genetics.  Integrated Genetics was in the process of
21  being acquired by Genzyme, and Serono -- I'm sorry,
22  and during the time that I was at Integrated
23  Genetics, we had a research program going on with
24  Serono.  And when Integrated Genetics was in the

---

9

1  process of being acquired by Genzyme, Serono
2  acquired the intellectual property that we had -- my
3  group had generated and also negotiated a right to
4  offer employment to me and to people in my group.
5      Q.  What was the nature of the research project
6  that you had going on with Serono while you were at
7  Integrated Genetics?
8      A.  We were developing methods to express human
9  gonadotropins.
10      Q.  What type of methods were you employing,
11  sir?
12      A.  We were using mammalian cell expression
13  technology.
14      Q.  I'm sorry, mammalian?
15      A.  Mammalian cell expression technology.
16      Q.  And did the techniques you employed involve
17  manipulation of those mammalian cells in any way?
18      A.  What do you mean by "manipulation"?
19      Q.  Let me ask you a slightly different
20  question.  What did you do to the mammalian cells --
21  strike that.  Did you do anything in the course of
22  this research program together with your coworkers
23  to alter the mammalian cells so that they could
24  achieve the expression you were desiring?

---

4 (Pages 10 to 13)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

10

1    A. Hm. Within the definition -- if "alter"
2  means to transfect them with exogenous DNA, then
3  yes, we altered them.
4    Q. Was that the primary mode of securing
5  expression of the gonadotropins you were seeking by
6  transfection with exogenous DNA?
7    A. Yes.
8    Q. What methods of transfection did you
9  employ?
10    A. Calcium phosphate precipitation and
11  electroporation.
12    Q. What did you transfect the mammalian cells
13  with?
14    A. With a plasmid that encoded the gene for
15  either human alpha subunit or the gene for human
16  beta subunit along with regulatory sequences.
17    Q. Were these genes present as endogenous DNA
18  in the cells being transfected?
19    A. No.
20    Q. Were the plasmids introduced through random
21  integration?
22    A. Yes.
23    Q. So there was no targeting of the particular
24  site of integration?

11

1    A. No.
2    Q. In addition to yourself in that group, was
3  Christie Kelton part of that group?
4    A. Yes.
5    Q. Who else was in that group?
6    A. Noreen Nugent, Susan Overton, Rene
7  Schweikhart. As with any other company, there were
8  people who came and went. Those people that I named
9  were the people that followed on to Serono. Are you
10  interested in the names of other people who were
11  part of the group but left?
12    Q. To the best of your recollection, if you
13  could identify those people who were part of the
14  group but did not carry on to Serono, that would be
15  valuable.
16    A. Okay. There was Laura Bitterman, Vinny
17  Velucci. It's been a while since I've thought about
18  these people.
19    Q. These depositions do take you back.
20    A. Linda Hyman. I think that's -- I've
21  depleted my memory.
22    Q. And I may have not gotten your answer
23  completely or may have misunderstood part of it, but
24  you referred to the human alpha and beta subunits.

12

1  Subunits of what?
2    A. Gonadotropins are hormones that are
3  secreted normally by the anterior pituitary gland.
4  They are dimeric proteins, so there's two subunits.
5  There's a common alpha subunit that's the same for
6  all of the gonadotropins, as well as TSH,
7  thyroid-stimulating hormone. And the hormone-
8  specific beta subunit is for -- imparts specificity
9  for LH, leuteinizing hormone, FSH, follicle-
10  stimulating hormone, hCG, human chorionic
11  gonadotropin, which is expressed by the placenta,
12  and TSH, thyroid-stimulating hormone. So each one
13  of the beta specific subunits are encoded by a
14  different gene. The alpha is common to all.
15    Q. Were you working with the beta subunits for
16  each of the gonadotropins you identified?
17    A. Not only were we working on each of the
18  subunit genes for LH, FSH, hCG, and TSH, but we also
19  were cloning and expressing equine gonadotropins,
20  porcine gonadotropins, bovine gonadotropins and
21  primate gonadotropins.
22    Q. So for the various mammal sources that
23  you've identified, you would be working with four
24  different subunits and the common alpha unit; is

13

1  that correct?
2    A. Actually, that's not the case only because
3  hCG is specific only to humans. So other species
4  don't make a chorionic gonadotropin, but for the
5  others, yes.
6    Q. Okay. You in fact caused to be filed at
7  least one patent application directed to that effort
8  that was carried on at Genzyme, supported by Serono,
9  right?
10    A. Could you repeat that?
11    Q. Prior to leaving Integrated Genetics, which
12  became Genzyme, you caused a patent application to
13  be filed directed to this modification of mammalian
14  cells for the expression of gonadotropins; is that
15  right?
16    A. I was involved -- I was one of the
17  inventors in I think several patents that were
18  initially submitted at Integrated Genetics and then
19  a series of others that were initiated with
20  continuing efforts going on at Serono.
21    Q. Did you ever have occasion to work with rat
22  genes for the expression of the various
23  gonadotropins? Let me give you some time frame for
24  that. While you were at Integrated Genetics before

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

14

1 joining Serono.
2     A. I personally -- we -- I don't recall
3 working on rat gonadotropins.
4     Q. Is TSH accurately characterized as a
5 gonadotropin?
6     A. Oh, no, it's not.
7     Q. How about with respect to rat TSH?
8     A. We did some work with rat TSH.
9     Q. Was it the same type of work you've
10 described, the random integration of plasmids with
11 genes for the protein of interest, in this case the
12 TSH beta subunit?
13     A. Yes.
14     Q. Was the aim of that effort to produce
15 greater expression of the target protein, whether it
16 was a gonadotropin or TSH?
17     A. May I ask, were you saying was the -- in
18 general, all of our efforts designed to improve
19 expression? Did you ask that?
20     Q. Generate more expression of the protein.
21     A. Yes.
22     Q. Were you successful in that regard, before
23 the group moved to Serono, in achieving greater
24 levels of protein expression?

15

1     A. Yes.
2     Q. And what proteins did you recover in
3 greater amounts than prior to the transfection?
4     A. Prior to the transfection expression levels
5 would be zero.
6     Q. Okay.
7     A. So after we transfected and expressed FSH,
8 LH, hCG, from a variety of different species as I
9 mentioned, and TSH.
10     Q. And recovered the protein for those
11 hormones?
12     A. Correct.
13     Q. The cells that you recovered these proteins
14 from, what types of cells were transfected?
15     A. We worked primarily with two cell types.
16 One is called C127. Those are mouse -- I think they
17 are fibroblast in origin. They are an expression
18 cell that people use. And the other was CHO cells,
19 Chinese hamster ovarian cells.
20     Q. With regard to the C127 cells, is there a
21 particular feature of those cells that led you to
22 select them to work with?
23     A. No, I hated those cells. Someone else
24 chose those cells before I was involved.

16

1     Q. What did you hate about them?
2     A. To produce these kind of proteins, you need
3 to use mammalian or eukaryotic cells because
4 glycosylation is critical for biologic activity. In
5 the early '80s not too much was known about
6 expression methods for using mammalian cells.
7 Almost -- in fact, all of the first work in
8 expression using recombinant DNA techniques were
9 using bacteria.
10     So for a variety of reasons, the C127
11 and the bovine papillomavirus expression vector were
12 used routinely at Integrated Genetics as mammalian
13 cell expression technology that was developed at
14 Integrated Genetics or optimized at Integrated
15 Genetics. And there were certain features of that
16 expression system which were not optimal for our
17 needs, and that expression system was ultimately
18 replaced by the CHO cell expression system.
19     Q. What was the nature of the features that
20 were not optimum for your needs?
21     A. The bovine papillomavirus vector was
22 self-replicating, as most viruses are, so the
23 investigator had no control over the number of
24 copies. And some people believe that the -- that

17

1 particular vector remained episomal, which means it
2 did not integrate into the host cell genome, and
3 therefore the expression was unstable to passage
4 because the cell could inject the vector or spit out
5 the vector.
6     Q. The expression vector, was that specific
7 for or developed specifically for the C127 cell?
8     A. The bovine papillomavirus expression
9 vector, yes, it was.
10     Q. And is it correct, then, that a principal
11 problem with the C127, working with the C127 cell,
12 was the vector that was developed to transfect that
13 cell with?
14     A. That was one problem. Another problem --
15 that was related to the vector itself. There was
16 also a problem with the cells. The cells, being
17 fibroblast in nature, were not engineered, in
18 quotes, engineered by God, to secrete large amounts,
19 so -- large amounts of any protein. They weren't
20 secretory in nature. So I felt or we felt that we
21 needed to change the expression system, and one of
22 the features that we would like to improve would be
23 to find a cell host that had better abilities to
24 secrete protein.

6 (Pages 18 to 21)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

18

1    Q. And the CHO cells were such a host?
2    A. Yes.
3    Q. And in fact, the CHO cell lines had been
4  established as good secretory lines prior to --
5  prior to your selection of them in this project,
6  right?
7    A. Yes.
8    Q. Did you also develop in the course of this
9  work supported by Serono a specific vector system
10  for the CHO cells?
11        MR. FLOWERS: Objection, lack of
12  foundation.
13    A. Each laboratory around the world or even
14  within Integrated Genetics developed their own
15  expression plasmid depending upon what it was, what
16  project they were working on and what their needs
17  were to accomplish the goal. So we, our little
18  group, built our own expression system. And in
19  fact, we built many different expression systems --
20  expression plasmids, sorry -- because it wasn't
21  known at the time how to create a system that would
22  be optimally expressing particular protein, in this
23  case a dimeric protein, so we tried many different
24  methods.

19

1    Q. *Did you, in this group that you've
2  referred to, ultimately develop a framework for a
3  plasmid that you thought was reasonably optimal for
4  working with the cells that you had selected?
5        MR. FLOWERS: Could you read that
6  question back.
7        *(Question read.)
8        MR. FLOWERS: Objection, vague and
9  ambiguous.
10    A. We developed an expression vector that was
11  superior to the BPV C127 expression system.
12    Q. Do you recall today what the elements of
13  that expression vector were?
14    A. In general terms, I think that the
15  contribution that we made had to do with converting
16  the cDNAs that we used into partial genomic clones.
17  That was Feature No. 1. Feature No. 2 was that the
18  two different subunits were on separate plasmids
19  instead of a single plasmid. And Feature No. 3 was
20  that each separate expression of plasmid had a
21  separate selectable and amplifiable marker. Those
22  were the three features that provided improved
23  expression of gonadotropins compared to the BPV C127
24  system.

20

1    Q. Now, these three elements or specific
2  aspects of improvement that you have identified,
3  those three elements had been the subject of
4  publications in the art for other proteins prior to
5  your selection of those features; isn't that right?
6    A. Certainly selectable markers were known.
7  I'm trying to recall whether anyone knew prior to
8  19 -- anyone had published prior to 1989 that
9  partial genomic sequences improved expression of
10  gonadotropins. There were not that many people
11  working in that area, so I don't know. The idea of
12  putting -- creating two separate expression vectors
13  and cotransfecting. Also, there weren't that many
14  people who were working on -- using recombinant
15  technology to express dimeric glycoproteins in a
16  mammalian system, but maybe, maybe there were.
17    Q. Antibodies are multimeric proteins, aren't
18  they?
19    A. Yes, they are.
20    Q. And those had been expressed recombinantly
21  prior to 1989, hadn't they?
22    A. Certainly making hybridomas was known at
23  that time. Whether -- the details of how antibodies
24  are -- were produced by recombinant DNA technology

21

1  and when that occurred, I don't know.
2    Q. You mentioned that each vector had a
3  selectible -- selectable, sorry, and amplifiable
4  gene. Then you indicated that -- as a marker. And
5  then you indicated that selectable markers were
6  known previously, right?
7    A. Yes.
8    Q. Were selectable and amplifiable marker
9  genes known previously for this kind of work?
10    A. Yes.
11    Q. In the plasmids -- in the vectors, sorry,
12  that you optimized for the work in the CHO cells for
13  the expression of gonadotropins, was there a
14  particular selectable and amplifiable marker gene
15  that you preferred to work with?
16    A. *There was one that we did work with. I
17  didn't prefer to work with any selectable marker --
18  amplifiable marker. Selectable, we had to. We used
19  dihydrofolate reductase gene.
20        MR. KELBER: Can I hear that answer
21  back.
22        *(Answer read.)
23    Q. Why did you not prefer to work with any
24  amplifiable gene?

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

22

1    A. There are several reasons.
2    Q. Okay.
3    A. The first was that to use a selectable
4  marker like dihydrofolate reductase means that you
5  need to treat the cells with a noxious chemical, in
6  this case methotrexate, which is used in
7  chemotherapy. It kills cells. Whenever anyone
8  thinks about building an expression system to create
9  a therapeutic protein that needs to go through the
10  FDA, any process that you use where you include a
11  noxious compound automatically means you need to
12  develop a method to show that you've gotten rid of
13  that noxious compound somewhere downstream. So
14  whenever you're building a system where the ultimate
15  goal is to get FDA approval, you want to avoid
16  creating more work for yourself that's not central
17  to the effort. So that's number one.
18         Number two was that the process by which
19  the gene is amplified is -- was not well known, but
20  what was known was that it created DNA structures in
21  the cells called "double minutes," spelled like
22  "minute," minutes; and those structures were
23  inherently unstable. And as soon as you remove the
24  drug, methotrexate in this case, the cell usually

23

1  got rid of that double minute, and expression levels
2  would go back down. So you hoped that when you
3  removed the drug, which you had to for an FDA
4  approvable process, that the expression levels fell
5  down. But they were higher than they were when you
6  started, and so you exerted all this effort to
7  improve expression. People use methotrexate with --
8  people who used methotrexate were routinely
9  ambivalent about the beauty of that particular
10  amplification system.
11    Q. Were there any other problems with the use
12  of a marker that was both selectable and
13  amplifiable?
14    A. Well, one other, the health concerns of
15  people working with noxious chemicals like
16  methotrexate, certain concerns with regard to OSHA,
17  safety issues.
18    Q. And I may have misheard you, but I think
19  that you said that people who worked with that
20  particular amplification system, DHFR, were almost
21  universally ambivalent about its use. My question
22  for you is, not with regard to names but with regard
23  to type of work, what kind of people in that time
24  frame were using DHFR?

24

1    A. Molecular biologists.
2    Q. And given the nature of its -- of the
3  attendant concerns that you have described for us,
4  why would a molecular biologist use DHFR?
5         MR. FLOWERS: Objection to the extent it
6  calls for speculation.
7    A. I can't tell you why anybody else would. I
8  could tell you why we did --
9    Q. Let's start with that --
10    A. -- or why I did.
11    Q. -- why you did.
12    A. Whenever you do molecular biology, you need
13  to have a selectable marker. We chose DHFR because
14  if we decided that we didn't like the expression
15  levels that we were seeing with our expression
16  system, we still had a second way to improve
17  expression, and that would be by amplifying the
18  gene, DHFR.
19         The way the expression system was made,
20  the DHFR was linked genetically to, in this case the
21  gonadotropin gene; so when we amplified the DHFR
22  gene, we were coamplifying the gonadotropin gene.
23    Q. I see. So the vector would have the
24  gonadotropin gene on it, and it would have the DHFR

25

1  so that if it was properly integrated, the DHFR, in
2  addition to providing the selection opportunity,
3  would itself amplify the gonadotropin unit gene; is
4  that right?
5    A. As methotrexate is added to the cell, DHFR
6  responds to that by increasing its copy number, and
7  all genes in the immediate vicinity also increase
8  their copy number.
9    Q. So in this case the gene of interest is the
10  gonadotropin subunit gene that was introduced
11  together with the DHFR; is that right?
12    A. Yes.
13    Q. Would you introduce DHFR without the gene,
14  just to target the -- to be able to select for a
15  recombinant event, or was it always a companion?
16         MR. FLOWERS: Vague and ambiguous,
17  objection.
18    A. In our hands it was always a companion.
19    Q. In the situation when you did get
20  amplification of the DHFR and you got amplification
21  of the gonadotropin subunit gene with it, what else would
22  get amplified?
23    A. Those were the two genes that we were
24  looking to see how they responded. I can't recall

8 (Pages 26 to 29)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

26

1  whether we actually checked to see if anything else
2  was amplified apart from the other sequences that
3  would be part of this plasmid that included the gene
4  of interest and the DHFR gene.
5      Q. Were the other sequences that would be part
6  of the plasmid fairly constant?
7      A. Yes.
8      Q. Can you, as best you can today, recall for
9  me what the other sequences or portions of the
10  plasmid were?
11      A. They would be promoter regions, they would
12  be polyadenylation sequences, some bacterial genes
13  to -- called origins of replication. These would be
14  sequences to allow you to make more copies in the
15  bacterial system. And there were -- the expression
16  vector itself was a backbone, had a backbone that
17  was DNA, and it was -- so there were other constant
18  regions that didn't encode anything, but they were
19  just sort of like restriction sites so that you
20  could open up plasmids to insert genes.
21      Q. You mentioned promoter regions. In the
22  case where you had a gonadotropin subunit gene and
23  the DHFR gene as the selectable marker, did each
24  gene get its own promoter?

27

1          MR. FLOWERS: Objection, vague and
2  ambiguous as to "get."
3      A. Each gene required a promoter. People
4  within our group had in-house lore that you needed
5  to have — you needed to try and have separate
6  promoters for it, if you were putting several
7  different genes in a plasmid. So routinely we would
8  try and use different promoters for different genes.
9      Q. I want to go back to something you said.
10  You said it had to have a selectable marker. I
11  gather that's so that you could be certain that the
12  recombination event occurred; is that right?
13      A. That was a quick way of separating cells
14  that took up the DNA from those that did not take up
15  the DNA.
16      Q. So integrate -- that's -- the marker's a
17  marker for -- a positive marker for integration of
18  the DNA?
19      A. Not necessarily, because the gene doesn't
20  have to integrate. It could remain episomal and
21  that still would express the selectable marker.
22      Q. Okay. So it's just entering into the cell?
23      A. Yes.
24      Q. Given the difficulties, did you have to

28

1  work with an amplifiable gene? Let me take that
2  back for a second and try and build to that. There
3  are selectable markers, or there were in 1989,
4  well-known selectable markers that are not
5  amplifiable, right?
6      A. That's correct.
7      Q. Why not use one of those?
8      A. We could have, we did. And as I mentioned,
9  DHFR can be used as a selectable marker, but you
10  don't have to amplify.
11      Q. And did you use it in that context of using
12  it as -- for select -- scratch that. How do you
13  detect the uptake of a DHFR marker without applying
14  selection criteria?
15          MR. FLOWERS: Objection, vague and
16  ambiguous as to time. Are you asking how he does it
17  today?
18      Q. Do you know what I mean?
19      A. Well, let me tell you what we did.
20      Q. Okay.
21      A. The DHFR-containing plasmid was inserted
22  into a population -- it was exposed to a population
23  of cells. A method was used, I mentioned calcium
24  phosphate precipitation or electroporation, where we

29

1  assumed that a certain percentage of those cells
2  took up the plasmid that contained DHFR, the
3  selectable marker.
4      We then took the cells out of the
5  chamber that they were being transfected in and
6  resuspended them in a media that contained
7  methotrexate. Methotrexate attaches to the enzyme
8  dihydrofolate reductase, which is a protein that's
9  required for DNA biosynthesis.
10      All cells have the gene for -- all
11  eukaryotic cells have the gene for dihydrofolate
12  reductase. Addition of methotrexate will kill all
13  cells except those that have an extra copy or extra
14  copies of dihydrofolate reductase. They survive
15  because they are also producing enzyme, allowing the
16  cell to continue.
17      Once that acute pressure, selectable
18  pressure, is put on that population of cells, the
19  cells that haven't taken up the DNA die. The cells
20  that have survived do. Cells are spun out of that
21  methotrexate-containing media, and they're
22  resuspended in fresh media that does not contain
23  methotrexate. And so that's how you use
24  dihydrofolate reductase to select cells that have

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

30

1  taken up the DNA, but you don't amplify the DNA --
2  the DNA amplification is a much longer process.
3      Q. I was going to ask you that because the
4  exposure to MTX using DHFR to -- as a selection
5  marker only is limited in time so that no
6  amplification occurs; is that right?
7      A. Yes.
8      Q. Did you continue to work with the gene
9  plus -- gene plus DHFR plasmid after joining Serono?
10     A. That was part of our genetic armamentarium.
11     Q. Okay. Did you ever overcome the problems
12  that you identified in using DHFR as an amplifiable
13  as opposed to a selection marker?
14     A. Could you repeat that.
15     Q. Well, you identified for me some problems
16  using DHFR in an amplifiable context as opposed to
17  the selectable marker, and you described for me how
18  to -- how you used DHFR as a selectable marker
19  without amplification. During the work you did at
20  Serono before leaving for Diacrin, did you work with
21  DHFR in the context of it being an amplifiable
22  selectable marker? Did you deliberately use it to
23  amplify the gene?
24     A. Yes.

31

1      Q. And did that work successfully result in
2  increasing levels of expression of whatever was
3  amplified with the DHFR?
4      A. Increase prior to --
5      Q. Let me try and break it down because I'm
6  probably -- most usually get it wrong from your
7  answers. But as I understand it, you transfect the
8  cell with a gene that is accompanied by the gene for
9  DHFR, and each gene has its promoter. You can
10  select for the uptake of that vector by brief
11  passage through an MTX medium without inducing
12  amplification.
13     A. Correct.
14     Q. And at that point if the uptake has been a
15  successful -- has been achieved in such a way that
16  the gene of interest is being produced, there will
17  be a given expression level of that gene. Call it
18  Expression Level 1. Did you subsequently amplify
19  DHFR and whatever associated with it to get a higher
20  expression level than the Expression Level 1?
21     A. Yes.
22     Q. Sorry for the long question, Doctor. With
23  what types of proteins were you successful in that
24  endeavor?

32

1      A. FSH, LH.
2      Q. Did you ever work with Art Skoultchi at
3  Integrated Genetics?
4      A. No.
5      Q. You were aware he was there at the time you
6  were there?
7      A. He was a member of the scientific advisory
8  board.
9      Q. In addition to FSH and LH, any other
10  proteins that you successfully increased the
11  expression level through amplification of DHFR and
12  accordingly the gonadotropin?
13         MR. FLOWERS: Objection, vague and
14  ambiguous as to the time frame. Are you asking --
15     Q. During your work prior to leaving Serono
16  for Diacrin.
17     A. No.
18     Q. But the two events, FSH and LH protein
19  expression increases through amplification, those
20  were prior to your departure for Diacrin?
21     A. Yes.
22     Q. We talked a little bit about CHO cells.
23  Did you use DHFR as a selectable marker for any
24  other types of cells? Again, let me confine the

33

1  time period to prior to the time you left for
2  Diacrin.
3      A. DHFR -- the DHFR gene was used primarily
4  for the CHO cell expression work, but -- and it was
5  used also -- you asked what other cell types?
6      Q. Yes, sir.
7      A. Besides CHO it was used in the GH3 cell work
8  for endogenous gene activation studies.
9      Q. Were the CHO cells that were used for DHFR
10  deficient strains?
11     A. They were not.
12     Q. It would have made life easier if they
13  were, wouldn't it?
14     A. Well, that's what some people thought;
15  however, the DHFR -- as I recall, the DHFR gene that
16  we used had been genetically modified so that it
17  was -- the protein and the enzyme that was created
18  was less sensitive to methotrexate, so cells that
19  hadn't taken up our gene would only have the
20  endogenous gene which was very sensitive to
21  methotrexate. So there was a -- sort of a genetic
22  insulation between the endogenous -- there were at
23  the time DHFR- CHO cell lines that we could have
24  used but we didn't.

10 (Pages 34 to 37)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

34

1    Q.  The DHFR enzyme that was expressed by the
2    DHF -- I'm sorry.  The DHFR genes that you used, did
3    a decrease in sensitivity to MTX give rise to a
4    reduced tendency to amplification under selection
5    pressure from MTX?
6          MR. FLOWERS:  Objection to the extent it
7    calls for speculation.
8      A.  I don't know.
9      Q.  You didn't experience that problem in your
10   laboratory?
11     A.  We wouldn't know if we were because we
12   didn't try anything else.
13         MR. KELBER:  Let's go off the record.
14         (Recess.)
15   BY MR. KELBER:
16     Q.  Did you do anything to prepare for your
17   deposition today, Doctor?
18     A.  Yes.
19     Q.  Can you tell me what you did?
20     A.  I reread the patent and I met with my
21   attorney.
22     Q.  And when did you meet with your attorney?
23     A.  Yesterday and about -- the exact date I
24   don't remember, but a time before, maybe a couple of

35

1    weeks ago.
2      Q.  Other than the patent that you referred to,
3    did you review any other documents?
4      A.  Yes.
5      Q.  What other documents did you review?
6      A.  The initial filing.  I saw a memo that I
7    wrote introducing the idea of endogenous gene
8    activation to senior management at Serono.
9      Q.  Anything else?
10     A.  Some laboratory notebooks.
11     Q.  Do you recall whose laboratory notebooks
12   they were?
13     A.  Christie Kelton.
14     Q.  While you were at Serono, did you have a
15   laboratory notebook?
16     A.  No, I did not.
17     Q.  Did you review the laboratory notebooks of
18   Jeff Olsen?
19     A.  While at Serono?
20     Q.  Yes, sir.
21     A.  Yes.
22     Q.  And did you review that notebook in
23   preparation for today's deposition?  I'm sorry, did
24   you review at least one of Jeff Olsen's notebooks in

36

1    preparation for today's deposition?
2      A.  Yes.
3      Q.  Anybody else's notebook besides Kelton's
4    and Olsen's?
5          MR. FLOWERS:  Objection as to form,
6    vague and ambiguous.
7      A.  I don't believe so.
8      Q.  When you moved, if you will, from
9    Integrated Genetics to Serono, did you personally
10   conduct laboratory work?
11     A.  No.
12     Q.  The memorandum that you reviewed
13   introducing the idea of endogenous activation at
14   Serono, was that in the form of a typed document?
15     A.  Yes.
16         MR. KELBER:  Has that document been
17   produced to us?
18         MR. FLOWERS:  All the documents he
19   reviewed have been produced.
20         MR. KELBER:  Do you know if they were
21   produced in the most recent production that we were
22   handed yesterday afternoon?
23         MR. FLOWERS:  I don't think so.  No, it
24   was not produced in the stack of the most recent

37

1    documents produced in this case.
2      Q.  Dr. Chappel, who are your -- you said you
3    met with "my attorney."  Who is your attorney?
4      A.  Kevin Flowers and Matthew Nielsen.
5          MR. FLOWERS:  That's pretty good.  They
6    usually forget.
7      Q.  Do you retain Mr. Flowers, Mr. Nielsen, or
8    their firm for other work on your personal behalf?
9      A.  No.
10     Q.  Do Mr. Flowers, Mr. Nielsen, or their firm
11   do any work for your company, Apple Tree Partners,
12   to the best of your knowledge?
13     A.  There is a portfolio company within Apple
14   Tree where Marshall Gerstein is currently performing
15   a freedom-to-operate on a totally unrelated issue.
16     Q.  Without identifying for me the specific
17   nature of any work -- any other work that firm may
18   have done, have they done any other work for your
19   company or any company contained within Apple Tree
20   Partners?
21     A.  No.
22     Q.  When did they begin the work with respect
23   to that portfolio, perform the clearance search?
24     A.  Either at the very end of last year or the

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

38

1  beginning of this year, somewhere around early
2  January.
3      Q. Had you met Mr. Flowers or Mr. Nielsen in
4  connection with this litigation before Marshall
5  Gerstein was retained to do that work with respect
6  to the patent portfolio?
7      A. Yes.
8      Q. When did you first meet -- let's take them
9  one at a time. When did you first meet Mr. Flowers?
10     A. In November.
11     Q. And to the best of your recollection, what
12  was the nature of that meeting? How did you come to
13  meet with them?
14     A. I believe it was a telephone meeting to --
15         MR. FLOWERS: Just don't reveal the
16  substance of the conversations.
17     A. To introduce me to this case.
18     Q. As best you can recall at this time, what
19  did Mr. Flowers say to you over the phone in that
20  first encounter?
21         MR. FLOWERS: Objection, calls for
22  attorney/client privileged communications. I would
23  just instruct you not to disclose any substance of
24  the conversation.

39

1      A. Actually, the most important thing was
2  trying to determine when I would be available for
3  this deposition and dates that -- where I was going
4  to be available.
5      Q. When did you next talk with the attorneys
6  from Marshall Gerstein with respect to this
7  litigation?
8      A. I don't recall the exact time. We had
9  several brief telephone calls to define days where
10  you were available, Serono was available, I was
11  available.
12     Q. Were you at any time asked to look for
13  documents that might pertain to activities relevant
14  to this litigation?
15         MR. FLOWERS: Calls for attorney/client
16  privileged communications. I instruct you not to
17  provide the substance of any conversations that we
18  had.
19     Q. Are you going to follow your counsel's
20  instruction?
21     A. I think I will.
22     Q. Are you paying for Mr. Flowers' and
23  Mr. Nielsen's attendance here?
24     A. No.

40

1      Q. Is your company, Apple Tree, or any
2  division of that company paying for their work in
3  connection with this deposition?
4      A. No.
5      Q. Who is paying?
6      A. I don't know.
7      Q. Do you have an agreement of any sort with
8  the law firm of Marshall Gerstein other than the
9  work that they're conducting for the portfolio --
10  patent portfolio unit that you mentioned?
11         MR. FLOWERS: It's a yes or no question.
12     A. Does my firm or do I --
13     Q. Sorry, you personally, Dr. Chappel.
14     A. Yes.
15     Q. What's the nature of that agreement?
16         MR. FLOWERS: Again, it calls for
17  disclosure of attorney/client communications. I'll
18  instruct you not to divulge the substance.
19     Q. Just tell me -- is it an agreement with
20  regard to services?
21     A. Yes.
22     Q. And is it about services you are to provide
23  to Marshall Gerstein?
24     A. Yes.

41

1      Q. And they pay you for those services under
2  this agreement, right?
3      A. Yes.
4      Q. And you're being paid for your time here
5  under that agreement; is that correct?
6      A. Yes.
7      Q. Are you being paid for anything other than
8  your time here?
9      A. No.
10     Q. Were you paid for the time you spent with
11  the attorneys looking at documents yesterday under
12  that agreement?
13     A. Not yet.
14     Q. Do you expect to be paid pursuant to that
15  agreement?
16     A. Yes.
17     Q. Does the agreement include opportunities
18  for you to be paid for anything other than your
19  deposition and your preparation for your deposition?
20     A. No.
21     Q. Is there an amount set forth in the
22  agreement that you will be paid?
23     A. An hourly rate.
24     Q. What is that hourly rate?

12 (Pages 42 to 45)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

42

1    A. $300.
2    Q. Per hour? $300 per hour?
3    A. Yes.
4    Q. Do you typically work an eight-hour day? I
5    know you probably work more than eight hours on a
6    given day; is that right?
7    A. Yes.
8    Q. Do you get paid 2400 a day for your work at
9    Apple Tree?
10   A. I'm not paid by the hour.
11   Q. Do you get paid the equivalent of $2400 a
12   day?
13        MR. FLOWERS: I will just remind you to
14   the extent that's confidential information to Apple
15   Tree, it's not part of this case, then I don't know
16   whether you want to divulge that or not. You are
17   not subject to any protective order in this case. I
18   also object as to the relevance of the question. I
19   don't think it's relevant to anything in this case.
20   Q. Do you get paid -- bear with me one second,
21   Doctor, maybe I can make this easier for you. I
22   didn't mean to create a controversy. Were you paid
23   more than $600,000 last year for your work on behalf
24   of Apple Tree by Apple Tree Partners?

43

1        MR. FLOWERS: Again, I will object to
2    the question as irrelevant.
3        MR. KELBER: The judge thought it was
4    relevant, Kevin. I do too.
5    Q. Could you answer the question?
6        MR. FLOWERS: To the extent it's
7    confidential information to Apple Tree, if you are
8    not comfortable disclosing it, you don't have to.
9    A. Mr. Kelber, I want to tell you that at a
10   venture firm, not peculiar or specific to Apple Tree
11   but any venture firm, we are paid a salary, but we
12   also enjoy other benefits called draw.
13   Q. Uh-huh.
14   A. So I'm hoping that -- well, your question
15   was, did I make in excess -- did I --
16   Q. Let me withdraw the question. Maybe I can
17   do it more simply. And I'm sure that with your
18   efforts, you will be entitled to the benefits of the
19   draw. For salary only, for 2005, if you are on an
20   annual calendar, were you paid more than $600,000?
21   A. No.
22   Q. Is $300 an hour your standard consultant
23   rate?
24   A. I have -- yes.

44

1    Q. And when you are compensated at that
2    level -- sorry. Strike that. Are you currently
3    consulting -- I don't want to know the nature of it,
4    but are you currently consulting for other
5    companies?
6    A. Yes.
7    Q. And the nature of that consultation, can
8    you describe for me generally what it is you are
9    supposed to do?
10   A. I provide scientific support, scientific
11   recommendations.
12   Q. Would it be fair to say that you do more
13   than simply provide scientific facts to the
14   companies that you consult for?
15   A. Scientific facts.
16   Q. You provide recommendations based on those
17   facts and your experience; is that correct?
18   A. Yes.
19   Q. Do you consult for Serono?
20   A. Yes.
21   Q. What are you paid in an hourly rate for
22   that consultation?
23   A. I'm not paid by the hour.
24   Q. I'm sorry, sir?

45

1    A. I'm not paid by the hour.
2    Q. What is the nature of your compensation for
3    your consultation with Serono?
4    A. It's annual.
5        MR. KELBER: I don't believe we have
6    received that document, Counsel.
7        MR. FLOWERS: What document?
8        MR. KELBER: His agreement with Serono.
9        MR. FLOWERS: What agreement?
10   Q. Dr. Chappel, the annual compensation that
11   you receive from Serono for consultation, is that
12   the subject of a written agreement?
13   A. Yes.
14       MR. KELBER: The written agreement, has
15   it been produced?
16       MR. FLOWERS: I don't believe so.
17   Q. What is the nature of the consultation that
18   you provide to Serono?
19   A. I have been retained to provide
20   presentations about gonadotropins like that
21   (indicating).
22   Q. Anything else in the nature of your
23   consultation for Serono besides the presentations
24   regarding gonadotropins?

FARMER ARSENAULT BROCK LLC

13 (Pages 46 to 49)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

46

1    A. No.
2    Q. And what are you compensated under that
3 agreement?
4    A. What?
5    Q. What is the amount of compensation you
6 receive from Serono under your written agreement to
7 provide presentations regarding gonadotropins?
8        MR. FLOWERS: Again, if you believe
9 that's confidential information of Serono, to the
10 extent you don't feel comfortable disclosing that --
11 since Serono is not a party to this case, I instruct
12 you not to answer that.
13    Q. Can you answer my question, Doctor?
14    A. No.
15    Q. When was the first time you heard about
16 what you referred to as "this case"?
17    A. Well, I knew there was a European case --
18 this was several years ago -- and I had heard that
19 this case or these cases have been ongoing for the
20 last several years.
21    Q. You were vice-president and chief scientist
22 at Serono in 1997 to '98; is that accurate? That's
23 off your resume that we earlier had looked at.
24    A. (Witness reviews document.) That's correct.

47

1    Q. Did you have any involvement with either
2 this case or the European case or some other case
3 while you were at Serono in that capacity?
4    A. No.
5    Q. You in fact prepared -- sorry. You in fact
6 signed a declaration that was filed in the European
7 case, didn't you?
8    A. Yes. That -- not during the time frame
9 that you mentioned.
10    Q. All right.
11        MR. KELBER: Actually, Counsel, today is
12 the date for production of that. Can we look
13 forward to that document?
14        MR. FLOWERS: Today is the date for
15 production of?
16        MR. KELBER: We served a request for
17 production of that specific document in its various
18 forms 30 days ago.
19        MR. FLOWERS: I don't know that that's
20 correct.
21        MR. KELBER: And I drew it to your
22 attention about two weeks ago in an e-mail.
23        MR. FLOWERS: I don't think any response
24 to anything that was served on us would be due

48

1 today. I don't think that's correct.
2        MR. KELBER: Can we expect a response to
3 it?
4        MR. FLOWERS: Today?
5        MR. KELBER: No. Obviously, you're not
6 going to produce it today. I was just wondering if
7 you are going to produce it.
8        MR. FLOWERS: You'll get a response,
9 yes.
10    Q. Were you at any time ever asked to look for
11 documents pertaining to the European case, this
12 case, the patent that is involved, or any
13 circumstances regarding these cases?
14    A. I was asked if I had any documents, which I
15 do not.
16    Q. Other than memoranda to Serono and similar
17 types of company memoranda, did you maintain notes
18 or some similar form of documentation of your
19 activities in the laboratory day to day at Serono?
20    A. No.
21    Q. Other than appearing for this deposition
22 and preparing for the deposition with counsel, are
23 you under an obligation to do anything else with
24 regard to this litigation under your agreement with

49

1 the Marshall Gerstein firm?
2    A. No.
3    Q. Besides Art Skoultchi, who else was on the
4 scientific board at Integrated Genetics prior to the
5 acquisition by Genzyme?
6    A. Jim Gazella, David Ward, David Houseman. I
7 don't know of anyone else -- I can't recall anyone
8 else.
9    Q. Were any of those gentlemen friends of
10 yours?
11    A. No.
12    Q. Did you talk with them in the course of
13 your work at Integrated Genetics?
14    A. Only Houseman.
15    Q. To the best of your recollection -- strike
16 that. When did you prepare the memo to Serono on
17 the concept of endogenous activation?
18    A. In August 1989, I believe.
19    Q. Sorry. I didn't hear the last part.
20    A. "I believe."
21    Q. Okay. You saw that document last night,
22 right, or yesterday sometime?
23    A. Yes.
24    Q. When did you join Serono?

14 (Pages 50 to 53)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

50

1    A. I believe it was June of 1989.
2    Q. And the memo to Serono on endogenous
3  activation -- obviously, I don't want a
4  word-for-word repetition, but generally what did it
5  say?
6    A. It said there's a technology that I've been
7  thinking about that I think could be used to express
8  proteins by a unique way, and I think that there are
9  strategic as well as defensive reasons for us
10  working on that, and I'd like permission to initiate
11  work in that area.
12    Q. When you were looking at this document
13  yesterday -- strike that. Do you know what
14  production numbers are? Have you seen documents
15  with production numbers on them?
16    A. Are you talking about legal documents like
17  in the bottom right-hand --
18    Q. Yes, sir.
19    A. Yes.
20    Q. Did the memo that you were looking at have
21  a production number on it; do you recall?
22    A. I believe so.
23    Q. When did you start thinking about
24  endogenous activation?

51

1        MR. FLOWERS: Objection, vague and
2  ambiguous.
3    A. The earliest time I can recall thinking
4  about it was on an airplane between Boston and
5  Arizona.
6    Q. I apologize for smiling. Virtually every
7  one of these cases has an airplane trip someplace
8  where the ideas come up. My apologies. Would that
9  have been 1989?
10    A. Yes.
11    Q. When did you start preparing your patent
12  application directed to endogenous activation?
13        MR. FLOWERS: Objection as to form,
14  vague and ambiguous as to "endogenous activation."
15    A. Shortly after I received permission to move
16  forward.
17        MR. KELBER: I ask you to mark that as
18  Exhibit 2080.
19        (Marked, Exhibit 2080, Green Form 4300,
20  Bates Nos. ARS 001480-001481.)
21    Q. Take your time, Doctor, to look at the
22  document that's been marked as Exhibit 2080. My
23  question to you is, is that in the nature of a
24  request for permission to move forward on endogenous

52

1  activation?
2    A. (Witness reviews document.) Could you
3  repeat the question?
4    Q. Surely. Is Exhibit 2080 in the nature
5  of -- I think you referred to it as a request for
6  approval to move forward with endogenous activation.
7    A. This is the formal request, and the
8  signature allows work to begin.
9    Q. When you say the signature, is that the
10  signature in the right-hand box just above the text?
11    A. That is.
12    Q. Now, the text seems to suggest that you --
13  and it refers to "we" -- are in the process of
14  submitting a patent on this idea; do you see that?
15    A. Yes, I see what you directed me to look at.
16    Q. To the best of your recollection, was that
17  accurate at the time, that is, as of the date of
18  your submission of the document that's been marked
19  2080, which appears to be October 11, 1989, there
20  was a group, including you, that was in the process
21  of submitting a patent on this idea?
22    A. Yes.
23    Q. When did you begin work on the patent, if
24  prior to authorization, prior to the date of the

53

1  authorizing signature?
2        MR. FLOWERS: Objection, asked and
3  answered.
4    A. The exact dates I certainly don't remember,
5  but I will tell you that I mentioned this as a
6  formal document; so when the exact work began, I
7  don't know, but this stamped date does not
8  necessarily mean that work happened -- that this is
9  time zero of work beginning.
10    Q. Right. But the patent application was in
11  preparation before time zero, if we assign this as
12  time zero; is that right?
13    A. I believe so.
14    Q. Who is the "we" that you are referring to
15  in that second sentence of the text underneath
16  "Scientific Basis and Proponent's Rationale"?
17    A. The royal "we."
18    Q. So Dr. Chappel -- what I meant to ask you
19  is, is that referring to your group that moved over
20  from Integrated Genetics with you that we discussed
21  earlier this morning?
22    A. You're asking about doing the work or --
23    Q. No, sir, simply the "we" that is referred
24  to as in the process of submitting a patent.

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

54

1    A.  I was in the process of submitting a
2  patent; however, because I am a -- was a complete
3  neophyte in the area of patent submission, a patent
4  attorney was helping me create the patent
5  application.
6    Q.  Who was the patent attorney that was
7  helping you create the patent application that is
8  referred to there?
9    A.  His name was, and I believe still is,
10  Giampiero De Luca.
11    Q.  And what was the nature of your interaction
12  with him in the process of putting together a
13  patent?
14    A.  The exact details I do not remember; but in
15  general, he would -- he was tasked with changing my
16  scientific description into a document that would be
17  acceptable for submission to the Patent Office.
18    Q.  Had work been authorized prior to the
19  authorizing signature being affixed to what's been
20  marked as 2080?
21    A.  By that "work" you're referring to my
22  creating a draft and interacting with him?
23    Q.  Working with Dr. De Luca, yes.
24    A.  It was around this time.  Whether it was

55

1  prior to or exactly that date -- I don't recall the
2  exact date.
3    Q.  As you read it today, is that paragraph
4  reasonably reflective of the work you intended to
5  do?
6    A.  To the extent that a scientific project can
7  be distilled in one paragraph, yes.
8    Q.  *Is there anything omitted in terms of
9  discrete projects or aspects that you in retrospect
10  would have felt important to include?
11    MR. FLOWERS:  Can I have that question
12  back.
13    *(Question read.)
14    A.  No.
15    Q.  Was the intent of the project similar to
16  the project we were discussing earlier, that is, to
17  provide desirable levels of protein expression
18  in the protein expression of proteins of interest?
19    MR. FLOWERS:  Objection as to form,
20  vague and ambiguous as to what the project is.
21    A.  As you can see from the first sentence, the
22  initial work was to generate data to demonstrate
23  that you could activate a gene using homologous
24  recombination.

56

1    Q.  And is that in order to obtain expression
2  of the gene product?
3    A.  Ultimately.  In a commercial sense, yes.
4    Q.  Well, does the technology have value
5  independent -- in terms of a useful product,
6  independent of the expression of protein?
7    A.  As a scientist the whole world -- the whole
8  focus is not necessarily to create a product; it's
9  to create a foundation of information.  Who knows
10  what may or may not -- yes, protein expression is
11  one aspect of that, but there could be many others.
12    Q.  When you were describing to me the nature
13  of your memo to Serono on the concept of
14  endogenous -- or introducing Serono to the concept
15  of endogenous activation, you indicated that it
16  would be used to produce proteins in a unique way.
17  Was there something else of value to Serono that you
18  described when producing proteins in unique
19  way for strategic as well as defensive reasons?
20    A.  Could you restate the question?
21    Q.  I'll try a layman's approach, Doctor, and
22  it may not work.  Was the target of this particular
23  project to produce proteins?
24    A.  There were two aspects, and the first was

57

1  to see if the technology actually would work to
2  activate a gene, and secondly, if that was the case,
3  that it could be used to produce proteins or -- yes,
4  it could be used to produce proteins.
5    Q.  Why else would you activate a gene?
6    A.  Well, for instance, there are companies now
7  that are focused exclusively on RNA as therapeutics,
8  so the gene products are not confined to proteins.
9  There are therapeutic products that are RNA as well.
10    Q.  And did you have that in mind in October of
11  1989?
12    A.  In October of 1989 I was focused on the
13  scientific concept of being able to activate genes
14  that were silent.
15    Q.  And when you tried to get Serono interested
16  in your interest, you told Serono that it would be a
17  useful way to produce proteins, right?
18    A.  Serono's a commercial entity, not an
19  academic foundation, so you needed to be able to
20  connect the dots to a commercial enterprise.
21    Q.  Did you propose to Serono that this would
22  be an interesting way to generate RNA of interest
23  back in 1989?
24    A.  No.

16 (Pages 58 to 61)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

58

1    Q. Did you discuss the nature of your answers
2  to the question "what was your interest in
3  endogenous activation" with counsel yesterday?
4        MR. FLOWERS: I instruct you not to
5  answer that question. It calls for attorney/client
6  privileged communications. I instruct you not to
7  answer.
8    Q. Are you going to follow that instruction?
9    A. Yes.
10   Q. Did you discuss with counsel yesterday
11 anything regarding the substance of what you
12 would -- might be asked today, without telling me
13 what it is?
14       MR. FLOWERS: Same instruction.
15       MR. KELBER: You're saying that's
16 attorney/client privileged, whether you discussed it
17 or not?
18       MR. FLOWERS: It's asking for the
19 substance of what he had conversations about with
20 his attorneys. What else would it be?
21   Q. My question to you, Doctor, is, did you
22 discuss with counsel yesterday or at any time
23 previously the nature of the answers you would
24 provide for specific questions that I might ask?

59

1        MR. FLOWERS: Same instruction.
2    Q. Are you going to follow that instruction,
3  Doctor?
4    A. Yes.
5    Q. Did you regard the generation of mRNA as an
6  end in itself for endogenous activation?
7        MR. FLOWERS: Objection, vague and
8  ambiguous as to time frame.
9    A. It's the first and most critical step.
10   Q. Okay. Is it an end in itself? In other
11 words, would -- let me try it a different way.
12 Would Serono have been happy, on demonstration that
13 activation was possible, to say, "We don't want to
14 go any further"?
15       MR. FLOWERS: Objection, calls for
16 speculation.
17   Q. You knew the answer then, and you know the
18 answer now. What is the answer to that question,
19 Doctor?
20       MR. FLOWERS: Same objection.
21   A. I don't know specifically what they would
22 say. It would -- I would guess that they would want
23 to carry the experiments further.
24   Q. As vice-president of research and

60

1  development -- I'm sorry, Doctor. I apologize. As
2  vice-president and scientific director of
3  Ares-Serono in 1992, would you have endorsed a
4  project that was purely of scientific interest that
5  cost the company money?
6    A. I would.
7    Q. Would the company have followed that
8  endorsement?
9    A. I don't know.
10   Q. In your memo that you reviewed yesterday to
11 Serono, did you mention that it would prove -- if
12 you demonstrated endogenous activation by
13 identification of transcription, that that would be
14 an end point for the project?
15   A. That was not included in the document.
16   Q. You reviewed your patent yesterday, right?
17   A. Yes.
18   Q. Did you see in the patent an indication
19 that the purpose of the patent, its utility, was
20 only the transcription of mRNA?
21   A. No.
22   Q. In fact, the patent specifically states
23 that the endogenous activation is for the purpose of
24 expression of a gene product, right?

61

1        MR. FLOWERS: I object to the extent the
2  document speaks for itself.
3    A. Protein expression is included in the
4  document. In fact, if you can give me a copy, I'll
5  point to what I'm speaking about.
6    Q. Well, I'm sure we'll get to it eventually,
7  Doctor, but you looked at it yesterday. Did you
8  come away with a feeling that the patent confined
9  its utility to observation of transcription?
10   A. No.
11       MR. KELBER: 2081.
12       (Marked, Exhibit 2081, Memo from S.
13 Bettelli to S. Chappel dated 11/7/89 plus
14 attachments, Bates ARS 001482-001490.)
15   Q. Doctor, I'm going to represent to you, as
16 you review Exhibit 2081, that I don't know that the
17 stapling of these pages into a separate document is
18 correct or accurate. It's simply how it was
19 received. My first question for you is, does this
20 document confirm the approval of your proposal that
21 we looked at in Exhibit 2080?
22   A. (Witness reviews document.) Yes.
23   Q. Was there a homologous recombination patent
24 at the time this document was prepared back in 1989?

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

Page 62

1    A. Patent, issued patent?
2    Q. Well, I'm just looking at -- the second
3    paragraph of the text of this document starts,
4    "Kindly note" -- it refers to -- I'm sorry. The
5    first paragraph says "homologous recombination
6    patent," and I'm just trying to get a feel for what
7    it's referring to.
8    A. I think -- there was no issued patent.
9    Q. Was there a patent application?
10   A. This was generated November 7, 1989. I
11   believe drafts were being prepared.
12   Q. And this document was directed to you,
13   correct?
14   A. Yes.
15   Q. There's a box there that contains the
16   legend MATAI; do you see that?
17   A. Yes.
18   Q. What is that referring to?
19   A. That's a drink.
20   Q. Sorry. And I could use one.
21       (Laughter.)
22   A. Ma-Tai was a pre e-mail, sort of like telex
23   kind of document.
24   Q. Why was this designated top secret?

Page 63

1    A. I don't know.
2    Q. Did you work on other things that were
3    designated top secret at Serono before leaving for
4    Diacrin?
5    A. Yes.
6    Q. Based on your experience, do you have an
7    understanding of why things would be designated top
8    secret?
9    A. My understanding is probably incomplete.
10   Q. To the best that you can express it, maybe
11   you could share it with me, however incomplete it
12   is.
13   A. Top secret projects were considered to be
14   strategic, potentially competitive.
15   Q. Who, if you recall, in the hierarchy of
16   Serono at the time was P. Ricci, R-i-c-c-i?
17   A. Paola Ricci was from the Geneva office, and
18   she was in charge of development.
19   Q. Do you see the paragraph that has kind of a
20   large exclamation point to its right?
21   A. Yes.
22   Q. Did you put that on; do you recall?
23   A. I don't recall.
24   Q. Is it your understanding that that was --

Page 64

1    that the title for the green form and the indication
2    of the product was to avoid generally disclosing the
3    specific work contemplated?
4    A. Yes.
5    Q. In what way would you provide relevant news
6    on the project to Serono?
7    A. Verbal communication.
8    Q. Well, there wouldn't be a likelihood of
9    verbal communication being inputted into the Ma-Tai,
10   in any event, would there?
11   A. Sorry?
12   Q. Do you see the bottom paragraph, that the
13   relevant news which you will be sending on this
14   project will not be input into the Ma-Tai?
15   A. (Witness nods.)
16   Q. Was all of the information that you
17   provided verbal?
18   A. Bettelli, the person who generated this,
19   Susi Bettelli, was involved in planning and time and
20   budget, not science. So she needed to know, is this
21   project ahead of schedule, behind schedule, above
22   budget, below budget. Those were issues for her.
23   Q. So those kinds of things are the relevant
24   news?

Page 65

1    A. As far as Susi Bettelli's concerned
2    (nodding).
3    Q. That's what you understood her to be
4    referring to?
5    A. Yes.
6    Q. And the green form rationale, is that the
7    description of the proposed project that we looked
8    at in Exhibit 2080?
9    A. Yes.
10   Q. To whom did you report the progress on this
11   project? Is it appropriate to refer to it as GF
12   4300? Does it retain that identity throughout?
13   A. Yes.
14   Q. Who did you verbally report to information
15   with respect to GF 4300?
16   A. Mr. Vannini and Mr. Bertarelli.
17   Q. And do you know, are they still with
18   Serono?
19   A. Fabio Bertarelli is dead and Mario
20   Vannini --
21       THE WITNESS: Is he dead?
22       MS. UHL: No, he's alive.
23   Q. Still alive?
24   A. He had a severe stroke.

18 (Pages 66 to 69)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

66

1    Q. Ah. In the course of working with -- is it
2  Dr. De Luca? Or in the course of working with
3  Giampiero on your patent application, did you review
4  prior art?
5    A. Are you asking did I do a prior art review,
6  or did he and I review prior art?
7    Q. Let's take it one at a time. Did you
8  review prior art?
9    A. Yes.
10   Q. And was that prior art generated in part by
11 Giampiero?
12   A. I don't believe so.
13   Q. Did you undertake to perform a specific
14 search for prior art relevant to your idea of
15 endogenous activation?
16   A. I wasn't qualified to do that.
17   Q. So what was the source of the prior art
18 that you did look at?
19   A. Scientific journals that I read or doing,
20 at the time, Index Medicus reviews.
21   Q. Were there periodic written reports
22 provided to anybody in the company regarding the
23 progress on GF 4300?
24   A. I don't believe so.

67

1    MR. KELBER: Would you mark this as
2  Exhibit 2082.
3    MR. FLOWERS: Could we go off the record
4  for a minute?
5    MR. KELBER: Sure.
6    (Recess.)
7    (Marked, Exhibit 2082, Part of report,
8  Bates Nos. ARS 001491-001492.)
9    MR. FLOWERS: Mr. Kelber, in regard to
10 your earlier questions regarding discussions that
11 Dr. Chappel had with us yesterday and whether those
12 included discussions of the substance of any answers
13 he was to give today, based on our conversation off
14 the record just now, I understand that you will
15 agree to ask that question and we will permit Dr.
16 Chappel to answer that question and agree that that
17 will not constitute any waiver of the attorney/
18 client privilege or work product as to further
19 details of any such discussions, so...
20   MR. KELBER: That's agreeable.
21   Q. So Dr. Chappel, did you, in discussions
22 with your attorneys in advance of this deposition,
23 discuss the substance of any questions you might --
24 substance of any answers you might provide in

68

1  response to questions during today's deposition?
2    MR. FLOWERS: I will just instruct the
3  witness not to divulge the details of what was
4  discussed, but you can answer that question.
5    A. Yes.
6    Q. Did you discuss -- and please give your
7  attorney an opportunity to object if he wants to --
8  the substance of the answer that you would provide
9  in response to questions concerning the purpose in
10 pursuing research on endogenous activation?
11   A. No.
12   Q. Did you receive instructions -- did you
13 discuss, without telling me what they would be, did
14 you discuss modifying any of the -- modifying the
15 substance of any of the answers you reviewed?
16   MR. FLOWERS: I'm sorry, repeat the
17 question.
18   Q. Let me try it more plainly. In the context
19 of discussing possible answers to questions that
20 were likely to be presented to you, did you discuss
21 modifications of the answers you were initially
22 inclined to provide?
23   MR. FLOWERS: I'll object to the
24 question on the basis that there's no foundation for

69

1  the predicate of the question.
2    Q. Let me try it again. You discussed the
3  substance of potential answers to questions that you
4  might be asked at today's deposition, right?
5    MR. FLOWERS: Subject to our earlier
6  agreement, you can answer that question.
7    A. We discussed what questions might be posed.
8    Q. And did you discuss what answers you might
9  give in response to the questions that might be
10 posed?
11   MR. FLOWERS: Same instruction.
12   A. In some cases, yes.
13   Q. Did you receive instructions from your
14 attorneys as to not to provide a specific answer
15 that you discussed?
16   A. No.
17   Q. Did you receive suggestions from the
18 attorneys as to an answer that might be valuable for
19 you to give?
20   A. Yes.
21   Q. What was the subject of those answers?
22   A. I was told --
23   MR. FLOWERS: That I will instruct you
24 not to answer.

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

70

1   A. -- to tell the truth.
2   MR. FLOWERS: Okay.
3   Q. Now that we've heard it, okay. Exhibit
4   2082 is the document that's in front of you, Doctor.
5   Is that a type of document that you're familiar with
6   seeing from your days at Serono through '92?
7   A. (Witness reviews document.) I'm sorry to
8   tell you, I don't -- I mean, this is obviously a
9   piece of a -- I don't know what this document is in
10  relation to, if this is like an internal progress
11  report or -- it says "interim report," but -- I
12  don't recall specifically what this is. Obviously,
13  it's detailing progress in several other programs,
14  several other green forms in addition to 4300.
15  Q. Was GF 4493 also in your laboratory?
16  A. Yes.
17  Q. Did your laboratory provide interim reports
18  for Serono on the progress of various investigations
19  authorized under green forms?
20  A. Yes.
21  Q. Is this such a report?
22  A. (Witness reviews document.) Yes.
23  Q. With what frequency were interim -- or,
24  sorry, progress reports provided; do you recall?

71

1   A. No.
2   Q. Did you author the substance of Exhibit
3   2082 that is related to GF 4300?
4   A. No.
5   Q. Do you know who is?
6   A. Who did?
7   Q. Who did write that? I don't mean to
8   suggest the typing, but the substance of the report.
9   A. I don't know, but someone within my group.
10  Q. Well, do you see in the first full
11  paragraph under the heading that ends "from the TSH
12  beta gene in rat GH3 cells," do you see there's
13  reference --
14  A. Wait, I'm sorry.
15  Q. I'm sorry, that first whole paragraph
16  underneath the caption. Have you found it?
17  A. Okay.
18  Q. There is a reference to Christie and Jeff,
19  and there's a reference in this report to Scott.
20  Would it have been the practice in the laboratory
21  for somebody other than yourself and Christie and
22  Jeff to do the writing?
23  A. The writing would have been done by someone
24  intimately involved in the project.

72

1   Q. Besides yourself, Christie, and Jeff, who
2   else could that have been? This is 1991.
3   A. Carol Luchetti.
4   Q. I'm sorry?
5   A. Carol Luchetti.
6   Q. Did you review the interim reports?
7   A. Did I or was I supposed to?
8   Q. Let's start with did you.
9   A. Probably not all the time.
10  Q. Do you recall reviewing the specific report
11  that is 2082?
12  A. No.
13  Q. Were you supposed to?
14  A. Yes.
15  Q. Why?
16  A. I was the head of the group.
17  Q. And were the reports intended to provide a
18  summary of the work that had gone on in the
19  laboratory on that project through that time period?
20  A. Yes.
21  Q. I know I asked you this before, but perhaps
22  in talking about it -- do you remember the
23  frequency with which interim -- sorry. Do you
24  remember the frequency with which reports of this

73

1   nature, that is, 2082, were supposed to be prepared?
2   A. No.
3   Q. Do you recall reports being prepared in
4   connection with any other project other than 4300
5   and 4493 during your employment at Serono from 1992?
6   A. Yes.
7   Q. What was the purpose of those reports, as
8   best you recall?
9   A. To provide updates to senior management in
10  Geneva.
11  Q. We looked a minute ago at an approval date
12  of October 1989 for GF 4300, right?
13  A. (Witness nods.)
14  Q. Do you think it's likely there was a report
15  on progress in the laboratory on GF 4300 prior to
16  1991?
17  A. I don't know.
18  Q. Do you think it's possible that a whole
19  year would have elapsed after approval of the
20  project without providing to management in Geneva an
21  idea of where the project was?
22  A. In written form?
23  Q. Yes, sir.
24  A. Yes.

20 (Pages 74 to 77)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

74

1    Q. That's just the way you operated?
2    A. That's the way top secret programs
3  operated.
4    Q. Well, why did it make a difference whether
5  it was top secret? I mean, if it was top secret --
6  well, let me ask, why did it make a difference if it
7  was top secret?
8    A. Why did what make a difference?
9    Q. The frequency of written reports.
10   A. Top secret reports didn't have written --
11  top secret programs didn't always have written
12  reports, progress reports. As I mentioned, they
13  were verbal.
14   Q. Was Exhibit 2082 against the rules at the
15  time?
16   A. No.
17   Q. Why would this particular document have
18  cause to be generated?
19   A. Perhaps because the program was no longer
20  considered top secret.
21   Q. Do you recall that that was true?
22   A. No.
23   Q. Why would it cease to be top secret?
24   A. Because a patent was filed.

75

1    Q. I'm sorry?
2    A. Because a patent was filed may be an
3  explanation.
4    Q. The patent was filed, I think you told me
5  in 1989, correct?
6    A. I don't think I told you, but I believe
7  that the initial submission date was December 1989.
8    Q. So if it went off top secret --
9    A. I don't know if it went off top secret.
10   Q. This is a project you put a substantial
11  amount of effort into yourself, correct, was GF
12  4300?
13   A. Correct.
14   Q. Do you recall it ever transitioning from
15  top secret to something else?
16   A. No.
17   Q. What other reason could it have had --
18  could there be for changing it from top secret to a
19  status that it would be subject to interim reports?
20       MR. FLOWERS: I just caution the witness
21  not to speculate.
22   A. I don't know.
23   Q. Did you work on any other top secret
24  projects at Serono?

76

1    A. Yes.
2    Q. Did any of those other top secret projects
3  change from being top secret to something else?
4    A. Yes.
5    Q. Do you recall the reasons for the change in
6  those projects?
7    A. Yes.
8    Q. Would you share that with me now?
9    A. Without going into detail, an example would
10  be there's -- a top secret project is developing a
11  product, and in parallel with that business
12  development acquires -- in-licenses a product and
13  the top secret program ends. And in fact, that's
14  the other top secret project that I was working on.
15   Q. In that case did the project itself end or
16  just its classification as top secret?
17   A. In that case the project itself ended.
18   Q. So the company didn't want to spend money
19  pursuing the same thing in two different directions
20  when it had obtained it by in-licensing, right?
21   A. Correct.
22   Q. That didn't happen with respect to GF 4300,
23  did it?
24   A. No.

77

1    Q. Would there have been an official
2  notification that you would have received if a
3  project changed from being top secret to something
4  else?
5    A. No.
6    Q. How would you know whether to treat it as
7  verbal only or as written plus verbal?
8    A. My boss would tell me.
9    Q. And who was your boss at that time, in the
10  1989 to 1992 time frame?
11   A. Fabio Bertarelli.
12   Q. Do you know with whom Fabio Bertarelli
13  would have shared the information that you provided
14  him regarding GF 4300, that you provided verbally?
15   A. No.
16   Q. Did Serono at some point in-license
17  endogenous activation technology?
18   A. No, not to my knowledge.
19   Q. Are you aware of activity at the Institut
20  Pasteur regarding endogenous activation in the same
21  general 1989 to 1992 time frame?
22   A. Yes.
23   Q. And are you aware that Serono in-licensed
24  that technology?

21 (Pages 78 to 81)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

78

1     A. No.
2     Q. No one ever discussed the possibility of
3  licensing --
4     A. The possibility, yes.
5     Q. And what was the nature of those
6  discussions, as best you can recall?
7          MR. FLOWERS: Just exclude from your
8  answer any attorney/client privileged conversations.
9     A. What was the nature of the discussion?
10    Q. Yes, sir, as best you can recall now.
11         MR. FLOWERS: Same instruction.
12    A. I don't recall any specifics.
13    Q. Was Serono looking at obtaining a license
14  from Institut Pasteur?
15         MR. FLOWERS: Same instruction.
16    A. Yes.
17    Q. Why?
18         MR. FLOWERS: Same instruction: Don't
19  divulge attorney/client communications with lawyers
20  from Serono.
21    A. I don't know.
22    Q. Nobody ever asked you whether it was a good
23  idea or bad idea?
24         MR. FLOWERS: Same instruction.

79

1     A. What?
2     Q. Again, whether to license endogenous
3  activation technology from Institut Pasteur. Were
4  you asked to comment on the value of that potential
5  license?
6     A. No.
7     Q. What were you asked -- sorry. Were you
8  asked to do anything with respect to the Institut
9  Pasteur's technology that paralleled your work on
10  endogenous activation?
11    A. I had lunch with Brulet, a guy at Institut
12  Pasteur. That was it.
13    Q. I take it you talked at lunch about what?
14    A. Molecular biology, I guess. I don't
15  recall.
16    Q. Well, let me back up a couple of paces.
17  You talked -- I think you told me that you were
18  aware of the possibility at Serono in 1989 to 1992
19  of licensing Institut Pasteur technology on
20  endogenous activation; is that accurate?
21    A. No, I don't think I said that.
22    Q. You didn't talk about that with anybody?
23    A. "With you," you said.
24    Q. You knew what, sir?

80

1     A. "With you," you said.
2     Q. Okay. Did you talk about the possibility
3  of licensing the Institut Pasteur technology on
4  homologous recombination with anybody in the time
5  frame 1989 to 1992?
6          MR. FLOWERS: Just exclude the substance
7  of any attorney/client conversations.
8     A. It's attorney/client privileged.
9          MR. FLOWERS: You can answer as to
10  whether you had conversation with anyone.
11    A. I did. I had a conversation with De Luca.
12    Q. You had a conversation with Giampiero De
13  Luca?
14    A. Yes.
15    Q. He's the same attorney that helped you
16  write this patent application you referred to,
17  right?
18    A. Yes.
19    Q. Any other attorneys present?
20    A. No.
21    Q. Was the conversation in person or over the
22  telephone?
23    A. Yes.
24    Q. Sorry. It was in person?

81

1     A. It was over the telephone and in person.
2     Q. Okay. So there was more than one
3  conversation on this subject, correct?
4     A. Yes.
5     Q. During any of the conversations that you
6  had, whether over the telephone or in person, were
7  there any attorneys ever present other than De Luca?
8     A. No.
9     Q. Was your opinion as to the value of the
10  Institut Pasteur technology on homologous
11  recombination solicited during these conversations
12  by De Luca?
13         MR. FLOWERS: That calls for
14  attorney/client communications from our
15  perspective. I can let him answer that yes or no if
16  you will agree it's not a waiver.
17         MR. KELBER: I'm not going to regard it
18  as a waiver.
19         MR. FLOWERS: You can answer that yes or
20  no.
21    A. So the question was?
22    Q. Was your opinion as to the desirability of
23  licensing Institut Pasteur technology on homologous
24  recombination solicited during the conversations you

22 (Pages 82 to 85)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

82

1  had over the telephone and in person with De Luca?
2      A. No.
3      Q. Was the value of their technology discussed
4  with you during these conversations?
5          MR. FLOWERS: Same. If you will accept
6  a yes or no on a no-waiver basis --
7          MR. KELBER: We will regard an answer as
8  a waiver -- we will not regard an answer as a
9  waiver.
10         MR. FLOWERS: You may answer.
11     A. The question was, was my scientific opinion
12 requested?
13     Q. Just your opinion, Doctor.
14     A. My scientific opinion, that's the only
15 opinion that was requested.
16     Q. If you can tell me, what's the difference
17 between a scientific opinion and another kind of
18 opinion? And I'm not talking now just in the
19 context of your conversations with De Luca, which
20 you were very careful to tell me your scientific
21 opinion was the only opinion requested. How do you
22 distinguish between that and a different kind of
23 opinion?
24     A. In my mind a scientific opinion would mean

83

1  after reviewing a published paper or a document, is
2  it scientifically sound, were the experiments done
3  appropriately, and is it scientifically of value.
4      Q. And the scientific opinion that you gave
5  with respect to the Institut Pasteur technology
6  employing homologous recombination was that it was
7  sound, correct?
8          MR. FLOWERS: I'll instruct you not to
9  answer that on the basis of attorney/client
10 privilege.
11     Q. Are you going to follow that instruction?
12     A. Yes.
13     Q. Did they -- did Serono advise you that they
14 did license Institut Pasteur technology?
15     A. Yes.
16     Q. I'm sorry, yes?
17     A. Yes.
18     Q. Is that consistent with your scientific
19 opinion?
20         MR. FLOWERS: Objection, vague and
21 ambiguous.
22     A. Yes.
23     Q. In rendering your scientific opinion, did
24 you need to see data demonstrating the

84

1  effectiveness -- strike that. Did you need to see
2  data, experimental data, to arrive at the conclusion
3  that you did?
4      A. Yes.
5      Q. Was GF 4300 a success in your opinion? Was
6  it successful?
7      A. Yes.
8      Q. When was the data obtained to confirm for
9  you that GF 4300 was a success?
10     A. When I saw that there was TS -- a rat TSH
11 beta transcript generated as a PCR product.
12     Q. Just looking at Exhibit 2082, that would
13 have been subsequent to the time this was written,
14 right?
15     A. That?
16     Q. The time that you saw the data that you
17 just referred to, the transcript.
18     A. Would have been subsequent to?
19     Q. To whenever this interim report or whatever
20 it is, the subject matter of 2082, was written.
21     A. I don't know. If you will give me a
22 minute, I will read it.
23     Q. Sure, take your time, Doctor. This is not
24 an endurance contest.

85

1      A. (Witness reviews document.) Okay, okay.
2      Q. At the time Exhibit 2082 was written,
3  whenever that was, your laboratory was not yet in
4  possession of data to allow it to be certain that
5  endogenous activation of the TSH beta gene in rat
6  GH3 cells had been achieved, correct?
7          MR. FLOWERS: Objection to the extent it
8  calls for speculation.
9      A. Well, it says in the results that two
10 samples have repeatedly tested positive.
11     Q. And it says that that "should allow us to
12 establish whether or not TSH beta gene transcription
13 is the result of homologous recombination," correct?
14 It's written in the future tense, right?
15     A. Yes.
16     Q. Had you already done work independent of
17 what was being reported here to confirm that in fact
18 that had occurred?
19     A. Could you say that again?
20     Q. Had you done work that is not reflected in
21 this report that in fact confirmed that TSH beta
22 gene transcription that was the result of homologous
23 recombination had been observed?
24     A. No.

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

86

1    Q. How did you and your laboratory ultimately
2  handle the problem of false positives that is
3  referred to in the first paragraph on the first --
4  on the page bearing Production No. 1491?
5      A. I believe it was handled by what's referred
6  to on the second page, and that is to depend more on
7  the selection system.
8    Q. Did you work in connection with GF 4300
9  with a dominant amplifiable marker other than DHFR?
10  And when I say "you" in this context, Doctor, I mean
11  your laboratory. I appreciate you didn't do the
12  laboratory work.
13     A. To the best of my knowledge, no.
14    Q. Do you see where it indicates that -- well,
15  the first two sentences under "Selection of a
16  dominant amplifiable marker gene" -- summarizing,
17  that this portion of the project has been a source
18  of some frustration? Does that reflect your
19  recollection of events as well?
20     A. Scientific research is 95 percent
21  frustration.
22    Q. This one was particularly frustrating to
23  whoever wrote this; is that also your memory?
24     A. No.

87

1    Q. You don't recall there being a particular
2  problem with the use -- the selection of a dominant
3  amplifiable marker gene?
4      A. There were problems each step along the way
5  as in any other research project.
6    Q. Is it your practice in the laboratory
7  always to turn to Celltech for assistance?
8      A. No.
9    Q. Is it your practice to turn to NIH for
10  assistance?
11     A. The scientific community, to -- these are
12  making requests to receive other selectable markers,
13  and it's easier to --
14    Q. Well, not just selectable, but amplifiable
15  as well, right?
16     A. Correct.
17    Q. And that was because the DHFR that was
18  being used in your laboratory was proving
19  intractable; is that right?
20     A. No.
21    Q. Why look elsewhere?
22     A. We tried many different things.
23    Q. Did you try using many different
24  amplifiable and selectable markers?

88

1      A. We tried obtaining others.
2    Q. You tried obtaining others when the
3  specific DHFR marker that you were working with
4  proved intractable in this particular project,
5  right?
6      A. If you look on the second page, the
7  sentence after "We therefore were forced to
8  discontinue our consideration of the glutamine
9  synthetase systems," it says, "The DHFR system,
10  which is already in-house, is being tested for use
11  in GH3 cells by the tissue culture group. The
12  results are not encouraging." That means that
13  projects were ongoing, we hadn't come to any
14  conclusion.
15    Q. "The results are not encouraging" is not a
16  positive progress report, is it?
17     A. No.
18    Q. Did you know in 1991 whether the DHFR
19  marker that you were working with would work in GH3
20  cells?
21     A. I do recall there were experiments to show
22  that it did work, it was effective in selecting
23  cells in -- GH3 cells. The exact date I don't
24  recall.

89

1    Q. Was it effective in amplifying DNA in the
2  GH3 cells?
3      A. I don't know.
4    Q. You don't remember seeing that?
5      A. No.
6    Q. If that were to have been done in your
7  laboratory, you would have seen it, though?
8      A. Yes.
9    Q. In fact, that's something you wanted to
10  happen as part of this project, right, amplification
11  of the DNA in GH3 cells through the use of DHFR?
12     A. Yes.
13    Q. The DHFR that is referred to on the second
14  page of Exhibit 2082 as in-house, I think is the
15  language, already in-house, is that the one that you
16  described for me before that has the mutation in the
17  enzyme?
18     A. It has mutation in the DNA.
19    Q. And I apologize for retreading some ground,
20  but in this context of using it as a selectable
21  amplifiable marker, why use that particular DHFR
22  with respect to that mutation?
23     A. Because the host cells contained an
24  endogenous copy of wild type DHFR.

24 (Pages 90 to 93)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

90

1    Q. If you could expand your answer. Why did
2  having the gene for DHFR with the mutation provide
3  some degree of utility because the host cell had an
4  endogenous copy of DHFR?
5    A. Yes. I lectured on that earlier today, and
6  I'll try and be more clear. The endogenous DHFR is
7  more sensitive to methotrexate than the engineered
8  version of DHFR. Therefore, you don't have to find
9  cells that are deficient in DHFR; you can select
10 between those that have taken up your copy of DHFR
11 in the presence of having an endogenous enzyme.
12   Q. Would the endogenous DHFR gene work as an
13 amplifiable marker in GH3 cells, perhaps not a
14 dominant one, but an amplifiable marker nonetheless?
15   A. Are you asking, the DHFR that is part of
16 the normal genome of a GH3 cell, could you amplify
17 that gene?
18   Q. Let's go with that.
19   A. I don't know.
20   Q. You needed the distinct form, the form with
21 the mutation, in order to be certain of that?
22   A. No.
23   Q. Could you use the mutated form to be
24 amplified -- amplifiable, sorry?

91

1    A. That's what we were doing.
2    Q. Yes. Was it successful?
3    A. Were we successful in demonstrating that
4  you could amplify the transgene version of DHFR in
5  the presence of wild type endogenous DHFR? Yes.
6    Q. Were you able to amplify the gene of
7  interest through that technique?
8    A. Yes.
9    Q. And were you able to obtain an increase in
10 protein expression through that amplification?
11   A. Yes.
12   Q. What was the protein that you expressed in
13 that way?
14   A. FSH.
15   Q. Did you try the same thing with TSH?
16   A. No.
17   Q. Did you see any documents at any time in
18 reviewing for your -- reviewing with your attorneys
19 for this deposition some sort of documentation that
20 reflected your success with FSH in amplification of
21 the gene encoding the FSH subunit?
22   A. No.
23   MR. KELBER: Has that been produced
24 counsel? The reason I ask is in the documents that

92

1  you just gave us just yesterday, which appear to be
2  relevant, you've cut out the FSH part, which is GF
3  14 -- 4493. Are you taking the position --
4    MR. FLOWERS: We produced the documents
5  that we believe are potentially relevant to the
6  issues in this case.
7    A. May I make a comment?
8    Q. Yes.
9    A. This is the receptor. This is not FSH.
10 This is FSH receptor.
11   Q. No, I understand that. Would the work that
12 you did in successfully demonstrating FSH, the
13 subunit's amplification and increased protein
14 expression, if all that we got were reports on GF
15 4300, would you expect it to be in there, a report
16 on the increased protein production and
17 amplification of the FSH subunit?
18   A. Would I -- I don't understand the question.
19   Q. Well, you achieved the desired result of
20 increasing protein production simply by
21 amplification of the mutant DHFR gene with respect
22 to FSH, right?
23   A. Yes.
24   Q. You didn't -- in connection with that, you

93

1  didn't insert a promoter for the FSH subunit itself,
2  right? It was just the DHFR gene?
3    A. No, that's not correct.
4    Q. Oh, I'm sorry, my mistake. So that was
5  with a promoter for FSH and a promoter for DHFR and
6  the DHFR gene; is that right?
7    A. Yes.
8    Q. But you didn't add another FSH gene; it was
9  the promoter plus the DHFR and the DHFR promoter,
10 right?
11   MR. FLOWERS: Sorry. Could you repeat
12 that?
13   Q. In the plasmid that you used to achieve
14 this amplification of the FSH gene and therefore the
15 production, there was a promoter for FSH, there was
16 a promoter for DHFR and DHFR, correct?
17   A. Correct, and a gene for FSH.
18   Q. So you inserted a gene for FSH as well?
19   A. Yes.
20   Q. Is that endogenous activation?
21   A. No.
22   Q. Ah.
23   MR. FLOWERS: I wondered why you were
24 spending time on this.

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

94

1          MR. KELBER:  Thank you, Counsel.
2      Q.  Did you achieve amplification through
3  endogenous activation and use of a selectable
4  amplifiable marker?
5      A.  No.
6      Q.  Has it been done by anybody else to date;
7  do you know?
8      A.  I don't know.
9      Q.  Did you -- did your laboratory try to do
10  that?
11      A.  No.
12      Q.  Why was it important to find an amplifiable
13  marker --
14          MR. FLOWERS:  Objection, vague and
15  ambiguous.
16      Q.  -- for GF 4300?  I mean, it's proving to be
17  a source of some frustration as of the writing of
18  2082.  Endogenous activation doesn't include the
19  additional gene for, in this case, TSH beta, right?
20      A.  I'm sorry, I don't understand the question.
21      Q.  Okay.  We talked a while ago about the
22  value of a dominant amplifiable marker in that if
23  you got it -- let me back up.  Your laboratory never
24  attempted -- is it correct, Doctor, that the people

95

1  working with you never attempted to achieve
2  increased protein production by the homologous
3  recombination of a targeting vector that had only
4  DHFR and a promoter for DHFR?  You just didn't do
5  that work; is that right?
6      A.  I'm sorry, I don't understand what -- could
7  you repeat the question?
8      Q.  I'll try it a different way.  I think I'm
9  just not being clear.  Was the use of an amplifiable
10  marker always -- in the endogenous activation work
11  that you and your laboratory did, was it always as
12  an adjunct to the insertion of a promoter for the
13  beta subunit?
14      A.  Was it always... No.
15      Q.  You used it without a promoter for the beta
16  subunit?  Let me back up entirely, get away from
17  2082 for a minute, because I'm confusing you, and
18  that was not my intention.
19          We talked a little bit about the vectors
20  that you used prior to this time for random
21  integration, and I want to talk about the vectors
22  that you would use for endogenous activation.  How
23  would the vector that you used for endogenous
24  activation of TSH beta differ from the vector that

96

1  you used just a few months previously for random
2  integration of the TSH beta subunit?
3      A.  Okay.  First, it wasn't a few months, it
4  was years.  We had been using it for years, DHFR,
5  for random -- amplifying genes for random
6  integration.  So for this particular work, the
7  plasmid contained targeting sequences which the
8  random would not.  It would contain a promoter that
9  would be put upstream of the desired that -- the
10  targeted gene.  It would contain a DHFR gene, and it
11  would contain a promoter for DHFR.  I think I
12  understood why I didn't understand what you were
13  saying.
14      Q.  Other than my bad words?
15      A.  And just to draw your attention to this
16  page, the second page, "Selectable marker to use to
17  super transfect the appropriate," so that was a --
18  those were studies that were going on trying to find
19  the best selectable marker for GH3.  This was not --
20  this was not homologous recombination.  Super
21  transfection was just testing different amplifiable
22  markers.  So when you were drawing my attention to
23  this, I think that --
24      Q.  Super transfection didn't involve targeted

97

1  recombination; is that right?
2      A.  Super transfection was not homologous
3  recombination.
4      Q.  I do appreciate your struggling to clarify
5  the confusion I created.
6          In the vector that you were describing
7  for me for endogenous activation, we talked about
8  four units.  There's the promoter -- there's the
9  targeting element, and then there's the promoter for
10  the targeting -- targeted gene, the gene of
11  interest, and that goes in upstream of the gene of
12  interest, there is DHFR, and the promoter for DHFR,
13  right?
14      A.  Yes.
15      Q.  Did you work on homologous recombination
16  with a vector that did not have that first promoter
17  for the gene of interest, that is, the active
18  element with the targeting segments, with a promoter
19  for DHFR, and the DHFR only?
20      A.  But no promoter for the --
21      Q.  (Nodding.)
22      A.  That could have been a negative control,
23  but I wouldn't understand why we would do that.
24      Q.  And I wasn't asking it as a trick question.

26 (Pages 98 to 101)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

98

1  **Was it part of a -- an intended part of GF 4300?**
2  A. Are you going to tell me which ones are the
3  trick questions and which ones aren't?
4  **Q. I promise.**
5  A. No, it was not.
6  **Q. One way you might use such a vector in**
7  **homologous recombination, that is, no promoter for**
8  **the gene of interest, the gene you wanted produced,**
9  **but the promoter for DHFR and DHFR, to my limited**
10  **way of thinking, is to activate the gene of**
11  **interest, if you could collocate that vector with**
12  **the gene of interest -- sorry -- to amplify the gene**
13  **of interest, if you could collocate the DHFR vector**
14  **with the gene of interest and thereby increase**
15  **expression. Did you do any work like that?**
16  A. No.
17  **Q. Did that work as a reality? Is that**
18  **possible?**
19  A. I don't know.
20  **Q. Do you have to see that done in order to be**
21  **able to render an opinion that yeah -- would you**
22  **have to see the data as we discussed before?**
23  A. Yes, I'd need to see the data.
24  **Q. Knowing that your interests remained**

99

1  **varied over the years, that you pursued different**
2  **lines of research, have you read about anybody doing**
3  **just that, using solely insertion of the amplifiable**
4  **gene through homologous recombination to increase a**
5  **copy of the gene of interest and thereby protein**
6  **expression?**
7  A. I haven't read that.
8  MR. KELBER: Let me ask you a much
9  harder question. This is not meant to be an
10  endurance contest. Do you want or need lunch?
11  THE WITNESS: Want? Yes. Need?
12  MR. KELBER: Ultimately, this is a
13  question up to your attorneys. But you guys, if
14  this is a good time to break for lunch, we're happy
15  with that.
16  (Discussion off the record.)
17  MR. KELBER: Actually, would you mark
18  this, please, 2083.
19  (Marked, Exhibit 2083, Final report on
20  Green Form 4300 dated January 1992, Bates Nos. ARS
21  001515-001119.)
22  (Luncheon recess at 12:45 p.m.)
23
24

100

1  AFTERNOON SESSION (1:36 p.m.)
2  BY MR. KELBER:
3  **Q. Welcome back, Doctor. Before you is**
4  **Exhibit 2083. We looked at this document a little**
5  **bit this morning as a collection of other documents;**
6  **and we looked specifically at page 1516, which is, I**
7  **believe, the second page of this collection of**
8  **documents. Do you recall seeing the entire**
9  **document, now that we have been talking about this**
10  **subject matter for a few hours?**
11  A. (Witness reviews document.) No.
12  **Q. Were final reports a standard kind of**
13  **document that was prepared at Serono in the '89 to**
14  **'92 time frame?**
15  A. Yes.
16  **Q. What was the nature of a final report?**
17  **What did it aim to achieve?**
18  A. Ordinarily, a final report would be
19  submitted at the conclusion of a green form, and a
20  green form would -- was the file for -- that
21  contained the science, the finance, the project plan
22  for a particular program.
23  **Q. If you know, what was the purpose for**
24  **entering such a final report? What was it intended**

101

1  **to achieve? Why go to the effort of preparing a**
2  **final report at the conclusion of a green form?**
3  A. I believe -- there were probably multiple
4  reasons, but the reason that I believe was most
5  important was to serve as an archive of the work
6  that was done so that others could access that
7  information at some time in the future, and also
8  because many, if not all, of these people, you know,
9  would cycle in and out of the company, and you need
10  to have some common site to access information.
11  **Q. Why would such a final report go to De**
12  **Luca?**
13  A. I don't know. There's a lot of other
14  people on the list too. De Luca because he --
15  again, this is my guess. It's because he was
16  involved in the beginning with me writing the patent
17  application.
18  **Q. In terms of the front page, which**
19  **identifies monitor, author, contributors, and people**
20  **on the circulation list, you're not identified. Is**
21  **it correct that you were the head of GF 4300?**
22  A. We didn't call people heads. They would be
23  the monitor.
24  **Q. And for this one Christie Kelton was the**

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

102

1  monitor?
2     A. Yes.
3     Q. What was your relationship to GF 4300? I
4  know you were the author of the request for
5  authorization for it. Did you have an official role
6  in the context of GF 4300?
7     A. No more than any other green form that
8  would be ongoing at Ares Advanced Technology. I was
9  a site head, therefore responsible for all of the
10  programs.
11     Q. Did you have any input into the final
12  report for GF 4300?
13     A. I haven't looked at this. I probably -- I
14  should have reviewed it before it was submitted.
15     Q. Do you have an understanding today of what
16  your signature on 1516 is intended to indicate?
17     A. That I read it.
18     Q. Okay. What struck me -- scratch that. We
19  talked a little bit this morning about laboratory
20  notebooks and that you didn't particularly keep a
21  laboratory notebook in this period at Serono; is
22  that right, or was that just for GF 4300?
23     A. I didn't keep a lab notebook.
24     Q. Independent of the project?

103

1     A. I kept no lab notebooks.
2     Q. I take it people working on this project,
3  at least Kelton and Olsen, did keep laboratory
4  notebooks?
5     A. Yes.
6     Q. What was the practice about laboratory
7  notebooks at Serono at that time, if you know? Were
8  they handed out one at a time?
9     A. Were the lab notebooks handed out one at a
10  time?
11     Q. How did you go about getting a laboratory
12  notebook if you wanted one?
13     A. You weren't asked if you wanted one. You
14  got one.
15     Q. Okay, you got one.
16     A. When you were hired as a scientist -- all
17  the lab notebooks were numbered -- you received the
18  next one in the pile. When you completed your --
19  when you filled up your lab notebook, you got the
20  next -- an empty --
21     Q. Whatever the next one was?
22     A. Right.
23     Q. Did you surrender the first one to get the
24  new one, or did you retain the notebooks?

104

1     A. Usually they were retained.
2     Q. What would happen to notebooks at the end
3  of the project?
4     A. Nothing.
5     Q. If the individual who had been working in a
6  series of notebooks left the company, did they have
7  the option of taking the notebooks with them?
8     A. No.
9     Q. I know you went back to Serono after having
10  left for a time. When you went back to Serono, to
11  the best of your knowledge, was the practice still
12  to maintain the company notebooks that had been
13  completed by folks that were no longer there?
14     A. By folks who were no longer there?
15     Q. Researchers who had completed a notebook
16  and were not retaining it perhaps because they left
17  the company. Let me ask it a different way, Doctor.
18  Did the company archive --
19     A. Yes.
20     Q. -- the laboratory notebooks?
21        You worked a fair amount of time with
22  Christie Kelton. In your opinion, was she a fairly
23  faithful recorder of events in the laboratory in her
24  notebook?

105

1     A. Yes.
2     Q. So if it showed up in her notebook, you
3  could rely on it?
4     A. Yes.
5     Q. Would the same be true of Jeffrey Olsen?
6     A. Yes.
7     Q. When the nominal author went to prepare a
8  final report, would the notebooks reflecting the
9  work to be detailed in the final report be accessed
10  by the author?
11     A. Ordinarily, you would assume that they were
12  still at the person's workbench if they were still
13  employed. Even if the notebook had been filled up
14  and they were on a new notebook, they would have on
15  their bookshelf older notebooks that they would be
16  able to access.
17     Q. The reason I asked is -- so just looking at
18  2083, which is the final report for GF 4300, the
19  author is Jeffrey Olsen. And I believe it's correct
20  that he did wet work on the project, GF 4300, right?
21     A. He's one of them, yes.
22     Q. And Christie Kelton also did wet work on
23  the project?
24     A. Yes.

28 (Pages 106 to 109)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

106

1  Q. I'm sure there were others. Would
2  Mr. Olsen access Ms. Kelton's laboratory notebook in
3  preparing the final report?
4       MR. FLOWERS: Objection to the extent it
5  calls for speculation.
6  A. I don't know, but by "access" I'm not sure
7  I understand what you mean.
8  Q. Would he look at them?
9       MR. FLOWERS: Same objection.
10  A. Probably.
11  Q. And again, like all the other documents,
12  feel free to look all or any part of it, but as I
13  was going through what has been marked as 2083, I
14  noticed that throughout sections there are specific
15  notebook references. If you turn to production page
16  1519, do you see the reference to -- I gather that's
17  a notebook, MB0002?
18  A. Yes.
19  Q. And it seems pretty straightforward, but
20  you never know. So at those pages of that notebook,
21  I would expect to see the work demonstrating that
22  the GH3 cells are TSH beta RNA negative by PCR,
23  right; is that your understanding?
24  A. Yes.

107

1  Q. I mean, you saw other final reports at
2  Serono, right?
3  A. Yes.
4  Q. And they all had this kind of general
5  format, right?
6  A. Yes.
7  Q. And that was the purpose of referencing
8  those notebook pages, so that you could go, if you
9  needed to, and review the work that had been done,
10  right?
11  A. Yes.
12  Q. If you turn to production pages 1522 to
13  1523, there's a whole listing of references for
14  particular notebooks. And some of it is for vector
15  construction, some of if is for screening. Do you
16  see that? Do you see those references there?
17  A. Yes.
18  Q. To able to know precisely what was done in
19  the work that's summarized in the preceding section,
20  you would go to those laboratory notebook pages, is
21  that right?
22  A. Yes.
23  Q. Is it your understanding that those
24  laboratory notebooks, if they're not in the

108

1  possession of an individual currently at Serono,
2  would be in the Serono archives?
3       MR. FLOWERS: I caution the witness not
4  to speculate.
5  Q. Let me try a different question on you, Dr.
6  Chappel. If you were authorized to access it, how
7  would you go about finding this notebook MB0002?
8  A. Today?
9  Q. Yes, sir.
10  A. I don't know, but what I would have done if
11  I was working for the company, for instance, and I
12  needed to access this, all laboratory notebooks are
13  microfiched, so probably that's what I would do. I
14  would need to find out what MB0002 stands for, and I
15  assume there is an index somewhere, and I would look
16  for microfiche.
17  Q. I realize that you didn't write this and
18  you may not have reviewed it in many years, but
19  would it be your conclusion that the pages of the
20  notebooks referenced reflect work done in connection
21  with at least GF 4300 even if that work might have
22  been used for other projects as well?
23  A. Yes.
24       MR. KELBER: Counsel, there's a

109

1  phenomenal number of notebooks that are listed in
2  this document that's been marked as 2083 that we
3  have not been provided. We are requesting now that
4  you take whatever steps you can to see if these
5  notebooks exist and, if so, make them -- produce
6  them or make them available for copying, anyway.
7  Q. Let me ask you to turn to page 1540,
8  production page 1540. In the first -- well, I
9  suppose it's a full paragraph. The large paragraph
10  on that page reads -- starts out with the
11  description, "These experiments described." The
12  second sentence refers to the quantitative aspect
13  and indicates that the question of whether levels of
14  protein sufficient for commercialization could be
15  produced using EGA was not directly addressed; do
16  you see that?
17  A. Yes.
18  Q. Were any levels of protein production of
19  TSH beta detected in the course of preparing -- of
20  the transfected cell detected in the course of
21  performing the work done under GF 4300?
22  A. No.
23  Q. Were they looked for?
24  A. No.

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

110

1  Q. Was there, to the best of your knowledge, a
2  project commissioned to determine whether protein
3  was produced?
4  A. No.
5  Q. Prior to the time that you arrived at
6  Serono, you had developed an assay to detect the
7  presence of the protein TSH beta subunit in -- or
8  obtained from transfected cells, right?
9  A. No.
10  Q. You didn't have an assay for doing that?
11  A. For a TSH beta subunit?  No.
12  Q. For THS?
13  A. TSH.
14  Q. Sorry, TSH.
15  A. Yes.
16  Q. You did have an assay?
17  A. Yes.
18  Q. Would it have been difficult to use that
19  assay in the context of the work you did on GF 4300
20  had you been interested in doing that?
21  A. Would it have been difficult.  No, but it
22  would have been a waste of time.
23  Q. Why is that?
24  A. Because the TSH assay that's used only

111

1  recognizes dimer; and in fact, the TSH beta subunit
2  is not expressed by itself.  Would it have been
3  difficult?  No.
4  Q. The experiment that you performed with FSH
5  that we discussed a little bit ago where you also
6  practiced amplification -- scratch that.  Why select
7  GH3 cells for your work -- I'm sorry -- for your
8  work in connection with GF 4300?
9  A. The reason was that we already had all of
10  the genetic tools and the laboratory methods to
11  clone and express TSH.  That was a program that was
12  ongoing.  And so the goal of the project was not
13  necessarily -- the goal of the project really had
14  nothing specifically to do with -- mouse TSH or
15  rat TSH, we didn't care -- but we wanted to activate
16  an endogenous gene.  We had all the tools for TSH.
17  And in the strategy to identify and
18  clone human TSH, we -- the sequence was known for
19  rat, so we first got the rat clone, then used that
20  to get a human clone, again for a project having
21  nothing to do with this.  So we had all the rat
22  tools.  And we knew from the literature, and we
23  found out ourselves, that TSH was nonexpressed in
24  rat GH3 cells, GH3 cells available from ATCC, so

112

1  that's how we selected those.
2  MR. KELBER:  Would you mark this 2084.
3  (Marked, Exhibit 2084, U.S. Patent
4  5,240,832.)
5  Q. Dr. Chappel, I think you are holding before
6  you Exhibit 2084, which is U.S. Patent 5,240,832; is
7  that right?
8  A. (Witness reviews document.) Yes.
9  Q. And you are one of the coinventors named in
10  that patent, right?
11  A. Yes.
12  Q. Does this patent reflect -- I think you
13  referred to moments ago that you had all the genetic
14  tools for the cloning expression of TSH.  Does this
15  patent reflect those genetic tools?  Does it reflect
16  a discussion of them?
17  A. (Witness reviews document.) The reason that
18  I am looking so carefully at this is because of the
19  fact that this describes cloning expression of FSH,
20  LH, and TSH, but this is human TSH; so the tools
21  that were used for Green Form 4300 were rat tools.
22  We used rat tools to get to this, but this -- your
23  question was, was this -- did this patent
24  specifically provide all of the tools for Green Form

113

1  4300, as I understand it; and so no, it doesn't, but
2  those tools were used for the creation of this work.
3  Q. The tools that were later used in the
4  context of the GF 4300 were also used to arrive at
5  the subject matter of Exhibit 2084 as far as it goes
6  to TSH?
7  A. Yes.
8  Q. Other than -- and I'm not discounting it as
9  unimportant.  But other than the change from human
10  to rat TSH, is there any -- do the procedures --
11  strike that.  What else would be different, as far
12  as cloning and expression of TSH, other than the
13  difference between rat and human that you referred
14  to earlier and what is reflected in 2084?
15  MR. FLOWERS:  Objection, vague and
16  ambiguous.
17  Q. What you used in GF 4300 was rat?
18  A. Yes.
19  Q. And one of the reasons for picking TSH and
20  GH3 cells was that you already had the genetic tools
21  to clone and express TSH?
22  A. Yes.
23  Q. Other than changing the sequence, rat to
24  human or human to rat, whichever, did the rest of

30 (Pages 114 to 117)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

114

1  the genetic tools for cloning and expressing TSH
2  beta remain the same for GF 4300 and the '832
3  patent?
4      A. Genetic tools, yes.
5      Q. Would it have made a difference in
6  providing satisfactory evidence, in your opinion, of
7  the activation of a -- strike that. You selected
8  GH3 cells because you were aware from the literature
9  confirmed by your own work that they did not express
10 TSH beta, correct?
11     A. Correct.
12     Q. If a similar -- if a cell was available to
13 work with that was similarly silent with respect to
14 human TSH, so a human cell was available, would it
15 have been suitable for use in the same way that you
16 used GH3 using human TSH beta?
17     A. Yes.
18     Q. Other than an available cell line with a
19 silent TSH beta gene and the use of homologous
20 recombination targeting rather than random
21 integration, does the '832 patent provide the
22 experimenter all you need to know to achieve gene
23 activation of TSH?
24     MR. FLOWERS: Having just been presented

115

1  with the document, I caution the witness not to
2  speculate.
3      A. Provide you all you need to know?
4      Q. What else would you need to know, Doctor?
5  I mean, you're not speculating. You are the
6  inventor of gene activation for Serono using TSH.
7  You are the inventor for Genzyme, the predecessor
8  company, for the expression -- cloning and
9  expression of TSH in random integration.
10     Other than inventing, recognizing the
11 utility of random -- sorry -- of homologous
12 recombination for targeting instead of integrating
13 the entire exogenous gene, what would you need to
14 know in addition to the '832 patent disclosure to do
15 the work embraced in GF 4300?
16     MR. FLOWERS: Same objection.
17     A. This patent has nothing to do with
18 homologous recombination or endogenous gene
19 activation. This is explaining -- in fact, what
20 this is explaining is taking cDNA vectors and
21 improving expression following random integration.
22 It's got nothing to do with homologous
23 recombination.
24     Q. I understand that, Doctor, but it's got all

116

1  the genetic tools necessary to clone and express TSH
2  beta of some mammalian species, right?
3      MR. FLOWERS: Objection to the question
4  as asked and answered.
5      A. It doesn't.
6      Q. What's missing?
7      A. In terms of tools, the tools that were
8  generated here do not include the targeting
9  sequence, so they're not all included here.
10     Q. I'm sorry, I didn't hear you.
11     A. So they're not all included.
12     Q. Okay. Anything else, sir?
13         (Pause.)
14     Q. Anything else?
15     A. Again, I think I'm having trouble
16 understanding what the -- what your question is.
17     Q. Let me ask you to turn to Figure 2 of
18 Exhibit 2084, the '832 patent. Figure 2, '832.
19 That vector that's there, because there are some
20 options, who developed that?
21     MR. FLOWERS: Objection, vague and
22 ambiguous as to the word "developed."
23     Q. Who invented it?
24     A. I don't know.

117

1      Q. Are you confident it was developed by one
2  of Kelton, Nugent, and Chappel?
3      A. It was made by Kelton, Nugent, or Chappel.
4  Invented? This pML is a commercially available
5  backbone vector. Metallothionein promoter is known.
6  Cloning site is, you know, potential space for
7  something. SV40 promoters, origins, or replication,
8  poly (A) sequences, those were all used routinely at
9  Integrated Genetics. They weren't invented.
10     Q. And the use of DHFR ODC or tPA? Do you see
11 the asterisk at the bottom?
12     A. Yes.
13     Q. That was routine as well?
14     A. Again, tPA is tissue plasminogen activator
15 that is used as a marker. DHFR, ODC are selectable
16 markers or amplifiable markers.
17     Q. And that all was customary and usual at
18 Integrated Genetics, the use of any one of those as
19 a selectable marker?
20     A. They were all available. They weren't used
21 customarily.
22     Q. Was DHFR customary?
23     A. It was used, yes.
24     Q. In the work that you did that is reflected

FARMER ARSENAULT BROCK LLC

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

118

1  in the '832 patent together with Kelton and Nugent,
2  did you use the same mutated DHFR that showed a
3  lower resistance to MTX -- I'm sorry, that showed a
4  the reduced MTX influence?
5      A. Yes.
6      Q. Did you tell the Patent Office about the
7  '832 patent while you were filing for your own
8  application on homologous recombination?
9      A. Did I?
10     Q. Yes, sir.
11     A. No.
12         MR. KELBER: Let's take just a short
13  break, a couple minutes. Is that okay?
14         THE WITNESS: Sure.
15         MR. KELBER: We'll go off the record.
16         (Recess.)
17  BY MR. KELBER:
18     Q. With a cell line having the variability of
19  GH3 cells, how, in terms of -- I'm sorry -- how do
20  you confirm that you're avoiding false positives,
21  genomic DNA or some type of phenotype change in the
22  clones that you pull off in -- or that you did pull
23  off in GF 4300?
24         (Pause.)

119

1      Q. Let me try it a different way. Isn't it
2  necessary to test the subclones to be certain you
3  are not seeing a change in the GH3 cell itself
4  rather than something due to the activation, if you
5  are working with a TSH beta?
6      A. First, I'm not sure what you mean by
7  variability in the GH3 cells. What do you mean by
8  "variability"?
9      Q. Let me try and do that one. You mentioned
10  that you looked at the literature for GH3 and you --
11  they were available from the ATCC, right?
12     A. Yes.
13     Q. In looking at that, you undoubtedly noticed
14  that the chromosome counts for these cells were all
15  over the board, up to as high as 73, right?
16     A. I didn't know that.
17     Q. Prior to making the decision on GH3 cells,
18  did you have anybody look at the stability of those
19  cells?
20     A. Genetic stability?
21     Q. Yes, sir.
22     A. No.
23     Q. How about phenotypic stability?
24     A. Phenotype could be anything. I don't know

120

1  what you mean.
2      Q. Well, it was important to you in the
3  context of TSH beta, right? Wouldn't the lack of
4  expression of mRNA --
5      A. Routinely what was done was when a clone --
6  when a cell line came in from ATCC or any source, it
7  was subcloned by limiting dilution, and we created
8  our stock, and we did all the experiments on
9  those -- on that stock. So we were not concerned
10  with any kind of variation because we were dealing
11  with a clone that was expanded and then frozen down.
12     Q. So you would grow up a single colony from
13  whatever came in, then expand that single colony,
14  and freeze it down to assure yourself of a
15  constant stock?
16     A. Yes, for several reasons, not just to
17  assure ourselves of constant stock, but also the big
18  concern, and one of the other reasons that we used
19  GH3, was concern about importing cells that harbored
20  an infectious agent, because we were dealing with
21  lots of cells. So there was a lot of concern,
22  especially with human cell lines, because they
23  weren't readily available. So that was one of the
24  reasons we picked GH3.

121

1          So when we'd get the culture from ATCC,
2  those are grown and then cloned by limiting
3  dilution, picking several subclones, looking for
4  growth characteristics and other -- whatever
5  phenotype that we were particularly looking for,
6  expanding up the population, and then freezing those
7  down; and that becomes the master cell bank and
8  working cell bank.
9      Q. Would there be -- would that work be
10  reflected in the context of these particular GH3
11  cells in Serono notebooks?
12     A. I'm boring you with these details. There
13  is a -- there was a laboratory within Serono that
14  was so-called -- it was like an exploratory
15  laboratory where any new cell lines that came in
16  were -- went into this laboratory. They were tested
17  for infection, for sterility, and all the other
18  tests we did routinely before they went back into
19  the laboratories.
20          So this was not part of real exploratory
21  research; it was sort of a -- like a facility that
22  all incoming cells, tissues, went into. And this
23  was a routine thing, sort of like making solutions.
24  There was an SOP -- there may have been an SOP, but

32 (Pages 122 to 125)

Scott C. Chappel, Ph.D.
Volume 1 - January 19, 2006

122

1  whether that was documented, you know, each time, I
2  don't know.
3      Q.  Got it.  Would you do the same kind of
4  procedure that you described for isolating,
5  expanding, freezing down -- is it correct to call
6  that subcloning?  Let me start again.  Suppose you
7  started with a primary cell.
8      A.  Primary?
9      Q.  Primary cell.  Would you undergo the same
10  procedures?
11      A.  In terms of cloning, no.
12      Q.  If you wanted to work with a primary cell
13  and assure yourself of the same confidence, what
14  would you do?
15      A.  Let's make sure we're defining primary
16  cell --
17      Q.  I tell you what, let me see if I can't make
18  that -- I'm handing you a document that's been
19  previously marked as 2001, Exhibit 2001.
20          MR. FLOWERS:  I thought we'd never get
21  to it.
22      Q.  You recognize this one, I think?
23      A.  (Witness reviews document.)  Yes, I do.
24      Q.  Is that in fact the patent that you looked

123

1  at yesterday with your attorneys?
2      A.  Yes.
3      Q.  Now, without limiting you to the meaning
4  that is attributed to it in this patent that is
5  Exhibit 2001, you discuss primary cells in Column
6  22.  Here again, you can be free to look at any
7  other part, but if --
8      A.  Can you tell me what line you're looking
9  at?
10      Q.  I was just about to do that.  Take a look
11  at the discussion -- or the sentence begins about
12  line 43, but you may want to look at the prior
13  sentence for context:  "The cell line may be animal
14  or plant, primary, continuous, or immortal."  What
15  did you mean by "primary"?
16      A.  Primary -- a primary cell line would mean
17  like a tumor cell line.
18      Q.  To work with such a cell line, how would
19  you go about preparing the necessary -- to work with
20  a primary cell line and conduct the same kind of
21  investigation that you conducted in the context of
22  GF 4300, how would you go about assuring yourself of
23  a stable stock?
24          MR. FLOWERS:  Objection to the extent

124

1  it's a hypothetical and calls for speculation.
2      Q.  How did you mean it in the context of the
3  '071 patent, sir?
4          MR. FLOWERS:  Objection.  You haven't
5  laid a foundation that he authored that portion.
6      A.  A tumor cell culture would come in -- this
7  is -- what do you call it?  This is hypothetical.
8  The culture would come in.  It would be tested for
9  infectious agents, and it would be cloned by the
10  limiting dilution.
11      Q.  In a fashion similar to what you explained
12  to me before?
13      A.  Yes.
14      Q.  *What's the difference -- do you have an
15  understanding of what is meant by the discussion in
16  Column 22 from lines 32 to 50 of the '071 patent?
17          MR. FLOWERS:  Could you read the
18  question back, please.
19          *(Question read.)
20          MR. FLOWERS:  Objection to the extent
21  the document speaks for itself.
22      A.  (Witness reviews document.)
23      Q.  I'm sorry, sir, do you have an
24  understanding of what's written there?

125

1      A.  Yes.
2      Q.  What's the difference between a -- as the
3  term is used there, a primary and a continuous cell?
4      A.  Primary cells have a defined life span in
5  culture.  Continuous are thought -- are considered
6  to be immortal.
7      Q.  At the other extreme of the spectrum, is
8  there a difference between continuous cells and
9  immortal ones?
10      A.  Continuous and immortal...
11      Q.  Again, as you -- or as they are used in
12  your patent.
13      A.  Is "immortal" used?
14      Q.  Again, you are free to look anywhere, but
15  look at the sentence at lines 43 to 45 of Column 22.
16      A.  Oh.  I think it's a continuum between
17  primary, with a defined, probably not consistently
18  renewed to passage; continuous, which would be
19  stable during multiple passages; and immortal is
20  self-defined.
21      Q.  In terms of the short end of the spectrum,
22  if you will, the primary cell, is it appropriate to
23  talk about the lifetime or the persistence of that
24  in terms of generations?  Or how do you define --