IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CELL GENESYS, INC., | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-12448-MLW |
| | ) | |
| APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V. | ) ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |
| | ) | |
| APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04 11810 MLW |
| | ) | |
| CELL GENESYS, INC. AND TRANSKARYOTIC THERAPIES, INC. | ) ) | |
| | ) | |
| Defendants. | ) | |

## EXPERT REPORT OF THEA D. TLSTY, PH.D.

I, Thea D. Tlsty, Ph.D., submit the following expert report on behalf of Cell Genesys, Inc. ("CGI") in this action.

## I.   QUALIFICATIONS

1.   I am currently a Professor of Pathology at the University of California, San Francisco ("UCSF") School of Medicine, the Director of the UCSF Center for Translational Research in the Molecular Genetics of Cancer, Director of Molecular Pathology, Director of Program in Cell Cycling and Signaling, and a Member of the

- 1 -

UCSF Comprehensive Cancer Center, Program in the Biological and Biomedical Sciences.

2. I received a B.S. degree in Zoology from the University of South Florida in 1973 and received a Ph.D. in Molecular and Cellular Biology from the Program in Biomedical Sciences, Washington University School of Medicine, St. Louis in 1980, where I subsequently pursued a Postdoctoral Fellowship in the Department of Microbiology (1980-1981). From 1981-1985, I pursued a second Postdoctoral Fellowship and worked as a Senior Research Associate with Dr. Robert T. Schimke in the Department of Biological Sciences at Stanford University. The focus of Dr. Schimke's laboratory, and my own work, was the regulation of gene amplification.

3. Since 1974, my research has concerned, generally, genomic DNA, its structure and the cellular mechanisms involved in maintaining genomic stability. My work has encompassed studies on responses to DNA damage (*e.g.* carcinogenesis), cell cycle regulation (*i.e.*, DNA replication, repair, recombination, and cell growth) and the regulation of gene amplification and the formation of other chromosomal abnormalities.

4. As detailed in my curriculum vitae, attached to this report as Exhibit A, I have substantial personal experience with the study and use of amplifiable genes, including dihydrofolate reductase, as reflected in my work published over the past 30 years. (*See*, Exhibit A hereto). I have published and lectured extensively on these and related subjects and serve as a reviewer for numerous scientific journals, such as Cell, Nature, PNAS, etc. I have organized numerous international conferences and chaired many scientific sessions addressing the subject of gene amplification specifically and genomic instability in general.

5.  I have been retained by Cell Genesys, Inc. ("CGI") as a consultant and possible testifying expert in the above captioned proceeding. For the time I spend working on this matter, I am being compensated at $600.00 per hour. I am separately reimbursed for any out-of-pocket expenses I incur in connection with my consulting work. No part of my compensation is dependent upon the outcome of this case or the nature of the opinions expressed in this report.

6.  I have listed, in this report and my curriculum vitae submitted herewith, all cases in which I have testified as an expert at trial or deposition within the four years preceding this date. I understand that Cell Genesys, Inc. is in the process of seeking permission to obtain further information and facts regarding some subjects. I am advised by counsel for Cell Genesys, Inc. that the subject matter as to which information is sought includes information as to the properties of a mutant DHFR gene used by those involved in developing the subject matter claimed in U.S. Patent 5,272,071 ("the '071 patent"). A mutant of this type with specific improved properties may be of value, commercially and in the laboratory, as a positive selection agent and as an amplifiable gene. I reserve the right to offer further opinions in the event such information is provided. I am advised by counsel for Cell Genesys, Inc. that that the subject matter as to which information is sought includes information as to the basis for holding a reasonable expectation that one of skill in the art could successfully practice the process of Claim 3 of the '071 patent without inserting a regulatory element such as a promoter gene in the construct recited in that claim. I reserve the right to offer further opinions in the event such information is provided.

7.  I have prepared no demonstrative or other exhibits, other than those listed in this report, necessary to explain the testimony I expect to offer. I reserve the right to prepare and rely on such exhibits in the event the nature of my testimony changes and requires such demonstratives or other exhibits.

## II.  INFORMATION CONSIDERED

8.  In arriving at my opinions presented in this report, I have relied on my own education and experience in the field, as well as the literature broadly. I have also reviewed the following documents:

Federspiel et al., *Journal of Biological Chemistry*, 259, 9127 - 9140 (1984);

Tlsty, *Proc. Natl. Acad. Sci. USA*, 87, 3132 - 3136 (1990);

Meinkoth et al., *Molecular and Cellular Biology*, 1415 - 1424 (1987);

Tlsty et al., *Proc. Natl. Acad. Sci. USA*, 86, 9441 - 9445 (1989);

Tlsty et al., *Molecular and Cellular Biology*, 1050 - 1056 (1984);

Rath et al., *Cancer Res.* 1984 Aug;44(8):3303-3306;

Michel et al., *Proc. Natl. Acad. Sci. USA*, 81, 7708 - 7712 (1984);

Kaufman et al., *Molecular and Cellular Biology*, 1750 - 1759 (1985);

Genetic Engineering, Principles and Methods, Principles and Methods, Vol. 9, Ed. Setlow, pages 155-198, High Level Production of Proteins in Mammalian Cells by R. Kaufman (1987);

Smithies et al., *Nature*, Vol. 317, Sept. 19, 1985;

Molecular Cloning, A Laboratory Manual, 2nd Ed., 1989, Sambrook et al., 16.1-16.29;

U.S. Patent 5,272,071, Chappel; and

U.S. Patent 6,528,313, Le Mouellic et al.

### III. SELECTION MARKERS IN GENETIC ENGINEERING (*e.g.*, DHFR)

9. Dihydrofolate reductase ("DHFR") is a naturally occurring enzyme critical to DNA synthesis, hence cell growth and survival. Specifically, DHFR is responsible for converting tetrahydrofolate to dihydrofolate, a key step in the production of thymidine - one of four nucleotides present in DNA. Thus, all normal (*i.e.*, non-mutant) cells contain at least one functional copy of DHFR (or its equivalent). Methotrexate is a drug that inhibits DHFR activity. Cells cannot survive when DHFR activity is inhibited beyond a critical range, which is why methotrexate has been used as a chemotherapeutic drug. By the early-1980's, it was known that some cells exhibit resistance to methotrexate and that at least one mechanism responsible for that resistance was gene amplification, an increase in the copy number of DHFR genes. It was also known that the process resulting in gene amplification frequently resulted in duplication of DNA sequences adjacent to the DHFR gene.

10. By the mid-1980's, DHFR gene amplification was widely studied, and like other genes responsible for drug resistance (*e.g.*, neomycin-resistance gene, abbreviated "Neo$^r$" or "Neo"), had become widely used in molecular biology research as a selectable, amplifiable gene. Cells transfected with a DHFR gene are better able to survive exposure to increasing levels of methotrexate. One way to isolate cells that exhibit higher levels of the DHFR enzyme is to expose a cell culture to methotrexate. Cells that survive typically have multiple copies of DHFR present in their genome.

11. The ability of cells with an increased number of DHFR genes to grow in the presence of methotrexate is the property that allows DHFR to be used as a positive selection marker. That is, if one wishes to identify cells that have undergone a particular

genetic transformation or modification, one introduces a DHFR gene and a regulatory sequence to promote expression of that DHFR gene at the same time the genetic transformation or modification occurs. In other words, the modification or transformation occurs together with insertion of a DHFR gene into the genome and a promoter (alone or with additional regulatory elements) to direct expression of that gene.

12. In order to identify the few cells that have undergone a desired genetic transformation or modification (*e.g.*, amplification of an inserted DHFR gene) out of a large population of cells, one exposes the population to a selective concentration of methotrexate. The cells that survive that exposure are more likely to have the inserted DHFR gene and promoter (to express the DHFR gene) than the population that did not acquire the DHFR gene and promoter. The transformed cells survive because they contain quantitatively more DHFR activity sufficient to overcome the inhibition by methotrexate, which is why they survive.

13. This use of DHFR genes with a promoter to express that gene to act as a selectable, amplifiable gene (*i.e.*, a positive selection marker) was known several years prior to 1989 and widely employed (*see, e.g.*, Kaufman et al., 1985 and Molecular Cloning, A Laboratory Manual, 2nd Ed., 1989, Sambrook et al., 16.1-16.29).

14. By 1989, DHFR was known as a selectable, amplifiable gene useful in genetic studies and for use in increasing the protein expression level of a gene of interest (*i.e.*, increased protein production). The selectability of DHFR is due to cell growth in the presence of methotrexate and the increased expression of protein-encoding genes is a result of the co-amplification phenomenon observed in sequences adjacent to the DHFR gene, such that when DHFR undergoes amplification the regions adjacent thereto also

undergo amplification. Exposing DHFR-transformed cells (*i.e.*, those containing an exogenous copy of the DHFR gene and promoter) to increasing concentrations of methotrexate, tends to identify cells in which the DHFR gene has undergone amplification, thereby increasing the number of DHFR genes present in the cell.

15. During amplification of the DHFR sequence, that portion of the genome closely associated with the DHFR gene and its promoter may be amplified, or multiplied, as well. This property of DHFR genes (*i.e.*, co-amplification) was known and exploited in genetic engineering, specifically to increase the expression level of a gene of interest several years before 1989 (*see, e.g.*, Kaufman, *Mol. Cell. Bio.* 1985, Michel et al., *PNAS* 1984). DHFR and other amplifiable genes, including CAD and Neo, were also used in recombinant DNA techniques by 1990 (*see, e.g.*, Tlsty et al., *PNAS* 1989, Tlsty, *Mol. Cell. Bio.*, 1984, Meinkoth et al., *Molec. Cell. Bio.*, 1987).

16. While resistance to methotrexate is identified by exposure to that drug, a concentration of methotrexate sufficient to identify a cell population resistant due to transfection with a DHFR-containing construct does not necessarily result in identifying cells with DHFR amplification. In addition, even the presence of increasing concentrations of methotrexate (or appropriate inhibitor for the amplifiable gene in question), does not necessarily lead to the identification of cells with gene amplification. That is, the amplification of DHFR or other amplifiable genes is not the only way cells may gain resistance to a drug. In addition, different cell types, even different mammalian cells, may require different methotrexate exposure protocols to select for cells with significant amplification.

17. It is also true that the more different the cells, for instance, the difference between mammalian cells and plant cells and bacterial cells, the greater the differences there are likely to be in how the serial exposure to methotrexate is conducted in order to significantly amplify the DHFR gene(s) present. For example, my own published work demonstrated that in contrast to tumor-derived cell lines, normal diploid human and rodent cells do not undergo detectable gene amplification (Tlsty, *PNAS* 1990).

18. Similarly, the location of the inserted DHFR (or other amplifiable) gene can critically impact stability of the inserted gene (*i.e.*, gene loss, silencing or rearrangement), which means the desired resistance to the selection drug does not occur (*see, e.g.*, Meinkoth et al., *Mol. Cell Bio.* 1987). Furthermore, it was known that DNA rearrangements associated with DHFR gene amplification are dynamic and continually changing during exposure to methotrexate (Federspiel et al., *JBC*, 1984). That is, there often is no definable "amplification unit," but rather, the duplication of DNA sequences adjacent to (flanking) the DHFR gene are usually highly variable and not predictable (*Id.*). Experience with various cell types has demonstrated the variability of the amplified unit.

19. Moreover, unless the amplification at the DNA level results in the production (expression) of enzymatically active DHFR protein, amplification alone does not confer resistance or selectivity to cells.

IV.   **U.S. Patent 5,272,071**

20. I have read U.S. Patent 5,272,071 ("the '071 patent"). The patent generally discusses the use of homologous recombination, a technique employed in modification of genomic DNA developed and reported in the field of genetic research beginning about

1985 or so (*e.g.*, Smithies et al., 1985), to insert, in a genome, a promoter gene in functional relationship with an endogenous gene, or gene of interest, to increase expression of the gene of interest, either to a greater level, or to cause an otherwise silent gene to be expressed.

21.  In homologous recombination, a vector with regions similar to target regions of the host genome is inserted into the host cell. The homology between these target regions and the host's genome allows a "crossover" to occur, inserting the remaining content of the vector into the genome. In this context, the '071 patent identifies the use of DHFR as a positive selection marker, as well as similar genes, to identify cells that have successfully undergone homologous recombination (which may be abbreviated "HR").

22.  The '071 patent describes the vector that is required to be inserted through homologous recombination to induce a change (increase) in expression levels. The vector is schematically reflected in Figure 1, with each letter identifying a different region. This vector, or construct, is also discussed at column 9, lines 31-44. The construct includes at least two regions, a DNA targeting segment (preferably two, A and B) and a regulatory segment, such as a promoter, to cause the expression level of the target gene to increase (region F). The patent identifies these as the essential elements to be inserted, and identifies all other regions as "optional" (col. 9, ll. 43-44).

23.  Region C is identified as a positive selection gene (col. 9, l. 37). As noted, those of skill in the art as of 1985 or so, would have recognized DHFR as a suitable candidate for a positive selection marker. One of an average level of skill in the art at about 1989 would have had a Ph.D. or equivalent in biological sciences, have had familiarity with techniques for preparing and inserting DNA construct into cells, running

cell cultures and similar techniques. One of average skill in this art in 1989 would have known how to use methotrexate to employ DHFR as a positive selection marker, and conditions necessary to sustain cells for measurement of protein expression (*e.g.*, published works by Urlaub, Chasin and Ringold, circa 1980-1983).

24. One document reflecting experiments of this type is U.S. Patent 6,528,313 ("the '313 patent"). This '313 patent also employs homologous recombination to achieve the insertion of heterologous DNA (col. 3, ll. 28-52). Like the '071 patent, it describes the insertion of regulatory elements such as promoters through homologous recombination to put the gene of interest under the control of a different, stronger, promoter, thereby changing expression levels of the gene of interest. (*See*, col. 5, l. 62 to col. 6, l. 5).

25. The '313 patent does not describe the use of amplifiable genes. It does discuss the use of genes encoding selectable markers however (col. 5, ll. 2-7); and DHFR, CAD or other amplifiable, expressible gene would be an obvious choice to one of skill in this art to use as a selection marker, as discussed above. The inclusion of an expressible selection marker gene in a gene targeting vector is specifically discussed in Claim 1 of the '313 patent (col. 23, ll. 61-65). The '313 patent identifies as one selection marker the gene encoding aminoglycoside phosphotransferase (*i.e.*, Neo gene), which confers resistance to neomycin and related compounds such as G418 (*e.g.*, Claim 12, col. 25, ll. 33-34). The Neo gene is also identified as a suitable selection gene in the '071 patent (col. 10, ll. 58-60).

26. The '071 patent equates the use of DHFR, CAD and Neo as selection markers (col. 10, ll. 56-65). Thus, by the same reasoning, one of skill in the art would

employ DHFR or CAD as the selection gene in the homologous recombination technique of the '313 patent. If so, one would be inserting into the cell's genome an expressible amplifiable gene, which, if caused to amplify, would result in the amplification of the portion of the genome proximate to it, including the targeted gene of interest.

27. Region D of the vector or construct of Figure 1 of the '071 patent is identified as an amplifiable gene (col. 9, ll. 30-38). Those of skill in the art would have recognized, by 1989, that DHFR is both an amplifiable and positive selection gene, as recognized in the '071 patent (col. 10, l. 66 to col. 11, l. 34). As explained above, the DHFR gene encodes an enzyme. The DHFR gene can therefore be said to be expressible. It will not be expressed, however, without a promoter for the DHFR gene. The '071 patent recognizes this as well, noting that a promoter for the DHFR gene must be collocated on the vector using the amplifiable gene (col. 5, ll. 34-36). The promoter to drive expression of the amplifiable gene, according to the '071 patent, is separately defined from the amplifiable gene, as shown by Region D' in Figure 1, and described consistently in the '071 disclosure as a separate DNA element from the amplifiable gene (*see, e.g.*, col. 5, ll. 32-37 and col. 13, ll. 8-11). Furthermore, the '071 patent specifically teaches that the regulatory elements for driving expression of selectable marker and amplifiable genes are considered separate and independent from the promoter of Region F, which is intended to drive expression of the targeted gene (col. 13, ll. 10-21 and Fig. 1). If no promoter is provided in a DNA construct as detailed in Claim 3, the DHFR gene will remain unexpressed, and it will not function as either a positive selection marker or an amplifiable gene.

28. The Example discussed in the '071 patent, at column 14, line 34 to column 22, line 31, does not make use of an amplifiable gene. It uses another well known positive selection marker gene discussed above, Neo, (for resistance to G418) to identify successfully transformed cells. This example does not seem, however, to demonstrate the effectiveness of the attempt to integrate a regulatory sequence and expression vector into the genome of a $GH_3$ cell by homologous recombination. This example does not show a change in the expression of the thyrotropin beta subunit "TSHβ" (*i.e.*, make more of the protein of interest). The expression of TSHβ is not shown. ('071 patent, col. 21, ll. 17-24).

29. In addition to failing to show an increase in protein production of any type that is the result of homologous recombination, the Example of the '071 patent is confusing in what it relies on to demonstrate the effectiveness of the insertion of a promoter. It attempts to rely on the presence of TSH*β* RNA in the cells undergoing homologous recombination, indicating that naïve (unmodified) cells of this type, rat $GH_3$ pituitary cells, are free of this RNA (indicating the gene is not transcribed at all - the first step in production of a protein encoded by the gene). It indicates that the presence or absence of this RNA, and thus activation or no activation, can be shown by a band of material at the 247 base pair level on a gel on which the nucleic acid extract of the cell is placed and then caused to migrate at a given speed. This type of gel is known to be quite precise (col. 21, l. 60 to col. 22, l. 30).

30. The '071 patent indicates that the presence of a band at 247 bp is indicative of the presence of the RNA sought, and indicates this is shown at Figure 15. Figure 15 is a drawn representation of this gel. Yet, looking at it, I cannot see an indication of a band

at the 247 bp mark. The patent indicates that these bands are present in lanes 4 and 5 of Figure 15 (col. 22, ll. 22-31). Simple inspection of Figure 15 shows no such bands at all. There is a band at the same level as the 298 bp marker. Lanes M1 and M2 are "marker lanes" - these lanes give the specific position for nuclear material of a given bp size. Lane M1 has a band at 242 bp. A band at 247 bp would be just a little above that level. Yet, the closest band in lanes 4 and 5 is at the 298 bp mark. If Figure 15 is a faithful reproduction, it appears to indicate that the RNA which would have shown successful activation of the gene is not present.

31. I am not a patent attorney. I have reviewed Claim 3 of the '071 patent and understand that it is reciting a process which calls for changing the expression level of a protein of interest (*modifying the expression characteristics of a predetermined gene*) of a cell by inserting the DNA vector or construct discussed above into the cell, and adding the DNA vector to the cell's genome by homologous recombination. In this case, rather than the regulatory segment the '071 patent teaches is an essential component, the construct or vector includes only an expressible, amplifiable gene which is capable of amplifying the gene of interest when they are close to each other (*in proximity*) and a targeting segment homologous to the region of the host cell genome to be targeted. The only requirement that I see in Claim 3 is that the amplifiable, expressible gene be close enough to the gene of interest or target gene so as to cause it to be amplified when the amplifiable gene is amplified. Claim 3 does not state that the amplification step *is* carried out, but only that *if it were*, coamplification of the target gene would occur when the amplifiable gene is amplified. Although not specifically stated, I understand Claim 3 to be indicating that a change in protein expression levels will occur because through

amplification, there are more copies of the gene of interest together with the amplifiable gene, such as DHFR.

32. I am doubtful that one of skill in the art could make the method of Claim 3 work in 1989 or even 1992. Certainly, with only the '071 patent contents to guide the skilled artisan, there would be a number of problems that would be difficult or impossible to overcome. Initially, I note that there is no reason to believe that simply because there are more copies of a gene, there will be a higher expression level, unless the regulatory machinery of the cell and the inserted DNA sequence permits the gene to be amplified and expressed. As noted, the change in expression levels of normally silent genes is the preferred end of the '071 patent (col. 22, ll. 12-16). If a gene is truly silent in a particular host genome, adding extra copies of the silent gene is unlikely to generate a change in expression levels.

33. Also, as noted, the construct recited in Claim 3 does not include a regulatory segment, which the patent describes as "required" for expressing the target gene of interest ('071 patent, col. 9, ll. 43-43). That is, the regulatory segment intended to yield increased target gene expression is not recited in Claim 3. Also, the construct of Claim 3 does not include the promoter necessary to cause the inserted DHFR or other amplifiable gene be expressed. That is, an intact open reading frame for DHFR is required but none of the regulatory sequences necessary to express the enzyme. Under these circumstances, DHFR will not be either a positive selection marker nor amplifiable, and so there will be no change in expression levels. The '071 patent simply provides no information on how to overcome this problem.

34. Similarly, there is no comment or instruction in the '071 patent on how to induce DHFR or the other amplifiable genes to amplify. While by 1989 there were known protocols or standards for determining how to investigate amplification phenomenon, including serial passage at various levels of selection pressure such as methotrexate, the '071 patent does not describe any, nor indicate this is of importance or may be different across different cell types. At the same time, Claim 3 seems to embrace ANY kind of cell, and the '071 patent indicates this could be a plant cell or animal cell, column 22, lines 42-45, microorganism or mammalian cell, column 23, lines 29-40. There is a great amount of variation in the measures necessary to induce this kind of amplification in cells this varied. Indeed, not all cells will support this (*e.g.*, primary diploid fibroblasts). Primary cells of this type are specifically included in the '071 patent as being appropriate for the disclosed methods (col. 22, ll. 43-43-45), however, the patent does not provide any teaching for how one of skill could achieve the intended result where the cells do not exhibit gene amplification. The '071 patent does not provide any information on how to even begin to establish the proper conditions for amplification.

35. In this respect, as I noted above, the '071 patent seems to clearly indicate that a regulatory segment must be present in the construct (Region F). This is not consistent with Claim 3. Yet, the '071 patent also clearly indicates the invention can be practiced by "the use of homologous recombination . . . to insert an amplifiable sequence, without a regulatory sequence, sufficiently near a gene in the genome of the cell line . . . to cause amplification" (col. 23, ll. 29-40). As noted, in the absence of a regulatory sequence to drive the DHFR gene, which absence seems to be specifically what the '071 patent is describing, there will be neither DHFR expression, (no positive selection) nor

amplification. Even if the '071 patent Claim 3 specifically recited the presence of a regulatory segment to drive expression of the target gene, those of skill in the art as of 1990-1992 would have required more information as to how to induce amplification in the specific cell selected, to have a reasonable expectation of successfully modifying the expression characteristics of the target gene and cell so modified. That is, factors including target loci (*i.e.*, gene-specific features) adjacent sequences which suppress expression, etc.), and the region targeted for insertion are critical to success, however, these are not variables mentioned in the '071 patent. This opinion is supported by my own research and experience. I personally studied methotrexate selection protocols in mouse 3T6 cells and following publication of that work in 1984 (Rath et al.), I received inquiries from labs around the world seeking advise on implementing such methods across a wide range of cell types and experimental conditions. The unpredictability can arise from cell or gene specific factors or a host of others.

36. I also find certain phrasing in Claim 3 inaccurate. Specifically the characterization at column 27, line 11, which suggests that the amplifiable gene "causes" amplification of the adjacent gene of interest. That is, the claim states a cause and effect relationship between the amplifiable gene and the target gene, which is simply not true.

Executed this 7th day of April 2006 in San Francisco, CA.

*signature*
Thea D. Tlsty, Ph.D.