CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 1

1                                          VOLUME 1

2                                          PAGES 1 - 158

3                                          EXHIBITS 1 - 48

4              IN THE UNITED STATES DISTRICT COURT

5                  FOR THE DISTRICT OF COLUMBIA

6                                      No. 04 CV 01407 (JDB)

7    - - - - - - - - - - - - - - - - - - - - - - - - -

8    CELL GENESYS, INC.,

9                              Plaintiffs

10           vs.

11   APPLIED RESEARCH SYSTEMS,

12   ARS HOLDING, N.V.,

13                          Defendants

14   - - - - - - - - - - - - - - - - - - - - - - - - -

15          DEPOSITION OF RAJU KUCHERLAPATI, Ph.D.

16          Thursday, October 6, 2005 9:10 a.m

17                 Harvard Medical School

18      77 Avenue Louis Pasteur, Boston, MA 02115

19

20        Reporter:  Janet M. Konarski, RMR, CRR

21                  LegaLink Boston

22       320 Congress Street, Boston, MA 02210

23                  (617)542-0039

24

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 53

1    you would be able to rely upon to support an argument

2    that Dr. Skoultchi made his invention at any certain

3    time?

4         A.    Not based on this document.

5         Q.    Okay.  You can put that to the side.  I'll

6    ask you one more question about it.  I told you to put

7    it aside.  Is this a document that you reviewed with

8    Mr. Kelber on Tuesday, October 4th?

9         A.    I do not recall reviewing this document.

10             MR. FLOWERS:  I'm going to mark a one-page

11   document bearing production number CGI16573 as ARS

12   Deposition Exhibit 6.  If you could initial it and pass

13   it to the witness, please.

14             (Document Bates stamped CGI16573

15        marked Exhibit 6.)

16        Q.    If you could take a look at that and let

17   me know when you're through.

18        A.    Yes.

19        Q.    Okay.  Is this a document that you

20   reviewed with Mr. Kelber on October 4th?

21        A.    I did.

22        Q.    Okay.  Previous to that review, had you

23   ever seen this document before?

24        A.    I might have seen this document, but I do

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 54

1    not recall when I might have seen it.

2          Q.    Okay.  Do you recall anything about the

3    circumstances under which you might have seen it before

4    October 4th?

5          A.    I do not.

6          Q.    Do you know what this document is?

7          A.    This document seems to be notes by Art

8    Skoultchi.

9          Q.    How do you know that?

10         A.    I believe I can identify his handwriting.

11         Q.    There is a date which appears to be

12   written on this document in the upper, left portion

13   under the line across the page.  It says Feb 15 -- it

14   looks like 1989.  Do you have any independent knowledge

15   as to whether Dr. Skoultchi created this document on or

16   about February 15, 1989?

17         A.    I do not.

18         Q.    You weren't there to see him create this,

19   if he created it on that date?

20         A.    I do not believe so.

21         Q.    Have you ever talked to Dr. Skoultchi

22   about this document?

23         A.    I've certainly talked with him about the

24   contents of this document.  I don't know if I talked

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 55

1    with him about the document, itself.

2            Q.    Is this a document that you would rely

3    upon in making any assertion about when Dr. Skoultchi

4    came up with the invention in this patent application?

5            MR. KELBER:   Objection as to form.   You

6    can answer.

7            A.    Can I have the question again, please.

8            (The pending question was read by the

9    reporter as requested.)

10           A.    I don't believe so.

11           Q.    I apologize if I asked this already, but

12   did you talk to Mr. Kelber about this document on

13   October 4th?

14           A.    Yes.

15           Q.    And what did you have to say about it

16   then?

17           MR. KELBER:   I tell you what, since you

18   asked this so frequently, again I don't want to

19   restrain your questioning, can we take a standing

20   exception to any waiver of privilege in connection with

21   Dr. Kucherlapati's conversations with counsel?   He's

22   not here as an expert, so ordinarily that would be

23   protected, but I don't want to restrict your ability.

24   But, I do not want to waive generally the privilege

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 56

1    either as to Dr. K or as to CGI.

2                    MR. FLOWERS:  I can proceed on that basis.

3                    MR. KELBER:  Thank you.

4    BY MR. FLOWERS:

5            Q.    So, on October 4, when you talked about

6    this document with Mr. Kelber, what did you have to say

7    about it then?

8            A.    I talked about this document, and Kelber

9    suggested that these would indicate that Dr. Skoultchi

10   had this idea, at least on this date.

11           Q.    If you could cast your mind back to

12   February 15, 1989 or around that time period, you were

13   involved with Cell Genesys at that time?

14           A.    Yes, I was.

15           Q.    And Dr. Skoultchi was involved with Cell

16   Genesys at that time?

17           A.    Yes.

18           Q.    Next to this February 15th, 1989 statement

19   it says, "Thinking about shorter-term projects for Cell

20   Genesys."  Were you at this time thinking about

21   shorter-term projects for Cell Genesys?

22           A.    Yes.

23           Q.    And what were you thinking about in terms

24   of shorter-term projects for Cell Genesys?

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati  October 6, 2005

Page 57

1         A.    I think it's going to be a little bit of a

2    long answer, but I'll try to answer the question.  The

3    prelude for thinking about the shorter-term projects,

4    as I mentioned to you that we have developed a plan for

5    the nature of the projects that Cell Genesys would

6    conduct, and those initial set of ideas indicated

7    modification of cells, as I've described to you

8    earlier, and these plans were presented to different

9    venture groups, and one of the venture groups, Mayfield

10   Fund, was engaged, and I don't know at this time

11   whether they also put some seed money into the company,

12   and in addition to providing seed money for the

13   company, that one of the people that is associated with

14   Mayfield Fund, Mark Levin, was working very closely

15   with us, and one of the goals at that time is to, for

16   the founders to work with Mark Levin to try to refine

17   the plan.  And, as I recall, Mark was constantly

18   pushing us about, you know, trying to refine the ideas,

19   make them better, more scientifically and commercially.

20   And so one of the things that I recall during the

21   period of time that it was a constant refrain of every

22   time that we meet with him that, you know, we should be

23   thinking about projects that would have both short-term

24   applications and medium and longer-term applications,

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 58

1    and that the projects that we were at the time involved

2    in were not short-term projects, so he was pushing all

3    of us to think about short-term projects.  And so we

4    were all thinking about what are the other types of

5    things that we could do with the technology that was

6    the basis for Cell Genesys to identify opportunities

7    that would be short-term projects.  That is the context

8    in which the shorter-term projects were being thought

9    about.

10        Q.    Okay.  You said earlier you referred to

11   the "idea" in this document?

12        A.    Yes.

13        Q.    In your own words, what is the "idea" in

14   this document?

15        A.    The idea is to manufacture therapeutic

16   proteins without infringing on the patents of cDNA

17   cloning and sequencing for those therapeutic proteins

18   and the use of homologous recombination to accomplish

19   that goal.

20        Q.    Do you have a specific recollection that

21   in February of 1989, that you were thinking about that

22   idea?

23             MR. KELBER:  I'm sorry, could I hear the

24   question back, please.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 59

1                    (The pending question was read by the

2        reporter as requested.)

3                    MR. KELBER:  Objection.  Foundation.  You

4        can answer.

5              A.    You're referring to me, personally?

6              Q.    You, yes.  We'll begin there.

7              A.    No.  I wasn't thinking about it.

8              Q.    Do you have any specific recollection,

9        aside from having looked at this document, that

10       Dr. Skoultchi was thinking about that idea in February

11       of 1989?

12             A.    I don't sound like I'm trying to parse it.

13       If he was thinking about -- I don't know the evolution

14       of the idea, but I know that when the idea was

15       developed, he certainly shared that with me and with

16       other people.

17             Q.    Okay.  When did he first share that idea

18       with you?

19             A.    I don't recall the exact date when he

20       shared that idea with me.

21             Q.    How close can you get on a date as to when

22       he shared that idea with you?

23             A.    I think definitely I think I could say

24       that it was -- this idea wasn't, to my knowledge,

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 60

1   anyway, wasn't there in June of 1988, and I know that

2   this idea was definitely there in mid 1989, so to the

3   best that I can recall, that is the sort of windows

4   that I can put on it.

5           Q.   And why can you say or why do you say that

6   it wasn't there, this idea wasn't there before June,

7   1988?

8           A.   Because before June, 1988, we were talking

9   with Mayfield Fund, but they had not made any

10  commitments to us, and until they made the commitments

11  to us, Mark Levin was not involved.  And so these sets

12  of ideas, as I mentioned to you earlier, were more

13  based upon modifications of cells, and so this idea did

14  not exist in the middle of 1988.

15          Q.   Okay.  And why do you say that this idea

16  was there no later than mid 1989?

17          A.   So, there was a transition period, you

18  know, from the time that Mayfield provided the seed

19  money and then they actually funded the company, and I

20  don't recall the date exactly when they funded the

21  company, but I believe it's in 1989, at the time that

22  the company was funded, that I know that there were

23  three major projects Cell Genesys was going to proceed

24  with, and that this is one of those three ideas.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 61

1          Q.    What were the three projects?

2          A.    In addition to this project, the second

3    project was to produce fully human monoclonal

4    antibodies using homologous recombination technology,

5    and the third project was what is referred to as a

6    universal donor project, and the idea of that is to

7    modify cells, human cells by homologous recombination,

8    and when they're introduced into humans that they will

9    not be rejected.

10         Q.    Do you remember the circumstances when

11   Dr. Skoultchi first presented this idea to you?

12         A.    I do not recall the exact place and time,

13   but it could have been either in a telephone call or at

14   a meeting that included him and myself and --

15         Q.    Was there any discussion in the phone call

16   or in the meeting about how Dr. Skoultchi may have come

17   up with this idea?

18         A.    I can share with you my thoughts about how

19   he came up with the idea, but I'm not sure whether he

20   articulated it.  It's possible that he did, but I'm

21   not -- I don't recall the specific conversation.  But,

22   I know the general circumstances around that time, how

23   this came to be.

24         Q.    Can you describe that for me?

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 62

1           A.    First, as I mentioned to you, at Cell

2    Genesys there was really an attempt to try to identify

3    projects that could be conducted, which would be

4    commercially significant in a shorter time frame, and,

5    as I mentioned earlier, I think all of these ideas

6    obviously had to be within the context of using

7    homologous recombination, because that was the basis

8    for starting the company.  And at that time there were

9    not too many biotechnology companies around, and the

10   biotechnology companies that were around, many of them

11   were really based upon trying to produce therapeutic

12   proteins, and I think in particular I believe that

13   Integrated Genetics, of which he's a member of the

14   scientific advisory board, was involved in cloning and

15   expressing and producing therapeutic proteins or

16   potential therapeutic proteins, and so when people

17   thought about biotechnology companies and potential

18   products, one of the ideas was therapeutic proteins,

19   and I believe that because of his involvement with

20   Integrated Genetics, and at the time Integrated

21   Genetics was built together, what the nature of the

22   biotechnology industry was that Art was thinking about,

23   you know, therapeutic proteins was on his mind.  And I

24   think that during the course of these conversations

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 63

1    that we had and the stimuli that I described to you and

2    think about homologous recombination, he was able to

3    put those two ideas together, and I believe that's how

4    this particular idea was developed.

5            Q.   So, can you point to any specific

6    conversations that support your view as to how he

7    developed the idea?

8            A.   No.

9            Q.   Can you point to any specific documents

10   that support your view as to how he came up with the

11   idea?

12           A.   No.

13           Q.   If you look at this page again, it has two

14   steps apparently, numbered one and two.  The second

15   step is "after" -- correct me if I read this wrong, if

16   you can tell.  "After develop of human cell line

17   transfer portion of chromosome to CHO," etc.

18           A.   Yes.

19           Q.   What does that mean to you?

20           A.   So, at this time the therapeutic proteins

21   were produced in Chinese hamster ovary cells, and that

22   is what CHO refers to, but the particular types of

23   modifications that were described here, those

24   modifications will be done in human cells, and it was

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 64

1    felt that such modification in human cells may not

2    directly be useful for producing therapeutic proteins.

3            Q.    Why?

4            A.    Because one of the types of things that

5    are talked about are human diploid fibroblast cells,

6    and these cells, they don't grow very well, and they do

7    not have many of the properties that the Chinese

8    hamster ovary cells have, and also because at that time

9    that is the method that was used to produce therapeutic

10   proteins, so the idea was that you do the genetic

11   modification in human cells, and if you can transfer a

12   segment of the chromosome in which the modification has

13   occurred into CHO cells, that that might be the

14   appropriate production machine to produce therapeutic

15   antibodies, therapeutic proteins.

16           Q.    I think in your answer you said diploid,

17   D-I-P-L-O-I-D, fibroblast cells?

18           A.    Fibroblast.

19           Q.    You said they were talked about here?

20           A.    No.  Not in this document.

21           Q.    So, what did you mean when you said that?

22           A.    I'm trying to explain to you, what this

23   item that is No. 2, what that idea is.

24           Q.    Okay.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 65

1           A.    It says, "After develop of human cell

2    line," and human -- one of the types of human cell

3    lines are diploid fibroblasts.

4                MR. FLOWERS:   I'm going to mark as ARD

5    Deposition Exhibit 7 a document bearing Bates Nos. 3469

6    to 3486.  If you could initial that and pass it to the

7    witness.  It's another double-sided copy.

8                     (Document Bates stamped 3469 to

9                3486 marked Exhibit 7.)

10   BY MR. FLOWERS:

11          Q.    If I could ask you in particular to focus

12   on the first two pages of this document.  It's the

13   front and back page.  Let me know when you've had a

14   chance to look at it.

15          A.    I have seen the first two pages.

16          Q.    And at any time if you want to look at the

17   rest of the pages, that is perfectly fine, but I'm just

18   going to focus on the first two pages.

19          A.    Yes.

20          Q.    This first page, is this a letter that you

21   sent to Steve Sherwin on August 12, 1994?

22          A.    Yes.

23          Q.    And why were you sending this letter and

24   apparently additional papers?

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 67

1      Q.    Did you have this idea that you just read

2  to me at some point?

3      A.    No.

4      Q.    Was this --

5      A.    I believe I'm representing, you know, Cell

6  Genesys's programs.

7      Q.    Do you know who you were representing

8  those programs to by writing this document?

9      A.    I do not.

10      Q.    Okay.   Is there anything else that you

11  could tell me about the genesis of this document?   If

12  you want to look at the other pages again, if that

13  refreshes your recollection in any way or helps you

14  answer the question, please do.

15      A.    I cannot recall the date on which this was

16  created, and whether that relates to the rest of this

17  document or whether this is in a serial way.   So, I

18  can't tell you.

19      Q.    I couldn't, either.

20      A.    If it came from a book, then perhaps if it

21  preceded others, then we could tell, but I can't tell

22  just looking at this.

23      Q.    Is this a document that you gave to

24  Mr. Kelber for the purposes of producing documents in

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 68

1    this case?

2           A.    I do not believe so.

3           Q.    I take it then that you don't believe that

4    this is in your files, at least here at Harvard?

5           A.    That's correct.

6           Q.    Okay.  Do you remember anything, anything

7    else about this document?

8           A.    I could speculate about it, but I can't

9    really recall when I created it or the context in which

10   I created this and whether I shared it with other

11   people at that time or these were just my notes.

12          Q.    Okay.  This could be laboring.  If you

13   wanted to try to figure out when you created this

14   document or any of the circumstances surrounding the

15   creation of it, what would you do?

16          A.    I think first we need to find out the

17   context in which this document is presented, and that

18   might help me.

19          Q.    Okay.  For example, whether it's part of a

20   book?

21          A.    That's right.

22          Q.    Or a notebook?

23          A.    Yes.

24          Q.    Anything else you could think to do?

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 69

1          A.    If it's not an isolated piece of paper, if

2    it is associated with some other paper, there is a

3    possibility that that would have a date associated with

4    it or the circumstances under which it was created.

5          Q.    You can put that to the side, for my

6    purposes.

7               MR. FLOWERS:   I'll mark the next exhibit

8    as ARS Deposition Exhibit 8.   It bears production

9    numbers CGI3426 to 3433.   Initial that and pass it to

10   the witness, please.

11               (Document Bates stamped CGI3426

12          to 3433 marked Exhibit 8.)

13          Q.    Let me know when you've had a chance to

14   look at it.   And, as you're looking at it, if you could

15   tell me if any of the handwriting on this document is

16   yours?

17          A.    None of the handwriting is mine.

18          Q.    Okay.   Do you recognize the handwriting as

19   somebody else's?

20          A.    I do.

21          Q.    Whose is it?

22          A.    I believe it's Art Skoultchi's.

23          Q.    That is because you recognize his

24   handwriting?

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 70

1          A.    That's correct.

2          Q.    Okay.  Do you know anything about the

3    genesis of this document?

4          A.    I do not.

5          Q.    Is this a document that you looked at on

6    Tuesday, October 4, in preparation for this deposition?

7          A.    I have not looked at this document on

8    October 4.

9          Q.    Have you ever seen this document before?

10         A.    I do not recall seeing this document

11   before.

12         Q.    Okay.  If I could focus on your attention

13   on the documents with the production numbers in the

14   lower, right-hand corner, CGI3431 and 3432.  They're

15   almost at the end.

16         A.    Yes.

17         Q.    Does any of this look familiar to you,

18   what is written on these two pages?

19         A.    Yes.

20         Q.    What looks familiar?

21         A.    All of them look familiar.

22         Q.    If we accept that this was written by Art

23   Skoultchi, do you know why he was writing what is on

24   these two pages?

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 71

1          A.    It's possible that these are notes of a

2    meeting or that he was trying to summarize what the

3    ideas were at that time, and how those ideas might be

4    translated into a presentation.

5          Q.    Why do you say that?

6          A.    I say that because of the title on Page 1

7    of this document, it says "Overheads."

8          Q.    And do you recall ever seeing overheads

9    that had the information listed after each of the

10   numbers in this document?  Do you have any specific

11   recollection?

12         A.    Certainly I recall seeing documents in

13   which you have described how to produce fully human

14   monoclonal antibodies that is shown in ten, and I've

15   seen a table of human therapeutic proteins that have

16   been approved in the document.

17         Q.    Is that at 11?

18         A.    At 11.

19         Q.    Can you tell me who you think is being

20   referred to here at 11, "George and Andy?"

21         A.    George and Andy.  I don't know exactly

22   what their roles were.  They were young entrepreneurs

23   at Mayfield Fund, and they helped us with some of the

24   diligence on some of these aspects.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 72

1        Q.   Is there anything else listed in this

2   document that you recall seeing on an overhead or a

3   slide?

4        A.   I do not recall seeing this particular

5   version that is referred to in 12, but there were ideas

6   of this nature that were presented to, and internally

7   discussed at Cell Genesys.

8        Q.   Turning to 13, do you recall seeing an

9   overhead relating to the subject matter listed there,

10  "steps in hu therp protein production by HR?"

11       A.   Definitely.

12       Q.   Is this a document that you would rely

13  upon to make any assertion about when Art Skoultchi

14  came up with the invention in his patent application?

15            MR. KELBER:  Objection.

16       A.   I don't believe that this document would

17  tell us about when he conceived of the idea, but if the

18  date can be authenticated, that would suggest that the

19  idea was there at this time.

20       Q.   So, what in this document suggests that

21  the idea was there at this time?

22       A.   I think that --

23       Q.   And if you could tell me what the "idea"

24  is that you're referring to, that would be helpful.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 73

1          A.    I think that this, on this page that is

2     CGI3431, Item No. 12, describes what the mechanism of

3     how the proteins are produced, and then it talks about

4     putting a slide together about how we'd be able to

5     generate human therapeutic protein productions by

6     homologous recombination.

7               MR. FLOWERS:   Could you read back the last

8     sentence.

9                    (Answer read by the reporter as

10           requested.)

11          Q.    But, you'd agree it doesn't give any

12     detail at all about how to produce therapeutic proteins

13     by homologous recombination?

14          A.    That's correct.

15          Q.    And you don't have any firsthand knowledge

16     as to the creation of this document whatsoever,

17     correct?

18          A.    I do not.

19          Q.    Okay.

20               MR. FLOWERS:   Mark as ARS Deposition

21     Exhibit 9 a document bearing production numbers CGI1970

22     to 1973.

23                    (Document Bates stamped CGI1970

24           to 1973 marked Exhibit 9.)

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 74

```
 1            Q.    After you've had a chance to look at it,
 2    if you could tell me if you recognize the document?
 3            A.    I do not believe that I have seen this
 4    document before.
 5            Q.    So, you don't know anything about the
 6    creation of this document?
 7            A.    I do not.
 8            Q.    You don't know who created it, firsthand,
 9    you don't know?
10            A.    I don't know.
11            Q.    Can you tell me the addressee appears to
12    be Pearson Forbes at Simeon, S-I-M-E-O-N, Properties.
13    Do you know who that person is or was?
14            A.    I do not.
15            Q.    In the first line of the body, it refers
16    to a Mark Pearson, P-E-A-R-S-O-N.
17            A.    Yes.
18            Q.    Do you know who that person is or was?
19            A.    Yes.
20            Q.    Who is he?
21            A.    He is a real estate agent.
22            Q.    And what was his role, if any, in Cell
23    Genesys?
24            A.    He was engaged by Cell Genesys to find
```

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 80

```
 1        A.   My reading of this is that it is possible

 2   to insert any sequences at a predesignated location in

 3   the genome.  So, we might be discussing this issue,

 4   this word "gene."  But, basically what the concept here

 5   that it's talking about is that we could introduce any

 6   piece of DNA into the mammalian genome.  Two is that

 7   and when we introduce that, that you could regulate

 8   gene expression.

 9        Q.   So, I'll ask you a similar question to

10   what I asked you before.  Is this statement something

11   that you would point to, for example, at trial to

12   support a view that Dr. Skoultchi had the idea for the

13   invention in his patent application as of April, 1989?

14             MR. KELBER:  Objection, form.

15        A.   As I mentioned before, I don't think that

16   this statement says anything about Skoultchi's

17   invention directly.

18        Q.   Okay.

19             MR. FLOWERS:  We'll mark as ARS Deposition

20   Exhibit 10 a document bearing Bates No. CGI3471.

21             (Document Bates Stamped CGI3471

22        marked Exhibit 10.)

23   BY MR. FLOWERS:

24        Q.   The same question as on the others:  Is
```

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 81

1    this your handwriting on this document?

2          A.    Yes.

3          Q.    Is all of the handwriting on this document

4    yours?

5          A.    I believe so.

6          Q.    Okay.  It looks to bear a date in the

7    upper, right-hand corner, April 26, 1989.  Is that

8    correct?

9          A.    That's what the document says.  Yes.

10         Q.    Do you have any memory as to creating this

11   document?

12         A.    I do not.

13         Q.    Have you seen this document in the last

14   year?

15         A.    Yes.

16         Q.    Okay.  Did you look at this document on

17   Tuesday, October 4?

18         A.    I'm not sure.

19         Q.    Is this one of the documents that you sent

20   to Mr. Kelber?

21         A.    I'm not sure.

22         Q.    How do you remember seeing it within the

23   last year?

24         A.    It's part of the document that you gave me

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 82

1    earlier.  It was part of No. 7.

2              Q.   Oh, okay.  Is there anything on this page

3    that relates to what we've been calling Dr. Skoultchi's

4    invention?

5              A.   I do not believe so.

6              MR. FLOWERS:  I'm going to mark as ARS

7    Exhibit 11 a document bearing the production numbers

8    CGI1852 to 1855.

9                   (Document Bates stamped CGI1852

10              to 1855 marked Exhibit 11.)

11   BY MR. FLOWERS:

12             Q.   The same question, if you can tell me if

13   you recognize this document?

14             A.   I believe I looked at this document on

15   October 4th.

16             Q.   Okay.  Can you tell me what this document

17   is?

18             A.   It seems to be a memo from Mark Levin,

19   describing the status of Cell Genesys.

20             Q.   Do you recall receiving this document back

21   in 1989?

22             A.   I do not.

23             Q.   Do you recall having seen this document

24   before October 4th of this year?

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 83

```
 1              A.    I do not recall.

 2              Q.    Is this one of the documents that you

 3   passed on to Mr. Kelber from your files?

 4              A.    I do not recall.

 5              Q.    If you could look at the second page of

 6   this document, Production No. 1853, middle of the page,

 7   Section B, No. 3, it says, "Scientific plan for Art's

 8   idea," then underneath, "Art to meet with Rowland."

 9              Do you have any specific knowledge as to

10   what Mark Levin was referring to when he said that in

11   this document?

12              A.    Yes, I do.  One of the -- at the time that

13   Cell Genesys was formed, there weren't any patent

14   applications, and so one of the things that Mark and

15   Skoultchi felt, and appropriately, that to have the

16   company, it is really important to have intellectual

17   property, and so we spent some time interviewing

18   different patent counsel that would help us with both

19   the strategic thinking about generating intellectual

20   property and writing patent applications, and we have

21   identified Bert Rowland as that person, and so

22   periodically when we go to California we would meet

23   with Bert and talk about, you know, the ideas for the

24   company, and how those ideas can be converted into
```

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 84

1    intellectual property by writing patent applications.

2    So, I think that this suggests that we were trying to

3    get Art and Bert together to try to write a patent

4    application.

5         Q.   Do you know specifically yourself what

6    "Art's idea" was, that is referred to here on this

7    page?

8         A.   I don't have -- this document doesn't say

9    what it is, but I think Art's idea is indeed the matter

10   that we're discussing today about producing therapeutic

11   proteins using a homologous recombination.

12        Q.   Did he have any other ideas at the time?

13   This is July of 1989?

14        A.   I'm sure Art had many different ideas

15   about many different things to do, but, as I mentioned,

16   there were three ideas that we settled upon for Cell

17   Genesys, and I have thought of the idea of producing

18   fully human monoclonal antibodies in the mice, and also

19   came up with the idea of generating these universal

20   donor cells, and the third idea was something that was

21   developed by Art, and so the conclusion is that this is

22   referring to that idea.

23        Q.   Now, this section in general is referring

24   to scientific plans or decisions to be made, as

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati  October 6, 2005

Page 85

1    Mr. Levin appears to be referring to them.  There are a

2    number of different ideas listed here, yes?  At least

3    six?

4         A.   I don't know what -- this certainly is a

5    document that is prepared by Mark Levin, I believe, and

6    I don't know what he was inferring.

7         Q.   So, I mean just as a matter of fact, you

8    don't know what he was referring to by "Art's idea" on

9    this page?  You yourself don't know what he was

10   referring to?

11        A.   I believe that he's referring to the

12   ability to produce therapeutic proteins, the time

13   period that we're talking about, as I talked to you

14   before, that we wanted to develop a project that would

15   be considered short term, and Art came up with the

16   idea, and then I don't know the specific timing of

17   that, but I know that that idea was converted into a

18   patent application in consultation with Bert, so it

19   couldn't be referring to anything else.

20        Q.   Okay.

21             MR. KELBER:  We are at noon, which is

22   actually another 90 minutes, relatively good time to

23   break to be lunch.  If you have a target break point in

24   view --

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 86

1          MR. FLOWERS:  One time is as good as

2     another to me.

3               (Discussion off the record.)

4          MR. FLOWERS:  I'm going to mark as ARS

5     Exhibit 12 a document with Bates Nos. 3650 to 3654.

6               (Document Bates stamped 3650 to

7          3654 marked Exhibit 12.)

8               (Lunch recess was taken.)

9     BY MR. FLOWERS:

10         Q.   If you could go back to ARS Exhibit 11,

11    I'll ask you another question.  If you could turn to

12    the page we were looking at when we broke off, 1853, in

13    the lower, right corner, Section B on that page, "We

14    have scheduled a meeting on July 24 and July 25 with

15    dinner July 25 in San Francisco."  Do you see that?

16         A.   Yes.

17         Q.   Was there in fact a meeting on July 24th

18    and 25th that is referred to here?  Do you remember

19    that?

20         A.   I don't remember it.

21         Q.   Do you recall any meetings in July of 1989

22    for Cell Genesys?

23         A.   I do not.

24         Q.   Then I suppose you don't recall having

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 87

1    dinner in San Francisco on July 23, either, right?

2              A.    At that time, you know, I was traveling

3    quite frequently to San Francisco, but I don't recall

4    the specific dates.

5              Q.    Okay.  Just to try to maybe refresh your

6    recollection, if you turn to the next page, under

7    "Agenda," I presume this is a proposed agenda for the

8    23rd, 24th and 25th of July, 1989?

9              A.    Mm-hmm.

10             Q.    Does this refresh your recollection at all

11   about whether in fact there was a meeting in July of

12   1989 in which these things were discussed, these items

13   listed in the agenda?

14             A.    I do not.

15             Q.    You can put that to the side.  Thanks.

16   The document I marked just before we left is ARS

17   Deposition Exhibit 12.  If you could turn to that.  I

18   don't know if you've had a chance to look at that yet.

19             A.    I looked at it.

20             Q.    Do you recognize the document that is

21   attached to this first page, which is the fax page?

22             A.    I do not.

23             Q.    As far as you're aware, you've never seen

24   this document?

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati    October 6, 2005

Page 88

1      A.    Page 1?

2      Q.    The --

3      A.    You're referring to Page 1?

4      Q.    No.  I'm referring to the substantive

5  part?

6      A.    I'm sure I have seen this document before.

7      Q.    Do you recall when you saw it first?

8      A.    I cannot recall the date when I first saw

9  it.

10      Q.    Do you recall the circumstances in which

11  you first saw this document?

12      A.    If I remember correctly, when Bert Rowland

13  would write a draft of the application, and he would

14  send it to -- I would be one of the recipients of that

15  draft, and then I would usually mark it and send it

16  back.  So -- and I don't know whether this was a draft

17  that I marked up or it was something after

18  incorporating my changes, but I remember seeing this

19  document.

20      Q.    Okay.  At this time in the summer of 1989,

21  were you involved in the preparation of a patent

22  application on which you were listed as an inventor?

23      A.    Yes.  I don't know the exact times and

24  timing, but around this time, yes.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati    October 6, 2005

Page 89

1        Q.    And was your patent application submitted

2   to the Patent Office around the same time that

3   Dr. Skoultchi's patent application was submitted?

4        A.    I believe so.

5        Q.    Okay.  Does this document, Plaintiff's

6   Exhibit -- ARS Deposition Exhibit 12, is this related

7   to your patent application?

8        A.    No.

9        Q.    Does this relate to Dr. Skoultchi's patent

10  application?

11       A.    I believe so.

12       Q.    Were you marking up drafts of

13  Dr. Skoultchi's patent application at that time?

14       A.    Yes.

15       Q.    Okay.  Why?

16       A.    I was trying to, you know, help make sure

17  that -- you know, however I could contribute to the

18  patent application.

19       Q.    Okay.  Was Dr. Skoultchi receiving drafts

20  of the patent application?

21       A.    I believe so.

22       Q.    Was he marking them up and sending them

23  back?

24       A.    Yes.

714ac87f-98db-4641-b875-5f7805134bc8

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 90

1          Q.   Can you point to any specifics, any

2    specific draft that you're aware of that was submitted

3    to you for markup of Dr. Skoultchi's patent

4    application?

5               MR. KELBER:   Can I hear that question

6    back, please.

7               (The pending question was read by the

8        reporter as requested.)

9          Q.   Let me restate that.

10              MR. KELBER:   I appreciate it.

11         Q.   Can you point to any specific draft of

12   Dr. Skoultchi's patent application that was submitted

13   to you for markup?  Do you have a specific recollection

14   of one?

15         A.   I have seen a document in which -- which

16   had both Art Skoultchi and I have made changes.

17         Q.   Is that a document that you provided to

18   Mr. Kelber?

19         A.   I don't believe so.

20         Q.   So, that wasn't a document that was in

21   your files, here at Harvard?

22         A.   That's correct.

23         Q.   But, you looked at that document on

24   October 4 of this year?

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 91

1       A.    That's correct.

2       Q.    Turning back to this ARS Exhibit 12, if

3  you look on the first page, it appears to be a fax

4  cover page from July 24th, 1989.

5       A.    Yes.

6       Q.    A fax from Mark Levin to Bert Rowland?

7       A.    Yes.

8       Q.    Do you have any memory of this fax being

9  sent, any firsthand knowledge?

10      A.    I do not.

11      Q.    Okay.  Turning again to the attached

12  pages, do you have a specific recollection of receiving

13  this document in 1989?

14      A.    I don't know how many different versions

15  of the application were sent to me, and I don't know if

16  more than one version was sent to me, whether this

17  particular version was sent to me or not, but I

18  certainly received at least one document that was the

19  draft that was prepared by Bert Rowland.

20      Q.    Okay.  As far as this document goes,

21  however, you can't provide any information --

22      A.    I cannot provide --

23      Q.    -- as to where it came from or whether you

24  saw it at the time?

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati  October 6, 2005

Page 92

```
 1          A.    That's correct.

 2          Q.    Fair enough.  If I could take you to the

 3   page marked 3652.

 4          A.    Yes.

 5          Q.    Recognizing you don't have a specific

 6   memory of this document or who wrote it, in the middle

 7   of the page there is a sentence in the second

 8   Paragraph that says, "There are several potential

 9   disadvantages with the first method, especially when a

10   human protein is to be produced."  The first method

11   appears to be listed above on this page.

12          The first full sentence says, "The overall

13   strategy is to integrate an amplifiable gene either

14   upstream or downstream of the gene of interest using

15   homologous recombination between these target DNA

16   sequences in the cell and the same sequences present on

17   a vector also containing the amplifiable marker gene."

18   It says, "The resulting primary cells which have the

19   integrated marker gene in the appropriate site could be

20   used in two ways to produce the protein of interest.

21   One method would be to subject these cells to

22   procedures which will select for cells with amplified

23   copies of the marker gene."

24          A.    Yes.
```

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 93

1          Q.   In the paragraph below, referring again to

2    that first sentence it says, "There are several

3    potential disadvantages with the first method."  Below

4    that it lists several potential disadvantages.

5          A.   Mm-hmm.  Yes.

6          Q.   Do you agree with those statements in that

7    paragraph?

8          A.   At that time, it was not known whether it

9    is possible to use human diploid cells for, as protein

10   production factories, so that is what is referring to,

11   so the answer is we don't know.

12         Q.   So, it simply wasn't known whether those

13   primary cells could be used to make protein you were

14   trying to express?

15         A.   That's correct.

16         Q.   If you would turn to the next page, at the

17   top, I believe it's the third full sentence, it says,

18   "In general, I do not think that the procedure is truly

19   competitive with traditional recombinant methods for

20   expression of newly cloned genes in mammalian cells."

21         A.   Yes.

22         Q.   Going back to your earlier answers to my

23   questions, do you know who the "I" is there?

24         A.   I do not.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 94

1          Q.    The idea listed in this sense, expressed

2    in the sentence about competitive aspects of the

3    procedure, did you agree with that statement at the

4    time back in 1989?

5          A.    Which statement, please?

6          Q.    "The procedure is not truly competitive

7    with the traditional recombinant methods for expressing

8    proteins."  Was that your feeling at that time, back in

9    1989?

10               MR. KELBER:  Objection as to form.

11         A.    I did not have any particular views about

12   it.

13         Q.    Okay.

14               MR. FLOWERS:  Mark as ARS Deposition

15   Exhibit 13 a document bearing production numbers

16   CGI3224 to 3235.

17                    (Document Bates stamped CGI3224

18               to 3235 marked Exhibit 13.)

19   BY MR. FLOWERS:

20         Q.    Take the time you need to look at that.

21   My first question is:  Did this document come out of

22   your files here at Harvard?

23         A.    I have seen this document, but I'm not

24   sure whether it is from my files or not.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 95

1          Q.    Okay.  When did you last see this

2     document?

3          A.    October 4th.

4          Q.    If you remember, when did you first see

5     this document?

6          A.    I believe I saw this document in an

7     earlier meeting with counsel that I mentioned earlier.

8          Q.    Could you be more specific?

9          A.    I think, if my recollection is correct, I

10    met with counsel I think from Cell Genesys, and I don't

11    remember the context, but this document was presented

12    to me specifically asking me the question as to if I

13    had knowledge about who drew the diagram, handwritten

14    diagram on Page 1 of this document.

15         Q.    Was that in the context of the Genpharm

16    litigation?

17         A.    I am not sure.

18         Q.    That wasn't Mr. Kelber?  The counsel

19    you're speaking of wasn't Mr. Kelber?

20         A.    I'm not sure who was at that meeting, but

21    I remember that the question about, the speculation

22    about who might have drawn this drawing.

23         Q.    Okay.  What was your answer at the time?

24    Do you remember?

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 96

```
 1          A.    The answer was that I didn't draw it, and
 2    the handwriting doesn't seem to be Art Skoultchi's, and
 3    I didn't know, you know, who might have drawn this
 4    picture.
 5          Q.    Okay.  So, it's not your handwriting.
 6    It's not Art Skoultchi's handwriting.  You didn't draw
 7    the picture.  I take it you don't think Art Skoultchi
 8    drew this picture on the first page?
 9          A.    That's correct.
10          Q.    Okay.  Do you know who created this
11    document?  Do you have any way of knowing?
12          A.    It is most likely created by Mark Levin.
13          Q.    Why do you say that?
14          A.    Because Mark is known to have very
15    detailed documents, like this one.
16          Q.    I was curious, still on that first page --
17          A.    Yes.
18          Q.    -- next to the drawing you were referring
19    to --
20          A.    Yes.
21          Q.    -- right beside it, it says "HSVTK --"
22          A.    Yes.
23          Q.    "-- vector.  Mario Kopeche."
24          A.    Mm-hmm.
```

CONFIDENTIAL - OUTSIDE COUNSEL ONLY
Raju Kucherlapati   October 6, 2005

Page 97

1          Q.   Does the spelling of Cappecchi give you

2    any indication as to who might have created this

3    document?

4          A.   That says that somebody, who doesn't know

5    what Mario's last name, how it is spelled.

6          Q.   Okay.  So, you wouldn't have spelled it

7    that way?

8          A.   I wouldn't have.

9          Q.   You don't believe that Art Skoultchi would

10   have spelled it that way?

11         A.   Yes.

12         Q.   What about Oliver Smithes, would he have?

13         A.   Definitely not.

14         Q.   Mark Levin might have?

15         A.   Mark might have, because Mark Levin -- I

16   mean of the people that were there, Cappecchi's name

17   was mentioned, and I don't think that -- I knew

18   Capecchi.  Art Skoultchi knew Cappechi.  Oliver Smithes

19   knew Cappechi, but Mark didn't know him.  It's possible

20   that --

21         Q.   But, in the end, you don't know who

22   created the document?  As a matter of fact, you don't

23   know who created the document?

24         A.   I don't.