1

1      UNITED STATES PATENT AND TRADEMARK OFFICE

2          ---------------------------

3      BEFORE THE BOARD OF PATENT APPEALS

4          AND INTERFERENCES

5          ---------------------------

6      APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

7          Junior Party

8          (Patent 5,272,071)

9          vs.

10         CELL GENESYS, INC.

11         Junior Party

12         (Application 08/102,390)

13         ---------------------------

14     Patent Interference No. 105,114

15

16          Deposition of BERTRAM IRWIN ROWLAND, taken

17     on behalf of Cell Genesys, at Cell Genesys,

18     500 Forbes Boulevard, South San Francisco,

19     California, commencing at 10:13 a.m.,

20     Wednesday, October 1, 2003, before LORRIE L.

21     MARCHANT, RPR, CSR NO. 10523.

22

21

1   testimony.

2       MR. GHOLZ:  Well, I suppose you mean

3   mischaracterizes the document.

4       MR. KELBER:  No.  Mischar- -- this is

5   testimony.

6       MR. GHOLZ:  Q.  Okay.  The sentence in

7   question is, quote -- and it's on the second page.

8           "A decision was made to move forward

9           and file a patent application on

10          two alternative forms of the idea of

11          Skoultchi, including expressing a gene in

12          the cells that had received the

13          amplifiable gene through homologous

14          recombination and the transfer of the

15    amplified gene to a secondary expression

16    host cell and expressing the amplified

17    gene in such secondary host cells,"

18    period, unquote.

19    Was that decision to file two separate patent

20    applications, or was it to file one patent application

21    that disclosed two different alternative forms of the

22    idea?

22

1    A.  I believe it was a single application on

2  two alternative forms.

3    Q.  All right.  Would you read paragraph 3 to

4  yourself.

5    A.  Yes.  I've read the paragraph.

6    Q.  All right.  Casting your mind back to 1989 and

7  your time with Leydig, Voit, did you keep billing

8  records?

9    A.  Yes, I did.

10    Q.  How did you keep billing records?  What kind

11  of format did you use?

12    A.  I don't recall the exact format we used at

13  Leydig.

14    Q.  Do you recall whether you kept billing records

15    by hand and somebody keyed them into a computer, whether

16    you keyed them into a computer, whether there was a

17    Leydig, Voit form that you had to fill out?

18        MR. KELBER:  Objection as to form.

19        You can answer.

20        THE WITNESS:  I really can't say precisely.

21    I've just done it too many different ways over the

22    years.

23

1        MR. GHOLZ:  Q.  Okay.  But you are sure that

2    you kept some kind of billing records that were in

3    existence prior to the time that the bills that are

4    attached to this got generated?  Is that fair?

5        A.  I don't know of any attorney who doesn't.  But

6    yes, I did.

7        Q.  Okay.  Neither do I.  I just wanted you to say

8    that.  I would have been stunned if I had gotten a

9    contrary answer.

10        Okay.  So it is your belief that you kept some

11    kind of billing records.  Are those billing records now

12    in your personal possession, custody, or control?

13        A.  No.

14        Q.  Did you leave them with Leydig, Voit when you

15   left the firm?

16      A.  Yes.

17      Q.  Have you asked Leydig, Voit to provide you

18   with copies of those billing records?

19      A.  I have not requested them to do that.

20      Q.  Were you asked to request them to do that?

21      A.  No, I was not.

22      Q.  Again, focusing on paragraph 3, I note the

24

1   passive voice towards the end of the paragraph.  And the

2   first question is who forwarded the draft application to

3   CG?  Or as you call it, CGI.

4       A.  I would have initiated the action, and my

5   secretary would have carried it out.

6       Q.  Was there another attorney involved at this

7   point at Leydig, Voit?

8           MR. KELBER:  Objection as to form.

9           THE WITNESS:  I really have no recollection of

10  whether there was or not.

11          MR. GHOLZ:  Q.  Do you recall the name of your

12  then-secretary, the one that you think would have

13  actually forwarded the application?

14      A.  I'm going to have to apologize to you.  I'm a

15   little deaf.

16      Q.  Oh, I'm sorry.

17      A.  So I hear much of what you say, but not all of

18   it.

19      Q.  All right.  That's fine.  I'll speak up a

20   little more.

21      Do you recall the name of your then-secretary

22   at Leydig, Voit?

25

1      A.  No, I don't.

2      Q.  Again, paragraph 3 does not identify the

3    specific actor.  You say this application was forwarded

4    to CGI.  Who at CGI was this application forwarded to?

5      A.  I don't recall who was my person I interacted

6    with at CGI.  Whether it would have been the director of

7    research or it would have been one of the inventors, I

8    just don't recall.  Or -- yeah.

9      Q.  Did you make any attempt to ascertain to whom

10   you forwarded that document?

11     A.  You mean now?  About --

12     Q.  Yes.  You're right.  Yes.  Now in connection

13   with this litigation.

14     A.  No, I have not.

15    Q.  Were you asked to ascertain to whom you had

16    forwarded that draft?

17    A.  I don't recall being asked.

18    Q.  Would you now read paragraph 4 in your

19    declaration -- oh, there are two paragraph 4's.  You

20    didn't notice that yesterday, did you?  There are

21    two paragraph 4's.  So --

22        MR. KELBER:  I'm happy to have brought some

26

1   joy into your life.

2       MR. GHOLZ:  Fair enough.

3       Q.  All right.  Please read the first paragraph 4

4   to yourself.

5       A.  Okay.  I've completed my reading.

6       Q.  Again, I note the passive voice.  Who --

7   specific individual, if you recall -- reviewed and

8   revised the draft application?

9       A.  I believe it would have been more than

10  one person, but I don't know who those people were, at

11  this time.

12      Q.  Was that draft applications reviewed and

13  revised at Leydig, Voit or at CGI?

14      MR. KELBER:  Objection as to form.

15        THE WITNESS:  It would have been reviewed at

16   CGI.

17        MR. GHOLZ:  Q.  Now, inviting your attention

18   to the second paragraph 4, would you please read that to

19   yourself.

20     A.  I've completed my review.

21     Q.  Okay.  With my apologies, I didn't ask the

22   two stock follow-up questions.  So I will go back to the

27

1    first paragraph 4 and ask you whether, recently in

2    connection with this interference, you made any attempt

3    to ascertain who had reviewed and revised the draft

4    application at CGI?

5        A.  No, I did not.

32

1        A.  With whom?

2        Q.  Lita Nelsen.

3        A.  I don't recall.

4        Q.  Was this invention made as a part of sponsored

5    research for MIT?

6        MR. KELBER:  Objection as to form.

7        THE WITNESS:  I don't recall that this

8    invention had anything to do with MIT.

9       MR. GHOLZ:  Q.  I believe that's right.  So

10   why were you calling Lita and billing it to CGI?

11      A.  If you'll look at the matter number, it's

12   general correspondence.  There were many issues going on

13   about patents at CGI, and one of them had to do with

14   MIT.

15      Q.  Okay.  So you have no reason to think that

16   that is connected with this matter?

17      MR. KELBER:  Objection as to form.

18      THE WITNESS:  I have no reason to believe it

19   has any connection with this matter.

20      MR. GHOLZ:  Q.  Okay.  And is the same true

21   for your "telecoon" with Hartdegen?

22      A.  That I cannot testify.  I've no recollection.

33

1      Q.  My odd pronunciation is simply because it says

2    "telecoon" rather than "telecon," but that is not

3    significant.

4        A.  I'm sorry.  I didn't appreciate the nuance.

5        Q.  I'm an inveterate editor.

6            Now, in paragraph 5, you said that Exhibit E

7    reflects the facts that you reviewed and revised the

8    application.

9            How does Exhibit E reflect the fact that you

10   reviewed and revised the application?

11       A.  Reading from the billing on 11/1/89, I

12   indicated that I reviewed and revised cell 3, the

13   subject application.

14       Q.  Okay.  And then it says that it reflects the

15   fact that you filed the application on November 6,

16   1989.  How does it reflect that?

17    A.  On 11/6/89 it states that I billed for filing

18    the application.  It also shows we billed for the office

19    fees.

20    Q.  Okay.

21        MR. GHOLZ:  I have no further questions.  Your

22    witness, Counsel.

                                34

1        You don't leave until --

2        MR. KELBER:  I just have a short one or two.

3            EXAMINATION BY MR. KELBER

4        MR. KELBER:  Q.  During the discussion with

5    Chico, he asked you about a variety of names, many of

6    which you couldn't recall the identity of the person or

7    the initials.

8        Do you recall that conversation?

9     A.  Yes.

10      Q.  In paragraph 2 of your declaration, you

11    indicate that you have a current recollection of a

12    meeting that you attended.  How is it that you have such

13    a clear -- I'm sorry.

14        How is it that you have a current recollection

15    of that meeting but there are many names and individuals

16    reflected there that you have no recollection of?

17      A.  Well, I was extraordinarily impressed by

18    Dr. Skoultchi's coming up with this idea.  And in my

19    career, that spans some 30 years -- at that time about

20    30 years -- I had never heard a conception that I

21    believed was also a reduction of practice, that it was

22    so clear that it would work.

                                35


1        And I have always used Skoultchi as the one

2   exception that one can have an idea which is obviously

3   going to work and there was no reason to believe that it

4   could not be executed.

5       MR. KELBER:  Nothing further.

6       MR. GHOLZ:  I do have a follow-up.

7       FURTHER EXAMINATION BY MR. GHOLZ

8       MR. GHOLZ:  Q.  And were you so persuaded that

9   the invention could be actually reduced to practice,

10  based upon Dr. Skoultchi's conception, because the

11  available technology known to people of ordinary skill

12  in the art at that time was such that all you needed was

13  the idea, and you could walk across the hall into the

14  lab and mix, stir, heat -- whatever you guys do -- and

15  come up with an actual reduction practice with no

16  further lengthy or difficult research work necessary.

17      MR. KELBER:  Objection as to form.

18      You can answer.

19      THE WITNESS:  I had had quite a bit of

20   dealings with DHFR in a number of contexts, one.

21      Two, with Oliver Smithies and Kuchlerapati and

22   readings Capcchi, C-A-P-C-C-H-I, papers, because of the

36

1    work that CGI was doing, it was pretty self-evident that

2    one could introduce the DHFR gene in proximity to a

3    target gene and that one would get the desired

4    amplification/identification of homologous

5    recombination.  So I felt that all the pieces were

6    there.

7        MR. GHOLZ:  Q.  Actually, there is another way

8    of characterizing this, which we owe to Steve, but which

9    we love on our side of the table.  Would you say that

10   the art at this point could be likened to a

11   supersaturated solution, all that you needed was the

12   idea, which would function like a seed, and the gold

13   would crystallize out of the mixture?

14   A.  It seems like much too romantic a notion for

15    me.  It's not scientific.

16        Q.  Well, one more way, would you agree that all

17    the enabling knowledge was present in the art, all you

18    needed was the idea and, "bingo," you could do it?

19        A.  I believe that once you had the idea, all the

20    enabling technology was available.

21        MR. GHOLZ:  Thank you, Dr. Rowland.

22        No further questions.

37