# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CELL GENESYS, INC., ) <br> ) <br> Plaintiff/Counterdefendant, ) <br> ) <br> v. ) <br> ) <br> APPLIED RESEARCH SYSTEMS ARS ) <br> HOLDING, N.V. ) <br> ) <br> Defendant/Counterclaimant. ) <br> ) <br> APPLIED RESEARCH SYSTEMS ARS ) <br> HOLDING, N.V., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CELL GENESYS, INC. AND ) <br> TRANSKARYOTIC THERAPIES, INC. ) <br> ) <br> Defendants. ) | C.A. No. 05-12448-MLW <br><br><br><br><br><br><br><br><br><br><br> C.A. No. 04 11810 MLW |

## EXPERT REPORT OF KIRK R. THOMAS, PH.D.

I, Kirk R. Thomas, Ph.D., submit the following expert report on behalf of Cell Genesys, Inc. ("CGI") in this action.

**I.    QUALIFICATIONS**

1. I am currently a Research Associate Professor of Internal Medicine at the University of Utah School of Medicine, a position I have held since 1995. I received an A.B. in Biology from the University of California, Santa Cruz in 1973, where my thesis work was focused on molecular genetics of DNA replication in *E. coli*. I pursued graduate studies of DNA replication, receiving my Ph.D. in Biology in 1981 from the University of Utah. I completed two Postdoctoral Fellowships, including one on the

## VII. THE SUBJECT MATTER OF CLAIM 3 IS DIFFICULT TO PRACTICE

61. I have compared Claim 3 with other claims in the '071 patent. Claims 1 and 2, for example, refer to the insertion of a regulatory element, typically a promoter, in proximity to a gene of interest, to increase the expression levels of the gene of interest - in simple terms, to cause the cell in which the gene is found to make more of the protein encoded by the gene of interest.

62. I understand this idea, and indeed, as noted above, it is the same idea expressed in my own '764 patent and the '313 patent. Both of these patents also set forth the idea that the targeted insertion vector should include a positive selection marker so as to permit easy identification of successful recombinant cells. DHFR and CAD and other amplifiable genes were well known selection markers by 1989. Neither the '764 patent nor the '313 patent specifies the use of any particular amplifiable gene, however, the '071 patent confirms that DHFR, CAD and others were recognized as "selection markers," (col. 10, ll. 56-65) in the same fashion the term is used in the '764 and '313 patents.

63. Another issue involved with amplifiable genes is the protocol used to induce the cell to amplify the amplifiable gene. As noted, the amplification event is associated with exposure to a selective pressure - in the case of DHFR; perhaps the best known of the amplifiable genes, the selective pressure is applied by exposure to methotrexate. Methotrexate is a toxin. Inclusion of methotrexate in cell culture media may limit the utility of the cells in a manner that frustrates the intent of the '071 methods. For example, the level of protein expression of a targeted gene may have been modified according to a method in the patent; however, requiring methotrexate in the medium may result in impaired cell growth, and therefore, prevent the ability to actually produce the protein

even though the gene was modified at the DNA level. In addition, highly amplified genes, including DHFR, are unstable and can be lost (*i.e.*, excised from the genome) spontaneously or when selection pressure is not maintained, making reproducibility difficult to achieve even when the same DNA construct is used.

64. The protocol to be used varies widely from cell to cell and gene to gene. Different cell types and different genes require different conditions before amplification will occur. While a wide variety of protocols were known for inducing the amplification of these genes, the '071 patent does not refer to any, and one of skill in this art, would find it difficult to figure out even where to start. One reason for my opinion is that all genes recited in the '071 for use as an amplifiable gene may be difficult to utilize because these genes are naturally occurring cellular genes. This means the native copy of the gene may undergo amplification just like those inserted from the construct. As a consequence, cells that have not incorporated the construct by homologous recombination can survive exposure to the toxin. In addition, if the amplifiable gene utilized is homologous to the native copy of the gene, the DNA construct can integrate by homologous recombination at an unintentional location instead of the target locus.

65. The instructions in the '071 patent are further confusing as they pertain to Claim 3, where the limited discussion of amplifiable genes teaches that it may be necessary to <u>omit</u> the amplifiable gene when the efficiency of homologous recombination is very low (*see*, column 11, ll. 23-28). This is an important statement in the context of Claim 3 because the DNA construct required by that claim does not exclude any minimum region of homology for the targeting segment. Further, the patent teaches no minimum required size - "size of the targeting regions, *i.e.*, the regions of homology, is