# EXHIBIT B,
# Part II

Interference 105,114

levels higher than normal, as Claims 107-109 of Genesys's Application 08/102,390 require.

Thomas does not describe, and reasonably would not have suggested, the transformed human 293 embryonal kidney cell defined by Claim 106 of Genesys's Application 08/102,390.

However, Thomas describes mammallian cells with an heterologous HSV-<u>tk</u> promoter inserted in the cell's genome though homologous recombination in the vicinity of, and operably linked to express a structural <u>neo</u> gene, <u>i.e.</u>, a mammalian cell line having pMC1Neo <u>neo</u> gene within <u>Hprt</u> inserted into mouse ES cells by homologous recombination.  The subject matter Thomas describes, or reasonably would have suggested, is encompassed by Claims 110-112 of Genesys's Application 08/102,390.

Therefore:

Claims 105 and 110-112 of Genesys's Application 08/102,390 are unpatentable under 35 U.S.C. § 102(b) over subject matter described by Thomas, or under 35 U.S.C. § 103 in view of the teaching of Thomas.

(7)  <u>Japan 1-215280 (Exh. 3010; Exh. 2016)</u>

<u>Japan's teachings</u>

Our study of Japan's teachings relies on, and refers to, the certified English translations of Japanese Patent publication No. 1-215280, published August 29, 1989, of record; one submitted

-74-

Interference 105,114

by ARS (Exh. 3010) and the other submitted by GENESYS

(Exh. 2016).  Japan generally describes its invention as follows:

> The present inventors . . . discovered that a
> microorganism capable of efficiently producing a specific
> target substance is obtained by introducing a powerful
> promoter capable of enhancing the expression of a gene
> concerned in the production of the target substance in
> the chromosome of a microorganism already containing
> the gene.  The present invention has been perfected as
> a result.

(Exh. 3010, p. 5, para. 3);

> [T]he inventors discovered that by introducing powerful
> promoters that could increase the expression of genes
> related to the production of specific desired substances
> into microbial chromosomes already containing said genes,
> microbes capable of producing the desired substances
> efficiently were obtained, thus completing the invention.

(Exh. 2016, p. 4, para. 1);

> This invention . . . is aimed at providing an improved
> microorganism which has an expression regulatory sequence
> for a gene concerned in the production of a target substance
> introduced in the chromosome of a microorganism possessing
> the chromosome containing the gene at a position and in a
> direction such that the expression of the gene is enabled to
> be controlled[;] a method for the production of the
> microorganisms; and a method for the production of a useful
> substance, characterized by culturing the organism[,]
> thereby yielding a product concerned in the gene and
> collecting the product.

(Exh. 3010, p. 5, para. 4);

> [T]his inventions presents: improved microbes that have
> chromosomes containing genes related to the production of
> desired substances wherein expression-controlling sequences
> for said genes have been introduced into said microbial
> chromosomes at positions and in directions that enable the
> control of expression of said genes; methods for producing
> said microbes; as well as methods for producing useful
> substances characterized by the fact that said microbes are

Interference 105,114

> cultured to produce products related to said genes, and said products are harvested.

(Exh. 2016, p. 4, para. 2).

> More specifically, Japan discloses:

>> This invention can be applied to a microorganism which already possesses a gene concerned in the production of a target substance in the chromosome thereof and exhibits the ability to produce the target substance and to a microorganism which already possesses a gene concerned in the production of a target substance in the chromosome thereof and nevertheless fails to produce substantially the target substance and derives an ability to produce the target substance from externally introducing anew an expression regulatory gene.

(Exh. 3010, p. 6, para. 1).

>> This invention can be used either on microbes that have chromosomes containing genes related to the production of desired substances on their chromosomes and can produce said desired substances, or on microbes that already have genes related to the production of desired substances on their chromosomes although practically speaking, cannot produce said desired substances, but become able to produce said desired substances by newly introducing exogenous expression-controlling genes.

(Exh. 2016, p. 4, third para.).

According to Japan, the target genes may encode, and be made to express, enzymes such as protease, amylase, glucose isomerase, cellulase, and tryptophan synthetase; hormones such as insulin, growth hormones, encephalin, and somatostatin; antigens for hepatitis, polio, and herpes; and lymphokines such as interferon and interleucine (Exh. 3010, p. 6, para. 2; Exh. 2016, p. 4, para. 4). As does Genesys (Exh. 2047, p. 5, l. 24-25), Japan

-76-

Interference 105,114

appears to broadly define a target gene as any gene of interest.

In that regard, Japan states:

> The gene which is concerned in the production of such target substance may be <u>a gene which inherently exists in the chromosome of a host microorganism or a gene which has been artificially inserted in advance in the chromosome of a host microorganism</u>.  The former gene possesses an expression regulatory series naturally attendant on the gene and, on being furnished with an additional, expression regulatory sequence to be inserted therein by the method of this invention, acquires an ability to enhance the production of the substance by a host.  It is otherwise capable of conferring an ability to produce the target substance [by] a host which has been inherently incapable of producing substantially, the target substance.  The latter gene in most cases possesses an expression regulatory domain attendant on the structural gene thereof and, on being furnished with a powerful expression regulatory sequence to be introduced by the method of this invention, acquired such effect as mentioned above.

(Exh. 3010, pp. 6-7, bridging para.; emphasis added);

> <u>Genes related to the production of such desired substances can be genes that naturally exist on the chromosome of the host microbe or can be genes that have been inserted artificially into the host microbe chromosome beforehand</u>.  The former genes have expression-controlling sequences that are attached to these genes naturally.  By inserting additional expression-controlling sequences in addition to these, production of the desired substance by the host can be increased or the ability to produce the desired substance can be given to hosts that essentially did not produce the desired substance naturally.  In the latter case as well, there are often expression-controlling regions attached to the structural genes, and by introducing the powerful expression-controlling sequences of the methods of this invention, effects like those mentioned above can be obtained.

(Exh. 2016, pp. 4-5, bridging para.; emphasis added).

Interference 105,114

Japan's "expression regulatory sequences" (Exh. 3010, p. 7, last complete sentence) or "expression-controlling sequences" (Exh. 2016, p. 5, first full para., first sentence thereof) may be promoters, terminators, SD sequences or operators. The means for inserting the expression regulatory or expression-controlling sequences is described as follows:

> Generally, the expression regulatory domain to be inserted is introduced either by a plasmid capable of being amplified in a host microorganism or in the form of a cyclic or linear DNA incapable of being amplified in the host microorganism.

(Exh. 3010, p. 8, first full para.);

> The expression-controlling region to be inserted is normally inserted using plasmids that can be amplified in the host microbe or as a cyclic or linear DNA that cannot be amplified in the host microbe.

(Exh. 2016, p. 5, second full para.).

Most importantly, Japan teaches that the expression regulating or expression-controlling sequences are inserted by homologous recombination:

> As a means for integrating an expression regulating sequence such as a promoter with the chromosome of a host microorganism, the so-called <u>homologous crossing-over</u> is adopted. For this purpose, the regulatory sequence to be inserted is preferred to be furnished at one terminal or both terminals thereof with a DNA sequence which is homologous with the DNA sequence of a gene already existing in the relevant chromosome and concerned in the formation of the target product.

(Exh. 3010, p. 8, second full para.; emphasis added);

-78-

Interference 105,114

    So-called <u>homologous exchange</u> is commonly used as the
method for integrating expression-controlling sequences such
as promoters into host microbe chromosomes.  For this
reason, it is preferable that controlling sequences to be
inserted have, at one or both ends, DNA sequences that are
homologous to the DNA sequences of the genes related to
production of the desired products already present on the
chromosomes.

(Exh. 2016, pp. 5-6, bridging para.).

    In its examples, Japan targets genes encoding tryptophan and

utilizes promoters derived from <u>Bacillus amyloliquefaciens</u> or the

SPO2 phage which infects <u>Bacillus subtilis</u> (Exh. 3010, pp. 8-9,

bridging para.; Exh. 2016, pp. 8-9, bridging para.), and marker

genes imparting resistance to chloramphenicol, ampicillin, and

tetracycline (Exhs. 3010 and 2016, Examples 1-3).  Japan also

employs radioactive markers (Exhs. 3010 and 2016, Example 6).

## Findings based on Japan's teachings

    Having concluded that a "cell line" of Claims 1, 2, 3, 17,

18, 19, 26, and 27 of ARS's patent reads on microorganisms, we

find that Japan describes an invention of Claims 1, 2, 5, 17, 18,

19, 20, 22, 26, 28, 52, 53, 54, and 56 of ARS's '071 patent,

and/or conclude that an invention of Claims 1, 2, 5-7, 13-20, 22,

23, 26, 28-30, 36-39, 52-54, 56 and 57 of ARS's '071 patent

reasonably would have been obvious to persons having ordinary

skill in the art in light of Japan's teachings.

    Furthermore, we find that Japan describes an invention of

Claims 110-112 of Genesys's Application 08/102,390 and/or

-79-

Interference 105,114

conclude that an invention of Claims 110-112 of Genesys's
Application 08/102,390 reasonably would have been obvious to
persons having ordinary skill in the art in light of Japan's
teachings.

<u>The parties' claims directed to eukaryotic cell lines</u>

Claims 105 and 107-109 of Genesys Application 08/102,390 and
Claims 9-12, 25, and 32-35 of ARS's '071 patent differ from the
inventions described by, or obvious in view of, Japan itself in
the eukaryotic cell line.  Compare the cell lines of, and the
related genomes, DNA constructs and methods encompassed by, the
parties' claims relative to the cell lines of Japan's claims:

| Cell line | Genesys | ARS | Japan |
|-----------|---------|-----|-------|
| Prokaryotic | yes | yes | yes |
|   bacteria | yes | yes | yes |
| Eukaryotes | yes | yes | no |
|   yeast | yes | yes | no |
|   plants | yes | yes | no |
|   mammals | yes | yes | no |

The significant issue for our consideration is whether
persons having ordinary skill in the art would have been led by
the methods described in Japan (for activating a prokaryotic
microorganism to express a gene of its genome encoding a protein
not normally expressed by said prokaryotic microorganism,
and/or for increasing the level of expression of a gene of a
prokaryotic microorganism's genome encoding a protein normally
expressed by said prokaryotic microorganism) to activate an

-80-

Interference 105,114

eukaryotic cell line to express a gene of its genome encoding a protein not normally expressed by said eukaryotic cell line, and/or for increasing the level of expression of a gene of a eukaryotic cell line's genome encoding a protein normally expressed by said eukaryotic cell line, with reasonable expectation of success.  More specifically, would persons having ordinary skill in the art have been led by the methods described by Japan (for activating a prokaryote to express a gene of its genome encoding a protein not normally expressed by said prokaryote, and/or for increasing the level of expression of a gene of a prokaryote's genome encoding a protein normally expressed by said prokaryote) to use the same type of procedure to activate an eukaryotic cell line, most especially a differentiated mammalian cell line, to express a gene of its genome encoding a protein not normally expressed by said eukaryotic or differentiated mammalian cell line, and/or increase the level of expression of a gene of an eukaryotic or differentiated mammalian cell line's genome encoding a protein normally expressed by said eukaryotic or differentiated mammalian cell line, with reasonable expectation of success.  We look to all the evidence of record for the answers.

We consider first the prior art cited by the parties as evidence of the state of the art at the time the parties first

-81-

Interference 105,114

filed their patent applications.  We find this pre-litigation
evidence to be the most credible characterization of the
knowledge and skill in the art at the pertinent time; far more
credible than the subsequent views of persons said to be skilled
in the art which were entered of record in this interference a
decade later.

First, Japan is not only concerned with stimulating or
enhancing expression of target genes endogenous to the genome of
prokaryotes but also instructs that expression of target genes
exogenous to the genome of prokaryotes which encode foreign
proteins can be stimulated or enhanced by inserting exogenous
expression regulatory sequences in operable proximity to the
exogenous target gene inserts by homologous recombination
(Exh. 3010, pp. 6-7, bridging para.).  As examples of target
genes, Japan names target genes which encode both plant and
animal proteins, including human proteins (Exh. 3010, p. 6,
second para.):

> The target substances which are produced by the
> method of this invention can be proteins or polypeptides
> such as, for example, varying species of enzymes such
> as, for example, protease, amylase, glucose isomerase,
> cellulase, tryptophan synthetase which are products of
> direct expression of genes; various species of peptide-like
> hormones such as, for example, insulin, growth hormones,
> encephalin, and somatostatin; various species of antigens
> such as, for example, hepatitis vaccine, polio vaccine, and
> Herpes vaccine; and various species of lymphokine such as,
> for example, interferon and interleucine.

-82-

Interference 105,114

In that light, we recall the teaching of Kaufman I

(Exh. 3007; Exh. 2014), cited by both parties in support of

their preliminary motions under 37 CFR § 1.633(a)(Paper No. 63,

pp. 1, 7-8 and 10-14). Kaufman I teaches (Exh. 3007; Exh. 2014):

> [I]t should now be possible to synthesize large
> quantities of these proteins in surrogate cell systems.
> For a variety of reasons, including the glycosylation
> patterns and the secondary structures of some of these
> proteins, synthesis in a mammalian cell expression
> system is highly preferable.

Kaufman II (Exh. 3015, cited by ARS to demonstrate that

"[e]ukaryotic cells have the ability to synthesize and secrete

proteins that are folded properly, modified, and biologically

active" (ARS's Motion 4 (Paper No. 48), p. 9, para. (35)),

further explains (Exh. 3015, p. 155):

> Although a variety of eukaryotic and prokaryotic host
> systems is available for the expression of a particular
> gene, the focus of this chapter is on the various
> approaches to the high level expression of heterologous
> genes in mammalian.
>
> The advantages of using mammalian cells as a host for
> the expression of a gene obtained from a higher eukaryote
> stem from experience that the signals for synthesis,
> processing, and secretion of these proteins are usually
> properly and efficiently recognized in mammalian cells.
> It has been found that:  1) proteins can be readily
> synthesized and secreted into the growth medium;
> 2) protein folding and disulfide bond formation are
> usually like that of the natural protein, and therefore,
> the proteins are usually produced in a functional form
> resistant to degradation;  3) glycosylation, both N- and
> O-linked, often occurs at normal positions;  4) other
> post-translational modifications can occur, e.g., the
> proteolytic processing of propeptides, the gamma-
> caboxylation of glutamic acid residues, and the sulfation

Interference 105,114

of tyrosine residues; and  5) multimeric proteins can be correctly assembled.

Japan and Kaufman I/II together provide ample motivation for persons having ordinary skill in the art to insert a DNA construct comprising an exogenous promoter or other expression regulating sequence capable of stimulating or enhancing the expression of an endogenous or exogenous target mammalian or other eukaryotic gene within flanking sequences homologous to a region of the genome of a host mammalian or other eukaryotic cell line in the vicinity of the target gene into the genome of the host mammalian or other eukaryotic cell line by homologous recombination in order to stimulate or enhance expression of the target gene and production of the protein the target gene encodes by the host mammalian or other eukaryotic cell line.  However, there remains the question whether persons having ordinary skill in the art reasonably would have expected success in so doing. We look to the teachings of Thomas (Exh. 2011) and Smithies (Exh. 2010) for that answer.

Thomas (Exh. 2011) was published November 6, 1987.  In its Introduction (Exh. 2011, p. 503, col. 1, para. 1, and cols. 1-2, bridging para.), Thomas positively states:

Gene targeting-the homologous recombination of DNA sequences residing in the chromosome with newly introduced DNA sequences-provides a means for systematically altering the mammalian genome (Smithies et al., 1985[Exh. 2010]; Thomas et al., 1986; Thomas and Capecchi, 1986).  A desired

-84-

Interference 105,114

alteration would first be introduced into a cloned DNA
sequence, and the gene targeting would then transfer the
alteration into the genome.  Gene targeting should be
equally effective for correcting or mutating the desired
chromosomal locus.

. . . The transfer of information by homologous
recombination allows one to mutate or correct the desired
chromosomal locus in a defined manner. . . . .

Thomas evaluated the level of success which could be

expected using mammalian stem cells (Exh. 2011, pp. 503-504,

bridging para.):

Under optimal conditions, we find that 1/1000 cells
transformed by exogenous DNA can undergo a gene-targeting
event.  The advantage of . . . gene targeting compared
with random mutagenic methods such as chemical mutagenesis
or retroviral DNA insertion is twofold.  First, the
nature of the mutant allele is at the discretion of the
experimenter, and second, unlike random mutagenic events,
the frequence of the targeting events is efficiently high
to make the procedure applicable to non-detectable genes.

Thomas concludes (Exh. 2011, pp. 510, col. 2, Conclusion):

We have . . . shown that ES [(mouse embryo-derived stem)]
cells are a suitable host for gene-targeting experiments.
It is hoped that this combination of using ES cells as the
recipient cell line and site-specific mutagenesis achieved
by gene targeting will provide the means for generating
mice of any desired genotype.

Smithies, cited in Thomas as "Smithies et al., 1985,"

anticipated the frequency of success in transforming mammalian

stem cells that Thomas would later predict (Exh. 2010, p. 230,

col. 1, para. 2):

The series of experiments reported here shows that
homologous recombination between exogenous DNA and a
chromosomal gene does occur in cultured mammalian cells

-85-

Interference 105,114

and can allow the stable insertion of defined DNA
sequences into the human β-globin locus in a predictable
fashion. Although the frequency of success (~$10^{-3}$ of the
transformed cells) is at present modest, the data show
unequivocally that the planned modification of a specific
human gene is possible _in vivo_.

Moreover, Smithies indicates that much of the rationale employed

in applying homologous recombination techniques to host mammalian

cells is "derived from experiments in yeast in Hinnen _et al_.

showing that recombination between incoming DNA sequences and

homologous sequences within the genome can direct the exogenous

DNA to the desired locus (Exh. 2010, p. 230, col. 1, para. 4;

citation omitted). Smithies concluded in 1985 that (Exh. 2010,

p. 234, col. 1-2):

The experiments reported here establish that the planned
modification of a specific human gene can be accomplished
in mammalian cells by homologous recombination without
detectably affecting other parts of the genome. . . .
[I]t is evident that extensions of the principles we have
used here to other genes in complex eukaryotes should
permit new approaches to many problems in molecular
genetics.

Based on the aforementioned prior art teachings, we find

that persons having ordinary skill in the art would have been

motivated to make and use inventions encompassed by Claims 1, 2,

5-7, 9-20, 22, 23, 25, 26, 28-30, 32-39, 52-54, 56 and 57 of

ARS's '071 patent and Claims 105 and 107-112 of Genesys's

Application 08/102,390 with reasonable expectation of success.

Therefore, we conclude that subject matter defined by Claims 1,

-86-

Interference 105,114

2, 5-7, 9-20, 22, 23, 25, 26, 28-30, 32-39, 52-54, 56 and 57 of

ARS's '071 patent and Claims 105 and 107-112 of Genesys's

Application 08/102,390 prima facie would have been obvious to

persons having ordinary skill in the art and unpatentable under

35 U.S.C. § 103 in view of the combined teachings of Japan,

Kaufman I, Thomas and Smithies, optionally further in view of

Kaufman II.[5]

---

[5]    We have considered ARS'S REQUEST FOR A TELECONFERENCE
TO DISCUSS FILING A 37 CFR 1.635 MOTION FOR PERMISSION TO FILE A
POST-HEARING MEMORANDUM CONCERNING NEW ISSUE RAISED AT HEARING
(Paper No. 170).  Genesys is said to oppose ARS's request (Paper
No. 170, p. 2, para. 5).  ARS's request is DENIED.  ARS argued:

> During the hearing, the panel inquired whether the
> claims of ARS's patent are obvious over a combination of
> Kaufman, Exhibit 3015, and JP '280, Exhibit 3010 (English
> translation).
> Inasmuch as the panel's sua sponte inquiries during
> the oral hearing were directed to a new issue that had not
> previously appeared in the record, ARS would like to be
> given a fair opportunity to respond to those specific
> questions.
> ARS's memorandum will clearly explain why ARS believes
> that the Kaufman 3015 reference cannot be properly combined
> with the JP '280 reference because it does not state what
> it was asserted to state during the oral hearing.

On this record, ARS first cited Kaufman II (Exh. 3015) to
demonstrate that "[e]ukaryotic cells have the ability to
synthesize and secrete proteins that are folded properly,
modified, and biologically active" (ARS's Motion 4 (Paper
No. 48), p. 9, para. (35)).  Kaufman II is ARS's own reference.
ARS cannot have been surprised by its teaching.  It is not unfair
to ARS to rely upon the disclosure of a reference ARS brought
to the Board's attention.  Moreover, though less comprehensive,
a like disclosure by Kaufman I was relied upon by both ARS
(Exh. 3007) and Genesys (Exh. 2014) as basis for rejecting and
responding to proposed rejections of the claims before us.

Interference 105,114

### Genesys's rebuttal and/or showing

Even presuming Japan to be prior art under 35 U.S.C. § 102(a) with respect to the subject matter of Claims 105-112 of Genesys's Application 08/102,390, we nevertheless conclude that the combined teachings of Japan, Kaufman I, Thomas and Smithies, optionally further in view of Kaufman II, do not establish a prima facie case of obvious under 35 U.S.C. § 103 for the invention of Genesys's Claim 106. We agree with Genesys's view that "Claim 106 . . . recites specific provisions that are nowhere found in the prior art" (Paper No. 63, p. 23, para. 1).

While "Claims 105, 107, 108 and 109 are directed to methods of treatment of mammalian cells, by incorporation, through homologous recombination, of an amplifiable gene into proximity of the target gene to be expressed" and "Claims 110-112 are directed to the cell that results from the homologous recombination process of Claims 105 and 107-109" (Paper No. 63, p. 23, para. 1), Genesys does not deny that subject matter encompassed by Claims 105 and 107-112 of Genesys's Application 08/102,390 would have been obvious in view of the combined prior art teachings including Japan. Note Genesys's Preliminary Motion 2 regarding the patentability of claims directed to the same patentable invention in ARS's '071 patent (Paper No. 63,

Interference 105,114

In response to ARS's preliminary motion for judgment under 37 CFR § 1.633(a) that its claims are unpatentable under 35 U.S.C. § 102 and/or § 103 based on prior art under 35 U.S.C. § 102(a), Genesys could have elected either to (1) ask the Board defer the opponent's Rule 633(a) motion to the priority phase of the proceedings or (2) antedate the § 102(a) reference, here Japan, under 37 CFR § 1.131.  See LeVeen v. Edwards, 57 USPQ2d 1416, 1420-21 (Bd. Pat. App. & Int. 2000)(footnotes omitted):

> When (1) a preliminary motion for judgment under 37 CFR § 1.633(a) against an opponent relies on a § 102(a) or § 102(e) reference and (2) the opponent alleges in its preliminary statement a date of invention prior to the prior art dates of the reference, the opponent will be given two choices.
>
> A first choice will be for the opponent to call attention to its preliminary statement and ask that a decision on the preliminary motion be deferred to the priority phase of the interference. . . . .
>
> A second choice is for the opponent to present proofs under 37 CFR § 1.131 together with its opposition.
>
> Each choice has advantages and disadvantages. . . . .
>
>                   . . . . .
>
> . . . Our decision leaves the opponent to sort out the advantages and disadvantages in a particular case and for the opponent to make an election.  If the opponent elects to present a Rule 131 showing, and it is not successful, its claims may be held to be unpatentable and any necessary adjustment to the count will be made. Whether the opponent with no patentable claims should then be allowed to put on a priority case to defeat the moving party, and what the count should be for that purpose, are matters which we leave for another day.

Interference 105,114

Genesys elected to antedate Japan by presenting the

Declaration Bertram I Rowland and supporting evidence under

37 CFR § 1.131.  Rule 131 reads, in pertinent part:

> § 1.131  Affidavit or declaration of prior invention.
>
>     (a) When any claim of an application . . . is
> rejected, the inventor of the subject matter of the
> rejected claim . . . may submit an appropriate oath or
> declaration to establish invention of the subject matter
> of the rejected claim prior to the effective date of
> the reference or activity on which the rejection is
> based. . . . .
>
>     (b) The showing of facts shall be such, in character
> and weight, as to establish reduction to practice prior to
> the effective date of the reference, or conception of the
> invention prior to the effective date of the reference
> coupled with due diligence from prior to said date to a
> subsequent reduction to practice or to the filing of the
> application.  Original exhibits of drawings or records, or
> photocopies thereof, must accompany and form part of the
> affidavit or declaration or their absence satisfactorily
> explained.

We shall presume that the Rowland Declaration and accompanying

exhibits constitute "an appropriate oath or declaration" to

establish invention of the subject matter of the rejected claim

prior to the August 29, 1989, publication date of Japan.

Accordingly, we shall proceed to consider the merits of Genesys's

showing.

First, we find of record, and all the panel members have

viewed, the VHS video labeled:

Bertrand Roland // Tape 1
October 1st, 2003
TRT: 43 min[.]

-93-

Interference 105,114

Based on Rowland's Rule 131 declaration (Exh. 2054), including video-cross-examination, Exhibits A-E attached to Rowland's Rule 131 declaration, and the Transcription of the Testimony of Bertram Rowland, dated October 1, 2003 (Exh. 2055), we find generally that Rowland's testimony is not particularly credible.

The Declaration of Bertram Irwin Rowland dated August 12, 2003, and attached Exhibits A-E (Exh. 2054), constitute Genesys's direct showing under Rule 131. Rowland declared that he was a patent attorney providing legal services to Cell Genesys, Inc. (Genesys) "during the period June of 1989 - February of 1990" (Exh. 2054, page 2, para. 1). Because Rowland's testimony is critical to its case, we quote from that testimony rather than paraphrase it. Rowland declared (Exh. 2054, pp. 2-3, para. 2):

> I have a current recollection of a meeting I attended at Cell Genesys, Inc. on or about July 24, 1989. The meeting was attended by Dr. Arthur Skoultchi and others of Cell Genesys, Inc. ("CGI" herein). Attached hereto as Exhibit A is a copy of notes of that meeting, which reflect three issues or areas of concern being addressed at CGI. Among the issues discussed at the meeting, later identified as issue or matter 3, was the problem that CGI, then in a start-up phase, wanted to work with a variety of proteins the recombinant forms of which and the isolated nucleic acids encoding them, were already patented. There were discussions of various proteins of interest, together with a discussion of how the patents of third parties might be avoided. Arthur Skoultchi ("Skoultchi" herein) suggested that the third party patents might be avoided if homologous recombination were used to alter cells to enhance expression of wild-type proteins encoded by the cells or to express genes that were not normally expressed. I observed that most of the patents I was familiar with would not cover such a process, or the product of the

-94-

Interference 105,114

resulting gene expression.  Skoultchi noted that the
easiest way to produce more product was to introduce an
amplifiable gene through homologous recombination in the
proper location with respect to the gene the expression
of which was desired.  When the amplifiable gene was
amplified, the gene of interest would be as well,
generating multiple copies and increased expression.
A decision was made to move forward and file a parent
application on two alternative forms of the idea of
Skoultchi, including expressing a gene in the cells that
had received the amplifiable gene through homologous
recombination and the transfer of the amplified gene
to secondary expression host cells and expressing the
amplified gene in such secondary host cells.

While we will assume that the Declaration of Bertram I.
Rowland and attached exhibits constitute "an appropriate oath or
declaration" to establish invention of the subject matter of the
rejected claim prior to the August 29, 1989, publication date of
Japan, we cannot help but note that paragraph 2 of Rowland's
declaration, quoted above, is replete with references to inventor
Skoultchi's ideas, suggestions and statements.  There is no
testimony by Dr. Skoultchi of record.  Nor is there any
explanation why Dr. Skoultchi could not have testified.  In this
respect, Rule 131 indicates that inventor testimony is necessary.
Nevertheless, Exhibit A, not Rowland's declaration, appears to be
the main course of Genesys's showing.

Exhibit A to Rowland's declaration carries the heading
(Exh. 2054, Exhibit A, p. 1):

                    CELL GENESYS, INC.
                    Minutes, SAB Meeting
                    July 24 and 25, 1989[.]

                            -95-

Interference 105,114

At Oral Hearing on February 26, 2004, we asked Genesys's counsel

to point to those specific portions of Exhibit A which establish

the inventor's conception of the invention of the subject matter

defined by Claims 105-112 of Genesys's Application 08/102,390,

dated prior to August 29, 1989 (TP (Paper No. 171), p. 43, l. 7,

to p. 47, l. 8).  Counsel directed our attention (TP, p. 47,

l. 9, to p. 50, l. 15) to the following information for meeting

held on "July 24" (Exh. 2054, Exhibit A, pp. 5-6) and "July 25"

(Exh. 2054, Exhibit A, p. 8):

      (Exh. 2054, Exhibit A, pp. 5-6 ("July 24"))

   REVIEW MHC

   1.  Short bridge to market

   2.  UD - high profile financing clinic
          other people's technology

   3.  Promoter for:  dystrophin - superdystrophin

   4.  Replica culture - preserve cell doubling

   5.  Do fibroblasts fuse?  (could express dystrophin?)

   MORE DATA

         HR efficiency is problem $2^{20}$ used

         Law, Partridge, Worton

   A.  Call Hillman re:  MyoGenica

         Go into more detail with H. Blau

   Ron Worton

   TRANSGENICS

                    -96-

Interference 105,114

> __Art__  HR - substitute another protein for lactoglobulin
>
> Can you do HR in germ-line of other species
>
> E.S. isolation is key  (mouse)  only
>                        (hamster)

Something like secretory factor in nursing mother's milk
for IgA or ? other proteins.

Not now - think about collaboration.

Counsel for Genesys argued at oral hearing that the term
"HR" in the portion of Exhibit A reproduced above meant
"homologous recombination" (TP p. 47, l. 9-12).  Even if we
accept Genesys's argument, we find no statement of an invention
encompassed by Claims 105-112 of Genesys's Application 08/102,390
on pages 5-6 of Exhibit A to Rowland's declaration (Exh. 2054,
Exhibit A, pp. 5-6).

> ___(Exh. 2054, Exhibit A, p. 8 ("July 25"))___

At oral hearing, counsel for Genesys directed the Board's
attention (TP (Paper No. 171), p. 47, l. 21, to p. 50, l. 15)
to page 8 of Exhibit A to Rowland's declaration (Exh. 2054,
Exhibit A, p. 8), particularly the copy of handwriting in
association with what is said to be a hand drawn genetic map of a
plasmid, which indicate potential sites for insertion of DNA
segments.  Both the handwriting and hand drawn genetic map of
what is said to be a plasmid appear on page 8 of Exhibit A under
the heading "__Art__" (__Art__ presumably referring to inventor Arthur

-97-

Interference 105,114

Skoultchi).  We shall attempt to translate the plasmid map and
the indicated sites for potential inserts without redrawing the
original at the top of page 8 of Exhibit A.

Above the hand drawn genetic map indicated to be a "plasmid"
there is handwritten the following:

Protein production in mammalian cells. S cloning tPA gene.
(Focus:  Known Therapeutic Proteins
Key:  Sidesteps Patents) < <u>Burt</u>
case by c
<u>CAN</u> DO

The "plasmid" depicted appears to include a dihydrofolate
reductase mutant (DHFR$^{mut}$) gene segment with a neo gene segment
and tk promoter segment upstream of the DHFR$^{mut}$ gene segment.
Downstream of the DHFR$^{mut}$ gene segment there is depicted a human
tissue-type plasminogen activator (tPA) gene segment from human
diploid fibroblasts.  There is an arrow from the term "eNh"
pointing to an area between the neo gene segment and the tk
promoter of the "plasmid".  An arrow pointing toward the term
"eNh" leads the phrase "Can Put eNhancer here.  for ^
expression".  To the lower-right of the "plasmid" there is
handwritten "Vector To go upstream or downstream from tPA gene".
There is an arrow leading from the "plasmid" toward the lower-
left where the is handwritten "Transfer into CHO (Chinese Hamster
Ovary)" and another arrow leading further from the "plasmid"
toward the lower-left where there is written:

-98-

Interference 105,114

> Methotrexate
> ^conc => amplification of
> DHFR (and nearby tPA gene)[.]

At the bottom of the handwriting and hand drawing, there is written:  "Need To Know upstream or downstream sequences".

At oral hearing, counsel for Genesys argued (TP (Paper No. 171), p. 48, l. 15, to p. 49, l. 12) that persons skilled in the art would not have needed to know upstream and downstream sequences unless they intended, as inventor Skoultchi is said to have intended, to insert DNA sequences into the genome of CHO cells by homologous recombination.  Moreover, the references to "HR" on pages 5-6 of Exhibit A to Rowland's declaration are said to be consistent with Genesys's argument.

In our view, Exhibit A to Rowland's declaration, with or without the corroboration and explanation provided by Mr. Rowland's declaration, does not establish that Genesys conceived of an invention within the scope of any one of Claims 105-112 of Genesys's Application 08/102,390, not to mention the full scope of the subject matter claimed, prior to the August 29, 1989, publication date of Japan.  Nowhere in Exhibit A to Rowland's declaration (Exh. 2054) is "HR" defined.  Even if "HR" would have been understood to mean homologous recombination, the relationship between the references to "HR" on page 6 of Exhibit A to Rowland's declaration showing the minutes of a

-99-

Interference 105,114

meeting on July 24, 1989, and the handwritten and hand drawn
portion on page 8 of Exhibit A to Rowland's declaration showing
the minutes of a meeting on July 25, 1989, is unclear.  There
appears to be no connection between page 6 of the minutes of Cell
Genesys, Inc.'s SAB Meeting on July 24 and the handwriting and
hand drawings on page 8 of the minutes of the meeting dated
July 25 (Exhibit A, p. 1 (July 24); p. 7 (July 25)).

On the other hand, Genesys urged that the handwritten and
hand drawn portions of the minutes of the July 25 meeting
presented on page 8 of Exhibit A inherently portray a method of
enhancing production of a target protein such as t-PA in mammals
by inserting an amplification sequence or a DNA expression
enhancer such as DHFR into the genome of a mammal cell line in
the vicinity of the gene encoding the target protein by
homologous recombination (TP (Paper No. 171), p. 48, l. 15,
to p. 49, l. 12).  In our view, the evidence does not establish
that insertion of foreign DNA by homologous recombination is
inherently described in the minutes of the July 25 meeting.  We
find that persons skilled in the art could interpret the
handwritten and hand drawn portions of page 8 of Exhibit A as a
method for inserting foreign DNA into the genome of the cell line
by techniques other than homologous recombination, e.g., by
random recombination or by point specific insertion techniques.

-100-

Interference 105,114

If knowledge of sequences upstream or downstream of the target DNA segment in the genome of the cell line or upstream or downstream of any other exogenous or endogenous DNA sequence described in the handwritten and hand drawn portions of page 8 of Exhibit A is, or may be, needed to insert a foreign DNA amplification or expression enhancer sequence into the genome of CHO cell line in operable vicinity of the target gene by techniques other than homologous recombination, then the handwritten and hand drawn portions of page 8 of Exhibit A to Rowland's declaration would not necessarily, and accordingly, does not inherently describe a method for inserting foreign DNA into the genome of a cell line in operable vicinity of a target gene by homologous recombination. See Langer v. Kaufman, 465 F.2d 915, 918, 175 USPQ 172, 174 (CCPA 1972):

> To prove inherency, the burden is . . . to show that the "necessary and only reasonable construction to be given the disclosure by one skilled in the art is one which will lend clear support to . . . [this] positive limitation in the interference count." . . . (quoting Binstead v. Littmann, 242 F.2d 766, 770, 113 USPQ 279, 282 (CCPA 1957).

See also Kennecott Corp. v. Kyocera Intl., Inc., 835 F.2d 1419, 1423, 5 USPQ2d 1194, 1198 (Fed. Cir. 1987).

Of record in this interference, we find Kaufman, R., et al. (Kaufman I), "Coamplification and Coexpression of Human Tissue-Type Plasminogen Activator and Murine Dihydrofolate Reductase

-101-

Interference 105,114

Sequences in Chinese Hamster Ovary Cells," <u>Molecular and Cellular</u>

<u>Biology</u>, Vol. 5, No. 7, pp. 1750-1759 (July 1985)(Exh. 3007;

Exh. 2014).  Kaufman I teaches (Exh. 2014, p. 1757-58,

Discussion; emphasis added; citations omitted):

> [A] <u>cotransfection method was used which yields cells</u>
> <u>containing the t-PA sequences closely linked to the</u>
> <u>DHFR sequences</u>. . . . The DHFR transcription unit was
> constructed without an enhancer element.  As a result,
> transformation of DHFR-deficient CHO cells to a DHFR⁺
> phenotype was inefficient with this DNA alone.  However,
> cotransfection of the DHFR unit with a t-PA transcription
> unit containing an enhancer dramatically increased the
> efficiency of DHFR transformation.  This appeared to
> occur by in vivo ligation of the two separate transcription
> units, resulting in the enhancement of DHFR expression
> by the t-PA-associated enhancer element.  Efficient DHFR
> expression was thus dependent on continued association
> with the enhance from the t-PA transcription unit.
>
> . . . These results are consistent with the existence
> of a gradient of DNA amplification . . . . Under this
> hypothesis, transfected DNA sequences at the center of the
> gradient would be frequently amplified in all MTX-resistant
> clones, whereas more distal transfected DNA sequences would
> be less likely to be amplified.
>
> . . . Since the continued presence of the enhancer
> element from the t-PA cDNA gene was necessary for efficient
> DHFR expression, a high percentage of this subset is
> expected to have coamplified t-PA sequences and to thus
> express t-PA at high levels.  Our results are consistent
> with this scheme.
>
> . . . CHO cells clearly have the capacity to
> accommodate the synthesis, glycosylation, and secretion of
> much larger quantities of protein than they do normally;
> this is substantiated by the fact that gene amplification
> has been used to obtain cell lines which express high
> levels of gamma interferon, beta interferon, hepatitis B
> surface antigen, and now human t-PA. . . . .

-102-

Interference 105,114

A limited analysis of the t-PA synthesized by CHO cells shows that it has approximately the same activity as native t-PA and is glycosylated in a similar but not identical manner. . . . .

Comparing the cotransfection method described in Kaufman I to the method described by the handwritten and hand drawn information on page 8 of Exhibit A to Rowland's declaration (Exh. 2054; Exhibit A (Exh. 2040), p. 8), we find that the methods described in Rowland's Exhibit A do not exclude methods described by Kaufman I. Kaufman I appears to describe the method depicted on page 8 of Exhibit A to Rowland's declaration (Exh. 2054; Exhibit A (Exh. 2040), p. 8), including the "need to know upstream or downstream sequences" (Exh. 2054, Exhibit A, p. 8 (also Exh. 2040)); e.g., the t-PA cDNA sequence including the t-PA enhancer must be closely linked to the mutant DHFR sequence. Kaufman I shows that the method depicted on page 8 of Exhibit A to Rowland's declaration is not necessarily a method whereby foreign DNA was inserted into the genome of CHO cells by homologous recombination. We find, therefore, that the evidence to which Rowland points in support of his declaration, as a whole, does not establish that insertion by homologous recombination is the necessary and only reasonable construction one skilled in the art would have given to the method depicted on page 8 of Exhibit A of Rowland's declaration.

-103-

Interference 105,114

Genesys would have us consider Rowland's declaration
(Exh. 2054), testimony (Exh. 2055) and Video Tape 1 thereof in
conjunction with the original draft of its patent application
(Exhibit B to Rowland's declaration (Exh. 2054)) and debit notes
(Exhs. C, D and E) relating to the drafting and November 6,
1989, filing of Genesys's parent U.S. Application 07/432,069
(Exh. 2028).  We proceed to do so.  In paragraphs 3, 4-3, 4-4
and 5 of his declaration, Rowland declared (Exh. 2054, pp. 3-4,
para. 3-5):

> 3.  . . . I worked on the CGI matter number 3 during the
> month of August, and prepared an initial draft application
> for review by the inventor, and completion by CGI.
> Attached hereto as Exhibit B is a copy of a draft
> application so prepared.  This application was forwarded
> to CGI for additional information and review.
>
> 4.  . . . Exhibit C is a copy of a debit note issued to
> CGI for the [monthly] period ending September 25, 1989.
> On page 3 the debit note reflects three entries in
> connection with the matter designated Cell-3, the
> application directed to the production of proteins
> using homologous recombination.  The entries reflect
> that I drafted the application and claims in August,
> 1989, and that the application was reviewed and revised
> approximately a week later.
>
> 4.  . . . Exhibit D is a copy of a debit note issued to
> CGI for the [monthly] period ending October 25, 1989.
> On page 2 there is an item for "review and revise
> application" with the matter designated Cell-3, the
> application directed to the production of proteins using
> homologous recombination.  The application had been drafted
> in August, 1989, following the July meeting, and the line
> item included reflects revision of that application.

Interference 105,114

    5.   Exhibit E is a copy of a debit note . . . for the
period ending November 25, 1989.  This debit note reflects
three entries in connection with the matter designated
Cell-3, the application directed to the production of
proteins using homologous recombination.  The entries
reflect that I reviewed and revised the application,
I spoke with inventor Skoultchi by telephone, and filed
the application on November 6, 1989.  That application
was given Serial Number 07/432,069. . . . The exhibits
hereto reflect a progression of about three months
from identification of invention to filing of a patent
application directed thereto, which is consistent with my
memory of my general working practices at the time period.
I worked on the application with due diligence and
attention, to the best of my recollection.

    Exhibit B to Rowland's declaration (Exh. 2054) consists

of two documents.  The first document is a hand-edited

and annotated, printed draft of an incomplete, non-final

specification for a patent application entitled "Production Of

Proteins Using Homologous Recombination" (Exhibit B, p. 1,

top-center) and claims identified as follows (Exhibit B, p. 1,

top-right):

27949/CELL-3
08/29/89:APP:slb[.]

The printed date "08/29/89" which is original to the document

does not establish that the printed subject matter thereof was

invented prior to the August 29, 1989, publication date of

Japanese Patent Publication 1-215280 (Exh. 3009; Exh. 3010; and

Exh. 2016).  Moreover, Rowland declared "that the [annotated and

edited copy of the] application was reviewed and revised

approximately a week later" (Exh. 2054, p. 3, para. 4).  The

-105-

Interference 105,114

second document is labeled "Experimental" and introduced by the

following handwritten identification (Exhibit B, last three

pages):

  Protein Patent  10/30/89    Nora 2309[.]

  Exhibit C to Rowland's declaration (Exh. 2054) is a copy of

INVOICE # 95853 from Leydig, Voit & Mayer, LTD. to Cell Genesys

dated September 25, 1989, "For Professional Services Rendered

Through September 25, 1989 In Connection With The Following

Matters –":

```
        MATTER NUMBER - 27949
              CELL-3
              U.S. Patent Application
              Production of Proteins Using Homologous Recombination
              Skoultchi

        8/25/89    BIR        Drafting application.
        8/29/89    BIR        Draft application and claims.
        9/06/89    BIR        Review and revise.

        PROFESSIONAL SERVICES                1,485.00

        MATTER TOTAL                         1,485.00[.]
```

  Exhibit D to Rowland's declaration (Exh. 2054) is a copy of

INVOICE # 717 from Leydig, Voit & Mayer, LTD. to Cell Genesys

dated October 25, 1989, "For Professional Services Rendered

Through October 25, 1989 In Connection With The Following

Matters –":

Interference 105,114

        MATTER NUMBER - 27949
            CELL-3
            U.S. Patent Application
            Production of Proteins Using Homologous Recombination
            Skoultchi et al

    9/05/89   ES        Review and revise application.

            PROFESSIONAL SERVICES                 150.00

            MATTER TOTAL                          150.00[.]

    Exhibit E to Rowland's declaration (Exh. 2054) is a copy of

INVOICE # 5484 from Leydig, Voit & Mayer, LTD. to Cell Genesys

dated November 25, 1989, "For Professional Services Rendered

Through November 25, 1989 In Connection With The Following

Matters -":

        MATTER NUMBER - 27949
            CELL-3
            U.S. Patent Application
            Production of Proteins Using Homologous Recombination
            Skoultchi et al

    11/01/89   BIR       Review and revise.
    11/03/89   BIR       Telecon Skoultchi.
    11/06/89   BIR       Filing application.

            PROFESSIONAL SERVICES                 385.00

            COSTS ADVANCED

            Postage                       11.05
            Photocopies                   25.00
            Patent and Trademark Office Fees  502.00

            TOTAL COSTS ADVANCED                  538.05

            MATTER TOTAL                          923.05[.]

Interference 105,114

Having considered the Declaration of Bertram Irwin Rowland
(Exh. 2054) and attached Exhibits A-E, we find that the evidence
as a whole does not establish that Genesys either reduced to
practice the invention of Claims 105-112 (to the extent they
require insertion of heterologous DNA into the genome of a
mammalian cell through homologous recombination) of Genesys's
Application 08/102,390 prior to the August 29, 1989, publication
date of Japan, or conceived of the invention of Claims 105-112
(to the extent they require insertion of heterologous DNA into
the genome of a mammalian cell through homologous recombination)
of Genesys's Application 08/102,390 prior to the August 29, 1989,
publication date of Japan, coupled with due diligence from a time
prior to said date to a subsequent reduction to practice or to
the November 6, 1989, filing date of Genesys's Application
08/102,390. See In re Gosteli, 872 F.2d 1008, 1012, 10 USPQ2d
1614, 1617 (Fed. Cir. 1989)(emphasis omitted):

> Rule 131 requirements are quite specific.  To antedate
> a prior art reference, the applicant submits an oath or
> declaration alleging acts that establish a completion
> of the invention . . . before the effective date of the
> prior art.  37 C.F.R. § 1.131(a).

We need not consider whether the same evidence (Exh. 2054)
is sufficient to antedate Japan's August 29, 1989, publication
date for the invention of Claims 105 and 110 to 112 (to the
extent they do not require insertion of heterologous DNA into the

Interference 105,114

genome of a mammalian cell through homologous recombination) of
Genesys's Application 08/102,390. We have concluded that the
subject matter of Claims 105 and 110-112 is unpatentable over
subject matter described and/or taught by Section 102(b) prior
art of record.

Additionally, each member of this panel has independently
reviewed the written Transcript of the Testimony of Bertram
Rowland dated October 1, 2003 (Exh. 2055) in conjunction with the
video tape thereof of record. We are as impressed, if not more
impressed, by Rowland's lapses of memory as we are impressed by
Rowland's memory. We are especially impressed by the complexity
of the subject matter Rowland seems to recall (Exh. 2055: "DHFR"
and "homologous recombination" in the para. bridging pp. 35-36; )
in comparison to facts relating to the meeting and attendees
thereof which he cannot recall (Exh. 2055; the "Art" mentioned
in Exhibit A "probably is" Arthur Skoultchi (p. 9, l. 9-22);
"I don't recall specifically" who or what "Nussenblatt" is
(p. 10, l. 1-18); "I don't personally remember Mark" (p. 12,
l. 19); "I don't remember [Tom Wakeman]" (p. 14, l. 10-18);
"I have no recollection of Ron Worton" (pp. 14-15); "I believe
I was not the author of this document" (pp. 15-16)). When asked
whether he took notes at the meeting, Rowland testified, "I have
no specific recollection, although that would have been my habit"

-109-

Interference 105,114

(Exh. 2055, p. 20, l. 1-3). When asked whose file the document came from, Rowland said he didn't know (Exh. 2055, p. 19, l. 4-9). Rowland did not recall the name of any persons at Leydig, Voit or Cell Genesys who worked with, or for, him on Cell Genesys's Cell-3 applications (Exh. 2055, pp. 24-26). When asked about the initials "E.S." in Exhibit D, Rowland couldn't recall (Exh. 2055, pp. 27-28). There were many, many basic facts regarding Exhibits A-E (Exh. 2054) that Rowland simply could not recall. On redirect examination by counsel for Genesys and further examination by counsel for ARS, Mr. Rowland provided the following explanation why he remembered the agenda of, and specifics of the complex technology discussed at, CGI's meeting on July 24-25, 1989 (Exh. 2055, pp. 34-36):

> Q. During the discussion with Chico, he asked you about a variety of names, many of which you couldn't recall the identity of the person or the initials.
>
> Do you recall that conversation?
>
> A. Yes.
>
> Q. In paragraph 2 of your declaration, you indicate that you have a current recollection of a meeting that you attended. How is it that you have such a clear-I'm sorry.
>
> How is it that you have a current recollection of that meeting but there are many names and individuals reflected there that you have no recollection of?
>
> A. Well, I was extraordinarily impressed by Dr. Skoultchi's coming up with this idea. And in my career, that spans some 30 years--at that time about 30 years-I had never heard a conception that I believed was also a

-110-

Interference 105,114

reduction of practice, that it was so clear that it would
work.

    And I have always used Skoultchi as the one exception
that one can have an idea which is obviously going to work
and there was no reason to believe it could not be executed.

                        . . . . .

    I had quite a bit of dealings with DHFR in a
number of contexts, one.

    Two, with Oliver Smithies and Kuchlerapati and
readings Capcchi, C-A-P-C-C-H-I, papers, because of the
work that CGI was doing, it was pretty self-evident that
one could introduce the DHFR gene in proximity to a target
gene and that one would get the desired amplification/
identification of homologous recombination. So I felt
that all the pieces were there.

                        . . . . .

    I believe that once you had the idea, all the
enabling technology was available.

Rowland's testimony does not remedy the deficiencies in

Rowland's declaration and supporting exhibits (Exh. 2054).

Moreover, we are not satisfied with Rowland's explanations why he

could recall the complex technology discussed at CGI's meetings

on July 24-25, 1989, many years later (Exh. 2055, pp. 34-36).

Most importantly, Rowland's declaration (Exh. 2054, pp. 2-3,

para. 2) that Dr. Skoultchi conceived of the invention of

Claims 106-109 of Genesys's Application 08/102,390 at the time of

CGI's meetings on July 24, 1989, and July 25, 1989, is not

consistent with the recorded minutes of CGI's July 24-25, 1989,

meeting (Exh. 2054, Exhibit A). Moreover, Rowland has not

-111-

Interference 105,114

explained how and when the handwritten entries in the recorded minutes of CGI's July 24-25, 1989, meeting (Exh. 2054, Exhibit A) became part of the document.

Genesys had the burden to antedate Japan. Genesys elected to do so under 37 CFR § 1.131. In our view, Genesys's evidence does not establish that it either reduced to practice, or conceived of, the invention of Claims 105-112 (to the extent the claims require insertion of heterologous DNA into the genome of a mammalian cell through homologous recombination) prior to the August 29, 1989, publication date of Japan. Accordingly, Japan is prior art to Genesys's Claims 106-109, and Claims 107-109 appear to be unpatentable under 35 U.S.C. § 103 in view of the combined prior art teachings of record, including that of Japan.

<u>ARS's rebuttal and/or showing</u>

Having considered the whole of ARS's primary case to the contrary, we concluded that the subject matter defined by Claims 1, 2, 5-7, 9-20, 22, 23, 25, 26, 28-30, 32-39, 52-54, 56 and 57 of ARS's '071 patent is unpatentable under 35 U.S.C. § 103 as having been obvious in view of prior art including Japan. However, ARS claims benefit under 35 U.S.C. § 120 of the December 22, 1989, filing date of its parent Application 07/454,783 (ARS's '783 application), from which continuation-in-part Application 07/893,447 (ARS's '447 application), filed

-112-

Interference 105,114

are unpatentable under 35 U.S.C. § 103 in view of the same prior art teachings.

Having considered ARS's case in support of its motion under 37 CFR § 1.633(a) for unpatentability of Genesys's claims over cited prior art, we are confident that ARS has not met its burden to show that remaining Claim 106 of Genesys's Application 08/102,390 is unpatentable under 35 U.S.C. § 102/103. Having considered Genesys's case in support of its motion under 37 CFR § 1.633(a) for unpatentability of ARS's patent claims over cited prior art, we are not satisfied that Genesys has shown that Claims 3, 4, 8, 21, 24, 27, 31, 40-51, 55 and 58 of ARS's '071 patent are unpatentable under 35 U.S.C. § 102/103.

C.    <u>Interference-in-fact</u>

Having concluded that Claims 1, 2, 5-7, 9-20, 22, 23, 25, 26, 28-30, 32-39, 52-54, 56 and 57 of ARS's '071 patent and Claims 105 and 107-112 of Genesys's Application 08/102,390 are unpatentable over prior art, we need to further consider whether there is an interference-in-fact between the subject matter defined by patentable Claims 3, 4, 8, 21, 24, 27, 31, 40-51, 55 and 58 of ARS's '071 patent and patentable Claim 106 of Genesys's Application 08/102,390, the only patentable claims remaining before us. "An <u>interference-in-fact</u> exists when at least one claim that is designated to correspond to a count and at least

-126-

Interference 105,114

one claim of an opponent that is designated to correspond to the

count define the same patentable invention."  37 CFR § 1.601(j).

"Same patentable invention" and "separate patentable invention"

are defined in 37 CFR § 1.601(n) as follows:

> (n)  Invention "A" is the <u>same patentable invention</u> as an
> invention "B" when invention "A" is the same as (35 U.S.C.
> 102) or is obvious (35 U.S.C. 103) in view of the invention
> "B" assuming invention "B" is prior art with respect to
> invention "A".  Invention "A" is a <u>separate patentable
> invention</u> with respect to invention "B" when invention "A"
> is new (35 U.S.C. 102) and non-obvious (35 U.S.C. 103) in
> view of the invention "B" assuming invention "B" is prior
> art with respect to invention "A".

Claim 106 of Genesys's Application 08/102,390 reads:

> 106.  A human 293 embryonal kidney cell, wherein the
> genome of the cell has inserted therein an enhancer and
> promoter of cytomegalovirus operatively associated with
> human erythropoietin gene, so that the cell expresses
> human erythropoietin.

The products or methods of making the products defined by each of

Claims 3, 4, 8, 21, 24, 27, 31, 40-51, 55 and 58 of ARS's '071

patent comprise, or insert within the genome of a cell line, a

DNA construct comprising an expressible, amplifiable gene capable

of amplifying a target gene when inserted in close proximity

thereto.  It is sufficient to note that the genome of the human

293 embryonal kidney cell of Claim 106 of Genesys's Application

08/102,390 need not have inserted therein any expressible,

amplifiable gene capable of amplifying the silent human

erythropoietin gene in a human 293 embryonal kidney cell when

-127-

Interference 105,114

inserted in sufficiently close proximity thereto. Rather the
genome of the human 293 embryonal kidney cell of Claim 106 of
Genesys's Application 08/102,390 has inserted therein an enhancer
and promoter of cytomegalovirus operatively associated with the
silent human erythropoietin gene in the human 293 embryonal
kidney cell.  Not only is the specific DNA construct inserted
into the genome of a human 293 cell of Genesys's Claim 106
patentably distinct in structure and function from any specific
DNA construct described in ARS's patentable claims, but the DNA
inserts in ARS's disclosure do not suggest enhancers and
promoters of cytomegalovirus.  Alternatively, the enhancers and
promoters of cytomegalovirus comprising the human 293 cell genome
insert of Genesys's Claim 106 do not collectively or severably
constitute an amplifiable gene capable of amplifying a gene
silent in the genome of any other mammalian cell.  Nor does the
evidence of record establish that the invention of any one of
ARS's remaining patentable claims would have been obvious to
persons having ordinary skill in the art in light of the specific
subject matter defined by the only remaining claim which is
patentable to Genesys.

ARS has not shown that the specific subject matter of
Claim 106 of Genesys's Application 08/102,390 would have been
obvious to a person having ordinary skill in the art further in

-128-

Interference 105,114

light of any other prior art of record, and we find no basis for
such a conclusion of record.  On the other hand, Genesys has
argued that Claims 3 and 27 of ARS's '071 patent are unpatentable
in view of prior art teachings including Kaufman I and Japan
(Paper No. 63, pp. 12-1, para. 41, 44 and 47).  However,
Kaufman I does not appear to teach that expressible, amplifiable
genes inserted into the genome of a cell line by homologous
recombination reasonably would be expected to amplify endogenous
target genes.  For a suggestion to do so with reasonable
expectation of success, Genesys points to Japan's disclosure.
However, Japan does not reasonably suggest that expressible,
amplifiable genes inserted into the genome of a cell line by
homologous recombination would be capable of amplifying an
endogenous target gene in a cell line.  In short, Japan does not
provide persons skilled in the art with a reasonable expectation
of success.  To the extent Genesys relies on Japan's teaching to
establish that Claims 3 and 27 ARS's '071 patent would have been
obvious in view of combined prior art teachings, Genesys merely
concludes:

> 41.  The inclusion of an amplifiable gene to increase
> expression, as called for in claims 3, 8, 31 and 43 was
> known in the prior art (Exhibit 2014, Kaufman et al.,
> p. 1753, col. 2, last ¶, ll. 5-7 and table 2; JP-A-1215280,
> p. 5, 3rd ¶, ll. 1-3).  Exhibit 2029, Nickoloff, ¶ 39.

-129-

Interference 105,114

The pinpointed disclosure in Kaufman I does not support Genesys's

conclusion (Exh. 2014, p. 1753-54, bridging para.; emphasis

added):

> To understand why t-PA activity did not increase
> with MTX resistance, clone 4C1 was subcloned in
> nucleoside-free medium before MTX selection to generate
> five subclones, and these subclones were selected for MTX
> resistance.  Only subclones H3B and B10A expressed higher
> levels of t-PA when selected for MTX resistance (Table 2).
> <u>The variation in responses of the different subclones to</u>
> <u>coamplification could have resulted from the integration</u>
> <u>of multiple DHFR genes at different sites, only some of</u>
> <u>which were linked to the t-PA gene, and upon MTX selection</u>
> <u>some subclones amplified DHFR sequences not linked to</u>
> <u>t-PA sequences.  Alternatively, the variation could</u>
> <u>have resulted from rearrangements around the site of</u>
> <u>amplification which separated the t-PA gene from the</u>
> <u>DHFR gene</u>.  To examine these possibilities in more detail,
> Southern blot analysis of the original and MTX resistant
> transformants derived from clone 4C1 was performed.  The
> results showed that most subclones amplified a similar, if
> not identical, restriction fragment (35-kb band; Fig. 2A,
> arrow).  However, subclone B10A amplified all restriction
> fragments containing t-PA sequences.  Since B10A had
> amplified both the 35-kb band and the other restriction
> fragments, they were probably closely linked.  In other
> subclones the copy number of the 35-kb fragment did not
> correlate with the copy number of the various t-PA
> restriction fragments (for example, compare subclones
> D8Bα and H8Bα), but the 35-kb was preferentially
> amplified in all subclones.  <u>These results indicate</u>
> <u>that the coamplification variability between subclones</u>
> <u>probably results from DNA rearrangements which dissociate</u>
> <u>the DHFR gene from the t-PA gene during the MTX selection.</u>
> <u>One subclone (H12B) exhibited no DNA amplification upon</u>
> <u>MTX selection, implying that in this subclone MTX</u>
> <u>resistance probably resulted from a mechanism other than</u>
> <u>gene amplification</u>.

Nor does Japan teach that any of its "expression-controlling"

sequences can be an "expressible, amplifiable gene" which can

-130-

Interference 105,114

amplify expression of a target gene when inserted into the genome

of a cell line by homologous recombination at a location

proximate thereto.  Japan merely teaches (Exh. 2016, p. 5, third

para., l. 1-3):

> The expression-controlling region to be inserted is
> normally inserted using plasmids that can be amplified
> in the host microbe or as cyclic or linear DNA that
> cannot be amplified in the host microbe.

With regard to Claim 27 of ARS's '071 patent, Genesys cites

Japan's Examples 1-3; Kaufman I, p. 1751, cols. 1-2, bridging

para.; and the Declaration of Nickoloff (Exh. 2029, para. 42).

Given the content of the discussion in each of Japan and

Kaufman I relating to amplification, we fail to see how the

materials and methods of Kaufman I and Japan's examples broaden

their general teachings.  Genesys's burden to explain its case

has not been satisfied, and we will not endeavor to make its case

for it.

Genesys further concludes (Paper No. 63, p. 14, para. 47):

> 47.  Furthermore, one of ordinary skill in the art
> would consider the use of an amplifiable gene as part of
> the method to increase gene expression, as recited in
> Claims 3, 8, 31, 41-43, 48-50 of the '071 patent, as an
> obvious variation of what is taught in Japan-A-1215280,
> especially given the teachings in Kaufman et al.
> (Exhibit 2014).  Exhibit 2029, Nickoloff, ¶ 45.

Initially, we thought that the Declaration of Jac A. Nickoloff,

Ph.D. (Exh. 2029, para. 39, 42 and 45) might shed greater light

Interference 105,114

on the matter.  Upon full consideration of the declaration, we
found little more than a restatement of Genesys's conclusion.

There being no persuasive evidence or argument to the
contrary, we conclude that there is no interference-in-fact
between the subject matter claimed in ARS's '071 patent which
stands patentable to ARS over prior art teachings of record and
the subject matter claimed in Genesys's Application 08/102,390
which stands patentable to Genesys over prior art teachings of
record.  More particularly, there is no interference-in-fact
between the subject matter Genesys has not shown to be
unpatentable to ARS, subject matter defined by Claims 3, 4, 8,
21, 24, 27, 31, 40-51, 55 and 58 of ARS's '071 patent, and the
subject matter ARS has not shown to be unpatentable to Genesys,
subject matter defined by Claim 106 of Genesys's Application
08/102,390.

While Claims 107-109 of Genesys's Application 08/102,390 are
directed to the "same patentable invention" as Claims 3, 27 and
46 of ARS's '071 patent, Genesys has maintained throughout these
proceedings that the subject matter defined by Claims 3, 27 and
46 of ARS's '071 patent is unpatentable to ARS under 35 U.S.C.
§ 103 in view of prior art teaching including Japan (Paper
No. 63, pp. 12-14) and has suggested that the subject matter of
Claims 107-109 of Genesys's Application 08/102,390 would have

-132-

Interference 105,114

been unpatentable to Genesys under 35 U.S.C. § 103 in view of

prior art teaching including Japan had Genesys not successfully

established under 37 CFR § 1.131(a) that it invented the subject

matter of Claims 107-109 of Genesys's Application 08/102,390

prior to the August 29, 1989, effective date of Japan (Paper

No. 63, p. 24, first full paragraph).

We conclude that Genesys has not established the subject

matter of ARS's Claims 3, 27 and 46 is unpatentable under

35 U.S.C. § 103 over cited prior art including Japan.  However,

because Genesys argued that Japan's teaching cannot be applied to

its claims because it invented the same patentable invention

prior to the effective filing date of Japan, and Genesys failed

to establish prior inventorship thereof under 37 CFR § 1.131(a),

the subject matter defined by Claims 3, 27 and 46 of ARS's '071

patent is not patentable to Genesys.  Therefore, on the record

before us, this interference should be dissolved.

    D.  <u>Preliminary Motions</u>

      (1)  Genesys's Preliminary Motion 1 (Paper No. 62)

under 37 CFR § 1.633(f) to be accorded the benefit of the

November 6, 1989, filing date of parent U.S. Application

07/432,069 (Exh. 2028) is dismissed as moot.  <u>Dismissed</u>.

      (2)  ARS's Preliminary Motion 7 (Paper No. 50) under

37 CFR § 1.633(f) to be accorded the benefit of the filing dates

-133-

Interference 105,114

them as corresponding to the interference count is denied.
Genesys has not shown that the subject matter thereof is
patentable to Genesys as required by 37 CFR § 1.637(c)(ii).
Denied.

(12) ARS's Preliminary Motion 1 (Paper No. 45) under
37 CFR § 1.633(a) for judgment that Genesys's Claims 105-112 are
unpatentable under 35 U.S.C. § 112, first paragraph, for
noncompliance with its written description requirement; ARS's
Preliminary Motion 2 (Paper No. 46) under 37 CFR § 1.633(a) for
judgment that Genesys's Claims 105-112 are unpatentable under
35 U.S.C. § 112, first paragraph, for noncompliance with its
enablement requirement; and Genesys's Preliminary Motion 3 (Paper
No. 64) for judgment that Claims 1-58 of ARS's '071 patent are
unpatentable under 35 U.S.C. § 112, first paragraph, for
noncompliance with its enablement requirement; are dismissed
with regard to Claims 105 and 107-112 of Genesys's Application
08/102,390 and Claims 1, 2, 5-7, 9-20, 22, 23, 25, 26, 32-39,
52-54, 56 and 57 of ARS's '071 patent, which have been determined
to be unpatentable over alternative and/or collective prior art
teachings; and denied for Claim 106 of Genesys's Application
08/102,390 and Claims 3, 4, 8, 21, 24, 27, 31, 40-51, 55 and 58
of ARS's '071 patent.  Our reasons are as follows.

-136-