IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CELL GENESYS, INC., | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-12448-MLW |
| | ) | |
| APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V. | ) ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |
| | ) | |
| APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04 11810 MLW |
| | ) | |
| CELL GENESYS, INC. AND TRANSKARYOTIC THERAPIES, INC. | ) ) | |
| | ) | |
| Defendants. | ) ) | |

**REPLY OF CELL GENESYS, INC. TO THE OPPOSITION
OF ARS TO THE MEMORANDUM – "JAPAN" IS NOT
PRIOR ART WITH RESPECT TO CGI CLAIMS 107 - 109**

## I.     OVERVIEW

Pursuant to the Order of this Court of August 9, 2005, Cell Genesys, Inc. ("CGI") submitted its Memorandum in support of the position that the reference referred to as "Japan" (Japanese patent publication, or Kokai, 1-215280) was not prior art to CGI. The Court's Order specifically noted that the parties had agreed, with respect to that issue, to proceed on the "record." The record includes the evidence submitted in the Interference itself, together with the evidence produced and taken in this litigation. That evidence includes testimony and documents produced in response to depositions taken by ARS pursuant to subpoena, and documents obtained and produced responsive to ARS production requests.

CGI's Memorandum of September 20, 2006 ("Initial Memo") noted that the burden was on CGI to demonstrate, by reliance on the newly considered evidence, a thorough conviction that the Board's decision finding that CGI had not produced sufficient evidence to demonstrate possession of the invention of Claims 107 – 109 was, in light of the newly produced evidence, in error. The Board's holding (which refers to CGI as Genesys) appears at p. 112 of the decision:

> Genesys [CGI] had the burden to antedate Japan. Genesys elected to do so under 37 CFR § 1.131. In our view, Genesys's evidence does not establish that it either reduced to practice, or conceived of, the invention of Claims 105 – 112 (to the extent the claims require insertion of heterologous DNA into the genome of the mammalian cell through homologous recombination) prior to the August 29, 1989 publication date of Japan. Accordingly, Japan is prior art to Genesys's Claims 1106 – 109, and Claims 107 – 109 appear to be unpatentable under 35 USC § 103 in view of the combined prior art teachings of record, including that of Japan.

It is this determination, that Genesys ("CGI") had not presented sufficient evidence that CGI conceived of the invention of Claims 107 – 109 prior to August 29, 1989 and reduced it to practice by filing its patent application on November 6, 1989, that CGI challenges.

The ARS opposition begins by taking issue with the Board's decision, not CGI's Initial Memo. ARS insists, without reliance on any evidence, that Genesys/CGI is not entitled, for

2

Claims 107 – 109, to its November 6, 1989 filing date, and that accordingly, Japan is a reference under 35 USC § 102(b) and not subject to antedation under Rule 131. The Board held to the contrary. The burden is on ARS to challenge this decision, and ARS advances no evidence in support. It would be inappropriate in the extreme to advance that evidence in an opposition, where ARS has the burden of proof. The Board found that Japan was a 102(b) reference against **ARS** (not Genesys/CGI) because **ARS** (not Genesys/CGI) was not entitled to the benefit of its December 22, 1989 filing date.

> We conclude that ARS is entitled to no more than the December 21, 1990 filing date of PCT/US90/07642, under 35 U.S.C. 363, and Japan is prior art under 35 U.S.C. 102(b) for all claims of ARS's patent designated as corresponding to the interference count.

Decision of the Board, p. 125. One can hardly miss the contrast. The Board found Japan to be art available <u>against CGI</u> under 35 U.S.C § 102(a) and thus subject to being antedated pursuant to 37 C.F.R. § 1.131, but prior art <u>against ARS</u> under 35 U.S.C. § 102(b). Accordingly, consideration of evidence demonstrating a conception of the subject matter claimed in Claims 107 – 109, coupled with the exercise of due diligence in not abandoning the invention while reducing it to practice, is a proper basis for considering the Board's decision.

ARS then turns to the issue of diligence. Ignoring the explicit holding of the cases it relies on, including *In re Nelson*, 420 F. 2d 1079 (CCPA 1970), ARS argues at pages 8 - 9 of its Opposition that CGI must account for each of the days between the publication date of Japan and the November 6, 1989 filing date to establish due diligence. Yet, *Nelson* explicitly holds, in the portion quoted by ARS at page 9 of its Opposition, that "constant effort is not required." 420 F.2d at 1080. The evidence shows conclusively that between August 28, 1989 and November 6, 1989, CGI and its founders, who were not employed by the company at the time but busy with their own unrelated endeavors (Skoultchi was, and remains, a university professor, as does

3

Kucherlapati) prepared and filed a patent application disclosing the subject matter of Claims 107 – 109, developed and pursued a business plan, and presented that business plan to investors, which emphasized as CGI's first project the subject matter of Claims 107 – 109, and pursued and secured laboratory space and instruments, employees and officers, and funding to pursue the subject matter of Claims 107 – 109. At no time did CGI exhibit any intent not to pursue this invention. This is the measure of diligence, in a showing under 37 C.F.R. 1.131.

At pages 11–19 of its Opposition, rather than deal with the evidence as a whole, which the law commands, ARS looks at each document advanced by CGI as demonstrating conception of the invention prior to August 29, 1989. ARS is critical of the evidence because, in the words of ARS, the documents say noting about causing "gene expression in a primary cell." *See* the ARS Opposition at pages 14–17. None of the CGI claims under consideration refer to primary or secondary cells. Indeed, ARS does not even discuss those claims, or take issue with the Board's construction of those claims, which was reviewed CGI's Memo at pages 7–8. The four requirements of those claims, which appear in the Board's decision at pages 35–36, do not refer to or make any requirement for expression in any particular location. CGI's Initial Memo specifically observed that "the Board construed claims 107 – 109 in its Decision on Motions. That determination is entitled to deference on review, and CGI does not challenge it herein." That decision does not distinguish between primary and secondary cells, or the place of expression. Having failed to advance evidence or reasoning that indicates why the Board's construction is in error, the ARS challenge to it is insufficient. Beyond this, however, it is clear from the documents advanced that Skoutchi and CGI did, in fact, specifically conceive of enhanced expression of the target gene in the cell altered by homologous recombination, or in what ARS refers to as a "secondary cell," one which receives the altered genome.

4

In response to the ARS Opposition, CGI maintains the position that taking the additional evidence presented during this case, and the evidence presented below, the Board's decision that CGI did not conceive of the invention of Claims 107 – 109 prior to August 29, 1989 pursuant to the provisions of 37 C.F.R. 1.131 is in error. While the law makes it clear that consideration of all the evidence is appropriate, in responding to the ARS criticism of the lack of conception, it is only necessary to focus on the singular document that is the description, in Skoultchi's own words, of his invention sent to the patent attorney, Bert Rowland, via facsimile on July 24, 1989, so that Rowland, who would attend the CGI Scientific Advisory Board meeting the following day specifically to learn of the invention and begin preparation of a patent application directed thereto, would have an understanding of what was to be presented.

## II.     JAPAN IS PRIOR ART TO CGI UNDER 35 U.S.C. § 102(a), NOT § 102(b)

The Japan reference is prior art to CGI under 35 USC § 102(a), as the Board specifically held. The Board also observed that this was ARS's position. The Board specifically noted that "Genesys [CGI] could have elected either to (1) ask the Board defer the opponent's Rule 633(a) motion to the priority phase of the proceedings or (2) antedate the §102(a) reference, **here Japan**, under 37 C.F.R. § 1,131." Decision, p. 92 (emphasis supplied). ARS nowhere offers evidence or explanation as to why the decision of the Board is in error in this respect. A reference under § 102(a) can be antedated, as noted by the Board. A reference under § 102(b) cannot.

In this respect, the Board would hardly have devoted pages 89–112 of its Decision to a discussion of the adequacy of the Genesys/CGI evidence of prior invention under 37 C.F.R. 1.131 if CGI could not antedate the reference because it was published more than a year in advance of the effective filing date of CGI. This is apparent because ARS attempted to antedate

5

the reference as well and the Board refused to consider it, finding Japan to be prior art under 35 USC § 102(b).

> If ARS cannot establish an effective date of December 22, 1989, for the full scope of its claims under 35 U.S.C. § 120, then Japan is prior art under 35 U.S.C. 102(b) and, as such, cannot be antedated for the full scope f the invention ARS claims by any means.

Board Decision, p. 116. Of course, in contrast to the CGI situation, where the Board did conclude that CGI was entitled to an effective filing date less than a year after the August 29, 1989 publication of Japan (CGI's date is November 6, 1989) the Board concluded, and ARS does not disagree, that ARS was not entitled to such a filing date.

> We conclude that ARS is entitled to no more than the December 21, 1990 filing date of PCT/US90/07642, under 35 U.S.C. 363, and Japan is prior art under 35 U.S.C. 102(b) for all claims of ARS's patent …(Board Decision, p. 125).

Whether ARS is trying to create confusion between the relative position of Genesys/CGI and ARS with respect to Japan as prior art, or is seriously challenging the Board's decision, is unclear. To demonstrate the Board's conclusion that Japan is prior art to CGI under 35 U.S.C § 102(a) rather than § 102(b), ARS would have to demonstrate that either the findings made by the Board were in error of such magnitude, or new evidence advanced showed that finding to be wrong, such that it leads to a thorough conviction that the Board made a mistake. *Morgan v. Daniels*, 153 U.S. 120, 124 (1894). ARS points to neither evidence nor reasoning that would tend to demonstrate a conviction that the Board was wrong in finding that Japan was prior art to CGI under § 102(a) and thus subject to being antedated by presentation of appropriate evidence. One is left with the conclusion that ARS is either confused, or attempting to raise a cloud of confusion. No confusion is required:

6

1. With respect to Genesys/CGI, Japan is a reference under 35 U.S.C. § 102(a) and **can** be antedated pursuant to 37 C.F.R. 1.131 on a showing of conception prior to August 29, 1989 with diligence to the CGI filing on November 6, 1989.

2. With respect to ARS, Japan's a reference under 35 U.S.C. § 102(b) and **cannot** be antedated pursuant to 37 C.F.R. 1.131.

## III. THE EVIDENCE DEMONSTRATES CONCEPTION OF THE SUBJECT MATTER OF CLAIMS 107 – 109 PRIOR TO AUGUST 29, 1989

CGI's opening memorandum carefully noted the Board's construction of Genesys/CGI Claims 107 - 109 and specifically noted that the Board's finding, entitled to deference, would not be challenged by CGI. The Board specifically found the claims required a showing of four elements:

- Insertion of a DNA construct by homologous recombination into the genome of a mammalian cell in proximity to a target gene within that genome.
- The target gene must encode a protein that is either not normally expressed by the cell (Claims 107 and 109) or normally expressed by the cell (Claim 108).
- The DNA construct must comprise either an amplifiable gene, a regulatory sequence (i.e., enhancer or promoter) or both.
- The DNA construct must also include DNA homologous with DNA in a region of the genome in proximity to the target gene.

Board Decision, pp. 35–36. There is no requirement that expression of the target gene occur in any particular place or time, it is just not an issue. The inventive subject matter, as expressly found by the Board, is the use of homologous recombination to alter the genome of a mammalian cell to express a gene not normally expressed (Claims 107 and 109), or express greater levels of

7

a gene expressed, normally, at a given, lower level. The act of expression itself is simply not part of the invention.

### A. Skoultchi Clearly Conceived of the Concept of Expression in Either the Cell Modified by Homologous Recombination, or a Recipient Cell, Prior to August 29, 1989

As noted, the Board's construction of the Claims at issue does not require expression of the target gene, either in the cell modified by homologous recombination, or in a recipient cell such as an FDA-approved source of therapeutic proteins like a Chinese Hamster Ovary cell, (CHO cell). ARS, at pages 13–17 of its Opposition, characterizes these as primary and secondary cells, although these terms do not appear in the Genesys/CGI Claims. Accordingly, a showing under Rule 131 does not require demonstration of conception of these features. Nonetheless, the evidence relied on by CGI clearly demonstrates conception of expression in both primary and secondary cells in advance of August 29, 1989. ARS offers observations with regard to each of the documents advanced by CGI, in accordance with the provisions of Rule 131, and purports to offer comments with respect to each. A review of each of these is not necessary. The principal documents relied on clearly show that Skoultchi conceived of expressing the target gene in either the cell modified by homologous recombination (ARS's "primary cell") or a secondary cell likely to be a better source for therapeutic protein expression (ARS's secondary cell).

Appendix D to CGI's Initial Memo discusses the facsimile from CGI to Bertram Rowland dated July 24, 1989, intended to acquaint the patent attorney with the invention he would learn more about at the Scientific Advisory Board Meeting the next day, so that a patent application could be prepared. At the end of Appendix D, CGI provided, in the form of three demonstrative pages, enlargement of certain of the key recitations of this document. ARS could

8

not have advanced the argument that Skoultchi did not conceive of expression in either the primary cell or the secondary cell had counsel read the demonstrative. It clearly discloses the alternative of expression in a "primary cell" or a "secondary cell." The Summary of the Invention appears on page 2 (CGI 3651) of this remarkable document, and is enlarged in the demonstrative at the end of Appendix D.

> Mammalian cells are produced which contain amplified copies of a specific region of that species or another species genome including the gene for a desired therapeutic protein. The specific region has been amplified by integration of a marker gene near the gene of interest by introduction of homologous DNA sequences and homologous recombination followed by selection procedures for amplification of the site. *The resulting cells may be used to produce the protein encoded by the gene.* Alternatively, the DNA from the cells containing the marker gene, either before or after amplification, may be used to prepare secondary cell lines containing amplified copies of the marker gene and the gene of interest. CGI 3651. (emphasis supplied).

Unquestionably, no later than July 24, 1989, well in advance of the August 29, 1989 publication of Japan, Skoultchi had conceived of expression of the target gene in either the primary or secondary cells that ARS addresses, even though these cells, and expression in them, is not a feature of Claims 107 – 109.

Kucherlapati confirmed this through testimony taken by counsel for ARS. He testified that in addition to producing protein in the modified, or primary cells, there was discussion of expression in secondary producing cells because of concern that the FDA would not accept protein from the primary cells. Kucherlapati Tr., pp. 95–100. Skoultchi and CGI preferred the use of secondary expression cells to resolve concerns over FDA approval – it was their preferred method. That does not mean that Skoultchi did not conceive of expression in the primary cells as well. Unquestionably, the express language of the July 24, 1989 fax, Skoultchi's description of his invention, reflects this idea.

9

### B. Skoultchi Clearly Conceived of the Introduction of Regulatory Elements into the Target Gene Vicinity Prior to August 29, 1989

Beginning at page 17 of its Opposition, ARS offers the novel but preposterous argument that to demonstrate conception of an invention that the Board held called for the introduction, through homologous recombination, a "DNA construct (that) must comprise either an amplifiable gene, a regulatory sequence (i.e., enhancer or promoter) or both," CGI must demonstrate conception of insertion of a regulatory segment only. Nowhere did the Board hold, nor do the claims admit, of such a reading. It is true that Japan describes the insertion of a regulatory segment, such as an enhancer or promoter. If Skoultchi conceived of that before August 29, 1989, even if he conceived of more than that, Japan is not a reference. Indeed, possession of the invention claimed would be shown by possession of the insertion of an amplifiable gene in a construct through homologous recombination, as the Board expressly held that would satisfy the claims.

In any event, we need not test the legal underpinning for the novel proposition advanced by ARS that by conceiving, before the date of the reference, of that which is called for by the Claims (insertion of an amplifiable gene through homologous recombination), one antedates the reference, because Skoultchi unquestionably conceived of the insertion of a regulatory segment as part of the DNA construct used to modify mammalian cells through homologous recombination. The very earliest document CGI relies on, Skoultchi's entry in his notebook dated February 15, 1989 (CGI 4004), describes, in clear handwriting, the use of homologous recombination for the purpose of "manufacturing proteins without using the patented nucleic acid sequence of that protein." The first of two alternatives set forth on CGI 4004 is the insertion of DHFR (an amplifiable gene) for "amplification of the gene in a human cell line making small amounts of the protein endogenously" (the invention of Claim 108). The second alternative was

to effect a "promoter – enhancer insertion" with DHFR. This alternative would also permit production of proteins not normally expressed by the cell. Unquestionably, from the very first conception of his invention, Skoultchi recognized that an aspect of the invention was the insertion of a regulatory sequence into the vicinity of the target gene, using a DNA construct bearing that regulatory sequence. The ARS argument that Skoultchi did not have possession of the idea of using a regulatory sequence, the core of the information in Japan, simply ignores the very words of the documents and testimony relied upon.

This also is reflected in the notes of Skoultchi's early conversation with the patent attorney Rowland. Following CEO Levin's instruction, Skoultchi called Rowland from Chicago to discuss the invention. *See* Skoultchi's notes. Document CGI 4025 captures that conversation, where the two discussed a "method to express patented proteins by homologous recombination amplification **OR** activation enhancement in human cell line" (emphasis supplied). Although this is a note, and not the full type of discussion that appears in the facsimile of July 24, 1989, Skoultchi and Rowland clearly discussed the insertion of an amplifiable gene (DHFR) or a regulatory segment (a promoter or activator, or enhancer).

The same idea **did** appear in the facsimile of July 24, 1989. Again, recognizing the central importance of this document, CGI included, as a demonstrative exhibit to Appendix D, an enlargement of certain text. The question of what is present on the DNA construct or vector, inserted by homologous recombination is answered in this enlargement.

> The vector may also include one or more of the following:…(3) one or more copies of a transcriptional enhancer sequence (e.g. SV40 enhancer) which may stimulate expression of the TPA gene after integration of the vector. CGI 3653.

Consistently and clearly, Skoultchi described his invention in terms of what could be done to increase expression of the target gene through homologous recombination inserting a vector into

11

the gene's vicinity. Consistently and clearly that vector included, as one option, the regulatory segment of Claims 107 – 109. Although separate proof of this element, as opposed to the use of an amplifiable gene, would not be necessary to establish prior possession of the invention, it is sufficient to note that this was part of what Skoultchi and CGI contemplated.

The ability to insert a regulatory segment to boost expression of inactive or poorly expressed genes was reaffirmed the very next day, on July 25, 1989, at the Scientific Advisory Board meeting. The notes of that meeting were taken by George Savage, as confirmed by his testimony taken by counsel for ARS. Savage and Thompson both testified in detail as to that meeting. The drawing of Skoultchi's invention that appears at CGI 3231 was made by Savage. It clearly shows a genome altered by homologous recombination, and notes, in writing on the right hand side of the picture, that you "can put enhancer here for ↑ expression." Again, in clear and incontrovertible writing, Skoultchi described his invention as including the insertion, through homologous recombination, of a DNA sequence including a regulatory sequence.

This idea, this invention, is reflected in the draft finished on the day of publication, August 29, 1989, and based on the information provided to Rowland before that day. Page 6 of that document, at line 34, specifically noted that the DNA construct inserted via homologous recombination may include a regulatory segment.

> In some instances, one may wish to introduce an enhancer in relation to the transcriptional origination origin, which can be provided by, for example, integration of the amplifying gene associated with the enhancer in a region upstream (of the target gene). Page 6, ll. 34 ff.

Again and again and again, from the very first written expression of the idea by Skoultchi in his notebook on February 15, 1989, to his first telephone call with patent attorney Rowland, to his description of his invention in the facsimile of July 24, 1989 and the following meeting on July 25, 1989, Skoultchi precisely and unquestionably characterized his invention as embracing

the enhancement of existing protein expression, or activating expression of a silent gene, by introducing, through homologous recombination, a DNA construct that comprised a regulatory segment (an enhancer or promoter). This communication is reflected in the draft of the patent application prepared prior to and completed on the day of publication of the reference.

The standard of the law has been, and remains, that enunciated in the decision *In re Stempel,* 241 F. 2d 755, 756, 113 USPQ 77, 81 (CCPA 1957):

> We are convinced that under the law all the applicant can be required to show is priority with respect to so much of the claimed invention as the references happens to show. When he has done that he has disposed of the reference. 113 USPQ at 81.

The Board found that Japan taught "that the expression regulating sequences or expression controlling sequences (promoters, enhancers, etc.) are inserted by homologous recombination." Decision, p. 78. As shown above, Skoultchi clearly conceived of the same prior to the publication date of the reference. CGI "has disposed of the reference." That Skoultchi invented more than just that does not somehow resurrect the reference.

The ARS argument that the CGI evidence fails to demonstrate conception of the invention of Claims 107 – 109 is legally flawed, in requiring more than what the claims require and more than what the reference teaches, and in error on the facts. From its inception on February 15, 1989, Skoultchi's idea embraced the insertion of regulatory elements like enhancers into the cell line by fashioning DNA constructs for introduction using homologous recombination bearing those regulatory segments.

## IV.   CGI WAS DILIGENT IN ITS REDUCTION TO PRACTICE

CGI's Initial Memo made the point that case after case has recognized that while the concepts of date of invention, conception and reduction to practice are encountered in both interference contests and in connection with efforts to antedate a reference under Rule 131, that

13

is coincidence, and that Rule 131 proofs are not held to the same standard that proofs of conception and reduction to practice and diligence are in an interference. *In re Mulder*, 716 F. 2d 1542, 1544, 219 USPQ 189, 193 (Fed. Cir. 1983) (*interference rules simply do not apply to issues of antedation under 37 C.F.R. 1.131)* and *In re Eickemeyer*, 602 F.2d 974, 978 – 80 (CCPA 1979) (*practice under Rule 131 is not controlled by interference law*). ARS argues, without case support or logic, that the distinction only applies to issues of constructive reduction to practice and conception, but not to diligence. ARS Opposition at 7. What sense does that make? Why would the standards be less rigorous for half of the proof required by Rule 131, but not the other half? The fact of the matter is, of course, that the same less rigorous standard applies to all aspects of Rule 131 practice, not just those ARS wants it too, because the policy issues are different. In an interference, the parties are trying to establish the opponent is not entitled to a patent. Rule 131 is a patent saving provision, however, and is construed more liberally for that reason. As the Court observed in *Mulder*, "[i]nterference rules do not necessarily apply; nothing is to be gained by treating the situation as though it were something it is not. Interferences involve policy questions not present when antedating a reference." 219 USPQ at 193.

Notwithstanding this distinction, ARS cites only cases where, in an interference, a party failed to explain a missing day or two. *In re Nelson*, 420 F. 2d at 1081, required the patent applicant to account for providing absolutely no explanation for what happened over a two month time frame. In *Nelson,* the applicant in that period was not pursuing a patent application, not pursuing funding to execute the idea, not pursuing laboratory space and employees to carry out the invention. He did nothing at all. By the same token, this is not a situation such as that

14

encountered in *In re Harry,* 333 F.2d 920 (CCPA 1964) where absolutely no facts were advanced, but rather, conclusory statements that actions had been taken were relied on.

This case aligns remarkably well with the decision of the Patent Office Board of Appeals (the predecessor of the current Board) in *Ex parte McGuckian,* 202 USPQ 398, 400 (PBAI 1976). In *McGuckian,* claims in an application were rejected over a reference having an effective date of April 16, 1969. In relying on Rule 131, the applicant first pointed to a Search Request dated March 25, 1969, which showed a conception of the invention. The other acts shown included:

| | |
|---|---|
| Bristol Board Drawings | April 2, 1969 |
| Application Prepared | April 17 and April 24, 1969 |
| Completed application forwarded | April 28, 1969 |
| Returned application filed on | May 2, 1969 |

Thus, the showing consisted of acts on four days following the effective date of the reference, all involving preparation and filing of the patent application. This should be contrasted with ARS's characterization of CGI's showing regarding the patent application:

> But during that entire period, CGI could point to only *four* days (August 25, August 29, September 6 and November 1) on which there is *any* evidence to show that *any* work was done on Skoultchi's application.

ARS Opposition, pp. 8 – 9. While the ARS characterization is incorrect, of course, it highlights the ARS problem – even given this limited and erroneous characterization – this fits precisely the facts found sufficient to establish diligence in a 131 situation.

Indeed, the simple fact of the matter is that ARS cannot point to a single case where the timely preparation of a patent application, without more, was held to be insufficient to establish diligence. Where an application is prepared from disclosure to filing in three months, as it was

15

in this case, it is per se reasonable and timely. In *Rey-Bellet v. Englehardt v. Shindler*, 493 F, 2d 1380, 1387 (CCPA 1974) the Court affirmatively held that the reasonable period of preparation of a patent application by in house counsel at a major corporation was sufficient to establish diligence.

> That the activity of those engaged in the preparation of a patent application accrues to the benefit of the inventor for the purpose of showing diligence requires no citation of authority. The responsibility for drafting Engelhardt's application fell to an attorney, Mr. Underwood, in Merck's patent department. He informally requested that Dr. Frank A. Cutler, technical advisor to the patent department, assist him in the preparation of this application. It was Dr. Cutler who prepared the preliminary draft of May 12, 1961. The record indicates that Dr. Cutler prepared two drafts. The second of these was completed on May 15, 1961. Apparently neither could be regarded as a draft of a complete application. Instead they appear to have been descriptions of experimental work appearing in the disclosure of invention. The rest of the specification was prepared by Mr. Underwood. Dr. Cutler was given on, or shortly after, April 24, 1961, a number of documents containing descriptions of experiments which he was ultimately to incorporate in the draft of Engelhardt's application. Dr. Cutler testified that he was putting the finishing touches on that draft on May 12, 1961, and would have been working on it before then. This is supported by the fact that several of the documents used by him in preparing the draft contain notations in his own hand.

In Genesys/CGI's case, the inventor was not an employee of a company, he was a university professor with other obligations all the way across the country. Yet still, as in *Rey-Bellet*, Skoultchi disclosed the invention to the patent attorney on July 25, 1989, and one month later, a draft was prepared – not a completed application, but one requiring attention from the inventor. Not only the inventor, but co-founder Kucherlapati, and CEO Mark Levin, testified they reviewed and commented on the draft. The law establishes that this is reasonable diligence, without more. ARS acknowledges that the case law, including *Shindelar v. Holdeman*, 628 F.2d 1337, 1342 (CCPA 1980) establishes that the time Skoultchi and Rowland took to go from initial disclosure to filing, three months is in fact reasonable. ARS offers no argument as to why a different standard should be applied here. The Courts in *Rey-Bellet*, in *Rines v. Morgan*, 250

16

F.2d 365, 369 (CCPA 1957) and in *Shindelar*, and the Patent Office itself in *McGuckian*, have consistently held that the reasonable preparation of a patent application in three months time, from disclosure to filing, is reasonable diligence. It should be here, as well, absent countervailing facts or policies that ARS has not advanced.

Indeed, in the present case there is even more diligence than in the supporting authorities cited above. While the patent application was being prepared, CGI did not simply wait for its filing. CGI prepared a new business plan, featuring this invention and its advantages, so that the same could be presented to investors in a meeting on September 8, 1989. CGI 15906 – 15925. ARS suggests this amounts to one day of activity. Anyone familiar with the preparation of business plans and presentations to investors of a start-up company knows that more than a single day of activity is involved. The company pursued the invention, and its realization, non-stop. This is why Levin testified that the effort to move forward with the invention to an actual reduction to practice did not occur on one day or another, *it was continuous.* Levin Tr., p. 144.

Subsequent to the presentation to the investors, a new business plan was drawn up on September 20, 1989. This business plan clearly made Skoultchi's invention the company's first priority. The new business plan detailed the new activities that were ongoing at CGI, including obtaining and outfitting laboratory space, and hiring employees to work at those facilities. The ARS suggestion, (p. 11) that this activity was unrelated to the invention, and that what was being done was related to optimization or market investigation, is unsupported by reference to any document or testimony. The documents in question are clearly tied to finding a home for the company so that it can practice Skoultchi's idea. It is clear that even if the laboratory space could be used for other purposes as well, if the continuous effort described was done so that Skoultchi's invention could be deployed by the company, it is evidence of diligence. *Scott v.*

*Koyama*, 281 F.3d 1243, 1247-48 (Fed. Cir. 2002). The ARS approach is to isolate one day's activity from the next, and make it seem as if it was disconnected. But that is not the evidence. Levin testified that throughout the period of September – December, CGI was continuously working on the Skoultchi invention – "from a market standpoint, IP standpoint, regulatory, technology business development; and this (a patent and investors meeting set for the end of October, 1989) is just a continuum as part of that." Levin Tr., p. 189.

It would be sufficient if Genesys/CGI referred to activities, for instance, the investors meetings of September and October 1989, as evidence that it did not surrender the invention or abandon progress on it. It would be sufficient if CGI had simply engaged in an effort to secure and equip laboratory space and workers to practice the Skoultchi invention. It would be sufficient if CGI had presented replacement business plans, reflecting an increasing focus on Skoultchi's invention as the technology being developed at CGI. Genesys/CGI did all of this and more. And from the beginning, from well prior to the publication date of Japan, it commissioned the preparation and filing of a patent application, which was done with dispatch and promptness. The patent application was based on information provided to the attorney on July 24, 1989, and a month later, a draft was completed. The draft was revised based on comments provided, and half of a month later, the revision was provided. This went to the inventors for review and signature, and in just three months from disclosure, the application was filed. The law recognizes this as due diligence adequate for purposes of antedating a reference under 37 C.F.R. 1.131.

## V. CONCLUSION

Genesys/CGI relies on documentary evidence, explained by testimony, obtained under subpoena by ARS, to establish conception of the invention of Claims 107 – 109 before the effective date of Japan. The evidence shows that the Board's construction is clearly satisfied by multiple documents, including Skoultchi's notebook of February 15, 1989, the facsimile reflecting Skoultchi's idea of July 24, 1989 and Skoultchi's presentation of the invention at the Scientific Advisory Board on July 25, 1989. Even if one adopts, in place of the Board's construction of the claims, the ARS interpretation requiring expression in a "primary cell" and insertion of a regulatory element, the evidence clearly reflects Skoultchi's recognition of the same.

The patent application that was filed November 6, 1989 was begun on July 25, 1989, before the effective date of the reference. Preparation continued through August and September, culminating in a final draft forwarded for review, execution and filing in October. This three-month period for patent application preparation has been recognized in the law as reasonable. During the same time period, CGI made presentations to investors, lined up laboratory space and equipment, and engaged workers to practice Skoultchi's invention. The company continued to press ahead with deployment of this technology, on a daily, continual basis. CGI was diligent to the filing date of November 6, 1989.

Having conceived of the invention of Claims 107 – 109 before the date of Japan, and pursued that invention with diligence to a constructive reduction to practice, Japan is not prior art to Claims 107 – 109. Genesys/CGI's date of invention is, at the latest, August 28, 1989. CGI now challenges ARS to advance evidence of a date of invention at least as early. ARS would have to show a reduction to practice by that date, or conception followed by diligence all the way

to December 21, 1990, its effective filing date. Board Decision, p. 125. If ARS cannot make such a showing, then Genesys/CGI and Skoultchi are the "first to invent" pursuant to 35 U.S.C § 102(g) and ARS is not entitled to any of its claims. The ARS complaint should be dismissed if ARS does not make such a showing.

>     Respectfully submitted,
>
>     CELL GENESYS, INC.
>
>     By its attorneys,
>
>     /s/  Steven B. Kelber
>     Steven B. Kelber
>     c/o Arnold & Porter, LLP
>     555 Twelfth Street, NW
>     Room 900A
>     Washington, DC  20004-1206
>     Telephone:  (202) 942-5747
>
>     T. Christopher Donnelly (BBO #129930)
>     Donnelly, Conroy & Gelhaar, LLP
>     One Beacon Street, 33rd Floor
>     Boston, Massachusetts  02108
>     Telephone:  (617) 720-2880

Dated: November 22, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this REPLY OF CELL GENESYS, INC.TO THE OPPOSITION OF ARS TO THE MEMORANDUM - "JAPAN" IS NOT PRIOR ART WITH RESPECT TO CGI CLAIMS 107- 109 was filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 22, 2006.

>     /s/   Steven B. Kelber
>     Steven B. Kelber