# EXHIBIT B

The opinion in support of the decision being
entered today is <u>not</u> binding precedent of the Board.

Paper 172

Filed by:    Motions Panel
             Mail Stop Interference                    Filed:
             P.O. Box 1450                         22 June 2004
             Alexandria, VA 22313-1450
             Tel:  703-308-9797
             Fax:  703-305-0942

UNITED STATES PATENT AND TRADEMARK OFFICE

```
┌────────────────────────────┐
│        MAILED              │
│                            │
│      JUN 2 2 2004          │
│                            │
│    PAT. & T.M. OFFICE      │
│ BOARD OF PATENT APPEALS    │
│   AND INTERFERENCES        │
└────────────────────────────┘
```

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.
Junior Party,
(U.S. Patent 5,272,071)

v.

CELL GENESYS, INC.
Junior Party,[1]
(U.S. Application 08/102,390)

Interference 105,114

DECISION ON PRELIMINARY MOTIONS

Before TEDDY S. GRON, <u>Administrative Patent Judge</u>,
FRED E. McKELVEY, <u>Senior Administrative Patent Judge</u> and
JAMES T. MOORE <u>Administrative Patent Judge</u>.

---

[1]    The NOTICE REDECLARING INTERFERENCE NO. 103,737 (Paper
No. 1) accorded both parties junior party status due to disputes
relating to the scope of the interference count and the parties'
priority benefit dates.

Interference 105,114

TEDDY S. GRON, <u>Administrative Patent Judge</u>.

1.  <u>Summary of the Decision</u>

     The parties present: (1) preliminary motions for benefit of
the filing dates of their earliest applications for subject
matter defined by the interference count; (2) preliminary motions
for judgment that the other party's claims corresponding to the
count are unpatentable under 35 U.S.C. § 102/103; (3) preliminary
motions for judgment that the other party's claims corresponding
to the count are unpatentable under 35 U.S.C. § 112, first
paragraph (written description and/or enablement requirements);
(4) contingent preliminary motions to add new claims and modify
the count; and (5) preliminary motions to designate certain
claims designated as corresponding to the count as not
corresponding to the count.  Having considered all the parties'
arguments and evidence, we conclude that each party has shown
that many of the other party's claims designated as corresponding
to the count are unpatentable to it over prior art, yet neither
party has established that the other party's claims do not
satisfy 35 U.S.C. § 112, first paragraph.  Since no party's
claims which remain patentable to it are directed to the same
patentable invention as a claim patentable to the other party,
there is no interference-in-fact, and this judgment of no
interference-in-fact will be entered.  Accordingly, the parties'

Interference 105,114

Claim 17 of ARS's '071 patent is directed to:

A genome of a cell line having

I.    a DNA regulatory segment, operatively linked
      with;

II.   a predetermined naturally occurring gene at an
      unnatural, predetermined insertion site
      characterized by a predetermined sequence.

Claim 18 of ARS's '071 patent is directed to:

A cell line capable of expressing anew the expression product of a gene transcriptionally silent within the genome of the cell line, said cell line having inserted in its genome, a DNA regulatory segment operatively linked with said transcriptionally silent gene which promotes its expression.

Claim 19 of ARS's '071 patent is directed to:

A cell line capable of enhancing the expression of the expression product of a gene endogenous to the genome of the cell line, said cell line having inserted in its genome a functionally effective exogenous DNA regulatory segment or amplifiable gene.

Claim 1 of ARS's '071 patent is directed to:

A method of activating a transcriptionally silent gene within the genome of a cell line to express the product it

-27-

Interference 105,114

region in the vicinity of said gene" and neither claim explicitly requires insertion by homologous recombination. GENESYS does not point to any evidence of record indicating that prior knowledge of sequences upstream and/or downstream of a target gene is never needed to insert an heterologous DNA into a cell's genome "in a region in the vicinity of said gene" by other known insertion techniques. Nor has GENESYS pointed to any evidence of record that heterologous DNA cannot be inserted into a cell's genome in a region in the vicinity of a target gene absent prior knowledge of sequences upstream and/or downstream of the target gene, e.g., by random or point-specific insertion techniques. GENESYS has not shown that heterologous DNA cannot be randomly inserted into a cell's genome at a specific site in a region in the vicinity of a target gene by procedures other than homologous recombination (TP (Paper No. 171), p. 24, l. 22, to p. 25, l. 3). Moreover, prior art Genesys cites against the patentability of subject matter claimed in ARS's '071 patent, prior art which is discussed in depth later in this paper, indicates that heterologous DNA sequences can be inserted by random recombination (Kaufman I) or homologous recombination into the genome of a cell line in the vicinity of the target cell with or without prior knowledge of sequences upstream and/or downstream of the target gene. Heterologous DNA sequences are commonly inserted by homologous

-32-

Interference 105,114

In ARS's Preliminary Motions 3 (Paper No. 47), 4 (Paper No. 4), and 5 (Paper No. 49) under 37 CFR § 1.633(a), ARS moves for judgment that Claims 105 and 110-112 of Genesys Application 08/102,390, filed August 5, 1993, are unpatentable over prior art under 35 U.S.C. § 102/103. In determining the prior art status of each of the references relied upon by ARS in support of its motions, again we shall presume that Claims 105-112 of Genesys Application 08/102,390 are entitled to benefit under 35 U.S.C. § 120 of the November 6, 1989, filing date of Genesys's parent U.S. Application 07/432,069. In support of its motion, ARS relies on the following prior art references:

> Kaufman, R., et al. (Kaufman I), "Coamplification and Coexpression of Human Tissue-Type Plasminogen Activator and Murine Dihydrofolate Reductase Sequences in Chinese Hamster Ovary Cells," Molecular and Cellular Biology, Vol. 5, No. 7, pp. 1750-1759 (July 1985)(ARS's Exh. 3007 (Paper No. 47); equivalent to Genesys Exh. 2014);

> Raibaud, O., et al. (Raibaud), "A Technique for Integrating Any DNA Fragment into the Chromosome of Escherichia coli," Gene, Vol. 29, 231-241 (1984) (ARS's Exh. 3008 (Paper No. 48); equivalent to Genesys Exh. 2012); and

> Japan Patent Publication 1-215280, published August 29, 1989 (Exh. 3009 (Original Japanese)(Paper No. 49); hereafter we refer to ARS's and Genesys's certified English translations of the Japanese publication (Exh. 3010; Exh. 2016)); and

> Genetic Engineering, Principles and Methods, Vol. 9, Edited by Setlow, J., Plenum Press, New York, 1987; Kaufman, R. (Kaufman II), "High Level Production of Proteins in Mammalian Cells," pp. 155-198 (Exh. 3015).

-39-

Interference 105,114

Kaufman I adds (Exh. 2014, p. 1758, col. 1):

> It appears that this approach will prove generally
> applicable to the development of cell lines producing
> high levels of a variety of proteins which may prove
> therapeutically useful but which have been previously
> difficult to obtain in sufficient quantities.

### Findings based on teachings of Kaufman I

We find in Kaufman I no teaching or reasonable suggestion to
insert a DNA regulatory segment or amplifiable gene into the
genome of a cell line by homogeneous recombination, as
Claims 1-16 and 28-51 of ARS's '071 patent require.

We find in Kaufman I no teaching or reasonable suggestion
of a DNA construct comprising a DNA regulatory segment or
amplifiable gene capable of stimulating or modifying expression
of a target gene within the genome of a host cell line and a DNA
targeting segment homologous to a region of the target gene, as
Claims 26 and 27 of ARS's '071 patent require.

We find in Kaufman I no teaching or reasonable suggestion
of a genome of a cell line having a DNA regulatory segment
operatively linked with a gene naturally occurring in the genome
of the cell line at a genome-insertion site characterized by a
predetermined DNA sequence, as Claim 17 of ARS's '071 patent
requires.

We find in Kaufman I no teaching or reasonable suggestion of
a cell line expressing a product encoded by a gene normally

-42-

Interference 105,114

silent within the genome of the cell line, wherein the genome
has inserted therein a DNA regulatory segment operatively linked
with said normally silent gene which stimulates the expression
characteristics thereof, as Claims 18, 22-24, and 56-58 of ARS's
'071 patent require.

We find in Kaufman I no teaching or reasonable suggestion of
a cell line showing enhanced expression of a product encoded by a
target gene within the genome of the cell line, wherein the
genome has inserted therein an exogenous DNA regulatory segment
and/or amplifiable gene operatively linked with said target gene
which stimulates its expression characteristics, as Claims 19-21,
and 52-55 of ARS's '071 patent require.

We find in Kaufman I no teaching or reasonable suggestion to
insert an heterologous DNA regulatory sequence or amplifiable
gene into the genome of a cell line by homogeneous recombination,
as Claims 107-109 of Genesys's Application 08/102,390 require.

We find in Kaufman I no teaching or reasonable suggestion of
a human 293 embryonal kidney cell having inserted in its genome a
cytomegalovirus promoter or enhancer operatively associated with
a human erythropoietin gene, as Claim 106 of Genesys's
Application 08/102,390 requires.

However, we find that Kaufman I describes a DHFR-deficient
Chinese hamster ovary (CHO) cell line, i.e., the cell line of a

-43-

Interference 105,114

mammalian host.  Kaufman I teaches that the DHFR-deficient CHO
cell line was made to express a DHFR gene which is not normally
expressed within the genome of the DHFR-deficient CHO cell line
and a human t-PA gene which is not normally expressed within the
genome of the DHFR-deficient CHO cell line.  Abnormal expression
of the DHFR gene product within the genome of the DHFR-deficient
Chinese hamster ovary cell line is said to have resulted from
insertion of the SV40 enhancer (heterologous regulatory sequence)
in the vicinity of, and operatively associated with, a coinserted
exogenous DHFR cDNA target gene not normally expressed within the
genome of the DHFR-deficient CHO cell line.  Abnormal expression
of the t-PA gene product within the genome of DHFR-deficient
Chinese hamster ovary cell line is said to have resulted from
insertion of the amplifiable DHFR cDNA gene in the vicinity of,
and operatively associated with, a coinserted exogenous t-DNA
cDNA target gene not normally expressed in sufficient quantities
within the genome of the DHFR-deficient CHO cell line.  Thus,
we find that Kaufman I describes subject matter encompassed by
Claims 105, 110 and 111 of Genesys's Application 08/102,390.

    We find in Kaufman I no teaching or reasonable suggestion of
a cell which expresses a gene not normally expressed therein,
wherein the genome of the cell has an heterologous amplifiable
gene or DNA regulatory sequence inserted through homologous

-44-

Interference 105,114

recombination in the vicinity of the gene not normally expressed

so to stimulate expression thereof, as Claim 112 of Genesys's

Application 08/102,390 requires.

However, ARS argues (Paper No. 47, p. 13, first para.):

[I]nserting the heterologous DNA into the cell line via
homologous recombination does not confer any specific or
distinguishing characteristics to the cells. Homologous
recombination can target essentially any sequence in the
genome of the cell. Therefore, without a description in the
claim of the specific sequence targeted in the cell, one
cannot distinguish whether a cell in which the DNA was
inserted by homologous recombination, or another process,
such as a random insertion procedure. Exhibit 3002 ¶ 274.

ARS's argument is taken from paragraph 274 of the "First

Declaration of Randal Kaufman" (Exh. 3002, para. 274). Randal

Kaufman's statement is unsupported. As such, it does not satisfy

ARS's initial burden to show that it is entitled to the relief

sought in ARS's Preliminary Motion 3 (Paper No. 47). See 37 CFR

§ 1.637(a)("A party filing a motion has the burden of proof to

show that it is entitled to the relief sought in the motion.")

Kaufman's unsupported declaration that one skilled in the

art cannot distinguish between a cell in which DNA was inserted

by random insertion and a cell in which DNA was inserted by

homologous itself is insufficient to shift the burden to Genesys

to establish anew that Claim 112 is patentable over the teaching

of Kaufman I. Suffice it to say that DNA randomly inserted into

the genome of a cell does not carry terminal sequences which are

-45-

Interference 105,114

homologous, but not identical, to a predetermined portion of a
target sequence.  The homologous terminal sequences guide the DNA
to be inserted toward an area in the vicinity of the target
sequence, as required for insertion by homologous recombination.
How much, if any, of the homologous terminal targeting sequence
or sequences is inserted into the cell genome at the targeting
site, its identity, and precisely how it is inserted, are not
fully understood and determinable without comparative sequencing
of genes modified by homologous and random recombination
insertion procedures and resultant expression activities.

    ARS's arguments also appear to be inconsistent with its view
of the relevance of the teaching of Kaufman I to the subject
encompassed by Claims 18, 22-25 and 57-58 (Paper No. 47, pp. 15)
and Claims 26-27 (Paper No. 47, p. 16) of ARS's '071 patent.
Moreover, ARS's arguments do not appear to be supported by the
teaching of ARS's '071 patent itself (ARS's '071 patent, col. 7,
l. 8, to col. 8, l. 47).  For example, ARS' '071 patent
specification suggests that pieces of the "targeting DNA
sequences" terminally attached to a potential insert sequence
will be inserted by homologous recombination into the target
sequence of the genome along with the desirable foreign DNA
insert (ARS's '071 patent, col. 7, l. 67, to col. 8, l. 37),
although the mechanism is not completely understood (ARS's '071

-46-

Interference 105,114

patent, col. 7, l. 23-24). Suffice it to say that ARS has not

satisfied its burden to show it is entitled to the relief it

seeks for Claim 112 of Genesys's involved application.

We find Claims 105, 110 and 111 of Genesys's Application

08/102,390 to be unpatentable under 35 U.S.C. § 102(b) over

subject matter described by Kaufman I.

We conclude that Claims 105, 110 and 111 of Genesys's

Application 08/102,390 are unpatentable under 35 U.S.C. § 103 in

view of the teaching of Kaufman I.

(2)  Raibaud (Exh. 2012/3008)

### Raibaud teachings

Raibaud describes a technique for integrating foreign

DNA into the chromosome of Escherichia coli via homologous

recombination (Exh. 3008, p. 231, Title & Summary).  According

to Raibaud, the foreign DNA is inserted into a chromosome of

E. coli at the EcoRI site within an endogenous promoter for

the structural gene encoding production of amylomaltase.

Segments of the endogenous promoter must flank the foreign DNA

insert, thus providing the targeting homologous sequences

required for homologous recombination (Exh. 3008, p. 231,

Summary; p. 238, Fig. 5).  Correct positioning of the foreign DNA

insert into the chromosome is shown by assaying for amylomaltase,

the expression product of the endogenous structural gene encoding

-47-

Interference 105,114

> . . . When the fragment contains a properly positioned
> promoter, the insertion of this fragment (i) inactivates
> the chromosomal <u>malPQ</u> promoter and (ii) <u>puts the malPQ
> operon under the control of the foreign promoter located in
> the fragment</u>. . . . [I]t can be concluded that the level of
> amylomaltase synthesis provides a true reflection of the
> activity of the [new] promoter located in the inserted
> fragment.   In the examples presented in this paper we have
> used amylomaltase synthesis as a measure of the activities
> of promoters controlling the synthesis of colicin E3 and the
> <u>lac</u> operon of <u>E. coli</u>. . . . .

### <u>Findings based on Raibaud's teachings</u>

We find that Raibaud describes a technique for modifying the

expression characteristics of the endogenous structural gene

encoding amylomaltase in the genome of a prokaryotic cell line

(<u>E. coli</u>) comprising inserting a DNA construct (the ColE3 DNA

fragment within a <u>malPp</u>$^a$ promoter) by homologous recombination,

said DNA construct comprising a DNA regulatory segment (colicin

promoter within the ColE3 fragment) capable of modifying the

expression characteristics of the native amylomaltase structural

gene when operatively linked thereto, and a DNA targeting segment

homologous (the terminal segments of the <u>malPp</u>$^a$ promoter

containing the ColE3 DNA fragment) to a region of the genome

(the native <u>malPp</u>$^a$ promoter) proximal to the native amylomaltase

structural gene, wherein said DNA construct (the ColE3 DNA

fragment within the <u>malPp</u>$^a$ promoter) is inserted such that said

a new regulatory segment (colicin promoter within the ColE3

Interference 105,114

fragment) is operatively linked to said amylomaltase structural

gene of interest.

Raibaud also teaches that the expression characteristics of

the native amylomaltase structural gene were modified when the

malPQ operon was driven by the colicin promoter insert, and

likely would be enhanced by an insert comprising a relatively

stronger promoter.  Raibaud explicitly states (Exh. 3008, p. 239,

col. 1, first full para.):

> The amount of amylomaltase found when the malPQ operon
> was driven by the promoter of the colicin gene was similar
> to that obtained after induction with maltose in the
> wild-type strain C600.  This result indicates that the
> efficiency of the colicin promoter is similar to that
> of the malPQ operon.

Raibaud states that, "in such constructions[,] the level of

amylomaltase is proportional to the strengths of the promoter"

(Exh. 3008, p. 239, col. 2).  "Therefore, it can be concluded

that the level of amylomaltase synthesis provides a true

reflection of the activity of the promoter located in the

inserted fragment" (Exh. 3008, p. 240, cols. 1-2, bridging

para.).  Accordingly, we find that Raibaud expressly teaches, and

we conclude that Raibaud reasonably would have suggested, subject

matter encompassed by Claims 2, 17, 19, 20, 26, 28, 31, 52, 53

and 54 of ARS's '071 patent to persons having ordinary skill in

the art.

-50-

Interference 105,114

On the other hand, Genesys has not shown that Raibaud discloses or would have taught methods of "activating a predetermined normally transcriptionally silent gene within the genome of a cell line," as required by Claims 1, 5-16, 18, 22-25, and 56-58 of ARS' '071 patent.  We interpret the phrase "normally transcriptionally silent gene within the genome of a cell line" to refer to a gene endogenous to the cell line.

Nor has Genesys shown that Raibaud discloses or reasonably would have suggested methods of modifying the expression characteristics of a target gene within the genome of a cell line which comprises insertion of a DNA construct comprising an "expressible, amplifiable gene" which amplifies the target gene within the genome of the cell line when it is amplified, as required by Claims 3, 4, 19, 21, 27, 40-51, and 53-56 of ARS's '071 patent.[4]

Moreover, Genesys has not shown that Raibaud discloses or reasonably would have suggested methods for activating or modifying the expression characteristics of a gene within the genome of an eukaryotic cell line, as required by Claims 9-12, 32-35 and 44-47 of ARS's '071 patent.

---

[4]    We are unable to find antecedent basis in Claim 3 for the references to "said regulatory segment" in Claims 40, 41 and 43 of ARS's '071 patent which depend from Claim 3.

-51-

Interference 105,114

Genesys has not shown that Raibaud discloses or reasonably would have suggested methods for activating or modifying the expression characteristics of a gene within the genome of a cell line using a DNA construct comprising a selectable marker, as required by Claims 4, 6, 7, 13-16, 23, 24, 29, 30, 36-39, 41, 48-51, 57 and 58 of ARS's '071 patent.

We find that Raibaud does not disclose or teach a mammalian host cell or cell line, or methods for activating or modifying the expression characteristics of a gene within the genome of a mammalian host cell or cell line, as required by Claims 105-109 of Genesys's Application 08/102,390.

However, we find that Raibaud describes a cell of E. coli transformed to express a gene encoding colicin. Genes encoding colicin are not normally expressed by E. coli. The cell is said to have been transformed by insertion of an heterologous DNA fragment comprising a gene encoding colicin in proximity to its normal regulatory sequence (a colicin promoter) into the genome of an E. coli cell within its endogenous malPp promoter by homologous recombination. Therefore, we find that Raibaud describes subject matter encompassed by Claims 110 and 112 of Genesys's Application 08/102,390.

We also find that Raibaud describes a cell of E. coli transformed to express a gene encoding colicin at higher levels

-52-

Interference 105,114

than that normally expressed.  Genes encoding colicin which

Raibaud describes are not normally expressed by E. coli at any

level.  E. coli cells are said to have been transformed by

insertion of an heterologous DNA fragment comprising a gene

encoding colicin in proximity to its normal regulatory sequence

(a colicin promoter) into the genome of E. coli cells by

homologous recombination within an endogenous malPp promoter.

Accordingly, we find that Raibaud also describes subject matter

encompassed by Claim 111 of Genesys's Application 08/102,390.

    Furthermore, we find that Raibaud teaches that cells of

E. coli can be transformed to express the expression product of

an endogenous gene encoding amylomaltase by inserting a foreign

regulatory sequence effective to promote expression of the

amylomaltase gene in association with a foreign gene (e.g., a

colicin promoter) into the genome of an E. coli cell within an

endogenous malPp promoter by homologous recombination.  While the

active foreign colicin promoter insert Raibaud describes is

"similar" in strength to the endogenous malPp promoter, Raibaud

teaches that the level of amylomaltase expressed by transformed

E. coli is proportional to the strength of the active foreign

promoter inserted.  Accordingly, we conclude that Raibaud

reasonably would have suggested subject matter encompassed by

Claim 111 of Genesys's Application 08/102,390.

Interference 105,114

Therefore:

Claims 2, 17, 19, 20, 26, 28, 31, 52, 53 and 54 of ARS's '071 patent are unpatentable under 35 U.S.C. § 102(b) over subject matter described by Raibaud, or under 35 U.S.C. § 103 in view of the teaching of Raibaud; and

Claims 110-112 of Genesys's Application 08/102,390 are unpatentable under 35 U.S.C. § 102(b) over subject matter described by Raibaud, or under 35 U.S.C. § 103 in view of the teaching of Raibaud.

     (3)  <u>Nasmyth I and II (Exh. 2008; Exh. 2009)</u>

<u>Nasmyth II teachings</u>

Nasmyth II teaches (Exh. 2009, p. 243, cols. 1-2; emphasis added):

> Switching is thought to be initiated by a specific double strand cleavage of mating type DNA by an endonuclease encoded by the <u>HO</u> gene. . . . Two lines of evidence suggest that the <u>failure of [haploid homothallic budding yeast] daughter cells to switch [its mating type as do mother cells] is due to the absence of HO endonuclease in such cells</u>. First, neither the endonuclease activity nor its mRNA are made during the first cell cycle of $G_0$ stationary phase daughters upon their inoculation into fresh medium, whereas they are both produced in a cell cycle-dependent fashion in mother cells under the same circumstances. . . . Moreover, neither the endonuclease nor its mRNA are sufficiently stable to be transferred to a daughter cell after their synthesis in a mother cell.

> The second piece of evidence concerns the analysis of <u>cells carrying a recombinant HO gene whose transcription is driven by the GAL upstream promoter element</u>, which is presumably active in both mother and daughter cells . . . . In the presence of galactose, which activates the <u>GAL</u>

-54-

Interference 105,114

(Exh. 2009, p. 244, Fig. 1).  The Nasmyth (1985a) article to

which Nasmyth II (Exh. 2009) refers is Nasmyth I of record

(Exh. 2008).  In the section of Nasmyth I entitled, "The Transfer

of Mutations into the HO Locus," the author explains that "Such

replacements are of course only readily obtained if the

transforming fragments possess sequences homologous to those on

both sides of the deletion/fusion in the genome (100bp is

sufficient)" (Exh. 2008, p. 221, col. 1), i.e., constructions

enabling homologous recombination.

### Findings based on teachings of Nasmyth II/I

We find that Nasmyth II describes, or reasonably would have

suggested, a method for activating expression, and thus modifying

the expression characteristics, of the native HO gene encoding

endonuclease in haploid homothallic budding yeast daughter cells.

The HO gene normally is transcriptionally silent in haploid

homothallic budding yeast daughter cells.  The method comprises

insertion of a GAL/OH promoter construct comprising the GAL

promoter sequence within flanking, targeting HO fragments into

the genome of yeast daughter cells by homologous recombination.

Thereby, the inactive, endogenous HO promoter is replaced by the

active GAL/OH promoter and expression of the OH gene encoding

endonuclease is activated.  Claims 1, 2, 5, 9, 17, 18, 25, 26, 28

and 32 of ARS's '071 patent encompass subject matter which is

-56-

Interference 105,114

described by Nasmyth II, and/or reasonably would have been
suggested by Nasmyth II, optionally in view of Nasmyth I.

We find that Nasmyth II describes, or reasonably would have
suggested, a method for modifying the expression characteristics
of the HO gene encoding endonuclease in haploid homothallic
budding yeast mother cells by insertion of a GAL/OH promoter
construct comprising the GAL promoter within flanking, targeting
HO fragments into the genome of the yeast mother cells by
homologous recombination. Thereby, the endogenous HO promoter is
replaced and expression of the HO gene encoding endonuclease is
enhanced. Claims 2, 9, 17, 18, 22, 25, 26, 28 and 32 of ARS's
'071 patent encompass subject matter described by Nasmyth II,
and/or reasonably suggested by Nasmyth II, optionally in view of
Nasmyth I.

We find that Nasmyth II describes a HO yeast daughter cell
expressing an HO gene encoding endonuclease not normally
expressed by that cell comprising heterologous DNA comprising a
regulatory sequence GAL/HO inserted in the HO yeast daughter cell
by homologous recombination whereby the HO gene encoding
endonuclease is amplified and expressed, as required by
Claims 110-112 of Genesys's Application 08/102,390.

We find that Nasmyth II describes a HO yeast mother cell
expressing an HO gene encoding endonuclease which expresses the

-57-

Interference 105,114

HO gene encoding endonuclease at higher levels than normally

expressed by that cell comprising heterologous DNA comprising a

regulatory sequence GAL/HO inserted in the HO yeast mother cell

by homologous recombination whereby the HO gene encoding

endonuclease is amplified and expressed, as required by

Claim 111 of Genesys's Application 08/102,390.

   Therefore:

   Claims 1, 2, 5, 9, 17, 18, 22, 25, 26, 28 and 32 of ARS's

'071 patent are unpatentable under 35 U.S.C. § 102(b) over

subject matter described by Nasmyth II, or under 35 U.S.C. § 103

in view of the teaching of Nasmyth II, optionally combined with

Nasmyth I.

   Claims 110-112 of Genesys's Application 08/102,390 are

unpatentable under 35 U.S.C. § 102(b) over subject matter

described by Nasmyth II, or under 35 U.S.C. § 103 in view of the

teaching of Nasmyth II, optionally in view of Nasmyth I.

       (4)  Smithies (Exh. 2010)

                  Smithies's teachings

   Smithies teaches (Exh. 2010, p. 230, col. 1, para. 2-4;

citations omitted; emphasis added):

       The series of experiments reported here shows that
       homologous recombination between exogenous DNA and a
       chromosomal gene does occur in cultured mammalian cells and
       can allow the stable insertion of defined DNA sequences into
       the [target] human β-globin locus in a predictable fashion.
       Although the frequency of success ($\sim 10^{-3}$ of transformed

-58-

Interference 105,114

> Hu 11 hybrid cells were transformed to G418 resistance by
> pΔβ117 cut with BstXI using electroporation as described in
> Table 1. . . . .

Smithies expressly concludes, "The experiments reported here
establish that the planned modification of a specific human
gene can be accomplished in mammalian cells by homologous
recombination without detectably affecting other parts of the
genome" (Exh. 2010, p. 234).

### Findings based on Smithies's teachings

Genesys has not shown that Smithies teaches "activating a
predetermined normally transcriptionally silent gene within the
genome of a cell line so as to enable said cell line to express
the product of said gene," as Claim 1 of ARS's '071 patent
requires.

Genesys has not shown that Smithies teaches "modifying the
expression characteristics of a predetermined gene within the
genome of a cell line," as Claims 2 and 3 of ARS's '071 patent
require.

Genesys has not shown that Smithies teaches insertion into a
predetermined cell line of "a DNA regulatory segment capable of
modifying the expression characteristics of genes in the host
cell line," as Claim 26 of ARS's '071 patent requires.

Genesys has not shown that Smithies teaches inserting into a
predetermined cell line "an expressible, amplifiable gene capable

Interference 105,114

of modifying the expression characteristics of genes in the host cell line," as required by Claim 26 of ARS's '071 patent.

Genesys has not shown that Smithies teaches "a cell capable of expressing a gene product by a predetermined normally transcriptionally silent gene within the genome of said cell line," as Claim 18 of ARS's '071 patent requires.

Genesys has not shown that Smithies teaches "a cell capable of enhanced expression of a gene product compared to the cell line from which it is derived, said gene product being the expression product of a predetermined endogenous gene," as Claim 19 of ARS's '071 patent requires.

Nor has Genesys shown that Smithies describes a genome of a cell line[, i.e., Hu 11 hybrid cells] . . . having a regulatory segment, i.e., sequences of the second element of the pΔβ117 test plasmid, that specify the neo gene and exogenous associated transcriptional signals (Exh. 2010, p. 231, col. 1, second full para.), operatively linked with a predetermined naturally occurring β-globin gene at an insertion site characterized by a predetermined DNA sequence.  While the first element of the pΔβ117 test plasmid comprises "4.6 kilobases (kb) of the DNA from the human β-globin locus, including the 5' part of the adult human β-globin gene," it lacks the second intervening sequence (IVS-2) and the remaining 3' portion of the gene, i.e., it is not

-62-

Interference 105,114

a naturally occurring β-globin gene. While this DNA to be
inserted provides replacement sequences in the incoming test
plasmid that can recombine with homologous target sequences in
the β-globin locus of the recipient cell to accomplish the
planned modification by homologous recombination]" (Exh. 2010,
p. 231, col. 1, first full para.), the DNA insert is not
operatively linked to a naturally occurring β-globin gene.
Moreover, Smithies' concludes that "[t]he experiments reported
here establish that the planned modification of a specific human
gene can be accomplished in mammalian cells by homologous
recombination without detectably affecting other parts of the
genome" (Exh. 2010, p. 234). Accordingly, we find that Smithies
neither describes, nor reasonably would have suggested, subject
matter encompassed by Claim 17 of ARS's '071 patent.

However, Smithies describes, and/or reasonably would have
suggested, subject matter encompassed by Claims 105, 110, 111 and
112 of Genesys's Application 08/102,390.

Smithies describes, or reasonably would have suggested, a
mammalian Hu 11 hybrid host cell that expresses a gene product
encoded by the exogenous target neo gene which is not normally
expressed within the genome of the cell line, said genome having
inserted therein a heterologous regulatory sequence operatively
associated with said exogenous target neo gene, so that the Hu 11

-63-

Interference 105,114

hybrid host cell expresses the product encoded by the exogenous target neo gene (Exh. 2010, p. 231, col. 1, second full para.); i.e., subject matter within the scope of Claim 105 of Genesys's Application 08/102,390.  As previously noted, Genesys's Application 08/102,390 expressly states that the "target gene may be any gene of interest . . ." (Exh. 2047, p. 5, l. 24-25).

Smithies also describes, or reasonably would have suggested, a Hu 11 hybrid cell capable of expressing a neo gene not normally expressed by that cell comprising an heterologous regulatory sequence, i.e., transcriptional signals associated with said neo gene, inserted by homologous recombination in said cell's genome in a region in the vicinity of said neo gene, whereby the gene may be expressed (Exh. 2010, pp. 231-233).  The cell Smithies describes is encompassed by Claims 110 and 112 of Genesys's Application 08/102,390.

Smithies also describes, or reasonably would have suggested, a Hu 11 hybrid cell capable of expressing a neo gene at higher levels than normally expressed by that cell, comprising an heterologous regulatory sequence, i.e., transcriptional signals associated with said neo gene, inserted in said cells genome in a region in the vicinity of said neo gene whereby the gene may be expressed (Exh. 2010, pp. 231-233).  The cell Smithies describes is encompassed by Claim 111 of Genesys's Application 08/102,390.

-64-

Interference 105,114

Therefore:

Claims 105 and 110-112 of Genesys's Application 08/102,390 are unpatentable under 35 U.S.C. § 102(b) over subject matter described by Smithies, or under 35 U.S.C. § 103 in view of the teaching of Smithies.

        (5)  Cid (Exh. 2013)

Cid's teachings

Cid teaches (Exh. 2013, p. 105, col. 2; citations omitted; emphasis added):

> As a first step in our mutational analysis of the yeast ATPase, the gene was cloned and a large deletion was shown to be lethal.  In this work we have replaced the constitutive promoter of the ATPase gene by a galactose-dependent promoter.  The physiological consequences of removing galactose from the growth medium are consistent with the essential role of the enzyme and with its participation in proton and amino acid transport.

According to Cid, "transformation must occur by integration into the yeast genome resulting from homologous recombination" (Exh. 2013, p. 106, col. 2).  Cid describes its integration method as follows (Id., citations omitted; emphasis added):

> In order to target the recombination to the ATPase sequences we treated the plasmid with XbaI, which cuts within the ATPase fragment, because restriction enzyme digestion within the region of homology greatly enhances the efficiency of integration.  Integration at the ATPase locus results in a constitutive promoter in front of a truncated coding region and the galactose-dependent promoter in front of a complete coding region.

-65-

Interference 105,114

<u>Findings based on Cid's teachings</u>

Genesys has not shown that Cid describes, or reasonably would have suggested, activating a predetermined normally transcriptionally silent gene within the genome of a cell line or modifying the expression characteristics of a predetermined gene within the genome of a cell line by inserting an amplifiable gene capable of amplifying the predetermined gene, or enhancing the expression characteristics of a predetermined gene within the genome of a cell line, as Claims 1, 3, 18, 19 and 27 of ARS's '071 patent.

However, we find that Cid describes, or reasonably would have suggested, a method for modifying the expression characteristics of the endogenous target ATPase gene in an eukaryotic yeast cell by inserting a galactose-dependent promoter operatively linked to the endogenous ATPase gene. The galactose-dependent promoter is inserted into the yeast cell genome by homologous recombination within ATPase fragments, thereby replacing the constitutive promoter of the ATPase gene with an operable galactose-dependent promoter. The DNA construct comprising a DNA regulatory segment is capable of modifying the expression characteristics of the ATPase gene. While Cid's method reduced the natural expression characteristics of the ATPase gene and yeast growth using a DNA construct comprising a

-66-

Interference 105,114

new galactose-dependent DNA regulatory segment, the new
regulatory segment was operatively linked to the ATPase gene and
did not terminate expression of the ATPase gene.  ARS's '071
patent specification defines "[t]he term 'modification of
expression' as used throughout the specification and claims,
. ... as excluding termination of expression by inserting by
homologous recombination . . . to prevent the product of interest
from being expressed" (ARS's '071 patent, col. 24, l. 6-12;
emphasis added).  Accordingly, Cid describes, or reasonably would
have suggested, subject matter encompassed by Claims 2, 17 and 26
of ARS's '071 patent.

Cid does not appear to describe, or reasonably suggest,
subject matter defined by any of Claims 105-109 of Genesys's
Application 08/102,390.  The host cell transformed in accordance
with Genesys's Claims 105-109 is mammalian, not merely eukaryotic
yeast.  However, while the expression characteristics of the
target ATPase gene of Genesys's Claims 110-112 are neither
activated from silence nor enhanced, the exogenous yeast URA3
and ampicillin resistance marker genes inserted via the pRS-61
plasmid into the yeast cells by homologous recombination, genes
not normally expressed by the yeast cell, are newly expressed by
the yeast cell line.  The exogenous URA3 and ampicillin
resistance marker genes, which Cid reports to have inserted by

-67-

Interference 105,114

homologous recombination into the genome of yeast cells via the
pRS-61 plasmid (Exh. 2013, p. 105, col. 2, Plasmids, last
sentence; Exh. 2013, p 106, col. 2, Results), are expressed in
the yeast cells. Therefore, Cid describes, or reasonably would
have suggested subject matter encompassed by Claims 110-112 of
Genesys's Application 08/102,390.

   Therefore:

   Claims 2, 17, and 26 of ARS's '071 patent are unpatentable
under 35 U.S.C. § 102(b) over subject matter described by Cid, or
under 35 U.S.C. § 103 in view of the teaching of Cid.

   Claims 110-112 of Genesys's Application 08/102,390 are
unpatentable under 35 U.S.C. § 102(b) over subject matter
described by Cid, or under 35 U.S.C. § 103 in view of the
teaching of Cid.

      (6) <u>Thomas (Exh. 2011)</u>

                    <u>Thomas's teachings</u>

   Thomas generally states (Exh. 2011, p. 503, col. 1, first
para.; citations omitted):

      Gene targeting-the homologous recombination of DNA
      sequences residing in the chromosome with newly introduced
      DNA sequences-provides a means for systematically altering
      the mammalian genome.

Here, Thomas extends what appears to be a conventional gene
targeting procedure "by using an endogenous gene as the target
and by using embryo-derived stem (ES) cells as the recipient

                              -68-

Interference 105,114

endogenous gene . . . . [(Exh. 2011, p. 506, col. 1, first
full para.)].

       To show that the G418, 6-TG phenotypes were the
result of gene-targeting events, the Hprt genes from
23 independently isolated G418, 6-TG cell lines were
characterized by Souther analysis.  In every instance
(23/23) the cells were shown to contain a single copy
of the Hprt gene harboring the neo gene in exon 8. . . .
Also, as expected, Hprt enzymatic activity could not be
detected in these cell lines. . . . [(Exh. 2011, p. 507,
col. 1, second full para.)].

According to Thomas:

We have analyzed 38 independent G418, 6-TG ES cell lines.
Each of these cell lines was shown to have arisen from
inactivation of the endogenous Hprt gene by homologous
recombination with the introduced neo-Hprt⁻ fragment. . . .
[(Exh. 2011, p. 510, col. 1, first full para.)].

       . . . The parameters that we believe influenced the
success of these experiments include using a neo gene that
is efficiently expressed in ES cells, maintaining the size
of the neo gene at a minimum, [and] using extensive homology
between the homing sequence and the target sequence . . . .
[(Exh. 2011, p. 510, col. 1, third full para.)].

Thomas concludes (Exh. 2011, pp. 510, concluding para.):

We have demonstrated that we can inactivate by gene
targeting a specific locus in the mouse genome.  The
protocol we have developed to inactivate the endogenous
Hprt gene should be adaptable to other genes as well.
. . . It is hoped that this combination of using ES
cells as the recipient cell line and site-specific
mutagenesis achieved by gene targeting will provide the
means for generating mice of any desired genotype.

                    <u>Findings based on Thomas's teachings</u>

     Genesys has not shown that Thomas describes, or reasonably

would have suggested, "activating a predetermined normally

transcriptionally silent gene within the genome of a cell line,"

                              -71-

Interference 105,114

as Claims 1 and 18 and claims dependent on Claims 1 and 18 of
ARS's '071 patent require.

Genesys has not shown that Thomas describes, or reasonably
would have suggested, "modifying the expression characteristics
of a predetermined gene within the genome of a cell line" by
inserting a DNA construct "comprising an expressible, amplifiable
gene capable of amplifying said gene," as Claims 3 and 27 and
claims dependent on Claims 3 and 27 of ARS's '071 patent require.

Genesys has not shown that Thomas describes, or reasonably
would have suggested, "modifying the expression characteristics
of a predetermined gene within the genome of a cell line,
comprising inserting a DNA construct into said genome . . .
wherein said construct is inserted such that said regulatory
segment is operatively linked to said gene of interest," as
Claim 2 of ARS's '071 patent and all claims dependent thereon
require.

Genesys has not shown that Thomas describes, or reasonably
would have suggested, a cell line "capable of enhanced expression
of a gene product compared to the cell line from which it is
derived" as Claim 19 of ARS's '071 patent and all claims
dependent thereon require.

Furthermore, Genesys has not shown that Thomas describes, or
reasonably would have suggested, a genome of a cell line

-72-

Interference 105,114

comprising a DNA regulatory segment unnaturally located in the
genome which is operatively linked with a predetermined naturally
occurring gene.  Genesys has not shown that the neo gene and
associated promoter within the neo-Hprt insert which replaces
the endogenous Hprt gene is operably linked with the
predetermined naturally occurring Hprt gene or any other gene
naturally occurring in the genome of the cell line, as Claim 17
of ARS's '071 patent requires.

    On the other hand, Thomas describes, or reasonably would
have suggested, a mammalian host cell (mouse ES cells) that
expresses a neo structural gene not normally expressed within the
genome of the cell line operatively associated with a
heterologous HSV-tk promoter as a pMC1Neo insert within Hprt.
While the Hprt-inactive neo-Hprt insert replaces the active Hprt
gene, the exogenous structural neo gene insert is active in the
cell line operably associated with the exogenous HSV-tk promoter.
Thus, Thomas describes, or reasonably would have suggested,
subject matter encompassed by Claim 105 of Genesys's Application
08/102,390.

    Thomas does not describe, and reasonably would not have
suggested, a mammalian cell expressing a gene "of that cell's
genome" encoding a protein not normally produced, or produced at

-73-

Interference 105,114

levels higher than normal, as Claims 107-109 of Genesys's
Application 08/102,390 require.

Thomas does not describe, and reasonably would not have
suggested, the transformed human 293 embryonal kidney cell
defined by Claim 106 of Genesys's Application 08/102,390.

However, Thomas describes mammallian cells with an
heterologous HSV-_tk_ promoter inserted in the cell's genome though
homologous recombination in the vicinity of, and operably linked
to express a structural _neo_ gene, _i.e._, a mammalian cell line
having pMC1Neo _neo_ gene within _Hprt_ inserted into mouse ES cells
by homologous recombination.  The subject matter Thomas
describes, or reasonably would have suggested, is encompassed by
Claims 110-112 of Genesys's Application 08/102,390.

Therefore:

Claims 105 and 110-112 of Genesys's Application 08/102,390
are unpatentable under 35 U.S.C. § 102(b) over subject matter
described by Thomas, or under 35 U.S.C. § 103 in view of the
teaching of Thomas.

(7)  Japan 1-215280 (Exh. 3010; Exh. 2016)

Japan's teachings

Our study of Japan's teachings relies on, and refers to, the
certified English translations of Japanese Patent publication
No. 1-215280, published August 29, 1989, of record; one submitted

-74-

Interference 105,114

by ARS (Exh. 3010) and the other submitted by GENESYS

(Exh. 2016).   Japan generally describes its invention as follows:

> The present inventors . . . discovered that a
> microorganism capable of efficiently producing a specific
> target substance is obtained by introducing a powerful
> promoter capable of enhancing the expression of a gene
> concerned in the production of the target substance in
> the chromosome of a microorganism already containing
> the gene.   The present invention has been perfected as
> a result.

(Exh. 3010, p. 5, para. 3);

> [T]he inventors discovered that by introducing powerful
> promoters that could increase the expression of genes
> related to the production of specific desired substances
> into microbial chromosomes already containing said genes,
> microbes capable of producing the desired substances
> efficiently were obtained, thus completing the invention.

(Exh. 2016, p. 4, para. 1);

> This invention . . . is aimed at providing an improved
> microorganism which has an expression regulatory sequence
> for a gene concerned in the production of a target substance
> introduced in the chromosome of a microorganism possessing
> the chromosome containing the gene at a position and in a
> direction such that the expression of the gene is enabled to
> be controlled[;] a method for the production of the
> microorganisms; and a method for the production of a useful
> substance, characterized by culturing the organism[,]
> thereby yielding a product concerned in the gene and
> collecting the product.

(Exh. 3010, p. 5, para. 4);

> [T]his inventions presents: improved microbes that have
> chromosomes containing genes related to the production of
> desired substances wherein expression-controlling sequences
> for said genes have been introduced into said microbial
> chromosomes at positions and in directions that enable the
> control of expression of said genes; methods for producing
> said microbes; as well as methods for producing useful
> substances characterized by the fact that said microbes are

Interference 105,114

cultured to produce products related to said genes, and said
products are harvested.

(Exh. 2016, p. 4, para. 2).

More specifically, Japan discloses:

This invention can be applied to a microorganism
which already possesses a gene concerned in the production
of a target substance in the chromosome thereof and
exhibits the ability to produce the target substance and
to a microorganism which already possesses a gene concerned
in the production of a target substance in the chromosome
thereof and nevertheless fails to produce substantially
the target substance and derives an ability to produce
the target substance from externally introducing anew an
expression regulatory gene.

(Exh. 3010, p. 6, para. 1).

This invention can be used either on microbes that
have chromosomes containing genes related to the production
of desired substances on their chromosomes and can produce
said desired substances, or on microbes that already have
genes related to the production of desired substances on
their chromosomes although practically speaking, cannot
produce said desired substances, but become able to produce
said desired substances by newly introducing exogenous
expression-controlling genes.

(Exh. 2016, p. 4, third para.).

According to Japan, the target genes may encode, and be made
to express, enzymes such as protease, amylase, glucose isomerase,
cellulase, and tryptophan synthetase; hormones such as insulin,
growth hormones, encephalin, and somatostatin; antigens for
hepatitis, polio, and herpes; and lymphokines such as interferon
and interleucine (Exh. 3010, p. 6, para. 2; Exh. 2016, p. 4,
para. 4).  As does Genesys (Exh. 2047, p. 5, l. 24-25), Japan

-76-

Interference 105,114

appears to broadly define a target gene as any gene of interest.

In that regard, Japan states:

> The gene which is concerned in the production of such target
> substance may be <u>a gene which inherently exists in the
> chromosome of a host microorganism or a gene which has been
> artificially inserted in advance in the chromosome of a host
> microorganism</u>.  The former gene possesses an expression
> regulatory series naturally attendant on the gene and, on
> being furnished with an additional, expression regulatory
> sequence to be inserted therein by the method of this
> invention, acquires an ability to enhance the production of
> the substance by a host.  It is otherwise capable of
> conferring an ability to produce the target substance [by] a
> host which has been inherently incapable of producing
> substantially, the target substance.  The latter gene in
> most cases possesses an expression regulatory domain
> attendant on the structural gene thereof and, on being
> furnished with a powerful expression regulatory sequence to
> be introduced by the method of this invention, acquired such
> effect as mentioned above.

(Exh. 3010, pp. 6-7, bridging para.; emphasis added);

> <u>Genes related to the production of such desired substances
> can be genes that naturally exist on the chromosome of
> the host microbe or can be genes that have been inserted
> artificially into the host microbe chromosome beforehand</u>.
> The former genes have expression-controlling sequences
> that are attached to these genes naturally.  By inserting
> additional expression-controlling sequences in addition to
> these, production of the desired substance by the host can
> be increased or the ability to produce the desired substance
> can be given to hosts that essentially did not produce the
> desired substance naturally.  In the latter case as well,
> there are often expression-controlling regions attached to
> the structural genes, and by introducing the powerful
> expression-controlling sequences of the methods of this
> invention, effects like those mentioned above can be
> obtained.

(Exh. 2016, pp. 4-5, bridging para.; emphasis added).

Interference 105,114

Japan's "expression regulatory sequences" (Exh. 3010, p. 7,
last complete sentence) or "expression-controlling sequences"
(Exh. 2016, p. 5, first full para., first sentence thereof) may
be promoters, terminators, SD sequences or operators.  The means
for inserting the expression regulatory or expression-controlling
sequences is described as follows:

> Generally, the expression regulatory domain to be
> inserted is introduced either by a plasmid capable of
> being amplified in a host microorganism or in the form
> of a cyclic or linear DNA incapable of being amplified
> in the host microorganism.

(Exh. 3010, p. 8, first full para.);

> The expression-controlling region to be inserted is
> normally inserted using plasmids that can be amplified in
> the host microbe or as a cyclic or linear DNA that cannot
> be amplified in the host microbe.

(Exh. 2016, p. 5, second full para.).

Most importantly, Japan teaches that the expression
regulating or expression-controlling sequences are inserted by
homologous recombination:

> As a means for integrating an expression regulating
> sequence such as a promoter with the chromosome of a host
> microorganism, the so-called homologous crossing-over is
> adopted.  For this purpose, the regulatory sequence to
> be inserted is preferred to be furnished at one terminal
> or both terminals thereof with a DNA sequence which is
> homologous with the DNA sequence of a gene already existing
> in the relevant chromosome and concerned in the formation
> of the target product.

(Exh. 3010, p. 8, second full para.; emphasis added);

-78-

Interference 105,114

So-called homologous exchange is commonly used as the method for integrating expression-controlling sequences such as promoters into host microbe chromosomes.  For this reason, it is preferable that controlling sequences to be inserted have, at one or both ends, DNA sequences that are homologous to the DNA sequences of the genes related to production of the desired products already present on the chromosomes.

(Exh. 2016, pp. 5-6, bridging para.).

In its examples, Japan targets genes encoding tryptophan and utilizes promoters derived from Bacillus amyloliquefaciens or the SPO2 phage which infects Bacillus subtilis (Exh. 3010, pp. 8-9, bridging para.; Exh. 2016, pp. 8-9, bridging para.), and marker genes imparting resistance to chloramphenicol, ampicillin, and tetracycline (Exhs. 3010 and 2016, Examples 1-3).  Japan also employs radioactive markers (Exhs. 3010 and 2016, Example 6).

### Findings based on Japan's teachings

Having concluded that a "cell line" of Claims 1, 2, 3, 17, 18, 19, 26, and 27 of ARS's patent reads on microorganisms, we find that Japan describes an invention of Claims 1, 2, 5, 17, 18, 19, 20, 22, 26, 28, 52, 53, 54, and 56 of ARS's '071 patent, and/or conclude that an invention of Claims 1, 2, 5-7, 13-20, 22, 23, 26, 28-30, 36-39, 52-54, 56 and 57 of ARS's '071 patent reasonably would have been obvious to persons having ordinary skill in the art in light of Japan's teachings.

Furthermore, we find that Japan describes an invention of Claims 110-112 of Genesys's Application 08/102,390 and/or

-79-

Interference 105,114

Genesys's rebuttal and/or showing

Even presuming Japan to be prior art under 35 U.S.C.

§ 102(a) with respect to the subject matter of Claims 105-112 of

Genesys's Application 08/102,390, we nevertheless conclude that

the combined teachings of Japan, Kaufman I, Thomas and Smithies,

optionally further in view of Kaufman II, do not establish a

prima facie case of obvious under 35 U.S.C. § 103 for the

invention of Genesys's Claim 106. We agree with Genesys's view

that "Claim 106 . . . recites specific provisions that are

nowhere found in the prior art" (Paper No. 63, p. 23, para. 1).

While "Claims 105, 107, 108 and 109 are directed to methods

of treatment of mammalian cells, by incorporation, through

homologous recombination, of an amplifiable gene into proximity

of the target gene to be expressed" and "Claims 110-112 are

directed to the cell that results from the homologous

recombination process of Claims 105 and 107-109" (Paper No. 63,

p. 23, para. 1), Genesys does not deny that subject matter

encompassed by Claims 105 and 107-112 of Genesys's Application

08/102,390 would have been obvious in view of the combined prior

art teachings including Japan. Note Genesys's Preliminary

Motion 2 regarding the patentability of claims directed to the

same patentable invention in ARS's '071 patent (Paper No. 63,

-88-

Interference 105,114

meeting on July 24, 1989, and the handwritten and hand drawn
portion on page 8 of Exhibit A to Rowland's declaration showing
the minutes of a meeting on July 25, 1989, is unclear.  There
appears to be no connection between page 6 of the minutes of Cell
Genesys, Inc.'s SAB Meeting on July 24 and the handwriting and
hand drawings on page 8 of the minutes of the meeting dated
July 25 (Exhibit A, p. 1 (July 24); p. 7 (July 25)).

On the other hand, Genesys urged that the handwritten and
hand drawn portions of the minutes of the July 25 meeting
presented on page 8 of Exhibit A inherently portray a method of
enhancing production of a target protein such as t-PA in mammals
by inserting an amplification sequence or a DNA expression
enhancer such as DHFR into the genome of a mammal cell line in
the vicinity of the gene encoding the target protein by
homologous recombination (TP (Paper No. 171), p. 48, l. 15,
to p. 49, l. 12).  In our view, the evidence does not establish
that insertion of foreign DNA by homologous recombination is
inherently described in the minutes of the July 25 meeting.  We
find that persons skilled in the art could interpret the
handwritten and hand drawn portions of page 8 of Exhibit A as a
method for inserting foreign DNA into the genome of the cell line
by techniques other than homologous recombination, e.g., by
random recombination or by point specific insertion techniques.

-100-

Interference 105,114

If knowledge of sequences upstream or downstream of the target
DNA segment in the genome of the cell line or upstream or
downstream of any other exogenous or endogenous DNA sequence
described in the handwritten and hand drawn portions of page 8 of
Exhibit A is, or may be, needed to insert a foreign DNA
amplification or expression enhancer sequence into the genome of
CHO cell line in operable vicinity of the target gene by
techniques other than homologous recombination, then the
handwritten and hand drawn portions of page 8 of Exhibit A to
Rowland's declaration would not necessarily, and accordingly,
does not inherently describe a method for inserting foreign DNA
into the genome of a cell line in operable vicinity of a target
gene by homologous recombination.  See Langer v. Kaufman,
465 F.2d 915, 918, 175 USPQ 172, 174 (CCPA 1972):

> To prove inherency, the burden is . . . to show that
> the "necessary and only reasonable construction to be
> given the disclosure by one skilled in the art is one
> which will lend clear support to . . . [this] positive
> limitation in the interference count." . . . (quoting
> Binstead v. Littmann, 242 F.2d 766, 770, 113 USPQ 279,
> 282 (CCPA 1957).

See also Kennecott Corp. v. Kyocera Intl., Inc., 835 F.2d 1419,
1423, 5 USPQ2d 1194, 1198 (Fed. Cir. 1987).

Of record in this interference, we find Kaufman, R., et al.
(Kaufman I), "Coamplification and Coexpression of Human Tissue-
Type Plasminogen Activator and Murine Dihydrofolate Reductase

-101-

Interference 105,114

A limited analysis of the t-PA synthesized by CHO cells shows that it has approximately the same activity as native t-PA and is glycosylated in a similar but not identical manner. . . . .

Comparing the cotransfection method described in Kaufman I to the method described by the handwritten and hand drawn information on page 8 of Exhibit A to Rowland's declaration (Exh. 2054; Exhibit A (Exh. 2040), p. 8), we find that the methods described in Rowland's Exhibit A do not exclude methods described by Kaufman I. Kaufman I appears to describe the method depicted on page 8 of Exhibit A to Rowland's declaration (Exh. 2054; Exhibit A (Exh. 2040), p. 8), including the "need to know upstream or downstream sequences" (Exh. 2054, Exhibit A, p. 8 (also Exh. 2040)); e.g., the t-PA cDNA sequence including the t-PA enhancer must be closely linked to the mutant DHFR sequence. Kaufman I shows that the method depicted on page 8 of Exhibit A to Rowland's declaration is not necessarily a method whereby foreign DNA was inserted into the genome of CHO cells by homologous recombination. We find, therefore, that the evidence to which Rowland points in support of his declaration, as a whole, does not establish that insertion by homologous recombination is the necessary and only reasonable construction one skilled in the art would have given to the method depicted on page 8 of Exhibit A of Rowland's declaration.

-103-

Interference 105,114

Genesys would have us consider Rowland's declaration
(Exh. 2054), testimony (Exh. 2055) and Video Tape 1 thereof in
conjunction with the original draft of its patent application
(Exhibit B to Rowland's declaration (Exh. 2054)) and debit notes
(Exhs. C, D and E) relating to the drafting and November 6,
1989, filing of Genesys's parent U.S. Application 07/432,069
(Exh. 2028).  We proceed to do so.  In paragraphs 3, 4-3, 4-4
and 5 of his declaration, Rowland declared (Exh. 2054, pp. 3-4,
para. 3-5):

>    3.  . . . I worked on the CGI matter number 3 during the
> month of August, and prepared an initial draft application
> for review by the inventor, and completion by CGI.
> Attached hereto as Exhibit B is a copy of a draft
> application so prepared.  This application was forwarded
> to CGI for additional information and review.
>
>    4.  . . . Exhibit C is a copy of a debit note issued to
> CGI for the [monthly] period ending September 25, 1989.
> On page 3 the debit note reflects three entries in
> connection with the matter designated Cell-3, the
> application directed to the production of proteins
> using homologous recombination.  The entries reflect
> that I drafted the application and claims in August,
> 1989, and that the application was reviewed and revised
> approximately a week later.
>
>    4.  . . . Exhibit D is a copy of a debit note issued to
> CGI for the [monthly] period ending October 25, 1989.
> On page 2 there is an item for "review and revise
> application" with the matter designated Cell-3, the
> application directed to the production of proteins using
> homologous recombination.  The application had been drafted
> in August, 1989, following the July meeting, and the line
> item included reflects revision of that application.

-104-

Interference 105,114

> 5.  Exhibit E is a copy of a debit note . . . for the
> period ending November 25, 1989.  This debit note reflects
> three entries in connection with the matter designated
> Cell-3, the application directed to the production of
> proteins using homologous recombination.  The entries
> reflect that I reviewed and revised the application,
> I spoke with inventor Skoultchi by telephone, and filed
> the application on November 6, 1989.  That application
> was given Serial Number 07/432,069. . . . The exhibits
> hereto reflect a progression of about three months
> from identification of invention to filing of a patent
> application directed thereto, which is consistent with my
> memory of my general working practices at the time period.
> I worked on the application with due diligence and
> attention, to the best of my recollection.

Exhibit B to Rowland's declaration (Exh. 2054) consists

of two documents.  The first document is a hand-edited

and annotated, printed draft of an incomplete, non-final

specification for a patent application entitled "Production Of

Proteins Using Homologous Recombination" (Exhibit B, p. 1,

top-center) and claims identified as follows (Exhibit B, p. 1,

top-right):

                    27949/CELL-3
                08/29/89:APP:slb[.]

The printed date "08/29/89" which is original to the document

does not establish that the printed subject matter thereof was

invented prior to the August 29, 1989, publication date of

Japanese Patent Publication 1-215280 (Exh. 3009; Exh. 3010; and

Exh. 2016).  Moreover, Rowland declared "that the [annotated and

edited copy of the] application was reviewed and revised

approximately a week later" (Exh. 2054, p. 3, para. 4).  The

-105-

Interference 105,114

second document is labeled "<u>Experimental</u>" and introduced by the

following handwritten identification (Exhibit B, last three

pages):

    Protein Patent    10/30/89       <u>Nora   2309</u>[.]

    Exhibit C to Rowland's declaration (Exh. 2054) is a copy of

INVOICE # 95853 from Leydig, Voit & Mayer, LTD. to Cell Genesys

dated September 25, 1989, "For Professional Services Rendered

Through September 25, 1989 In Connection With The Following

Matters —":

        MATTER NUMBER - 27949
           CELL-3
           U.S. Patent Application
           Production of Proteins Using Homologous Recombination
           Skoultchi

    8/25/89    BIR        Drafting application.
    8/29/89    BIR        Draft application and claims.
    9/06/89    BIR        Review and revise.

    PROFESSIONAL SERVICES        1,485.00

    MATTER TOTAL           1,485.00[.]

    Exhibit D to Rowland's declaration (Exh. 2054) is a copy of

INVOICE # 717 from Leydig, Voit & Mayer, LTD. to Cell Genesys

dated October 25, 1989, "For Professional Services Rendered

Through October 25, 1989 In Connection With The Following

Matters —":

Interference 105,114

    MATTER NUMBER - 27949
        CELL-3
        U.S. Patent Application
        Production of Proteins Using Homologous Recombination
        Skoultchi et al

   9/05/89   ES       Review and revise application.

     PROFESSIONAL SERVICES          150.00

     MATTER TOTAL               150.00[.]

    Exhibit E to Rowland's declaration (Exh. 2054) is a copy of

INVOICE # 5484 from Leydig, Voit & Mayer, LTD. to Cell Genesys

dated November 25, 1989, "For Professional Services Rendered

Through November 25, 1989 In Connection With The Following

Matters -":

    MATTER NUMBER - 27949
        CELL-3
        U.S. Patent Application
        Production of Proteins Using Homologous Recombination
        Skoultchi et al

   11/01/89  BIR      Review and revise.
   11/03/89  BIR      Telecon Skoultchi.
   11/06/89  BIR      Filing application.

     PROFESSIONAL SERVICES          385.00

     COSTS ADVANCED

     Postage               11.05
     Photocopies           25.00
     Patent and Trademark Office Fees  502.00

     TOTAL COSTS ADVANCED        538.05

     MATTER TOTAL              923.05[.]

Interference 105,114

Having considered the Declaration of Bertram Irwin Rowland
(Exh. 2054) and attached Exhibits A-E, we find that the evidence
as a whole does not establish that Genesys either reduced to
practice the invention of Claims 105-112 (to the extent they
require insertion of heterologous DNA into the genome of a
mammalian cell through homologous recombination) of Genesys's
Application 08/102,390 prior to the August 29, 1989, publication
date of Japan, or conceived of the invention of Claims 105-112
(to the extent they require insertion of heterologous DNA into
the genome of a mammalian cell through homologous recombination)
of Genesys's Application 08/102,390 prior to the August 29, 1989,
publication date of Japan, coupled with due diligence from a time
prior to said date to a subsequent reduction to practice or to
the November 6, 1989, filing date of Genesys's Application
08/102,390. See In re Gosteli, 872 F.2d 1008, 1012, 10 USPQ2d
1614, 1617 (Fed. Cir. 1989)(emphasis omitted):

> Rule 131 requirements are quite specific. To antedate
> a prior art reference, the applicant submits an oath or
> declaration alleging acts that establish a completion
> of the invention . . . before the effective date of the
> prior art. 37 C.F.R. § 1.131(a).

We need not consider whether the same evidence (Exh. 2054)
is sufficient to antedate Japan's August 29, 1989, publication
date for the invention of Claims 105 and 110 to 112 (to the
extent they do not require insertion of heterologous DNA into the

-108-

Interference 105,114

are unpatentable under 35 U.S.C. § 103 in view of the same prior
art teachings.

Having considered ARS's case in support of its motion under
37 CFR § 1.633(a) for unpatentability of Genesys's claims over
cited prior art, we are confident that ARS has not met its burden
to show that remaining Claim 106 of Genesys's Application
08/102,390 is unpatentable under 35 U.S.C. § 102/103. Having
considered Genesys's case in support of its motion under 37 CFR
§ 1.633(a) for unpatentability of ARS's patent claims over cited
prior art, we are not satisfied that Genesys has shown that
Claims 3, 4, 8, 21, 24, 27, 31, 40-51, 55 and 58 of ARS's '071
patent are unpatentable under 35 U.S.C. § 102/103.

    C.   <u>Interference-in-fact</u>

Having concluded that Claims 1, 2, 5-7, 9-20, 22, 23, 25,
26, 28-30, 32-39, 52-54, 56 and 57 of ARS's '071 patent and
Claims 105 and 107-112 of Genesys's Application 08/102,390 are
unpatentable over prior art, we need to further consider whether
there is an interference-in-fact between the subject matter
defined by patentable Claims 3, 4, 8, 21, 24, 27, 31, 40-51, 55
and 58 of ARS's '071 patent and patentable Claim 106 of Genesys's
Application 08/102,390, the only patentable claims remaining
before us. "An <u>interference-in-fact</u> exists when at least one
claim that is designated to correspond to a count and at least

-126-

Interference 105,114

one claim of an opponent that is designated to correspond to the

count define the same patentable invention."   37 CFR § 1.601(j).

"Same patentable invention" and "separate patentable invention"

are defined in 37 CFR § 1.601(n) as follows:

> (n)   Invention "A" is the <u>same patentable invention</u> as an
> invention "B" when invention "A" is the same as (35 U.S.C.
> 102) or is obvious (35 U.S.C. 103) in view of the invention
> "B" assuming invention "B" is prior art with respect to
> invention "A".   Invention "A" is a <u>separate patentable</u>
> <u>invention</u> with respect to invention "B" when invention "A"
> is new (35 U.S.C. 102) and non-obvious (35 U.S.C. 103) in
> view of the invention "B" assuming invention "B" is prior
> art with respect to invention "A".

Claim 106 of Genesys's Application 08/102,390 reads:

> 106.   A human 293 embryonal kidney cell, wherein the
> genome of the cell has inserted therein an enhancer and
> promoter of cytomegalovirus operatively associated with
> human erythropoietin gene, so that the cell expresses
> human erythropoietin.

The products or methods of making the products defined by each of

Claims 3, 4, 8, 21, 24, 27, 31, 40-51, 55 and 58 of ARS's '071

patent comprise, or insert within the genome of a cell line, a

DNA construct comprising an expressible, amplifiable gene capable

of amplifying a target gene when inserted in close proximity

thereto.   It is sufficient to note that the genome of the human

293 embryonal kidney cell of Claim 106 of Genesys's Application

08/102,390 need not have inserted therein any expressible,

amplifiable gene capable of amplifying the silent human

erythropoietin gene in a human 293 embryonal kidney cell when

-127-

Interference 105,114

inserted in sufficiently close proximity thereto. Rather the
genome of the human 293 embryonal kidney cell of Claim 106 of
Genesys's Application 08/102,390 has inserted therein an enhancer
and promoter of cytomegalovirus operatively associated with the
silent human erythropoietin gene in the human 293 embryonal
kidney cell. Not only is the specific DNA construct inserted
into the genome of a human 293 cell of Genesys's Claim 106
patentably distinct in structure and function from any specific
DNA construct described in ARS's patentable claims, but the DNA
inserts in ARS's disclosure do not suggest enhancers and
promoters of cytomegalovirus. Alternatively, the enhancers and
promoters of cytomegalovirus comprising the human 293 cell genome
insert of Genesys's Claim 106 do not collectively or severably
constitute an amplifiable gene capable of amplifying a gene
silent in the genome of any other mammalian cell. Nor does the
evidence of record establish that the invention of any one of
ARS's remaining patentable claims would have been obvious to
persons having ordinary skill in the art in light of the specific
subject matter defined by the only remaining claim which is
patentable to Genesys.

   ARS has not shown that the specific subject matter of
Claim 106 of Genesys's Application 08/102,390 would have been
obvious to a person having ordinary skill in the art further in

-128-

Interference 105,114

light of any other prior art of record, and we find no basis for
such a conclusion of record.  On the other hand, Genesys has
argued that Claims 3 and 27 of ARS's '071 patent are unpatentable
in view of prior art teachings including Kaufman I and Japan
(Paper No. 63, pp. 12-1, para. 41, 44 and 47).  However,
Kaufman I does not appear to teach that expressible, amplifiable
genes inserted into the genome of a cell line by homologous
recombination reasonably would be expected to amplify endogenous
target genes.  For a suggestion to do so with reasonable
expectation of success, Genesys points to Japan's disclosure.
However, Japan does not reasonably suggest that expressible,
amplifiable genes inserted into the genome of a cell line by
homologous recombination would be capable of amplifying an
endogenous target gene in a cell line.  In short, Japan does not
provide persons skilled in the art with a reasonable expectation
of success.  To the extent Genesys relies on Japan's teaching to
establish that Claims 3 and 27 ARS's '071 patent would have been
obvious in view of combined prior art teachings, Genesys merely
concludes:

> 41.  The inclusion of an amplifiable gene to increase
> expression, as called for in claims 3, 8, 31 and 43 was
> known in the prior art (Exhibit 2014, Kaufman et al.,
> p. 1753, col. 2, last ¶, ll. 5-7 and table 2; JP-A-1215280,
> p. 5, 3rd ¶, ll. 1-3).  Exhibit 2029, Nickoloff, ¶ 39.

Interference 105,114

The pinpointed disclosure in Kaufman I does not support Genesys's

conclusion (Exh. 2014, p. 1753-54, bridging para.; emphasis

added):

> To understand why t-PA activity did not increase
> with MTX resistance, clone 4C1 was subcloned in
> nucleoside-free medium before MTX selection to generate
> five subclones, and these subclones were selected for MTX
> resistance.  Only subclones H3B and B10A expressed higher
> levels of t-PA when selected for MTX resistance (Table 2).
> <u>The variation in responses of the different subclones to
> coamplification could have resulted from the integration
> of multiple DHFR genes at different sites, only some of
> which were linked to the t-PA gene, and upon MTX selection
> some subclones amplified DHFR sequences not linked to
> t-PA sequences.  Alternatively, the variation could
> have resulted from rearrangements around the site of
> amplification which separated the t-PA gene from the
> DHFR gene.</u>  To examine these possibilities in more detail,
> Southern blot analysis of the original and MTX resistant
> transformants derived from clone 4C1 was performed.  The
> results showed that most subclones amplified a similar, if
> not identical, restriction fragment (35-kb band; Fig. 2A,
> arrow).  However, subclone B10A amplified all restriction
> fragments containing t-PA sequences.  Since B10A had
> amplified both the 35-kb band and the other restriction
> fragments, they were probably closely linked.  In other
> subclones the copy number of the 35-kb fragment did not
> correlate with the copy number of the various t-PA
> restriction fragments (for example, compare subclones
> D8Bα and H8Bα), but the 35-kb was preferentially
> amplified in all subclones.  <u>These results indicate
> that the coamplification variability between subclones
> probably results from DNA rearrangements which dissociate
> the DHFR gene from the t-PA gene during the MTX selection.
> One subclone (H12B) exhibited no DNA amplification upon
> MTX selection, implying that in this subclone MTX
> resistance probably resulted from a mechanism other than
> gene amplification</u>.

Nor does Japan teach that any of its "expression-controlling"

sequences can be an "expressible, amplifiable gene" which can

-130-

Interference 105,114

amplify expression of a target gene when inserted into the genome

of a cell line by homologous recombination at a location

proximate thereto.  Japan merely teaches (Exh. 2016, p. 5, third

para., l. 1-3):

> The expression-controlling region to be inserted is
> normally inserted using plasmids that can be amplified
> in the host microbe or as cyclic or linear DNA that
> cannot be amplified in the host microbe.

With regard to Claim 27 of ARS's '071 patent, Genesys cites

Japan's Examples 1-3; Kaufman I, p. 1751, cols. 1-2, bridging

para.; and the Declaration of Nickoloff (Exh. 2029, para. 42).

Given the content of the discussion in each of Japan and

Kaufman I relating to amplification, we fail to see how the

materials and methods of Kaufman I and Japan's examples broaden

their general teachings.  Genesys's burden to explain its case

has not been satisfied, and we will not endeavor to make its case

for it.

Genesys further concludes (Paper No. 63, p. 14, para. 47):

> 47.  Furthermore, one of ordinary skill in the art
> would consider the use of an amplifiable gene as part of
> the method to increase gene expression, as recited in
> Claims 3, 8, 31, 41-43, 48-50 of the '071 patent, as an
> obvious variation of what is taught in Japan-A-1215280,
> especially given the teachings in Kaufman et al.
> (Exhibit 2014).  Exhibit 2029, Nickoloff, ¶ 45.

Initially, we thought that the Declaration of Jac A. Nickoloff,

Ph.D. (Exh. 2029, para. 39, 42 and 45) might shed greater light

-131-

Interference 105,114

on the matter. Upon full consideration of the declaration, we
found little more than a restatement of Genesys's conclusion.

There being no persuasive evidence or argument to the
contrary, we conclude that there is no interference-in-fact
between the subject matter claimed in ARS's '071 patent which
stands patentable to ARS over prior art teachings of record and
the subject matter claimed in Genesys's Application 08/102,390
which stands patentable to Genesys over prior art teachings of
record. More particularly, there is no interference-in-fact
between the subject matter Genesys has not shown to be
unpatentable to ARS, subject matter defined by Claims 3, 4, 8,
21, 24, 27, 31, 40-51, 55 and 58 of ARS's '071 patent, and the
subject matter ARS has not shown to be unpatentable to Genesys,
subject matter defined by Claim 106 of Genesys's Application
08/102,390.

While Claims 107-109 of Genesys's Application 08/102,390 are
directed to the "same patentable invention" as Claims 3, 27 and
46 of ARS's '071 patent, Genesys has maintained throughout these
proceedings that the subject matter defined by Claims 3, 27 and
46 of ARS's '071 patent is unpatentable to ARS under 35 U.S.C.
§ 103 in view of prior art teaching including Japan (Paper
No. 63, pp. 12-14) and has suggested that the subject matter of
Claims 107-109 of Genesys's Application 08/102,390 would have

-132-

Interference 105,114

been unpatentable to Genesys under 35 U.S.C. § 103 in view of

prior art teaching including Japan had Genesys not successfully

established under 37 CFR § 1.131(a) that it invented the subject

matter of Claims 107-109 of Genesys's Application 08/102,390

prior to the August 29, 1989, effective date of Japan (Paper

No. 63, p. 24, first full paragraph).

We conclude that Genesys has not established the subject

matter of ARS's Claims 3, 27 and 46 is unpatentable under

35 U.S.C. § 103 over cited prior art including Japan.  However,

because Genesys argued that Japan's teaching cannot be applied to

its claims because it invented the same patentable invention

prior to the effective filing date of Japan, and Genesys failed

to establish prior inventorship thereof under 37 CFR § 1.131(a),

the subject matter defined by Claims 3, 27 and 46 of ARS's '071

patent is not patentable to Genesys.  Therefore, on the record

before us, this interference should be dissolved.

D.   <u>Preliminary Motions</u>

(1)  Genesys's Preliminary Motion 1 (Paper No. 62)

under 37 CFR § 1.633(f) to be accorded the benefit of the

November 6, 1989, filing date of parent U.S. Application

07/432,069 (Exh. 2028) is dismissed as moot.  <u>Dismissed</u>.

(2)  ARS's Preliminary Motion 7 (Paper No. 50) under

37 CFR § 1.633(f) to be accorded the benefit of the filing dates

-133-

Interference 105,114

them as corresponding to the interference count is denied.
Genesys has not shown that the subject matter thereof is
patentable to Genesys as required by 37 CFR § 1.637(c)(ii).
Denied.

    (12) ARS's Preliminary Motion 1 (Paper No. 45) under
37 CFR § 1.633(a) for judgment that Genesys's Claims 105-112 are
unpatentable under 35 U.S.C. § 112, first paragraph, for
noncompliance with its written description requirement; ARS's
Preliminary Motion 2 (Paper No. 46) under 37 CFR § 1.633(a) for
judgment that Genesys's Claims 105-112 are unpatentable under
35 U.S.C. § 112, first paragraph, for noncompliance with its
enablement requirement; and Genesys's Preliminary Motion 3 (Paper
No. 64) for judgment that Claims 1-58 of ARS's '071 patent are
unpatentable under 35 U.S.C. § 112, first paragraph, for
noncompliance with its enablement requirement; are dismissed
with regard to Claims 105 and 107-112 of Genesys's Application
08/102,390 and Claims 1, 2, 5-7, 9-20, 22, 23, 25, 26, 32-39,
52-54, 56 and 57 of ARS's '071 patent, which have been determined
to be unpatentable over alternative and/or collective prior art
teachings; and denied for Claim 106 of Genesys's Application
08/102,390 and Claims 3, 4, 8, 21, 24, 27, 31, 40-51, 55 and 58
of ARS's '071 patent.  Our reasons are as follows.