# **EXHIBIT 6**

Paper No. _____

Filed on behalf of: Junior Party CELL GENESYS, INC.
Filed on behalf of Cell Genesys, Inc.
By: Steven B. Kelber, Esquire
Piper Rudnick LLP
1200 Nineteenth Street, N.W.
Washington, D.C. 20036-2430
Tel: (202) 861-3900 (Receptionist)
   (202) 223-2085 (Facsimile)
E-mail: steven.kelber@piperrudnick.com

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Administrative Patent Judge Michael P. Tierney)

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

Junior Party
(Patent 5,272,071)

vs.

CELL GENESYS, INC.

Junior Party
(Application 08/102,390)

Patent Interference No.105,114

**SECOND DECLARATION OF JAC A. NICKOLOFF, PH.D.**

INTERFERENCE 105,114
ARS V. CELL GENESYS
EXHIBIT 2030

I, Jac A. Nickoloff, Ph.D. do hereby declare as follows:

1. I received my B.A. with Highest Honors in Biochemistry from the University of California, Santa Barbara in1978 and my Ph.D. in Biochemistry from the University of Colorado, Boulder in 1984. In addition, I completed two Postdoctoral fellowships prior to joining the faculty at the Harvard School of Public Health in the Department of Cancer Biology. I am currently Professor and Chair of the Department of Molecular Genetics and Microbiology at the University of New Mexico School of Medicine. Since 1982, I have conducted and supervised research in the field of homologous recombination and gene expression in eukaryotes, including studies in yeast and mammalian systems. I have published and lectured extensively on these and related subjects and serve as a reviewer for numerous scientific journals, including P.N.A.S., Cell, Gene, Molecular Pharmacology and Molecular and Cellular Biology. My expertise in the field of homologous recombination is further detailed in my curriculum vitae, which is submitted as Exhibit 2002.

2. I understand that an administrative proceeding in the United States Patent Office called an interference is being conducted between two parties, ARS (Applied Research Systems) and Cell Genesys Inc. I make this declaration in support of Cell Genesys.

3. I have reviewed ARS's U.S. Patent No. 5,272,071 (hereinafter "the '071 patent") (Exhibit 2001), which issued on December 21, 1993. I understand that the '071 patent claims are directed, generally, to a method of modifying the expression characteristics of a predetermined gene within the genome of a cell line (i.e., a native gene) by inserting a DNA regulatory element that is capable of altering the expression of the target gene product in that cell. Additionally, the regulatory element being inserted has to be operatively linked to the gene in question and the

-1-

insertion of the regulatory element is accomplished by means of homologous recombination. The '071 patent also claims cell lines having gene expression patterns modified by the above-described method (claims 17-24 and 52) and methods of obtaining a gene product obtained from such methods (claims 53-58).

4. As reflected in my curriculum vitae (Exhibit 2002), I have substantial personal experience related to homologous recombination and gene expression, both in research and literature review. My observations set forth below are within and supported by my personal knowledge and experience and may additionally be supported by reference to specific publications. In formulating my opinions, I have considered the literature broadly related to homologous recombination and gene expression in eukaryotic cells from 1980 to present. Furthermore, I have conducted my own review of the literature of the late 1980s and have re-read many of the references with which I was familiar at that time. In particular, I have also reviewed the following publications:

Exhibit 2018 - Gregg et al., *Cold Spring Harbor Symp. Quant. Biol.* 51:(2) 1093-1099 (1986)

Exhibit 2019 - Mirell et al., *Mol. Cell Endocrinol.*, 47(1-2):145-51, (1986)

Exhibit 2020 - Palmiter et al., *Ann. Rev. Genet.* 20, pages 465-499 (1986)

Exhibit 2021 - Alberts et al., *Molecular Biology of the Cell* (2nd edition), page 577, Garland Publishing Inc. (1989)

Exhibit 2009 - Nasmyth, *EMBO J.*, 6(1): 243-248 (1987)

Exhibit 2022 - Tanguay, *Biochem, Cell, Biol.* 66: 584-593 (1988).

5. I have been asked by counsel for Cell Genesys to give my opinion as follows: (i) what

subject matter is encompassed by the elements required by the claims of the '071 patent, in particular, Claims 1-3, 17-19 and 26-27; (ii) what is taught in the disclosure of the '071 patent as read by one of ordinary skill in the art; (iii) whether one skilled could practice the subject matter described the Claims 1-3, 17-19 and 26-27.

6. In my opinion, a person of "ordinary skill" in the art would be a person having a Ph.D. in Molecular Biology, Biochemistry, Genetics or related fields and at least two years of experience with DNA recombination and gene expression. An individual with such credentials and experience as of December 1989 would be well versed in methods for isolating, manipulating and characterizing RNA, DNA and proteins, in addition to understanding the relationships of DNA regulatory segments (e.g., promoters, enhancers etc.) and coding regions of genes, whether native or exogenous to the cell in which they are studied.

7. Claim 2 of the '071 patent reads:

A method of modifying, the expression characteristics of predetermined a gene within the genome of a cell line, comprising inserting a DNA construct into said genome by homologous recombination, said DNA construct comprising a DNA regulatory segment capable of modifying the expression characteristics of said gene when operatively linked thereto, as compared to its existing DNA regulatory segment, and a DNA targeting segment homologous to a region of said genome within or proximal to said gene, wherein said construct is inserted such that said regulatory segment is operatively linked to said gene of interest. Exhibit 2001, Claim 2.

8. Claim 3 of the '071 patent reads:

A method of modifying the expression characteristics of a predetermined gene within the genome of a cell line, comprising inserting a DNA construct into said genome by homologous recombination, said DNA construct comprising an expressible, amplifiable gene capable of amplifying said gene when inserted in sufficiently close proximity thereto, and a DNA targeting segment homologous to a region of said genome within or proximal to said gene, wherein said construct is inserted such that said amplifiable gene is in sufficiently close proximity to said gene of interest to cause amplification thereof when said amplifiable gene is amplified. Exhibit 2001, Claim 3

9. To practice Claim 2, one of ordinary skill in the art needs to accomplish the following tasks:

Step 1: identify a target gene;

Step 2: identify a target cell line;

Step 3: identify a DNA regulatory segment capable of activating or modifying the expression characteristics of the target gene when operatively linked to the target gene;

Step 4: insert a DNA construct comprising the DNA regulatory segment and a DNA targeting segment into the genome of the target cell line through homologous recombination so that the DNA regulatory segment is operatively linked to the target gene and activates or modifies the expression characteristics of the target gene. Exhibit 2001, Claim 2

10. The same steps would be necessary for Claim 1, the distinction being that the target gene is a "silent" gene.

11. To practice Claim 3, one of ordinary skill in the art needs to perform the following steps:

Step 1: identify a target gene;

Step 2: identify a target cell line;

Step 3: identify an expressible, amplifiable gene, capable of amplifying the target gene when inserted in sufficiently close proximity thereto;

Step 4: insert a DNA construct comprising the expressible, amplifiable gene and a DNA targeting segment into the genome of the target cell line through homologous recombination so that the inserted expressible, amplifiable gene is in sufficiently close proximity of the target gene to cause amplification of the target gene. Exhibit 2001, Claim 3.

12. Although Claims 1-3 have different limitations, i.e., using either a regulatory DNA element (claim 2) or an amplifiable gene (claim 3) to modify target gene expression, or targeting a "silent" (claim 1) verus active gene (claim 2), they share three common elements. These elements are: identifying a target gene, identifying a cell line, and inserting the DNA construct to the genome of the target cell through homologous recombination.

### (i) The target gene

13. Claims 2-3 place no limits, and therefore, embrace virtually every gene in an eukaryotic or prokaryotic genome. Claim 1 confines the choice to all "silent" genes, however, this qualification does not simplify the number of possible target gene choices in a useful way, but instead adds additional layers of complexity for one of skill attempting to practice the method.

14. The '071 patent provides no direction with respect to the choice of a target gene. Moreover, the '071 patent describes: "[a]ny gene which is normally expressed when present in its specific eukaryotic cell line..., can be forced to expression in a cell line not specific for it wherein the gene is in a silent format ," thus suggesting that any silent gene may be activated. Exhibit 2001, col 9, lines 5-10.

15. This statement of the '071 patent is erroneous for the reasons set forth. It was well appreciated in the late 1980s that higher eukaryotic genes fell broadly into three categories. Genes in the first category are constitutively "on" in all or most cell types (effectively "housekeeping genes"). Genes in the second category are normally "off" in some cell types, but are inducible to be switched on by chemical or physical means in those cell types ("inducible genes"). In the third category, genes are permanently switched off in certain cell types (but not in others), and are not inducible in those cell types. For sake of completeness, I should also mention genes which are truly silent because they cannot be expressed at any detectable level. This would include defective genes and pseudogenes.

16. The mechanism of regulation of the latter two categories is known to be quite

-6-

different. Inducible genes are regulated by the interaction of *cis*-acting regulatory elements in their DNA sequence with trans-acting transcription factors, for example, hormone receptors. In contrast, genes falling within the third category exist in a repressed chromatin confirmation due to heterochromatin structure. In interphase vertebrate cells, the majority of the genome is in the more condensed region of the chromatin which is not transcriptionally active. For example, Gregg et al described that gene activation is not possible at silent loci. (Gregg et al., *Cold Spring Harbor Symp. Quant. Biol.* 51:(2) 1093-1099 (1986), at p. 1095, right col, lines 1-6) (Exhibit 2018).

17. Invariably position effects prevented the transfected gene from being adequately expressed (see for example, Palmiter et al., Ann. Rev. Genet. 20, p. 465-499 (1986), (Exhibit 2020), particularly, p. 479 last ¶ to p. 480; p. 482 2nd ¶). This is because local repressive chromatin environment overrides positive expression features within the inserted transgene. This was very well appreciated by December 1989, and, in fact had become the standard information presented in common undergraduate text books. For example, the book Molecular Biology of the Cell (2nd edition), Alberts et al., Garland Publishing Inc. (1989), p. 577 (Exhibit 2021), describes the effect of heterochromatin on transcription. In particular, the final paragraph of section 27 on that page states that during specialization of cells the amount of DNA in the heterochromatic state increases, and that genes within sections of heterochromatic DNA are not transcribed because the condensed structure of the DNA is not accessible to gene activating proteins. In fact, the majority of the genome in an interphase vertebrate cell is in the more condensed state of the chromatin which is not transcriptionally active and cannot be activated simply by targeting a promoter to a gene in such a region by homologous recombination.

18. However, for those genes falling within the second category noted above (inducible genes), it would have been predictable that expression of some genes could be activated by replacement of *cis-acting* regulatory elements e.g. the inducible promoter, with, for example, a strong or constitutive promoter. The work of Nasmyth in yeast [EMBO J.6(1), 243-248 (1987) Exhibit 2009] demonstrated that repression could be overcome in this category of genes, and I see no reason why the same would not have been predicted as being possible in higher eukaryotes. Control of gene expression for this class of genes was known to be very similar between yeast and higher eukaryotes. One good example of this is the Heat Shock Protein genes whose regulation was known to be highly conserved. [see Exhibit 2022, Tanguay R. M., *Biochem, Cell, Biol.* 66:584-593 (1988), e.g. the first full paragraph on page 5865 where it describes the activity of Drosophila heat sensitive elements in yeast].

19. In short, gene activation by homologous recombination was a highly unpredictable technology before December 1989, in the absence of the knowledge of the gene of interest. Activation of a silent gene using homologous recombination has not been proven to work in every gene transfer case.

20. With respect to the description of the '071 patent, considering the existence of tens of thousands of potential target genes, without any guidance, it is my opinion that one skilled in the art would not be able to activate or to modify "any gene" in its specific eukaryotic cell line using homologous recombination without considerable amount of experimentation.

-8-

### (ii) The target cell line

21. Claims 2-3 of the '071 patent place no limits, and therefore, embrace any cell line.

22. Considering the existence of thousands potential target cell lines, the '071 patent provides no guidance with respect to the choice of a cell line.

23. It is well-known to one skilled in the art that gene expression in cultured cells may vary under different culture conditions and over different cell passage numbers. Information such as the cell culturing conditions and what constitute expression characteristics of the target gene (expression levels, inducibility, suppressibility etc.), is absent from the disclosure of the '071 patent. Without restraints on the culture conditions and expression characteristics, it is impossible for one skilled in the art to choose a cell line in which the expression characteristics of the target gene may be "modified."

24. In my opinion, based on the information disclosed in the '071 patent, one skilled in the art would be unable to activate "any gene" in any "genome of cell line".

### (iii) The homologous recombination process

25. The key to the success is the choice of the DNA targeting segment. Claims 1-3 place no limits on the DNA targeting segment except that it is "homologous to a region of said genome within or proximal to said gene." Exhibit 2001, claims 1-3. Information such as the level of homology and relative position between the target segment and the target gene is absent from the disclosure of the '071 patent. Moreover, in the absence of the knowledge of the gene of interest such as the specific open reading frame and sequences up and downstream of the open reading frame, targeting by homologous recombination is not possible.

-9-

26. The specification of the '071 patent provides the following contradictory statements: On the one hand, the specification describes that "the size of the targeting regions, i.e., the regions of homology, is not critical...." ( Exhibit 2001, col 10, lines 18-19). On the other hand, the specification also describes that short target region is less efficient for homologous recombination and that the optimal results are achieved with large target regions. With regard to the lower limit of the homologous region, the specification provides "it has been suggested that the minimum requirement for sequence homology is 25 base pairs." Exhibit 2001, col 10, lines 25-26. With regard to the upper limit of the homologous region, the specification describes that: "as long as the regulatable segment F can be operatively linked to the gene of interest there is no limit to the size of the targeting region...." Exhibit 2001, col 10, lines 36-39.

27. This description would easily confuse one of ordinary skill in the field of homologous recombination with regard to the choice of the DNA targeting segment. For a each target segment, one skilled in the art is faced with an infinite number of choices (from a minimum of 25 base pairs to an infinite length). Here, the only qualifier "[A]s long as the regulatable segment F can be operatively linked to the gene of interest" is of little use because it describes something one can only find out after the experiment, not prior to the experiment. Moreover, the specification provides no guidance, whatsoever, with regard to the relative position between the target segment and the target gene. Positional information is absolutely critical, and would include knowing where to insert the regulatory segment, yet the '071 patent fails to teach how to achieve such placement and one of skill could not supplement this deficiency by looking to the prior art.

28. Similarly, the '071 patent provides no guidance, whatsoever, as to what constitutes

-10-

"sufficiently close proximity" with regard to the distance between the amplifiable gene and the target gene, irrespective of whether the target gene is silent or active in the particular cell line utilized. Accordingly, the use of the amplifiable gene is not taught by the specification of the '071 patent and one of skill in the art could not turn to the prior art to supplement this deficient teaching.

29. Considering the existence of tens of thousands possible target genes in the eukaryotic genome; hundreds to thousands of potential target cell lines; and the choice of hundreds of thousands of possible DNA targeting segments for each target gene in each target cell line, the problem in practicing claims 1-3 becomes insurmountable.

30. In addition, Claims 1 and 2 use a DNA regulatory segment to modify the expression of the target gene. However, these claims place no limits on the DNA regulatory segment except that it is "capable of" stimulating (claim 1) or modifying (claim 2) "the expression characteristics of said gene when operatively linked thereto", Exhibit 2001, claims 1-2.

31. The specification only provides a generic description about the regulatory segment as follows:

> the appropriate DNA regulatory segment is selected depending upon the cell type to be used. The regulatory segment preferably used is one which is known to promote expression of a given gene in differentiated host cell line.... Also usable are promiscuous DNA regulatory segments that work across cell types, such as the rous sarcoma virus (RSV) promoter. As long as the regulatory segment stimulates transcription and/or expression, or can be induced to stimulate transcription and/or expression, of the gene of interest after being inserted into the host cell line so as to be operatively linked to the gene of interest by means of the present invention, it can be used in the present invention[.] Exhibit 2001, col 12, lines 27-48.

32. This description is of little use to one of ordinary skill of art with regard to selecting a regulatory segment for a particular target gene in a particular target cell line. Before carrying out

-11-

the experiment, one skilled in the art is unlikely to know which regulatory segment is "known to promote expression" of the target gene in the target cell line. Based on the guidance of the specification, one skilled in the art would have to select, among thousands of possible choices of promoters, a promiscuous DNA regulatory segments that work across cell types. The qualifier "[A]s long as the regulatory segment stimulates transcription and/or expression, or can be induced to stimulate transcription and/or expression, of the gene of interest after being inserted into the host cell line so as to be operatively linked to the gene of interest by means of the present invention, it can be used in the present invention" (Exhibit 2001) is of no practical use, since it describes something one can only find out after the experiment, not prior to the experiment.

33. I also note that "modifying" gene expression, as called for in claim 2, would embrace either an increase or a decrease in gene expression, however, the '071 patent does not describe how to decrease or halt the expression of a target gene using a regulatory segment.

34. Claim 3 uses an expressible, amplifiable gene to modify the expression of the target gene. Exhibit 2001, claim 3. Again, Claim 3 place no limits on the expressible, amplifiable gene except that it is "capable of amplifying said gene when inserted in sufficiently close proximity thereto." Exhibit 2001, claim 3.

35. Lastly, Claim 1 adds a further limitation of activating "a predetermined normally transcriptionally silent gene" (Exhibit 2001), however, the specification does not provide any guidance as to what constitutes a "normally transcriptionally silent gene" and the transcriptional activity for all genes is not known for a single cell type, let alone all cell types. Furthermore, it is well known that transcription activity can differ with, for example, culture conditions. In the absence of specifying under what conditions a gene is "silent", one of skill in the art cannot practice claim 1, without an extraordinary undertaking to determine if a chosen target gene is truly "silent."

36. Taken together, the minimal disclosure in the specification renders it impossible for one skilled in the art to practice the full breadth of the method of activating silent genes that

would be embraced by Claim 1. Substantially more information about all silent genes in all cell lines would be required, but that information was not available to one of skill in the art in December of 1989.

37. TSHβ is not chromatin suppressed in GH3 cells. Mirell et al. suggested that lack of TSH secretion in GH3 cell is "probably not due to sequence modification of genomic DNA, but to undetermined factor controlling transcription." (Exhibit 2019, Mirell et al., Summary). Accordingly, the working example, even if worked, would not prove that the methods of Claims 1-3 will be effective in modifying the expression characteristics of chromatin suppressed genes.

38. Because claims 1-3 are of enormous breadth, the specification provides an extraordinary limited teaching, and also considering the unpredictability of activating gene expression using homologous recombination technology, it is my opinion that the amount of experimentation required to practice homologous recombination for a particular gene in a particular cell line would be substantial.

39. Claims 17-19 are directed to a cell line created based on the methods of Claims 1-3. As discussed above, simply because one skilled in the art cannot practice the method of Claims 1-3 of the '071 patent, one skilled in the art is not able to make or to use a cell line which is capable of expressing, or has enhanced expression of, a normally transcriptionally silent gene product by using homologous recombination.

40. Claims 26-27 are drawn to a DNA construct for insertion into a predetermined host cell line, the construct comprises a DNA regulatory segment capable of modifying the expression characteristics of genes in the host cell line (claim 26) or an expressible, amplifiable gene capable of amplifying a gene in the host cell line (claim 27). Exhibit 2001, Claims 26 and 27.

41. Considering the choice of hundreds of thousands of possible DNA targeting segments for each target gene in each target cell line and the lack of guidance in the specification,

it is my opinion that one of ordinary skill in the art would not be able to make and to use the vast spectrum of DNA constructs to activate or modify a gene within a host cell line, as is broadly claimed in the '071 patent.

42. I declare that all statements made herein of my own knowledge are true and all statements made on information and belief are believed true. Further, I am aware that willful false statements and the like are punishable by fine, imprisonment or both, 18 U. S. C. § 1001, and may jeopardize the position of Cell Genesys in the above-captioned interference, and any patents that have issued or are to issue on the applications of Cell Genesys involved therein.

Aug 4, 2003
Date

Jac A. Nickoloff, Ph.D.

-14-