# EXHIBIT 7, PART 1

# Transcript of the Testimony of **Nancy Craig**

**Date:** September 29, 2003
**Volume:** 1

**Case:** Applied Research Systems  v. Cell Genesys

Printed On: October 6, 2003

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: Info@acefederal.com
Internet:

INTERFERENCE 105,114
ARS V. CELL GENESYS
EXHIBIT 2058

Page 1

1    UNITED STATES PATENT AND TRADEMARK OFFICE

2

3    ―――――――――

4    BEFORE THE BOARD OF PATENT APPEALS

5    AND INTERFERENCES

6    (Administrative Patent Judge Michael P. Tierney)

7    ―――――――――

8    APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

9    Junior Party

10   (Patent 5,272,071)

11   vs.

12   CELL GENESYS, INC.

13   Junior Party

14   (Application 08/102,390)

15   ―――――――――

16   Patent Interference No. 105,114

17

18   DEPOSITION OF NANCY L. CRAIG

19

20

21   Washington, DC

22   Monday, September 29, 2003

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 2

1     Deposition of NANCY L. CRAIG, called for
2  examination pursuant to notice of deposition, on
3  Monday, September 29, 2003, in Washington, DC, at
4  the offices of Piper Rudnick, 1200 19th Street NW,
5  at 8:59 a.m., before SARA EDGINGTON, a Notary Public
6  within and for the District of Columbia, when were
7  present on behalf of the respective parties:
8
9         ALTON D. ROLLINS, ESQ.
10     Oblon Spivak McClelland Maier & Neustadt
11     1940 Duke Street
12     Alexandria, Virginia 22314
13     703-413-7058
14     On behalf of Applied Research
15
16     ROGER L. BROWDY, ESQ.
17     Browdy and Neimark
18     624 9th Street NW
19     Washington, DC 20001
20     202-628-5197
21     On behalf of Applied Research
22                  --continued--

Page 3

1  APPEARANCES (CONTINUED):
2
3     STEVEN B. KELBER, ESQ.
4     PING WANG, ESQ.
5     Piper Rudnick
6     1200 19th Street NW
7     Washington, DC 20036
8     202-861-6675
9     On behalf of Cell Genesys
10
11  ALSO PRESENT:
12     JENNY CARDEN, Video Operator
13
14
15
16
17
18
19
20
21
22

Page 4

PROCEEDINGS

1     VIDEO OPERATOR:  This is the video
2  deposition of Nancy Craig taken on behalf of the
3  Plaintiff in the matter of Applied Research Systems
4  versus Cell Genesys, Incorporated, for the U.S.
5  Patent and Trademark Office, patent interference
6  number 105,114.
7     This deposition is being held at Piper
8  Rudnick, 1200 19th Street, Northwest, Washington,
9  D.C.  The date is September 29, 2003.  The time is
10  approximately 8:59 a.m.
11     The court reporter today is Sara Edgington
12  with Ace-Federal, and my name is Jenny Carden on
13  behalf of Ellen Grauer.  Will the attorneys please
14  introduce themselves and who they represent.
15     MR. ROLLINS:  Alton Rollins for ARS.
16     MR. BROWDY:  Roger Browdy for ARS.
17     MR. KELBER:  Steven Kelber for Cell
18  Genesys.
19     DR. WANG:  Ping Wang for Cell Genesys.
20     VIDEO OPERATOR:  Please swear the witness.
21  Whereupon,
22

Page 5

NANCY L. CRAIG

1  was called as a witness and, having first been duly
2  sworn, was examined and testified as follows:
3            EXAMINATION
4  BY MR. ROLLINS:
5     Q   Dr. Craig, would you please state your
6  full name and address for the record.
7     A   Nancy Lynn Craig, 850 South Bond Street,
8  Baltimore, Maryland 21131.
9     Q   I'm sure that Mr. Kelber has given you
10  some instructions as to how the depositions go, and
11  basically, it's just a talk between you and I.  And
12  if you have any questions about the questions that I
13  ask, you need clarification, definitions, anything
14  of that sort, ask me.
15     But for the rest of the deposition,
16  Mr. Kelber will not be helping you, and the way that
17  I prefer to conduct a cross-examination is very
18  informally.  If you want to call a break at any time
19  to get a drink, whatever, feel free, and the same
20  with all of you gentlemen and ladies.  I don't think
21  that we will be taking all of your day.  Sometimes I

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 6

1  misjudge, but I hope not. I hope it doesn't take
2  all of my day.
3          How did it come about that you made your
4  declaration?
5      A   Sue Jensen from Piper Rudnick contacted me
6  about participating in this and asked me if I would
7  be interested in doing that, and that's how it
8  began, so -- and followed from there.
9      Q   Have you testified before in legal
10  proceedings?
11      A   No.
12      Q   Do you have any financial interest in Cell
13  Genesys?
14      A   No.
15      Q   Do you have any financial interest in TKT,
16  Transkaryotic Industries --
17      A   No.
18      Q   -- Therapies? Sorry about that. Do you
19  hold stock or stock options in either of those
20  companies?
21      A   No.
22      Q   And are you being paid for your testimony?

Page 7

1      A   Yes.
2      Q   How much are you being paid?
3      A   $350 an hour.
4      Q   And could you give me a general estimate
5  of how much of a total cost you have incurred
6  preparing your declaration up until today?
7      A   Probably something close to $3000.
8      Q   And could you give me an estimation as to
9  whether that's a significant part of your income or
10  a minuscule part of your income?
11      A   It's a small fraction of my income --
12  useful but small.
13      Q   That's fair. Does your compensation
14  depend in any way on the outcome of the proceeding?
15      A   No.
16      Q   And you're being paid by whom?
17      A   By Piper Rudnick.
18      Q   Would you give me a summary of how you
19  went about preparing for your deposition today?
20      A   At the first level, I reviewed -- focused
21  particularly on today, I reviewed the deposition
22  that I had previously crafted and reviewed the

Page 8

1  references, et cetera, and the other -- the exhibits
2  that are mentioned in here and then also other
3  scientific literature related to this topic.
4      Q   And did you have any Q and A preparation
5  with your attorneys?
6      A   We talked in reasonably general terms
7  about how this was likely to proceed, et cetera,
8  especially because I had no prior experience in
9  doing this, was the focus of what we did.
10      Q   And who was present at these conferences?
11      A   These two (indicating).
12      Q   I'm sorry?
13      A   These here (indicating).
14      Q   Steven? Do you recall what specific
15  documents you reviewed in preparation for the
16  deposition?
17      MR. KELLY: Objection as to form. You can
18  answer.
19      THE WITNESS: Well, there's several
20  references in particular that are actually cited in
21  the deposition. So I went back and reviewed that,
22  and then a number of other primary literature and

Page 9

1  reviews about the general topics of homologous
2  recombination and gene targeting.
3      BY MR. ROLLINS:
4      Q   Did you review the -- I believe it's
5  Exhibit 2028, I might be wrong, but I think we also
6  call it the '069 application?
7      A   Yes.
8      Q   And are you familiar -- did you review it
9  in detail?
10      A   Yes.
11      Q   Did you review your CV?
12      A   No.
13      Q   Did you review your declaration?
14      A   Yes.
15      Q   Did you notice any errors in the CV or in
16  the declaration?
17      A   Not in the declaration.
18      Q   And you didn't review the CV?
19      A   No.
20      Q   And do you still agree that everything
21  that you said in your declaration is correct?
22      A   Yes.

Nancy Craig - September 29, 2003
Applied Research Systems  v. Cell Genesys

---

Page 10

1    Q    In your CV, which is rather impressive, I
2    noticed that you didn't list any patents or patent
3    applications.  Are you an inventor on any patent or
4    patent applications?
5    A    Yes, I am.
6    Q    I see.  Could you tell me approximately
7    how many patents?
8    A    One.
9    Q    And could you tell me how many
10   applications that --
11   A    One.
12   Q    The same one?
13   A    Yes.
14   Q    And I believe it's on pages 4 and 5 of
15   your CV, Exhibit 2027.  You have written a summary
16   of your general interests?
17   A    Right.
18   Q    Is this statement generally correct?
19   A    Just a moment while I rewire here.  What
20   page is my statement of interests?  Yes.
21   Q    I believe it begins on page 4.
22   A    Yes.

---

Page 11

1        MR. KELBER:  I actually think she answered
2    your last question.  There's a yes on the record,
3    isn't there?
4        THE WITNESS:  Yes.
5        BY MR. ROLLINS:
6    Q    Can you tell me a little bit about Tn7?
7    A    Tn7 is a transposable element, a piece of
8    DNA that moves from place to place, and we're
9    interested in understanding its movement and how it
10   actually occurs at that molecular level.
11   Q    And you began working with Tn7 in
12   approximately what time?
13   A    1984.
14   Q    And you continue to work on it --
15   A    Yes.
16   Q    -- today?
17   A    Yes.
18   Q    And in the paragraph bridging pages 4 and
19   5, you indicate that "remarkably little is known
20   about the intracellular architecture of bacterial
21   chromosomes," et cetera.
22   A    Uh-huh; yes.

---

Page 12

1    Q    And that's still true today?
2    A    Yes.
3    Q    And bacterial chromosomes, would you
4    regard them as being fairly simple compared to, say,
5    mammalian or human chromosomes?
6        MR. KELBER:  Objection as to form.
7        THE WITNESS:  They are generally similar
8    in the sense that they code less repetitive DNA, but
9    they still have -- I mean, both eukaryotic and
10   bacterial chromosomes share many of the same
11   functions.
12       BY MR. ROLLINS:
13   Q    I believe in your declaration, which is
14   Exhibit 2026, in paragraph 1, you indicate that
15   you've been invited to talk at national symposia and
16   conferences for over 25 years; is that correct?
17   A    Yes.
18   Q    And I believe in your CV, you indicated
19   that you received your doctorate degree in 1980 --
20   A    Correct.
21   Q    -- is that correct?
22   A    Correct.

---

Page 13

1    Q    Were you invited to talk at national
2    symposia and conferences prior to receipt of your
3    CV?
4    A    Yes.
5    Q    Do you recall the subjects of any of
6    those?
7    A    Yes.  When I -- at several meetings, I
8    discussed my work on the E. coli RegA protein, which
9    is the protein that -- it actually executes
10   homologous recombination in bacteria and also has
11   the ability to control gene expression, and I was
12   asked to present that work at several national
13   meetings.
14   Q    How was your declaration prepared?  Did
15   you draft it?
16   A    It was drafted in collaboration with Sue
17   Jensen, and I believe you also worked on drafting of
18   the document (indicating), between the three of us.
19   There were drafts -- excuse me.  There were drafts,
20   and I read it, and I made changes, et cetera, and to
21   the point that I certainly agree with everything
22   that's in the declaration.

---

Nancy Craig - September 29, 2003
Applied Research Systems  v. Cell Genesys

Page 14

1      Q    When you indicate "you," did you mean
2  Mr. Kelber?
3      A    Excuse me?
4      Q    When you said that "I believe you worked
5  on the declaration"?
6      A    Sue Jensen, and I'm sorry.  I forget
7  your --
8      MS. WANG:  Ping Wang.
9      THE WITNESS:  Ping Wang, I believe you
10  assisted in this.
11  BY MR. ROLLINS:
12     Q    And Dr. Kelber; is that correct?
13     A    I never discussed with him what was
14  actually in the declaration.
15     Q    Okay.  Do you remember how many drafts of
16  the declaration that you went through?
17     A    A number.
18     Q    Could you put a little closer estimation
19  of the number?  One?  10?  Five?  4000?
20     A    Thank goodness it wasn't 4000.
21     Q    You can make more money that way.
22     A    There was -- I don't know.  There were at

Page 15

1  least, I think, four or five different occasions
2  where we discussed in detail what would be in the
3  declaration, and there were stages of revision,
4  et cetera, et cetera.
5      Q    In paragraph 5 of your declaration, you
6  state that you were asked by counsel for Cell
7  Genesys to give your opinion of, among other things,
8  what is taught in the disclosure of the '069
9  application as read by one of ordinary skill in the
10  art.
11     A    Yes.
12     Q    Can you explain to me what you mean by
13  that?
14     A    What the novel aspect is, I believe, that
15  someone reading this application would appreciate.
16     Q    And I take it that you are familiar with
17  what a patent application is; is that correct?
18     A    I am.
19     Q    And presumably you had a fairly happy
20  outcome with your patent application?
21     A    Yes.
22     Q    Did you participate much in the

Page 16

1  prosecution of your patent application?
2      A    There were -- again, doing the drafts,
3  et cetera, of the scientific part of the patent
4  application was what my -- where my major
5  involvement was.
6      Q    Did you write any claims -- I'm sorry.
7  Did you finish?
8      A    Yeah.
9      Q    Did you write any claims?
10     A    Yes.  There were claims that we made in
11  the patent application.
12     Q    And were some of your claims rejected?
13     A    Yes.
14     Q    And you participated in redrafting or
15  amending or reforming those claims to meet the
16  examiner's rejections?
17     A    Yes.
18     Q    So you're pretty familiar with what a
19  patent claim is, how it's read, and to whom it's
20  directed --
21     A    Uh-huh.
22     Q    -- et cetera?

Page 17

1      A    Uh-huh; yes.
2      Q    Are you familiar enough with patents to be
3  able to analyze whether all of the elements of a
4  patent claim are present in the disclosure?
5      A    No, not couched in those words.  I don't
6  know exactly what that means in terms of patent law,
7  but --
8      Q    Okay.  Are the qualifications of a person
9  skilled in the art time sensitive?  That is, do they
10  change as time advances?
11     MR. KELBER:  Objection as to form.
12     THE WITNESS:  I would say no.
13  BY MR. ROLLINS:
14     Q    So do you think a person ordinarily
15  skilled in the art -- or do you think a person
16  ordinarily skilled in the art in 1989 would have
17  essentially the same level of understanding as a
18  person skilled in the art today?
19     MR. KELBER:  Objection as to form.
20     THE WITNESS:  I think they would know the
21  same -- they would be able to apply the same sort of
22  reasoning.  They may not know in detail sort of

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 18

1  exactly the same information.  So I took "skilled in
2  the art" as someone who knows how to practice
3  science, but certainly there's many particular
4  pieces of information that are different now than
5  were different in 1989.
6        BY MR. ROLLINS:
7        Q  I'm always a bit curious as to how one
8  goes about determining the level of ordinary skill
9  in the art, say in a time period replete in 15, 20,
10  30 years ago, whatever.  Can you tell me how you do
11  that?
12        A  I think there are two issues there.  One
13  is ability to sort of comprehend, read what's in the
14  literature, but then I think the literature tells
15  you at the time sort of what was common knowledge.
16        Q  But when you review that literature, it's
17  very hard to block out knowledge that you've
18  acquired in the meantime, isn't it?
19        A  Not necessarily.
20        Q  So you don't agree that hindsight is
21  better by far?
22        A  Well, I want to say it depends upon what

Page 19

1  you're talking about.  There's certain things that
2  you could understand in 1989.  You didn't have to
3  have the details of what we know today.  It could
4  influence what you might do with them, but you
5  wouldn't necessarily have to know that.
6        Q  In paragraph 6 of your declaration, you
7  discuss several publications, specifically exhibits
8  2011, 2018, 2024, and 2025.  Am I correct that those
9  articles are two that you discuss -- or that you
10  mention in paragraph 6?
11        A  Yeah.
12        Q  And you indicated in paragraph 4 of your
13  declaration that you considered those publications
14  in the preparation of your declaration?
15        A  Yes.
16        Q  In paragraph 6, you cite Shortle et al.,
17  the abstract and page 373, column 1, last paragraph
18  as teaching homologous recombination in eukaryotic
19  cell lines, eukaryotic microorganisms, and
20  prokaryotic microorganisms.  Doesn't that
21  argument -- article relate to the lethal disruption
22  of genes by homologous recombination?

Page 20

1        A  Yes, it does.
2        Q  It does not relate to modification in the
3  sense of enhancing or increasing the expression
4  product of a given gene, does it?
5        A  It's altering the expression of a
6  particular gene by removing that gene.
7        Q  Did the -- does the article report any
8  expression of the target gene in the transformed
9  cells -- I believe actin as the gene of interest?
10        A  There's no direct measurement of a product
11  of a gene other than its absence in the organism,
12  absence of its activity.
13        Q  Does the -- is it fair to say that the
14  homologous recombination in that article results in
15  a mutated gene that did not express the normal
16  expression product of the actin gene?
17        A  Yes.
18        Q  In paragraph 6, you cite the Gregg et al.
19  article published in 1986 to show that -- I think
20  I'm quoting, but if I'm quoting incorrectly, I hope
21  you will understand the gist -- the use of
22  homologous recombination to specifically target

Page 21

1  genes in yeast and mammalian cell lines was well
2  known in 1989.
3        MR. KELBER:  Objection.
4        THE WITNESS:  Yes.
5        MR. ROLLINS:  I'm sorry, Steve?
6        MR. KELBER:  Just objection as to form.
7        BY MR. ROLLINS:
8        Q  What part of the gene was being targeted
9  in the Gregg et al. article?
10        A  Targeted in what way?  What part of it was
11  being used as the cite of insertion or -- I'm
12  confused about what the question is.
13        Q  Where was the insertion intended to occur?
14        A  In this paper, there are actually several
15  different forms in which that occurs between genes
16  on plasmids -- genes in plasmids and the chromosome.
17        Q  And did any of those result in enhancement
18  of expression of a product of the targeted gene?
19        A  Not that I know of.
20        Q  And what types of cells were used in
21  Gregg's experiments?
22        A  Mammalian cells.

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 22

1    Q    Do you recall what type of mammalian
2    cells?
3    A    What cell line?  No.
4    Q    What was the purpose of Gregg's use of
5    homologous recombination?  What was he hoping to
6    achieve?
7        MR. KELBER:  Objection as to form.
8        BY MR. ROLLINS:
9    Q    You can answer each question separately.
10    A    I think what he was seeking to achieve was
11    the modification of chromosomal genes.
12    Q    In what way?
13    A    In particular, bringing in an exogenous
14    piece of DNA and incorporating that into the genome
15    in directive fashion at a particular site.
16    Q    Was the stated purpose related to
17    correction of mutant or defective genes?
18    A    That would be one way to evaluate that.
19    Q    And would you expect a correction of a
20    mutant or defective gene to have an influence or a
21    bearing on the expression product of the gene?
22    A    Yes.

Page 23

1    Q    And could you explain what type of
2    influence you would expect?
3    A    In some of these experiments, there's a
4    mutant chromosomal -- a mutant gene, and he's asking
5    for repair of that gene, i.e. restoration of
6    activity in these experiments.  Not all the
7    experiments, though, depend upon that assay.
8    Q    Then does Gregg target a coding portion of
9    the gene?
10        MR. KELBER:  Can I hear that question
11    back, please?
12        (The reporter read the record as requested.)
13        MR. KELBER:  Objection as to form.  You
14    can answer.
15        THE WITNESS:  The modification need not be
16    in the very DNA sequences that actually encode the
17    protein for some of these experiments.  In others,
18    they do depend on modification of the DNA to change
19    the gene product.
20        BY MR. ROLLINS:
21    Q    Are you -- you say in "some of these
22    experiments."  Are you speaking of experiments that

Page 24

1    are described in the Gregg article?
2    A    One set of experiments has to do with
3    simply following the incorporation of a marker to
4    you this region, not into some particular
5    chromosomal region, not actually modification of the
6    coding region of a particular gene.
7    Q    And what is the purpose of inserting the
8    marker?
9    A    The purpose is being able to follow that
10    the incorporation could actually occur, how would
11    you know that recombination was actually going on.
12    Q    So that probably was not intended to
13    correct the mutation or the defect in the gene, was
14    it?
15    A    No, not in all cases.
16    Q    That's simply one of the manipulative
17    steps designed to tell you whether you were
18    inserting the DNA in the way that you wanted to
19    insert it?
20    A    Yes.
21    Q    And I think you indicate or cite the
22    Exhibits 2025 and 2011, which are Doetschman and

Page 25

1    Thomas, for the proposition that they teach detailed
2    experiments -- experimental procedures for repairing
3    the defective gene or introducing mutations into the
4    genes by homologous recombination; is that correct?
5    A    Correct.
6    Q    Don't all of those publications have to do
7    with changing the coding region of a gene?
8    A    No, actually.  The first ones -- sorry.
9    You mean in the second two papers in particular or
10    in the Gregg and Smithies one also.
11    Q    Speak to all of them, if you will.
12    A    Part of the Gregg and Smithies article
13    talks about changing chromosomal sequences, but not
14    actually changing coding regions.  They're looking
15    for the -- they end up looking for the incorporation
16    of a marker that they score separately from what
17    actually happens to the cell.  They're not changing
18    the coded -- the expression of some endogenous gene.
19    In the Doetschman and Capecchi references, they are
20    using expression of particular genes.  They're
21    following what's actually happening to the
22    chromosomal genes.

Nancy Craig - September 29, 2003
Applied Research Systems  v. Cell Genesys

Page 26

1    Q   And what was the result in those
2  references?
3    A   Well, Gregg and Smithies show that they
4  can incorporate homologous sequences into the
5  chromosome.
6    Q   And did they correct the mutated or
7  defective genes?
8    A   They can do that, and that's shown in
9  Doetschman and Kirk and Capecchi.  Those are
10  specific examples of changing expression of
11  chromosomal genes.
12    Q   When you say "changing the expression of
13  chromosomal genes," do you mean -- what do you mean?
14    A   It changes from lack of functional
15  expression of an HPRTG gene as to now having HPRTG
16  activity.
17    Q   Did you mean Thomas and Capecchi?
18    A   Sorry.  Did I say it wrong?  Thomas and
19  Capecchi, and then Doetschman -- both of those talk
20  about using HPRT minus cell lines and then modifying
21  those cell lines.
22    Q   And what type of cells were they

Page 27

1  experimenting with?
2    A   Again, mammalian cells.
3    Q   And do those articles describe experiments
4  designed to enhance or modify the expression
5  characteristics of a gene without introducing
6  heterologous material into the coding section of the
7  gene or the coding region?
8    MR. KELBER:  Could I hear that question
9  back, please.
10    (The reporter read the record as requested.)
11    MR. KELBER:  Objection as to form.  You
12  can answer.
13    MR. BROWDY:  Before you answer, could you
14  read that back again.
15    (The reporter read the record as requested.)
16    THE WITNESS:  The Thomas and Capecchi
17  experiments specifically talk about using another
18  marker, a different marker from what's actually
19  already present in the chromosomal DNA.  So it is
20  the introduction of heterologous material.
21    BY MR. ROLLINS:
22    Q   But isn't that designed just to express

Page 28

1  the marker?
2    A   No.
3    Q   When they introduce the marker, do they
4  measure changes in the output of the endogenous
5  gene's expression product?
6    A   They do, but they begin by making their
7  transformants by actually evaluating the
8  incorporation of heterologous DNA.  So they're not
9  looking directly at expression of the defective HPRT
10  gene.
11    Q   What, in your opinion, took some five
12  years between the first articles in 1982 and the
13  Shortle argument -- and Thomas articles in 1987 in
14  order to go from -- advance the art from the
15  experiments in 1982, 1984, or whatever up to 1987?
16    MR. KELBER:  Objection as to form.  You
17  can answer.
18    THE WITNESS:  The experiments done in 1982
19  by Shortle et al. deal with experiments that are
20  done in yeast, and the other experiments that we're
21  talking about are actually being done in mammalian
22  cells.  So there are different methodologies that

Page 29

1  needed to be developed to be able to follow the
2  recombination in mammalian cells.  A significant
3  problem -- well, one that is sort of dealt with in
4  the five-year interim has to do with being able to
5  actually identify events that have undergone
6  homologous recombination as opposed to simply random
7  integrations of pieces of DNA.
8    MR. ROLLINS:  Excuse me.  Would you read
9  back the first line or two of that answer?
10    (The reporter read the record as requested.)
11    BY MR. ROLLINS:
12    Q   Were any of the experiments in any of
13  those articles carried out for the purpose of
14  modifying the expression characteristics of an
15  endogenous gene without modification of the gene
16  expression product?
17    MR. KELBER:  Objection as to form.
18    THE WITNESS:  Some of these experiments
19  are directed at actually changing the gene product,
20  i.e., the gene is nonfunctional in the original cell
21  line, but then they introduce exogenous material
22  that actually will change the coding sequence.  And

Nancy Craig - September 29, 2003
Applied Research Systems  v. Cell Genesys

Page 30

1  so that changes the protein that's actually being
2  made. Another aspect of some of these experiments
3  is changing the DNA -- the noncoding DNA that
4  surrounds these particular genes as well.
5       BY MR. ROLLINS:
6       Q  And which experiments were directed to
7  enhancing or modifying the expression
8  characteristics without any change in the expression
9  product?
10      MR. KELBER: Objection as to form. You
11  can answer.
12      THE WITNESS: The Doetschman products or
13  experiments are focused on the HPRT, on what's
14  actually happening to the HPRT gene. The Thomas and
15  Capecchi references are more general in the sense
16  that they describe incorporating pieces of DNA that
17  provide neoresistance to a particular drug that may
18  or may not change the expression of the host genes.
19      BY MR. ROLLINS:
20      Q  The insertion of the neogene is primarily
21  to enable you to tell -- to follow the insertion
22  procedure; is that correct?

Page 31

1       A  Yes, to identify cells in which the
2  exogenous DNA has actually been incorporated into
3  the host genome.
4       Q  Does that necessarily increase or enhance
5  the production of the endogenous gene?
6       A  No.
7       Q  Do any of those articles actually describe
8  experiments targeting an area outside the coding
9  region of a gene in order to increase the expression
10  of the gene product of that endogenous gene?
11      A  These papers actually deal with alteration
12  of the coding sequence. That's the examples that
13  they use, because they're looking at alterations in
14  correcting of the coding sequences of HPRT.
15      Q  In paragraph 3 of your declaration, you, I
16  believe correctly, give your understanding of the
17  '069 application as disclosing methods for the
18  expression of mammalian genes by using the process
19  of homologous recombination to integrate adjacent to
20  a host target gene encoding protein of interest --
21  actually, would you read that?
22      A  Sorry. Let's see. "The '069 application

Page 32

1  discloses methods for the expression of mammalian
2  genes by using the process of homologous
3  recombination to integrate, adjacent to host target
4  gene (encoding the protein of interest), regulatory
5  sequences and/or an amplifiable gene in order to
6  increase the expression of the target gene, and as a
7  direct and intended consequence, the production of
8  the protein encoded by the target gene."
9       Q  Okay. And in paragraph 4, you indicate
10  that you have considerable personal experience in
11  the field of homologous recombination; is that
12  correct?
13      A  Yes.
14      Q  In claim 3 of the '071 patent -- you
15  understand what I mean by the '071 patent?
16      A  Yes.
17      Q  It's Exhibit-2046. How do you understand
18  the phrase "modification of the expression
19  characteristics of a predetermined gene"?
20      A  I'm confused with what particular thing
21  you're actually asking about.
22      Q  I believe claim 3 states that it's a

Page 33

1  method for the modification of the expression
2  characteristics of a predetermined gene?
3       MR. KELBER: Use actually referring to --
4       BY MR. ROLLINS:
5       Q  It's in column 27 also.
6       A  I'm sorry. I have a different page --
7       MR. KELBER: You can take that one, and
8  I'll take this one.
9       THE WITNESS: Okay.
10      BY MR. ROLLINS:
11      Q  If you look at paragraph 8 of your
12  declaration, I think you make that claim.
13      A  So your question is?
14      Q  What is your understanding of the
15  limitation of modifying the expression
16  characteristics of a predetermined gene?
17      MR. KELBER: Objection as to form.
18      THE WITNESS: The limitation -- I don't
19  understand what you mean by "limitation." My --
20  sorry. Go ahead.
21      BY MR. ROLLINS:
22      Q  Okay. What do you understand that phrase

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 34

1 to mean?
2    A  Changing the --
3    Q  Modifying.
4    A  Modifying the expression --
5    Q  Characteristics of a predetermined gene.
6    A  Predetermined in the sense that one could
7 identify exactly what gene, right, and choose to
8 modify -- or choose to identify a cell line or cells
9 where the DNA around the gene of interest has
10 actually been modified in a site-directed fashion.
11    Q  What sort of modifications of the gene
12 expression characteristics do you believe that
13 covers?
14        MR. KELBER: Objection as to form and
15 capacity.
16        THE WITNESS: Do -- this one I answer,
17 too?
18        MR. KELBER: Yes, I'm sorry. I'll tell
19 you if there's a question we don't think you should
20 answer.
21        THE WITNESS: Okay. In terms of -- well,
22 there are actually two stages. One stage is

Page 35

1 actually modifying the DNA, so you could change the
2 copy number of the DNA. I think that's the
3 fundamental experiment that is described here, and
4 that could change the regulatory -- may or may not
5 change the expression of the gene of interest in the
6 area.
7    BY MR. ROLLINS:
8    Q  Do you think the expression would, for
9 example, comprehend the experiments with the actin
10 gene?
11    A  "Comprehend," what do you mean? Would
12 include?
13    Q  Yeah, sure, encompass, whatever.
14    A  No. The experiments with the actin genes
15 are actually directed at the very regions that
16 encode the protein. This is talking about
17 introducing pieces of -- introducing segments of DNA
18 that alter regions of the host chromosome other than
19 the actual coding sequence.
20    Q  So what type of modifications would you
21 think would be within that expression?
22    A  You mean a changing gene expression?

Page 36

1    Q  Yeah.
2    A  Well, in terms of changing gene
3 expression, you could imagine outputs at a number of
4 different levels. You could change the level of the
5 RNA that's made from the gene. You could change the
6 amount of the protein that's actually being made.
7 You could modify the activity of the protein,
8 depending on what cellular compartment it was in and
9 how it might be modified. So there are a wide
10 variety of ways to change gene expression.
11    Q  When you say modify the RNA -- I believe
12 you said that -- would you consider that changing
13 the expression product, the gene expression?
14    A  If you were changing -- you could change
15 the level of the RNA that was being expressed, the
16 absolute amount of the RNA that was being expressed.
17 That would be one way to affect gene expression.
18    Q  Assuming that you have translation of any
19 increase of RNA; is that correct?
20    A  If the amount of message produced was
21 actually the rate-limiting step in the expression of
22 some particular gene, then increasing the amount of

Page 37

1 that gene's RNA would lead to an increase in
2 expression of the protein.
3    Q  But if it were not the rate-limiting step,
4 that would not necessarily --
5    A  Correct.
6    Q  Excuse me if you've already answered this.
7    A  That's no problem.
8    Q  But would you consider modification to
9 include repair of a defective or mutated gene?
10    A  Yes.
11    Q  In what sense?
12    A  So repair -- do you mean "repair" in terms
13 of restoration of activity or "repair" in terms of
14 actual modification of the coding sequence or some
15 regulatory sequence?
16    Q  I guess it could be either.
17        MR. KELBER: Objection as to form.
18        THE WITNESS: It could be either. You
19 could have a protein that has a defect so that it
20 only works 1 percent as well as the wild type does,
21 but if you made 100 times as much of it, that could
22 be enough activity for whatever the downstream assay

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 38

1  is that you're following.
2      MR. KELBER:  We've been going about an
3  hour.  Can we take a short break?
4      MR. ROLLINS:  Yes.
5      VIDEO OPERATOR:  We're going off the
6  record at approximately 10:00 a.m.
7      (Recess.)
8      VIDEO OPERATOR:  This is tape 2, and the
9  time is approximately 10:10 a.m.
10      BY MR. ROLLINS:
11      Q  All set?
12      A  Away we go.
13      Q  Jackie Gleason.
14      In paragraph 8, you correctly describe
15  claim 3 of the '071 patent as being a method of
16  modifying the expression characteristics of a
17  predetermined gene; is that correct?
18      MR. KELBER:  Objection as to form.
19      THE WITNESS:  Yes.
20      BY MR. ROLLINS:
21      Q  However, in paragraph 9, you list a number
22  of steps for homologous recombination, which are

Page 39

1  steps for homologous recombination for any purpose;
2  is that correct?
3      A  Yes.
4      Q  In your opinion, does the performance of
5  those steps necessarily result in accomplishing the
6  purpose specified in claim 3, that; modifying the
7  expression characteristics of the predetermined
8  gene?
9      A  It may or may not, depending on the gene.
10      Q  Well, would it also depend on the purpose
11  of the recombination?
12      A  I see -- I understand the purpose of the
13  recombination event here that's described is to
14  introduce a region -- a segment DNA that can be
15  amplified, so will increase the copy number of that
16  region of the genome.
17      Q  Did the processes in the articles that you
18  cited and that we discussed earlier necessarily
19  increase the expression product of the targeted
20  gene?
21      A  Not necessarily.
22      Q  Then are they steps that you give in --

Page 40

1  well, I believe you've asked and answered this.
2  Forgive me if I ask you to repeat yourself.  The
3  steps in paragraph 9 do not necessarily result in
4  enhancement of expression of the target genes; is
5  that correct?
6      A  Not necessarily.
7      Q  I remember now you did answer that.  I
8  apologize.
9      A  That's okay.
10      Q  Does the '069 application describe each of
11  the six steps identified in paragraph 9 in order to
12  modify the expression characteristics of an
13  endogenous predetermined gene in the cell in which
14  it is endogenous?
15      MR. KELBER:  Objection as to form.
16      THE WITNESS:  Yes.
17      BY MR. ROLLINS:
18      Q  In the primary cell?
19      A  Yes.
20      Q  And doesn't the '069 application teach
21  that additional steps are necessary in order to
22  enhance the expression of the endogenous gene or the

Page 41

1  targeted gene?
2      MR. KELBER:  Objection as to form.
3      THE WITNESS:  Their -- the '069
4  application focuses on inserting a piece of DNA that
5  could undergo amplification, but it will undergo
6  amplification only in response to the cells being
7  treated with certain chemicals.  So simply
8  integrating the appropriate piece of DNA may not be
9  sufficient to change the expression.
10      BY MR. ROLLINS:
11      Q  Doesn't the '069 application teach that
12  the process requires the additional steps of
13  fragmenting the inserted DNA, using it to transform
14  a secondary host cell, and then expressing the gene
15  product in the host cell?
16      MR. KELBER:  Objection as to form.
17      THE WITNESS:  That may or may not be a
18  necessary step, another step.
19      BY MR. ROLLINS:
20      Q  I believe my question was, doesn't the
21  '069 application teach that its process requires
22  those steps?

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 42

1    A   It discusses those steps.  I don't believe
2  the application poses it as essential to the
3  expression -- to the subsequent expression of the
4  desired protein, of the target gene of interest.
5    Q   Can you point to the places in the '069
6  application where it teaches that those steps are
7  optional?
8    MR. KELBER:  Off the record for a second.
9    VIDEO OPERATOR:  Okay.  Going off record
10  at approximately 10:17 a.m.
11    (Discussion off the record.)
12    VIDEO OPERATOR:  Going back on record at
13  approximately 10:18 a.m.
14    BY MR. ROLLINS:
15    Q   I believe that you've now been given the
16  Exhibit 2028, which is a copy of the '069
17  application; is that correct?
18    A   Yes.
19    Q   Referring to my previous question, can you
20  point to any part?
21    A   Yes.  So on page 3, line 21, says "The
22  region comprising the amplifiable gene and the gene

Page 43

1  of interest may be amplified, the genome fragmented
2  and directly or indirectly transferred to an
3  expression host for expression of the target
4  protein." I read that to say that you may or may
5  not amplify -- you may or may not transfer that gene
6  to another host.
7    Then on page 4, line 30, it says -- it
8  implies that the target gene may need to be moved to
9  some other cell line, certain differentiated cell
10  lines where expression may occur.
11    So I read those things as being primary or
12  secondary cells.
13    Q   Does the expression that you refer to
14  in -- on page 4, is that referring to the primary
15  cell or the secondary host cell?
16    A   Let's see.  I read those -- from the point
17  above -- from, say, line 23, it says "various cell
18  types may be used as the primary cells."  Right?
19  "These cells may or may not be expressing a gene of
20  interest."  Then it comes back to say you could --
21  basically you could move it to certain
22  differentiated cells.  One may select cells in which

Page 44

1  the target gene is expressed.  So I take that as
2  that you could do it in primary or secondary cells.
3    Q   You can do what?
4    A   Sorry.  You could examine the consequence
5  of amplifying this particular region containing the
6  target gene where you introduce the amplifiable gene
7  by homologous recombination.
8    Q   When you say you could do that, does the
9  '069 application describe doing that?
10    A   Examining the readout for a particular
11  gene of interest?
12    Q   Yes.
13    A   No, it doesn't.
14    Q   And back on page 3, will you refresh my
15  recollection as to what portion?
16    A   Line -- let's see.  Line 21 says "the
17  region containing the amplifiable gene and the gene
18  of interest may be amplified, the genome fragment
19  directly or indirectly transferred to a host" --
20  "expression host for expression."
21    Q   And would that apply to an expressible
22  amplifiable gene?

Page 45

1    A   Would what apply?
2    Q   Would that section that it may be
3  amplified?
4    A   The introduction of the amplifiable gene,
5  right, provides the possibility of increasing the
6  copy number of the DNA surrounding the target gene.
7  The consequences of that are not described, except
8  in the most general term of increasing gene
9  expression.
10    Q   Where does it indicate that that increases
11  gene expression?
12    A   That may occur.  That's the increasing
13  copy number by this amplifiable -- by this strategy
14  of increasing the amplifiable gene is one potential
15  strategy for increasing the expression of the target
16  gene.
17    Q   I seem to recall that you earlier
18  indicated that you were familiar with the '069
19  application, and I can see that you appear to be.
20  Can you tell me, is there any portion of this that
21  you recall which describes the expression of the
22  target gene product by amplifying the primary cell

Nancy Craig - September 29, 2003
Applied Research Systems  v. Cell Genesys

Page 46

1  after it's been transformed?
2      A   To me, reading the application, the
3  concept that that could occur was certainly clear.
4      Q   That it could occur?
5      A   It could occur in the primary cells.
6      Q   When you amplify --
7      A   Yes.
8      Q   -- the amplifiable gene?
9      A   Yes, when you amplify the amplifiable
10  gene.
11      Q   In the examples, do you recall whether
12  the -- actually, the example, do you recall whether
13  the primary cell was amplified?
14      A   Well, it doesn't actually -- the
15  primary -- let's see. This application, I believe,
16  doesn't actually describe measuring the output of
17  the gene, but it actually did discuss moving the
18  constructs made in one cell type into another cell
19  type.
20      Q   So generally --
21      A   I don't recall that they actually measured
22  the amount of t-PA or the amount of erythropoietin

Page 47

1  that was actually made.
2      Q   Is any EPO made in the '069 application?
3      MR. KELBER: Objection as to form.
4      THE WITNESS: That's an '071. That's an
5  additional example.
6      BY MR. ROLLINS:
7      Q   Doesn't the example in the '069
8  application exert an expressible marker gene?
9      A   They discuss the inclusion of
10  dihydrofolate reductase as the marker gene.
11      Q   Do they have a neogene?
12      A   I don't recall that in this example they
13  actually do. I don't know if -- they do actually.
14  There is a biocide hygromycin that they use, I
15  think. So they discuss the possibilities of
16  including that.
17      Q   Does the '069 application indicate that
18  all of the manipulative steps that are set out in
19  paragraph 9 of your declaration were old and well
20  known in the art?
21      MR. KELBER: Objection as to form.
22      THE WITNESS: Many of the individual -- or

Page 48

1  the individual steps were known. Their combination
2  here is novel.
3      BY MR. ROLLINS:
4      Q   Their --
5      A   Their use in this particular strategy is
6  novel.
7      Q   And what do you consider the particular
8  strategy of the '069 application?
9      A   The strategy of introducing by homologous
10  recombination an amplifiable region next to a
11  defined target gene.
12      Q   I seem to recall that the strategy
13  included then transferring the DNA from the primary
14  cell, which acted as a convenience spot to make a
15  construct into the secondary host cell for
16  expression.
17      A   May or may not be required, depending on
18  the expression characteristics of the target gene.
19      Q   Where does it say in the '069 application
20  that that may or may not be required?
21      A   It's -- the examples that I talked about
22  previously, I think, imply to me -- at least to me

Page 49

1  reading the application, that depending on the
2  expression characteristics of the particular target
3  gene you're looking at, it may or may not be
4  necessary to use some subsequent cell type.
5      Q   Does it say that?
6      MR. KELBER: Objection as to form.
7      THE WITNESS: That's what I understood it
8  to read.
9      BY MR. ROLLINS:
10      Q   And could you read to me the portion that
11  you understood to imply that?
12      A   Page 3 of my declaration, of the '069,
13  back to line 21. "The region containing the
14  amplifiable gene, a gene of interest, may be
15  amplified."
16      Q   Okay. We'll come back to that.
17      Would you read the abstract of the
18  invention of the '069 application? I believe it's
19  at page 22.
20      A   "Methods and compositions are provided for
21  expression of mammalian genes in culture. An
22  amplifiable gene is introduced by homologous

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 50

1  recombination in juxtaposition to a target gene, the
2  resulting combination of amplifiable gene and target
3  gene transferred to a convenient host and the target
4  gene amplified by means of the amplifiable gene.
5  The resulting expression host may then be grown in
6  culture with enhanced expression of the target
7  gene."
8      Q   Does anything there indicate that the
9  steps of transferring into the secondary expression
10 host are optional or not a part of the invention?
11     MR. KELBER: Objection as to form.
12     THE WITNESS: I think someone of skill in
13 the art would appreciate that one could stop at that
14 point.
15     BY MR. ROLLINS:
16     Q   That one could stop at that. I'm sorry.
17 I didn't --
18     A   I'm sorry. You could,
19     Q   You were finished, weren't you?
20     A   Yeah, yeah.
21     Q   But you didn't find anything in there that
22 said stop at that?

Page 51

1      MR. KELBER: Objection as to form.
2      BY MR. ROLLINS:
3      Q   Nothing like the road sign on the Beltway
4  that said Virginia or Richmond or whatever?
5      A   No, but I think that one -- one would
6  appreciate that the desired outcome is
7  overexpression of the protein, and if you got to
8  overexpression of the protein in step 1, there's
9  really no reason to take it to step 2. I mean, I
10 think the desired outcome is clear.
11     Q   Well, would one then wonder why in the
12 world they do that?
13     A   Why in the world they do what?
14     Q   Take it out of the primary cell, put it
15 into a secondary host cell, and then express the
16 protein?
17     A   Some of the reasons for doing that are
18 laid out in the application, that the protein might
19 be better expressed in some other cell lines or that
20 might be more suitable. But again, I read it to
21 understand that -- if your goal is to accomplish the
22 increased expression of a protein, if you got enough

Page 52

1  that -- the desired level at step 1, there's no
2  reason to go on to step 2.
3      Q   Does that procedure that you just
4  explained suggest that you might ought to measure
5  the output of the expression -- output of the
6  expression in step 1 to see whether it would be
7  necessary to go on to step 2?
8      A   That would be part of the criteria you
9  could use for deciding whether to do that or not.
10     Q   But that type of procedure is not
11 described in the '069 application, is it, that is,
12 stop here if it's not necessary to go on to --
13     A   No. I understand from reading this that
14 the goal is to make more of the target protein, and
15 if one step would be sufficient in putting it into
16 the primary cells that grow well in culture,
17 et cetera, and it's expressible there, that would be
18 enough without necessarily going on to the second
19 cells.
20     Q   In paragraph 12, do you note that the '069
21 application particularly recommends mammalian cells
22 which do not grow readily in culture as the primary

Page 53

1  cells?
2      A   That's a class of cells that are
3  mentioned.
4      Q   And they're mentioned as being
5  particularly recommended?
6      A   I'm not sure that they're particularly
7  recommended. I think they're particularly noted as
8  the kinds of things -- kind of cells that you might
9  be interested in using.
10     Q   Did the words "in particular" appear to
11 describe those particular cells?
12     A   I read that as here's a list of some of
13 the variables that one who is interested in doing
14 these kinds of experiments might consider in what
15 they're going to use as their host cells. It's not
16 restricting it to those cells, however, i.e., that
17 it's, for example, only human cells.
18     Q   Why would one practicing the invention of
19 the '069 application want to pick those particular
20 cells that do not grow well in culture?
21     A   I wasn't asked to comment about that,
22 about the choices of particular kinds of cells.

Nancy Craig - September 29, 2003
Applied Research Systems  v. Cell Genesys

Page 54

1    Q   Do you have an opinion?  You've given me
2  your opinion as to what's implied by a lot of the
3  language.
4    A   I think it has -- I would see that as
5  hinging on what the particular application was.
6  There are many, many, many different proteins that
7  one could use that this strategy would be applicable
8  to.  So I doubt that there's a universal -- in fact,
9  I'm sure there would not be a single universal cell
10  line that would be appropriate to do -- to get into,
11  so it would depend on what you wanted to actually
12  detect.
13    Q   If you were aiming to find the simplest
14  way of achieving increased expression and you
15  decided the best way to do that would be to take a
16  primary cell and use it as the factoring, would you
17  pick any of those cells that do not grow well in
18  culture?
19    A   The amount of protein -- the amount of
20  gene product you're going to get out at the end is
21  going to be influenced by both the absolute amount
22  of protein that any particular cell makes and how

Page 55

1  many cells you can get.  So I could imagine
2  situations where you might have to balance those
3  choices.
4    Q   Without any data for balancing those
5  choices, would you not think that particularly
6  recommending cells that do not grow well in culture
7  tends to lead away from an implication that you
8  ought to cultivate and express the products of the
9  primary cell?
10    A   I think they're discussing here the
11  prospect that the primary cells could be some of
12  these human cells that may not grow particularly
13  well in culture.  All right?  So part of the issue
14  here is if you're going to express a human protein
15  which requires some particular kind of processing,
16  then it may not actually occur in any mammalian cell
17  line.  So you might be forced to get the particular
18  processing events that you require to use something
19  that doesn't grow particularly well in culture.
20    Q   Well, isn't that essentially what the
21  invention in the '069 application is, a method of
22  getting a gene product from a cell line which is not

Page 56

1  in itself a good subject for your factoring?
2    MR. KELBER:  Objection as to form.
3    THE WITNESS:  The critical step, it seems
4  to me, is the strategy of increasing gene dosage to
5  increase expression of the protein.
6    MR. ROLLINS:  I'm sorry.  Would you read
7  that answer back.
8    (The reporter read the record as requested.)
9    BY MR. ROLLINS:
10    Q   Could you say that another way?  I'm not
11  sure that I understand it.
12    A   The expression of any protein, the
13  ultimate readout of any particular gene as a
14  protein, will be dependent on very many steps,
15  and this -- you could imagine various ways to
16  try and modify that.  This application deals with
17  the let's make many more copies of this gene in a
18  single cell so that you would increase the amount of
19  message and, therefore, increase the amount of the
20  protein.
21    Q   And which cell are they using to increase
22  the amount of message and increase the amount of

Page 57

1  protein?  The primary cell or the secondary host
2  cell?
3    A   I think that could -- I think that would
4  be possible either -- under either circumstance.
5    Q   You think --
6    A   I think it's not -- I think it's not
7  obligatory to go on to the secondary cells; it
8  depends.
9    Q   Does the '069 application say that it's
10  obligatory to go on to the secondary cells?
11    MR. KELBER:  Asked and answered.
12    THE WITNESS:  I believe it -- as I read
13  it, I understand that you could use the primary
14  cells to look for expression or you could use
15  secondary cells to look for expression.
16    BY MR. ROLLINS:
17    Q   Do you mean that if you had the
18  motivation, it might occur to you to say my gosh,
19  why do we want to go on to these steps?
20    MR. KELBER:  Objection as to form.
21    THE WITNESS:  Yeah, one could stop, again
22  sort of depending -- it's very related to how much

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 58

1   of a gene product do you want, what's sufficient for
2   your needs or your desires, et cetera.
3       BY MR. ROLLINS:
4       Q   And does the '069 application indicate
5   that you ought to check and see whether the primary
6   cell is expressing enough of the gene product that
7   you want and then decide whether to go on to the
8   steps of creating another cell to do the expression?
9       A   No. I think it points out the possibility
10  of you could move it between cell lines. If that
11  was -- if that was essential or if that was
12  necessary to get the increased expression of the
13  protein you want, you could move it between cell
14  lines, but I don't see anything here that I read as
15  you must go on to the second step.
16      Again, I think somebody, in doing the
17  experiments, et cetera, to do this being led by this
18  path would be interested in evaluating the outcome
19  at each path -- at each step, and you don't need to
20  go any farther than you have to.
21      Q   Would the process that you suggest is
22  implied, that is, omitting transfer to the secondary

Page 59

1   host expression cell, would that influence your
2   choice of amplifiable gene or other regulatory
3   segments?
4       A   Not necessarily.
5       Q   Doesn't --
6       A   It may or may not.
7       Q   I'm sorry. Doesn't the '069 application
8   indicate that you choose an amplifiable gene or a
9   regulatory segment that is particularly active in
10  the secondary host cell?
11      A   I don't think it's active only in the
12  secondary host cells. I think the issue about the
13  host cells speaks more to the -- what -- how does
14  the actual processing -- how does the actual gene
15  expression event work, not necessarily an
16  amplification process.
17      Q   In paragraph 19 of your declaration, you
18  state your understanding that claim 3 of the '071
19  patent does not require amplification or expression
20  of the target gene; is that correct?
21      A   The strategy of using the -- introducing
22  the segment to do the amplification by homologous

Page 60

1   recombination, that, you don't have to actually have
2   amplification to see.
3       Q   Is it your understanding that the '071
4   application describes a process in which the
5   strategy includes fragmenting the DNA of the primary
6   cell and using it to transfect a secondary host cell
7   and then selecting and culturing -- or culturing and
8   selecting the secondary host cell products?
9       MR. KELBER: Can I hear that question back
10  again, please.
11      (The reporter read the record as requested.)
12      MR. KELBER: Objection as to form. Can we
13  make that the '071 "patent"?
14      MR. BROWDY: Why is that?
15      MR. KELBER: It reads "application"
16  currently.
17      MR. ROLLINS: Sure.
18      THE WITNESS: That step is described in
19  the '069 as well, the notion that one could move --
20  could fragment the genome that's already been
21  modified and move that to a secondary cell.
22      MR. ROLLINS: I'm sorry. Can I hear the

Page 61

1   question again?
2       (The reporter read the record as requested.)
3       MR. KELBER: Objection to form; relevance.
4       THE WITNESS: I know the '069 discusses
5   that explicitly. I can't recall exactly about the
6   '071. I think it does.
7       BY MR. ROLLINS:
8       Q   In your understanding of claim 3, does it
9   require that the process steps that are set out in
10  the claim modify the expression characteristics of
11  the target gene which the cell line -- actually
12  within the genome of the cell line?
13      A   That's the hoped-for consequence, but --
14      Q   That's the result?
15      A   Amplifying the gene may not -- need not,
16  does not always have to result in increased gene
17  expression.
18      Q   I didn't -- I don't believe I said
19  "increased gene expression," but does claim 3
20  require the modification of the expression
21  characteristics of the targeted gene within the
22  genome of the cell line?

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 62

1   A   Well, if the amplified region -- if the
2   region is amplifiable, I guess under many
3   circumstances, I would expect that the amount of
4   transcription would go up, i.e. would modify the
5   expression of the gene. Whether that resulted in
6   more protein is an entirely different question.
7   Q   Could you explain that?
8   A   Well, it depends on what -- what is
9   actually the rate-limiting step for making the
10  protein. So you might increase the number of
11  proteins that you're making 100-fold, but if
12  there's -- if the last step in the maceration of the
13  protein is a modification and the cells don't have
14  any more of the modifying enzyme, even if you have
15  100 times as much of the protein, you still get only
16  out the same fraction of active protein at the end,
17  modified protein at the end. So making more might
18  help change the final readout of the amount of
19  protein gene product that you've got, but no
20  guarantees.
21  Q   That's very interesting and not about
22  technique. Does that mean that there are a lot of

Page 63

1   other factors involved that could affect the
2   quantity of the expression product that you get when
3   you carry out, say, the process of the '071 patent
4   or the '069 application?
5   MR. KELBER: Objection as to form.
6   THE WITNESS: It might be. It would
7   depending upon the gene that you were studying.
8   BY MR. ROLLINS:
9   Q   And are all of those factors recognized
10  and predictable?
11  A   No, not even today compared to then.
12  Q   Could you say by carrying out the example
13  of the '069 application and measuring the amount of
14  t-PA that you collect at the end be able to tell how
15  much t-PA was expressed when the primary cell was
16  amplified?
17  MR. KELBER: Can I hear that question
18  back, please.
19  THE WITNESS: Yeah. I don't understand
20  the question.
21  MR. KELBER: Maybe you can just -- rather
22  than reading it back.

Page 64

1   MR. ROLLINS: Would you read it back.
2   Let's see if I understood it.
3   (The reporter read the record as requested.)
4   MR. KELBER: Note my objection. You can
5   answer.
6   THE WITNESS: Well, the question -- I
7   interpret your question as you're asking about when
8   can you actually tell if you have increased gene
9   expression or not, and if you're -- and again, that
10  depends on what part of the step in the process
11  you're interested in.
12  If your readout is active t-PA, then you
13  would have to measure that in the cells that have
14  not undergone amplification and in the cells that
15  have undergone amplification, and if there was a
16  difference, then you could say that you did get an
17  increase, but it's not -- it's not -- it's not
18  obligatory with the amplification that you would get
19  an increased amount of the active protein.
20  BY MR. ROLLINS:
21  Q   Referring again to paragraph 19 of your
22  declaration, does the '069 application teach one of

Page 65

1   skill in the art to expect to achieve amplification
2   and enhanced target gene expression?
3   A   I think it teaches a novel strategy for
4   trying that.
5   Q   Which is?
6   A   The increase -- the amplified increased
7   gene dosage -- increased through amplification
8   increasing gene dosage, so that if the -- if that's
9   the rate-limiting step in expression of your target
10  gene, the strategy of amplification will lead to
11  increased expression.
12  Q   Why do you think, then, that the example
13  carried out the steps of transferring the DNA to a
14  secondary expression host cell?
15  MR. KELBER: Objection as to form.
16  THE WITNESS: It's possible that the
17  processing events or some other step in expression
18  of the gene would work better in the secondary cell
19  line.
20  BY MR. ROLLINS:
21  Q   You mean it's possible that they had a
22  reason for doing so?

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 66

1    A   Oh, yes. Again, it may be sufficient in
2  the primary cell line to get increased expression.
3  It may be useful to move it to a secondary cell line
4  to get increased expression.
5    Q   Did you notice anything in the example
6  that would indicate why that was necessary to move
7  it to a secondary expression host?
8    MR. KELBER: Objection as to form.
9    THE WITNESS: They used a cell line that
10  was lacking dihydrofolate reductase so that you
11  could use the dihydrofolate reductase as a marker.
12    BY MR. ROLLINS:
13    Q   But they put that in the primary cell, did
14  they not?
15    A   Yes, but they used another marker to
16  actually select for the incorporation of the segment
17  carrying the DHFR gene into the genome.
18    Q   That would be the neo gene?
19    A   Yeah, I think it was neo.
20    Q   What in the '069 application forms the
21  basis for your opinion that one skilled in the art
22  would have recognized and fully expected increased

Page 67

1  target gene expression in the primary cell line as a
2  result of homologous recombination and gene
3  amplification in that cell line?
4    A   So the fully expect, one skilled in the
5  art would know that for many genes, the amount of
6  transcription of the gene is the rate limiting step
7  in gene expression. So there are many examples
8  where if you increase transcription of a gene, you
9  get more of a gene product. So that would certainly
10  be -- that would certainly be a step that one might
11  expect.
12    If you change that, you would get gene
13  expression, increased gene expression. And then
14  would recognize -- would recognize, because, I
15  think, one would appreciate that you had to
16  actually -- you could measure the amount of the gene
17  product that's actually being made. One of skill in
18  the art would know how to measure t-PA or could find
19  out how to measure t-PA, et cetera.
20    Q   Do you think -- I'm sorry. Do you think
21  the inventors in the '069 application recognized
22  those factors?

Page 68

1    MR. KELBER: Objection as to form and
2  capacity.
3    THE WITNESS: Yeah, I think their
4  suggestion of this as a method for increasing gene
5  expression suggests that they appreciated that that,
6  for some genes, was certainly the limiting step.
7    BY MR. ROLLINS:
8    Q   Would that be the reason for their using
9  the additional expression host?
10    A   I think they would appreciate -- I think
11  they appreciated that the target gene could be
12  differentially expressed, might be differentially
13  expressed in different cell lines. So it may be --
14  it could be advantageous to put it into a different
15  cell line to actually see the final readout of
16  recombination.
17    Q   So they just wanted to run it through the
18  secondary host cell and get a final readout to
19  compare with the results from the primary cell?
20    A   I don't think they expected that one would
21  have to do that. I think they expected that that
22  was an additional step that one could take. The

Page 69

1  initial -- the single homologous recombination to
2  introduce the amplifiable region might not be the
3  only step, that there could be additional steps at
4  increasing expression.
5    Q   Do you recall what the readout was of t-PA
6  expression in the primary cell?
7    A   I don't think they actually assayed it. I
8  think they proposed it as simply an example of a
9  protein that you could use. I don't recall that
10  they did a measurement.
11    Q   Could you calculate the amount of
12  expression of the primary cell from an assay of the
13  results of the second other cell?
14    A   No. You could be -- you could be unlucky
15  and have the secondary cell you put in decrease the
16  amount of expression. To find out whether it was,
17  in fact, useful to go from primary to secondary
18  cell, you would need to assay them both.
19    Q   Would you know whether or not there was
20  any expression of the primary cell from the result
21  of the assay in the secondary cell?
22    A   No. The gene could be totally off in the

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 70

1  primary cell and on the secondary cell. There's
2  no -- in the primary cell, one is selecting for the
3  incorporation of the amplifiable region. It may or
4  may not be that that would turn on the gene in that
5  primary cell line. So it could be completely off,
6  and that you would only see expression when you
7  moved it into some other cell line. So just because
8  it's expressed in the second cell line, you can't
9  say it wasn't first.
10     Q  So in the first -- if that were the case,
11  would that example satisfy claim 3 of the '071
12  patent?
13     A  I think the patent recognizes the
14  possibility that you might find it useful to move it
15  to another cell line. It recognizes that
16  possibility that that might be important for
17  expression of your target gene.
18     Q  I'm sorry. You say the patent?
19     A  Sorry, the '069. Sorry. It recognizes
20  that that situation could exist, that moving it into
21  a secondary host would be advantageous. And I think
22  the skill -- the person doing the experiments would

Page 71

1  have to -- would have to determine whether using the
2  amplifiable segment and amplifying it in the primary
3  cell really did lead to an increase in expression
4  and then consider whether or not moving it to a
5  secondary cell to try and increase expression would
6  be appropriate.
7     Q  But the '069 application doesn't describe
8  any of that, does it?
9     A  It talks explicitly about how to actually
10  do that.
11     Q  How to actually --
12     A  How to do that, making -- doing the
13  modification in the primary cell line and then
14  moving it into the secondary cell.
15     Q  How did they -- when you say "the
16  modification," do you mean the modification --
17     A  The homologous recombination.
18     Q  You don't mean the modification of the
19  expression characteristics of the gene?
20     A  The modification -- adding the amplifiable
21  gene provides the potential for increasing the
22  expression characteristics. Having the amplifiable

Page 72

1  segment there without amplifying it may or most
2  likely not will change the expression of the gene.
3  Amplifying it may or may not change the expression
4  of the gene.
5     Q  Okay. So claim 3 does require the
6  modification of the expression characteristics of a
7  predetermined gene in the genome of a cell line,
8  doesn't it?
9        MR. KELBER:  Can I hear that question
10  back, please.
11        (The reporter read the record as requested.)
12        MR. KELBER:  Objection as to capacity.
13  You can answer.
14        MR. ROLLINS:  Two courts.
15        MR. KELBER:  If you want to talk about it,
16  we can.
17        THE WITNESS:  I think the claim is that
18  introduction by homologous recombination of a
19  particular -- of an amplifiable gene has the
20  potential to change the expression of the target
21  gene, so that the application suggests that as a
22  strategy for changing gene expression, not modifying

Page 73

1  a promoter -- not modifying the promoter, per se,
2  other than changing its copy number, not affecting
3  the stability of the message by changing the
4  sequence of the message, or changing some other
5  component that may participate in the production of
6  the target gene product.
7     BY MR. ROLLINS:
8     Q  In paragraph 20 of your declaration, is it
9  your opinion that the '069 application also provides
10  an example using the steps recited in paragraph 21
11  of your declaration to, quote, modify the expression
12  characteristics of a predetermined gene in the
13  predetermined cell line?
14     A  Yes.
15     Q  And could you tell me what that example
16  is.
17     A  It's using tissue plasminogen activator,
18  t-PA.
19     Q  Can we turn to the '069 application?
20  Could you walk me through how that example
21  accomplishes the modification of the expression
22  characteristics of the predetermined gene in the

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 74

1 genome of the primary cell line?
2      A   So what the example provides for, it
3 describes how to introduce the DHFR gene, which we
4 know is a gene that can undergo amplification. It
5 can increase the copy number of the DNA right around
6 the gene. So what the example provides for is
7 taking sequences, taking known sequences from t-PA
8 and introducing that into a construct with the DHFR
9 gene and also with another selectable gene, then
10 taking that construct and applying it to recipient
11 cells.
12      In this case, they say "fiberglass," in
13 fiberglass, and then selecting for recombinants by
14 using hygromycin selection, and then we establish
15 whether the integration actually occurred via
16 homology within the t-PA sequences, because that's,
17 in fact, key to doing this kind of genome
18 modification of increasing the copy number -- or
19 potentially increasing the copy number of the
20 promoter for the t-PA gene, the regulatory region of
21 t-PA.
22      So it's a targeted insertion of this gene

Page 75

1 DHFR which can be amplified in response to
2 particular genes. The notion is if you make more
3 gene copies, you would make more RNA and then that
4 you end up making more protein out of that.
5      Q   Now, the construct used in the example
6 includes the gene for t-PA?
7      A   It includes part of it.
8      Q   It includes an amplifiable gene?
9      A   DHFR.
10      Q   DHFR. Does it include an amplifiable
11 expressible marker gene?
12      A   The hygromycin gene that is used to select
13 the integrants does not require that it be amplified
14 in order to select its presence. It's the DHFR
15 gene, and you don't need to amplify that to actually
16 make the homologous construction.
17      Q   But if it's in the vicinity of an
18 amplifiable gene, would it be amplified?
19      MR. KELBER: Objection as to form.
20      THE WITNESS: It depends on the distances.
21 It depends on the actual physical relationship of --
22 well, the distance between the DHFR gene and the

Page 76

1 hygromycin marker, but I would suspect that it would
2 be -- it would be close enough to do that.
3      BY MR. ROLLINS:
4      Q   Does the example indicate whether the
5 amplifiable gene is operatively linked to the neo
6 gene?
7      A   In the substrate DNA, the plasmid which
8 provides the substrate to do the homologous
9 recombination with those genes are physically linked
10 to each other, and the goal is to isolate recipient
11 cells where the DHFR gene is, in fact, physically
12 linked to the chromosomal copy of t-PA.
13      Q   Now, how do you define a chromosome?
14      A   I would say a chromosome is a piece of DNA
15 that encodes -- includes genes, includes other
16 sequences, includes signals to be propagated from
17 generation to generation, and we generally think of
18 chromosomes as the complement of pieces of DNA that
19 are essential to organisms. So you might have some
20 plasmid that you may or may not be able to live with
21 or without, given particular conditions, but
22 basically, you need all the copies of the

Page 77

1 chromosome -- copies of all the chromosomes for the
2 cells that survive.
3      Q   So a chromosome might include a lot of
4 things other than, say, a predetermined gene of
5 interest?
6      A   Yes.
7      Q   And the material that you inserted into
8 the vicinity of the gene of interest?
9      A   Correct.
10      Q   Would those factors or could those factors
11 have a varying on the activity of, say, the
12 predetermined gene of interest?
13      MR. KELBER: Objection as to form.
14      THE WITNESS: Yes, because the biggest
15 problem in doing the sort of targeting that's
16 discussed in these experiments is that most of the
17 incorporation of, in this case, t-PA, hygromycin,
18 DHFR, will actually happen at sites other than the
19 chromosomal t-PA. So an important step in this is
20 realizing or identifying recombinants that have
21 actually undergone a homologous recombination to put
22 the DHFR near the chromosomal copy of t-PA.

20 (Pages 74 to 77)

Nancy Craig - September 29, 2003
Applied Research Systems v. Cell Genesys

Page 78

1     BY MR. ROLLINS:
2     Q  If you were to excise a chromosome from a
3 given cell and insert it into a different cell,
4 could you obtain effects that you would not be able
5 to obtain in its original environment and the
6 original cell?
7     MR. KELBER:  Objection as to form.
8     THE WITNESS:  Well, the caveat being that
9 in most cases a cell can't survive with an
10 additional chromosome copy, it could be that if you
11 move the chromosome into a different cell type, that
12 that -- the sequences on that chromosome would be
13 expressed in the second cell type but not in the
14 first type, or expressed in the first cell type and
15 not in the second cell type.
16     MR. BROWDY:  Can we take a short break?
17     MR. KELBER:  Sure.
18     VIDEO OPERATOR:  Going off record at
19 approximately 11:20 a.m.
20     (Recess.)
21     VIDEO OPERATOR:  This is tape 3, and we're
22 going back on the record at approximately 11:29 a.m.

Page 79

1     BY MR. ROLLINS:
2     Q  In paragraph 23 of your declaration you
3 state that "the '069 application also exemplifies
4 the selection of the transformed cells using the
5 biocide hygromycin." Would you show me in the '069
6 application that you're describing, I think it's on
7 page 13, where it's shown having preparation of the
8 primary recipients?
9     MR. KELBER:  Can I hear the question
10 again?
11     COURT REPORTER:  My computer just froze.
12 If he could repeat it again.
13     BY MR. ROLLINS:
14     Q  I will try to state it again. In section
15 23 you state that the '069 application also
16 exemplifies the selection of the transformed cells
17 using the biocide hygromycin. Would you show me in
18 the '069 application where that occurs?
19     A  Page 13, line 20.
20     Q  And that's referring to the primary cells;
21 is that correct?
22     A  Correct.

Page 80

1     Q  Next, you refer to "selection of clones
2 with high levels of t-PA expression, consequent to
3 gene amplification using medium supplemented with
4 progressively increasing concentrations of
5 methotrexate." Would you show me where that occurs?
6     A  So to get from the selection of
7 hygromycin, what the intervening steps were to first
8 identify integrants where actually the homologous
9 recombination occurred, because in the vast majority
10 of the cells, the construct, the t-PA plus
11 hygromycin plus the DHFR construct didn't integrate
12 by homologous recombination. In the vast majority
13 of the cases, it entered illegitimately into many
14 other places in the genome. That's why this step of
15 going through and analyzing colonies by PCR is
16 important, because that's identifying by using sites
17 inside the vector and outside the vector.  You can
18 identify those cells in which the homologous
19 recombination event actually occurred.  So --
20     Q  Did they use PCR?
21     A  That's the method that they say, yes, that
22 that's possible.  It's not the only way, but that's

Page 81

1 one way you could do it. So then you identify those
2 rare cells that actually have the construct
3 integrated at the t-PA gene. In this particular
4 case, then they make DNA from these cells and go on,
5 then, to recombine -- or to introduce that DNA into
6 cell lines, but lack a DHFR.
7     So they do a secondary round of cells, of
8 selection in these secondary cells. And then now
9 having the secondary cells with the construct
10 integrated into it, they amplified the t-PA region
11 by treating with progressively higher concentrations
12 of methotrexate. So the cells would die if you
13 initially exposed them to the highest concentration,
14 but they gain resistance because the DHFR gene
15 undergoes amplification, and there's more and more
16 and more of DHFR gene product that can deal with the
17 methotrexate.
18     So you do a step-wise amplification
19 procedure. And then you can actually measure how
20 much t-PA there is. And the particular example they
21 say is you could use an antibody-dependent assay,
22 that is a monoclonal ELISA assay that would measure