# EXHIBIT 9

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V. VS. CELL GENSYS, INC.

RANDAL KAUFMAN, PH.D. - 9/30/03

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:

 

**Ellen Grauer**
**Court Reporting Co.**
133 East 58th Street, Suite 1201, New York, New York 10022
Phone: (212) 750-6434  Fax: (212) 750-1097
www.ellengrauer.com

INTERFERENCE 105,114
ARS V. CELL GENESYS
EXHIBIT 2056

THIS PAGE LEFT INTENTIONALLY BLANK

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.                 BSA XMAX(1/1)                                    VS. CELL GENSYS, INC.
RANDAL KAUFMAN, Ph.D. - 9/30/03

## Page 1

(1)        UNITED STATES PATENT AND TRADEMARK OFFICE
(2)
(3)        BEFORE THE BOARD OF PATENT APPEALS
(4)                    AND INTERFERENCES
(5)     (Administrative Patent Judge Michael P. Tierney)
(6)
(7)       APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.
(8)                     Junior Party,
(9)                  (Patent 5,272,071)
(10)                         v.
(11)                  CELL GENESYS, INC.,
(12)                    Junior Party.
(13)              (Application 08/102,390)
(14)              Interference No. 105,114
(15)
(16)   The Videotaped Deposition of RANDAL KAUFMAN, Ph.D.,
(17)   Taken at 1150 West Medical Center Drive,
(18)   Ann Arbor, Michigan,
(19)   Commencing at 10:00 a.m.,
(20)   Tuesday, September 30, 2003,
(21)   Before Leisa M. Pastor, CSR-3500, RPR, CRR.
(22)
(23)        ELLEN GRAUER COURT REPORTING, CO.
(24)            133 East 58th Street, Suite 1201
            New York, New York
(25)               212-750-6434
                  Ref.: 71580

## Page 2

(1)   APPEARANCES:
(2)
(3)    CHARLES L. GHOLZ
(4)    JAMES J. KELLY, Ph.D.
(5)    Oblon, Spivak, McClelland, Maier & Neustadt, P.C.
(6)    1940 Duke Street
(7)    Alexandria, Virginia  22314
(8)    (703) 413-3000
(9)       Appearing on behalf of Junior Party Applied Research
(10)      Systems ARS Holding, N.V.
(11)
(12)   STEVEN B. KELBER
(13)   Piper Rudnick, L.L.C.
(14)   1200 Nineteenth Street, Northwest
(15)   Washington, D.C.  20036
(16)   (202) 861-3900
(17)      Appearing on behalf of Junior Party Cell Genesys, Inc.
(18)
(19)   ALSO PRESENT:
(20)   Matt McKinley - Video Technician
(21)
(22)
(23)
(24)
(25)

## Page 3

(1)    Ann Arbor, Michigan
(2)    Tuesday, September 30, 2003
(3)    10:00 a.m.
(4)
(5)            VIDEO TECHNICIAN:  We are now on the
(6)    record.  This is the videotaped deposition of Dr.
(7)    Randal Kaufman being taken on September 30th, 2003.
(8)    The time now is 10:00 and 12 seconds a.m.  We are
(9)    located at 1150 West Medical Center Drive in Ann
(10)   Arbor, Michigan.  We are here in the matter of Applied
(11)   Research Systems ARS Holding N.V., Junior Party,
(12)   Patent 5,272,071, versus Cell Genesys, Incorporated,
(13)   Junior Party, Application 08/102,390.  This is
(14)   Interference No. 105,114.  This matter is being held
(15)   before Administrative Patent Judge Michael P. Tierney
(16)   in the United States Patent and Trademark Office.
(17)           My name is Matt McKinley, videotape
(18)   operator.  Will the court reporter swear the witness
(19)   in and the attorneys briefly identify themselves for
(20)   the record, please?
(21)           RANDAL KAUFMAN, Ph.D.,
(22)   was thereupon called as a witness herein, and after
(23)   having first been duly sworn to testify to the truth,
(24)   the whole truth and nothing but the truth, was
(25)   examined and testified as follows:

## Page 4

(1)           MR. GHOLZ:  Charles Gholz for ARS.
(2)           DR. KELLY:  James Kelly for ARS.
(3)           MR. KELBER:  Steven Kelber for Cell
(4)    Genesys.
(5)                     EXAMINATION
(6)    BY MR. KELBER:
(7)    Q.  Good morning, Dr. Kaufman.  How are you?
(8)    A.  Good morning.
(9)           MR. GHOLZ:  Before we get into any
(10)   questions, Steve, I have one thing to state on the
(11)   record, that is, in preparation yesterday, we noticed
(12)   a typographical error in paragraph 295 which I would
(13)   like to -- I can either tell it to you or you can ask
(14)   Dr. Kaufman, whichever you --
(15)           MR. KELBER:  You can tell it, just one less
(16)   question.
(17)           MR. GHOLZ:  I'd suspected you had noticed
(18)   it.  All right.  Paragraph 295, lines 2 and 3, the
(19)   words operatively linked appear, and they shouldn't be
(20)   there, so it should read with a predetermined
(21)   naturally occurring gene.  That's it.
(22)   BY MR. KELBER:
(23)   Q.  How are you today?
(24)   A.  Very good, thank you.
(25)   Q.  Is it a requirement that the cells of a cell line be

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

BSA XMAX(2/2)

RANDAL KAUFMAN, Ph.D. - 9/30/03

VS. CELL GENSYS, INC.

## Page 5

(1) immortal, is that a definition of the term cell line?

(2) A.  Of all the cell lines I know, I would say yes, they're

(3)  immortal, meaning that they have potential to grow

(4)  indefinitely.

(5) Q.  Okay.  That's a characteristic of the cell lines

(6)  you're familiar with.  Is that a requirement; in other

(7)  words, if a line of progeny is not immortalized, it

(8)  cannot be a cell line?

(9) A.  Well, when you start to grow cells in culture, they

(10)  become immortal just by virtue of the fact that you're

(11)  selecting for those cells that continue to grow, so

(12)  even if you started with a primary culture, it will

(13)  eventually become a cell line.

(14) Q.  Is that true of any cell?

(15) A.  They acquire mutations, it makes them grow

(16)  indefinitely.

(17) Q.  So the mutations that they acquire, that's true of any

(18)  cell; is that right?

(19) A.  Any type of cell divides its mutations.

(20) Q.  Is there a difference in your mind between a

(21)  continuous culture and an immortal culture?

(22) A.  Continuous culture would be a culture that would have

(23)  a finite lifespan -- or it may or may not have a

(24)  finite lifespan.

(25) Q.  So there is a difference between continuous and

## Page 6

(1)  immortal, right?

(2) A.  Yes.

(3) Q.  Have you ever been deposed before?

(4) A.  Yes.

(5) Q.  I'll just go over the basic ground rules, then.

(6)  Interferences are -- have you ever been deposed in an

(7)  interference before?

(8) A.  No.

(9) Q.  Okay.  A little bit different, not much.  My basic job

(10)  is to ask you questions that are clear and

(11)  understandable.  If at any time I ask you a question

(12)  that is either not clear to you or uses language that

(13)  is unfamiliar to you or is to you not susceptible of

(14)  understanding, just let me know, don't try and answer

(15)  that question, okay?

(16) A.  Yes.

(17) Q.  Your job is to answer the questions as fully and

(18)  completely as you can.  I don't want you to speculate,

(19)  and it's not a memory contest.  The requirement is

(20)  that you answer audibly; is that okay?

(21) A.  That's right.

(22) Q.  In the event that I ask you a question that you

(23)  believe would require you to reveal sensitive or

(24)  confidential information, either your own or a third

(25)  party's, please feel free to consult with counsel for

## Page 7

(1)  ARS before answering that question.  They may from

(2)  time to time otherwise object to my questions.  Once

(3)  they've stated their objection, then you can answer my

(4)  question if you recall it --

(5) A.  Yes.

(6) Q.  -- is that okay?

(7) A.  Yes, okay.

(8) Q.  Tell me about the experiments that you've actually

(9)  conducted wet lab conduction experiments involving

(10)  homologous recombination?

(11) A.  How far back do you want me to go?

(12) Q.  Well, let's separate it into -- into two -- for the --

(13)  let's start with prior to 1989.

(14) A.  Prior to 1989, I had a laboratory in which several

(15)  investigators were involved with doing homologous

(16)  recombination of embryotic stem cells as well as

(17)  somatic cultured cells.

(18) Q.  And were you involved in any of the work that those

(19)  investigators were -- were pursuing from a hands-on

(20)  basis?

(21) A.  At times I would participate.

(22) Q.  Tell me about the things you did and the nature of

(23)  your participation?

(24) A.  I would culture cells, I would prepare DNA, I would

(25)  analyze cells, I would introduce DNA into cells.

## Page 8

(1) Q.  When you prepared DNA for homologous recombination,

(2)  what information did you need to prepare that DNA?

(3) A.  Well, it depends on what the purpose of -- or what the

(4)  method of introducing the DNA would -- was going to be

(5)  for that --

(6) Q.  Okay.

(7) A.  -- particular experiment.

(8)  In some experiments we might use cell

(9)  fusion --

(10) Q.  Uh-huh.

(11) A.  -- in other experiments we would use DNA

(12)  microinjection.

(13) Q.  Okay.

(14) A.  In other experiments we might use electroporation or

(15)  other procedures.

(16) Q.  Well, let's start with electroporation.  In your own

(17)  personal experience, what did you need to do -- I'm

(18)  sorry -- what did you need to know to prepare the DNA

(19)  that would be used to effect homologous recombination?

(20) A.  Well, you'd want to know where you wanted to recombine

(21)  the DNA, so you'd want to know the sequence target.

(22) Q.  Anything else?

(23) A.  I -- preferably you would like to have some selection

(24)  procedure by which you could identify those cells that

(25)  had integrated by homologous recombination.

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

BSA XMAX(3/3)

RANDAL KAUFMAN, Ph.D. - 9/30/03

VS. CELL GENSYS, INC.

## Page 9

(1) Q. One selection procedure, a marker gene?

(2) A. A marker gene would be suitable.

(3) Q. What other kind of selection procedures did you use in

(4)    your experience?

(5) A. Oh, we used a variety of procedures, some of them were

(6)    selection where you actually do a large-scale screen

(7)    just as a -- for whether or not the DNA has inserted

(8)    by homologous integration or not.

(9) Q. Okay. Now, you said you would want to know the

(10)    sequence target, the DNA sequence target. What do you

(11)    mean by the sequence target?

(12) A. If the intent was to put in a particular piece of DNA

(13)    into the genome at a particular site, then you would

(14)    want to know the sequence of that site.

(15) Q. And is it correct that that's one of the virtues of

(16)    homologous recombination, that you can target the DNA

(17)    that you want to introduce into a particular site?

(18) A. That's the definition of homologous recombination is

(19)    that it's a site-specific integration, yeah.

(20) Q. But, in fact, when you perform a homologous

(21)    recombination with a targeted piece of DNA, you get

(22)    many more recombinations than the one that you

(23)    specifically were seeking, right?

(24) A. It depends upon the situation. Like the method of DNA

(25)    transfer, the particular recipient, some recipients

## Page 10

(1)    act as a better target for homologous recombination

(2)    than other cell types.

(3) Q. Using bacteria, just as an example, and

(4)    electroporation, would that be a reasonable

(5)    combination?

(6) A. Bacteria homologous recombination would be more

(7)    efficient because the genome is so much smaller.

(8) Q. Okay. Now, the efficiency rate for that is about --

(9)    I'm sorry -- as of about 1989 was about 1 in 1,000,

(10)    right?

(11) A. That would be high efficiency, yes.

(12) Q. So why do so few work?

(13) A. Well, I mean, it's quite a difficult task, if you can

(14)    imagine, for a DNA sequence to go out and find its

(15)    partner DNA sequence in 500 bases out of, you know, 10

(16)    billion.

(17) Q. Is it correct then that to even get that 1 out of a

(18)    1,000 efficiency rating or efficiency success rate, if

(19)    you will, that you have to get that targeting sequence

(20)    right precisely?

(21) A. As of 1989?

(22) Q. Yes, sir.

(23) A. It was -- it was believed in those days, yes, that

(24)    you'd really need to have -- that the efficiency goes

(25)    up with the degree of homology, and ideally it would

## Page 11

(1)    be an identical sequence.

(2) Q. Provided it's identical, 100 percent homology, is a

(3)    few bases enough to target in whatever DNA you want to

(4)    insert in your target sequence?

(5) A. No.

(6) Q. How much do you need; again, as of 1989, how much was

(7)    perceived to be necessary?

(8) A. Based on experiments in cultured animal cells which,

(9)    you know, the mechanism there may be different than in

(10)    microorganisms, but 500 bases with -- on each side as

(11)    a targeting arm, homologous recombination requires

(12)    two -- two recombination events.

(13) Q. I think you said 500 on each side. Do you have to use

(14)    two arms, that is, one flanking on either side of the

(15)    DNA to be inserted?

(16) A. You don't have to, but if you wanted to insert a

(17)    particular sequence at a particular site, you would

(18)    need to have two arms.

(19) Q. Understood. Okay. We've talked, and you've been very

(20)    obliging, about some of your personal experiences in

(21)    the laboratory before 1989. Could you address your --

(22)    your personal work, experimental work with homologous

(23)    recombination post '89?

(24) A. In 1989 I was in a biotechnology company, and at that

(25)    point we had been using homologous recombination to

## Page 12

(1)    engineer mice embryotic stem cells, as well as tried

(2)    to engineer Chinese hamster cells to make proteins, as

(3)    well as immunoglobulin producing cells, myeloma cells.

(4)        Then in 19 -- I believe it was about 1994,

(5)    I moved to the University of Michigan, and here a

(6)    major part of our effort has been to engineer mice

(7)    that have -- that have genetic homologous

(8)    recombination in their germ line.

(9) Q. Been reasonably successful?

(10) A. Yes.

(11) Q. What kind of mutations have you introduced through

(12)    homologous recombination in the mouse germ line, just

(13)    examples?

(14) A. In one particular case we put in a single amino acid

(15)    chain where we changed a phosphorylation site in a

(16)    protein so it can not be phosphorylated. In other

(17)    situations we would just delete the gene.

(18) Q. So there will be times today when I try and

(19)    recapitulate what your testimony is just so we're all

(20)    on the same -- same level, and I think one of the

(21)    things you've indicated is that you have experience in

(22)    homologous recombination in embryotic stem cells,

(23)    Chinese hamster ovary cells and myeloma cells; is that

(24)    right?

(25) A. Those are the specifics that I remember, yes.

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.        BSA XMAX(4/4)        VS. CELL GENSYS, INC.
RANDAL KAUFMAN, Ph.D. - 9/30/03

## Page 13

(1) Q. Your work at the University of Michigan, has that been
(2) mostly wet work as opposed to supervision?
(3) A. Unfortunately when I moved to the University of
(4) Michigan I moved pretty much by myself, so I set up
(5) the lab.
(6) Q. Aha, okay. So do you still do a fair amount of wet
(7) work?
(8) A. I haven't done wet work -- every now and then I get in
(9) the lab, but I'd say that it's a rare event over the
(10) past five years.
(11) Q. Do you have any personal experience in homologous
(12) recombination in microorganisms?
(13) A. I have a fellow in my lab who does quite extensive
(14) homologous recombination in yeast.
(15) Q. Are yeasts plants? The classification scheme, it
(16) seems to be an issue that changes over the years since
(17) I went to school.
(18) A. No, I would say yeast are not plants.
(19) Q. Okay. Yeast are a class of fungi, right?
(20) A. Yes.
(21) Q. And do they fall into the animal kingdom?
(22) A. Yeah, they would fall into the animal kingdom being
(23) that their genetic material is more like animal than
(24) like plant.
(25) Q. Bacteria are in -- in their own kingdom; is that

## Page 14

(1) right?
(2) A. Yes, bacteria being nonnucleated.
(3) Q. Do bacterial cells synthesize proteins?
(4) A. Do bacterial cells synthesize proteins?
(5) Q. Do they make proteins?
(6) A. Yes.
(7) Q. Do some bacterial cells secrete proteins?
(8) A. Yes.
(9) Q. The proteins that are secreted, are bacterial cells
(10) capable of folding them properly; by properly, I mean
(11) so that they have whatever biological function they
(12) are --
(13) A. It's possible. It depends on the complexity of the
(14) protein.
(15) Q. Are you familiar with the bacteria -- the -- sorry,
(16) the antibiotic niacin (phonetic)?
(17) A. I know the name.
(18) Q. Oh.
(19) A. I don't know what it does.
(20) Q. Okay. I hand you a document that's been previously
(21) marked as Exhibit 2001. I think you'll recognize that
(22) document, but one of the rules is that any time I hand
(23) you a document today for any reason, feel free to look
(24) at all of the document or any part of it. I may from
(25) time to time direct you to a portion of the document,

## Page 15

(1) but that doesn't mean your answer needs to be confined
(2) to it, okay?
(3) Do you, in fact, recognize this document
(4) that is Exhibit 2001?
(5) A. Yes.
(6) Q. In what connection did you first see this document?
(7) A. Oh, probably the first time is when I was contacted
(8) regarding this case.
(9) Q. Who contacted you?
(10) A. I believe it was Chico.
(11) Q. Not looking for a word-for-word transcription, but
(12) generally what was exchanged in that initial phone
(13) call?
(14) A. Just whether or not I would be available to -- would
(15) participate as an expert witness.
(16) Q. Did there come a time when you were requested to
(17) involve yourself in the preparation of the
(18) declaration?
(19) A. Yes.
(20) Q. Are you currently involved in the preparation of a
(21) second declaration?
(22) A. I'm not aware.
(23) Q. If you were doing it, you'd be aware, right?
(24) A. I don't know, but...
(25) Q. Okay. Tell me a little bit about how your declaration

## Page 16

(1) came to exist in its final form, what was the process
(2) of synthesizing that declaration?
(3) A. It was pretty much, you know, a back and forth
(4) interaction between the -- the legal groups that I was
(5) involved with, which I don't even know who all the
(6) people are --
(7) Q. Neither do we.
(8) A. -- and myself, iterative of where I would, you know,
(9) continue and make comments with regard to aspects.
(10) Q. Are you comfortable if we call your side -- your
(11) engagement the scientific side as opposed to the legal
(12) side?
(13) A. Yes.
(14) Q. Did you have anybody assist you with the scientific
(15) side of the declaration preparation?
(16) A. No.
(17) Q. Tell me about claim dependency, what does that mean to
(18) you?
(19) A. It's just that there are -- I guess you would look at
(20) it like umbrellas where there would be some components
(21) of a larger territory.
(22) Q. So would a dependent claim be within the umbrella of
(23) an independent claim?
(24) A. Yes, that's my understanding.
(25) Q. Okay. Take a look, if you would, at the back of this

## Page 17

(1) document that is Exhibit 2001. At column 29 there's a
(2) paragraph that begins with the numeral 28 at the very
(3) top left-hand side. Do you see that?
(4) A. Yes.
(5)     MR. GHOLZ: Objection, outside the scope of
(6) the direct.
(7) BY MR. KELBER:
(8) Q. Is that an independent claim?
(9) A. No, that's -- that's dependent in accordance with
(10) claim 2.
(11) Q. So is it correct, then, that whatever claim 28 covers,
(12) it covers less than what claim 2 covers?
(13)     MR. GHOLZ: Objection, outside the scope of
(14) the direct. I'd like to have a continuing --
(15)     MR. KELBER: We'll take a continuing.
(16)     MR. GHOLZ: Fine.
(17) BY MR. KELBER:
(18) Q. You can answer the question, if you recall it.
(19) A. I'm not a legal expert so...
(20) Q. I hand you another document that I think you'll
(21) recognize as Exhibit 3002. And do you recognize
(22) Exhibit 3002?
(23) A. Yeah, it looks familiar, it looks like my declaration.
(24) Q. Is that your signature on the very last page, that is,
(25) page 214?

## Page 18

(1) A. That's right.
(2) Q. What's jurat?
(3) A. I don't know.
(4) Q. Before you signed this Exhibit 3002, you read it over
(5) pretty carefully, right?
(6) A. Yes, I suspect that when I looked at jurat, I --
(7) then under there, it says that I declare under penalty
(8) of perjury that the statements are true, you know,
(9) within this document.
(10) Q. Okay. Since we looked at the last page, let's look at
(11) the first page, page 1 of your document that is
(12) Exhibit 20 -- I'm sorry, 3002.
(13)     MR. GHOLZ: Is that the cover page or --
(14)     MR. KELBER: Page 1 marked in text.
(15)     MR. GHOLZ: Arabic 1?
(16)     MR. KELBER: Arabic 1.
(17) BY MR. KELBER:
(18) Q. Do you see there at the bottom item 6, there's two
(19) sentences, the first says that you are familiar with
(20) U.S. patent practice from the perspective of a
(21) frequent user of the patent system. Do you see that?
(22) A. Yes.
(23) Q. Does that mean you've applied for numerous patents?
(24) A. I have.
(25) Q. Do you have a rough idea how many?

## Page 19

(1) A. Over 20.
(2) Q. Okay. Is that where you acquired your understanding
(3) of claim dependency?
(4) A. Yes.
(5) Q. So you understand claim dependency, but you lack the
(6) understanding to answer my question whether claim 28
(7) would be -- embraces claim 2 of Exhibit 2001; is that
(8) correct?
(9) A. Like I said, it's -- claim 28 is dependent on claim 2,
(10) the way I read claim 28.
(11) Q. And what does that mean to you that it's dependent on
(12) claim 2?
(13) A. That it is a subsection of what claim 2, you know,
(14) claims.
(15) Q. Okay. So --
(16) A. It's a specific.
(17) Q. So it claims less than what claim 2 claims; is that
(18) right?
(19) A. It's more specific.
(20) Q. Well, what do you mean by more specific, sir?
(21) A. Well, I have -- let me see claim 2.
(22)     As they read, they sound very similar.
(23) Q. So is it your testimony that claim 28 is not more
(24) specific than claim 2?
(25) A. Well, claim 28 states that it's a method in accordance

## Page 20

(1) with claim 2 --
(2) Q. Uh-huh.
(3) A. -- so that would basically be --
(4) Q. Are there requirements in claim 28 that are not
(5) present in claim 2?
(6) A. I do not believe there are.
(7) Q. Okay. Well, if a dependent claim doesn't specify --
(8) are you comfortable with the word requirements for
(9) claim recitations?
(10) A. I believe so.
(11) Q. If a dependent claim doesn't specify any additional
(12) requirements that are not present in the independent
(13) claim from which it depends, in what way is it
(14) dependent?
(15) A. No, no, it is -- it specifies more --
(16) Q. Okay.
(17) A. -- of a particular example, whatever.
(18) Q. I'm sorry, I must have asked the wrong question, and
(19) that will happen.
(20)     What requirements are present in claim 28
(21) that are not present in claim 2?
(22) A. Okay. I have to take a look at these very closely.
(23)     Claim 28 appears to have the requirement
(24) for a particular DNA sequence being upstream and a
(25) sequence being downstream.

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.    BSA XMAX(8/8)    VS. CELL GENSYS, INC.
RANDAL KAUFMAN, Ph.D. - 9/30/03

### Page 21

(1) **Q.** And just to make sure the record reflects it
(2)    accurately, and that's not a requirement of claim 2;
(3)    is that right?
(4) **A.** That's -- claim 2 doesn't specify sequences upstream
(5)    and downstream.
(6) **Q.** Does claim 2 require two of these -- are these what
(7)    you -- oh, I'm sorry, let me withdraw that question.
(8)    Are these what you referred to before as
(9)    targeting arms?
(10) **A.** That's right.
(11) **Q.** Does claim 2 require two targeting arms at all?
(12) **A.** Claim 2 reads that there was one region of homology.
(13) **Q.** Okay. So in the context of dependency, is it correct
(14)    to say that it's your testimony that claim 2 covers
(15)    embodiments that are not covered by claim 28; is that
(16)    right?
(17) **A.** Yeah, claim 28 has two regions of homology, claim 2
(18)    specifies one.
(19) **Q.** Is claim 32 a dependent claim, and claim 32 can be
(20)    found in column 29?
(21) **A.** Yes, dependent in accordance with claim 2.
(22) **Q.** Okay. So it's dependent from the same independent
(23)    claim that 28 was, right?
(24) **A.** No, with claim 2.
(25) **Q.** Yeah, so claim 28 is also dependent from claim 2,

### Page 22

(1)    right?
(2) **A.** Claim 28's dependent on claim 2. Claim 31 is
(3)    dependent -- or 32 is dependent on claim 2.
(4) **Q.** And by the same token, does claim 32 embrace less than
(5)    claim 2?
(6) **A.** Yes.
(7) **Q.** Now, you've used homologous recombination in embryonic
(8)    stem cells, Chinese hamster ovary cells and myeloma
(9)    cells, right?
(10) **A.** I believe so, yes, that's what I said.
(11) **Q.** And a fellow -- or I'm sorry, a person in your
(12)    laboratory has done work with homologous recombination
(13)    in bacteria; is that correct?
(14) **A.** In yeast.
(15) **Q.** In yeast, sorry. Is there anybody in your laboratory
(16)    that's done work at any point in time with homologous
(17)    recombination in bacteria?
(18) **A.** Yes.
(19) **Q.** Do you recall what bacteria was the focus of that
(20)    work?
(21) **A.** Well, typically we use E. coli or derivatives of --
(22)    different mutations of E. coli.
(23) **Q.** Is it true that some E. coli are of pathogenic
(24)    significance?
(25) **A.** Yes.

### Page 23

(1) **Q.** Did you do -- did you pursue any education that
(2)    qualified you as -- with particular skill as an
(3)    English grammatics expert?
(4)    **MR. GHOLZ:** I think we've gotten through
(5)    the period where I have the running objection --
(6)    **MR. KELBER:** Oh, okay.
(7)    **MR. GHOLZ:** -- at least based on the
(8)    question you just asked.
(9)    **MR. KELBER:** Fair enough.
(10)    **MR. GHOLZ:** So everything prior to this, my
(11)    objection applied to. Now it doesn't.
(12)    **MR. KELBER:** Everything? Really? Do you
(13)    want to reconsider that, Counsel?
(14)    **MR. GHOLZ:** Well, when I file the motion to
(15)    strike, I may specify in more detail, but basically,
(16)    you're outside the scope.
(17)    **MR. KELBER:** So you objected to my question
(18)    to the witness, what do you understand about claim
(19)    dependency --
(20)    **MR. GHOLZ:** I'm not here --
(21)    **MR. KELBER:** -- as outside the scope?
(22)    **MR. GHOLZ:** I'm not here to testify,
(23) Counselor.
(24)    **MR. KELBER:** No, that's not what I'm
(25)    asking. I'm trying to find out what you're objecting

### Page 24

(1)    to. Is that correct?
(2)    **MR. GHOLZ:** I'll file my paper and you'll
(3)    have a chance to respond. In any event, I'm no longer
(4)    objecting.
(5)    **MR. KELBER:** Well, you did.
(6)    Okay, back to work. I'm sorry, can you
(7)    read back the last question that I started?
(8)    **MR. GHOLZ:** Is he a grammarian?
(9)    **MR. KELBER:** Yeah.
(10) **BY MR. KELBER:**
(11) **Q.** Did you undertake any specific education to obtain
(12)    specific skills in the English language?
(13) **A.** I've went through high school and college.
(14) **Q.** Anything beyond that?
(15) **A.** I write pretty much as my main -- my responsibility
(16)    is -- what I do is I write scientific papers.
(17) **Q.** And the scientific papers that you write -- I'm
(18)    sorry -- the scientific papers that carry you as an
(19)    author on them are as grammatically correct as you can
(20)    make them, right?
(21) **A.** I try to make them correct.
(22) **Q.** Okay. And it's your testimony that at least in the
(23)    context of a patent application where there's a series
(24)    of nouns recited separated by and/or, that implies a
(25)    choice among those items in the series, right?

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

BSA XMAX(7/7)

RANDAL KAUFMAN, Ph.D. - 9/30/03

VS. CELL GENSYS, INC.

## Page 25

(1) A. That's right.

(2) Q. So if I have ice creams of chocolate, vanilla or
(3) strawberry, that's a choice between chocolate, vanilla
(4) or strawberry, right?

(5) A. Yes, yes.

(6) Q. I'm sorry, I'm hesitating because I'm missing a
(7) document, but I'll be right with you.

(8) Would you turn to column 22 of Exhibit --

(9) MR. GHOLZ: That was column 22.

(10) BY MR. KELBER:

(11) Q. -- 22 of Exhibit 2001, that's the patent.

(12) Again, you're free to look at any part.

(13) I'm particularly interested in the sentence that

(14) begins at line -- along line 43 of column 22. It

(15) starts, the cell line may be.

(16) A. Yes.

(17) Q. And it's -- have you had an opportunity to read that
(18) sentence?

(19) A. I just read it, yes.

(20) Q. Does that imply a choice between cell lines that are
(21) either continuous or immortal?

(22) A. That sentence itself doesn't say which would be
(23) preferred.

(24) Q. No, I'm not asking if there's a preference expressed.
(25) I'm just saying that identifies that you can use cell

## Page 26

(1) lines that are continuous or immortal, right?

(2) A. That's correct.

(3) Q. Is that consistent with your understanding of the way
(4) the term cell line is used in this document?

(5) A. I think that's consistent with how cell line is used
(6) in the document.

(7) Q. Is there also a choice implied here between primary
(8) and continuous cell lines?

(9) A. It states that there are primary, continuous or
(10) immortal as being probably three different subsets of
(11) cell lines.

(12) Q. What's a -- the difference between a primary cell line
(13) and a continuous cell line?

(14) A. A primary cell line is one which you may take from a
(15) particular organ out of an animal, and those cells
(16) would typically grow and eventually lose their
(17) properties of what people call differentiating
(18) properties --

(19) Q. Uh-huh.

(20) A. -- and eventually become immortal, so a primary cell
(21) line is -- it is a cell line that's continually
(22) changing.

(23) Q. Now, the following sentence after the one that we've
(24) been looking at indicates that it's desirable that the
(25) cell line be stable and immortal, right?

## Page 27

(1) A. That's right.

(2) Q. And that's how it can be commercialized, right, I mean
(3) that's what this -- that's what this sentence says;
(4) that's why it's important, right?

(5) A. It says that it's desirable to be stable and immortal,
(6) I don't know why that's desirable.

(7) Q. Well, why don't you read that whole sentence starting
(8) at about line 45 with, of course, and I'll ask you the
(9) question?

(10) A. The final end of the sentence states so that the
(11) expression can be commercialized.

(12) Q. Is it your understanding that the claims of the 071
(13) patent are confined to commercially acceptable
(14) practices?

(15) A. I don't -- I don't know what you mean by commercially
(16) acceptable.

(17) Q. Okay. Is it your understanding that the claims of the
(18) 071 patent are confined to commercialized practices?

(19) A. I mean, that's where they would have potential
(20) importance, with respect to their potential
(21) commercialization.

(22) Q. So these claims should be understood to be confined
(23) only to processes or products that have been
(24) commercialized; is that right?

(25) A. Not necessarily.

## Page 28

(1) Q. See, the following sentence indicates that cloned
(2) microorganisms, whether procaryotic or eucaryotic, may
(3) also be treated?

(4) A. Yes.

(5) Q. Take a look at claim 1 of the 071 patent, which you
(6) can find on column 25?

(7) A. Okay.

(8) Q. Describe for me the differences in the actual
(9) manipulations that are required by claim 1 that would
(10) be performed if you were treating a cell, a --
(11) sorry -- a Chinese hamster ovary cell as opposed to a
(12) bacteria?

(13) A. There is a lot of difference, like I say, in that the
(14) barriers are much larger to use a eucaryotic cell
(15) versus a procaryotic cell.

(16) Q. Okay. But what I want to know is you see that there's
(17) some method steps recited in claim 1, right?

(18) A. That's right.

(19) Q. And you've testified that claim 1 is supposed to be
(20) applied to eucaryotic cells, right?

(21) A. On the virtue -- it says a genome of a cell line so I
(22) would say yes, a eucaryotic cell.

(23) Q. Okay. So what steps in accordance with claim 1 would
(24) be different if you applied it to a Chinese hamster
(25) ovary cell as opposed to an E. coli?

## Page 29

(1) A. The construct that you would use would be completely
(2) different. The amount of homologous DNA sequence that
(3) you would need would be different, you need a larger
(4) sequence. The preferred method of introducing the DNA
(5) might be different, the selection for the integrated
(6) sequences would be different. The particular elements
(7) that you would use for regulatory control of a gene of
(8) interest would be different.
(9) Q. I don't mean to rush you, is that --
(10) A. I think that's -- offhand what comes to mind.
(11) Q. You mentioned that the construct might be different.
(12) Now, would the construct for the Chinese hamster ovary
(13) cell comprise a DNA regulatory segment capable of
(14) stimulating expression of the target gene when
(15) operatively linked thereto?
(16) A. The particular DNA sequence that you would use in a
(17) bacteria would be different than the sequence that you
(18) would use for a Chinese hamster cell.
(19) Q. Is the difference specified here in claim 1?
(20) A. No.
(21) Q. And I think you indicated that the amount of DNA you
(22) would require is different. You'd require a larger
(23) sequence for the Chinese hamster ovary cell; is that
(24) right?
(25) A. Sequent semiology (phonetic), yes.

## Page 30

(1) Q. Okay. And does claim 1 specify a minimum for the DNA
(2) targeting segment?
(3) A. No.
(4) Q. You also indicated that the preferred method of
(5) introducing the DNA might be different for the Chinese
(6) hamster ovary cell and the E. coli, right?
(7) A. That's right.
(8) Q. Does claim 1 indicate a specific method of introducing
(9) the DNA?
(10) A. No.
(11) Q. I think you indicated that the selection method for
(12) the integrated sequence might be different between the
(13) Chinese hamster ovary cell and the E. coli, right?
(14) A. That's right.
(15) Q. Does claim 1 specify a selection characteristic at
(16) all?
(17) A. No.
(18) Q. Could you practice claim 1 without even having a
(19) selection mechanism in your homologous recombinants?
(20) A. It's possible, it's just a matter of convenience.
(21) MR. GHOLZ: We've been going for an
(22) academic hour, 50 minutes. May we have a break?
(23) MR. KELBER: You may have a break at any
(24) time.
(25) MR. GHOLZ: Thank you, I need one.

## Page 31

(1) VIDEO TECHNICIAN: We are going off the
(2) record. The time is 10:51 and 21 seconds a.m.
(3) (Recess taken at 10:51 a.m.)
(4) (Back on the record at 10:57 a.m.)
(5) VIDEO TECHNICIAN: We are back on the
(6) record. The time is 10:57 and 50 seconds a.m.
(7) BY MR. KELBER:
(8) Q. Dr. Kaufman, before the break we were talking about
(9) some differences that you might observe in practicing
(10) claim 1 of the 071 patent if you were going to
(11) practice that method in the context of a Chinese
(12) hamster ovary cell versus an E. coli. One of the
(13) things we talked about is you might use a different
(14) construct; do you recall that?
(15) A. Yes.
(16) Q. There are 58 claims in this document that is Exhibit
(17) 2001, and I wonder if you could look through those
(18) claims and identify one for me that specifies a
(19) construct which could be used in the Chinese hamster
(20) ovary cell but could not be used in the E. coli cell?
(21) MR. GHOLZ: Objection, outside the scope of
(22) the direct.
(23) MR. KELBER: We're going to do this for
(24) each of the differences we discussed, so we'll take a
(25) standing objection, if that's okay?

## Page 32

(1) MR. GHOLZ: That's absolutely okay, yeah,
(2) let's move it along.
(3) A. Okay. You want me to go through each claim?
(4) BY MR. KELBER:
(5) Q. Well, you're pretty familiar --
(6) A. Yeah.
(7) Q. -- with what's claimed in this document, right?
(8) If you can't do this at all, Doctor,
(9) because it's too much of a task, you need to let me
(10) know, but otherwise --
(11) A. No, it will just take time.
(12) Q. What I'm interested in finding out is can you identify
(13) a claim which has requirements for the construct such
(14) that that construct would be useful in the Chinese
(15) hamster ovary cell but not the E. coli cell?
(16) A. So there are specific claims here that -- with regard
(17) to eucaryotic cell line, there are claims regarding
(18) specifics of eucaryotic cell line, animal cell line,
(19) mammalian cell line, plant cell line.
(20) Q. Okay. Are you looking at claims 9 through 12?
(21) A. Yes.
(22) Q. Okay. Do any of those claims specify a requirement
(23) for the construct that would be useful for the
(24) E. coli -- I'm sorry -- would be useful for the
(25) Chinese hamster ovary cell that would not be useful

## Page 33

(1)     for the E. coli cell?
(2)  A. No.
(3)  Q. Okay. If you would continue your review of the claims
(4)     of the 071 patent to see if there are any claims that
(5)     specify a requirement for the construct that would
(6)     render it useful in the Chinese hamster ovary cell but
(7)     not useful in the E. coli cell, and again, sir, you're
(8)     free to look at any of the -- the claims or any part
(9)     of this document, but to give you kind of a guide,
(10)    there is a claim, for instance, that characterizes the
(11)    construct itself, and that's like claim 26 and 27?
(12)    I'm not saying that those are the answer to my
(13)    question, but what I'm looking for is that -- claims
(14)    that recite a requirement for the construct like that.
(15) A. Okay. Well, there are method claims here regarding
(16)    production of a particular protein product; depending
(17)    upon what that protein product is, you may be
(18)    restricted to a particular type of microorganism or
(19)    cell line.
(20) Q. And what protein product have you identified as
(21)    recited in claims?
(22) A. It just says -- it doesn't specify, it just says a
(23)    gene product.
(24) Q. Okay.
(25) A. Again, like in method 16 is a herpes simplex virus

## Page 34

(1)     thymidine kinase gene, that would be different if it
(2)     were going to be used in a microorganism or a
(3)     eucaryotic cell.
(4)  Q. In what way would it be different?
(5)  A. I -- I just am not familiar with people using the
(6)     herpes simplex thymidine kinase gene for negative
(7)     selection in E. coli or in microorganisms. I know
(8)     that it's used in mammalian cells.
(9)  Q. Okay. Any other claims that specify a requirement for
(10)    the construct that would be suitable for use in
(11)    Chinese hamster ovary cells but not E. coli?
(12) A. I can't see anything that stands out at this point.
(13) Q. Okay. I hate to give you tasks that are unnecessarily
(14)    difficult, but one of the things that -- in searching
(15)    for a claim that would require a difference in the
(16)    construct that would make it acceptable for Chinese
(17)    hamster ovaries, can I say CHO cells, is that
(18)    acceptable to you?
(19) A. Okay, that's fine, yeah.
(20) Q. CHO cells, and not E. coli cells, would you have found
(21)    one that requires a larger sequence, we talked about
(22)    the amount of sequence?
(23)    MR. GHOLZ: Can I have that question read
(24)    back? I got lost.
(25)    (The requested portion of the record was

## Page 35

(1)     read by the reporter at 11:10 a.m.)
(2)     MR. KELBER: Let me withdraw that and try
(3)     and do something that's at least reasonably clear.
(4)     MR. GHOLZ: Thank you, Steve.
(5)  BY MR. KELBER:
(6)  Q. You recently looked through the claims of the 071
(7)     patent that is Exhibit 2001 for claims that might
(8)     recite a requirement of the construct that would make
(9)     that construct suitable for use in CHO cells but not
(10)    E. coli cells, right?
(11) A. That's right.
(12) Q. In the context of that search, would you have
(13)    identified a claim that required a larger sequence for
(14)    the CHO cells as opposed to the E. coli cells?
(15) A. It doesn't specify anywhere in here the length of
(16)    sequence required.
(17) Q. Okay. One of the things we talked about that
(18)    characterizes a process differently for CHO cells as
(19)    opposed to E. coli cells is the method of introducing
(20)    the DNA. Could you look through the claims of the 071
(21)    patent to see if any of the claims there specify a
(22)    method of introducing the DNA?
(23) A. No, they don't talk about methods specifically.
(24) Q. We did talk about selection for the integrated --
(25)    yeah, for the integrated sequence that might be

## Page 36

(1)     different. One of the claims that you identified for
(2)     me I think is claim 16, which employs the herpes
(3)     simplex virus thymidine kinase as a selection marker;
(4)     is that right?
(5)  A. As a negative selection marker.
(6)  Q. Negative selection marker. And I think it's your
(7)     testimony that you're not familiar with literature
(8)     that directs the use of the HSV TK gene for use in
(9)     microorganisms, right?
(10) A. For use as a negative selective marker microorganism.
(11) Q. Would you take a look at column 5, lines -- it's a
(12)    full paragraph, it's column 5 about line 38 to 47.
(13)    What I believe this is directed to is use of the
(14)    HSV TK gene as a negative selectable marker, but could
(15)    you read that and confirm that's correct?
(16) A. Okay. The question was?
(17) Q. Is that paragraph directed to the use of the HSV TK
(18)    gene as a negative selectable marker?
(19) A. That's right.
(20) Q. Does that paragraph indicate that it is suitable for
(21)    use only in eucaryotes?
(22) A. No, but again, like -- I don't know of any example
(23)    where anyone has used that in procaryotes as a
(24)    negative selectable marker.
(25) Q. And I can point you back to that portion, but the 071

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

BSA XMAX(10/10)

RANDAL KAUFMAN, Ph.D. - 9/30/03

VS. CELL GENSYS, INC.

### Page 37

(1) patent generally teaches that the techniques that are
(2) described there are suitable for use in both
(3) eucaryotes and procaryotes, right?
(4) A. The -- you're saying which -- which particular claims
(5) or --
(6) Q. Well, that's -- you testified, I think, that it's
(7) correct that the phrase cell lines or microorganisms
(8) appears throughout the 071 patent, right?
(9) A. There -- there are points where it states cell lines
(10) versus microorganisms, I believe, yes, or both.
(11) Q. Exclusive of the claims, the patent does not teach
(12) that the techniques that are described are not
(13) suitable for microorganisms, does it? By the patent,
(14) I mean the 071 patent.
(15) A. Well, there are no examples, and --
(16) Q. Is it your understanding that a patent should be
(17) understood to be confined in its teaching to its
(18) examples?
(19) A. As a scientist, I've looked at these examples as being
(20) quite important in determining the claims --
(21) Q. Okay.
(22) A. -- but --
(23) Q. I'm sorry if I interrupted you, I didn't mean to.
(24) A. That's -- I just think that the examples are -- are
(25) the essence of what the claim should be about. I know

### Page 38

(1) that in patents there's -- there's a desire to have as
(2) broad a claim as possible.
(3) Q. But they should be directed to the subject matter
(4) example; is that right?
(5) MR. GHOLZ: Objection, it's a slightly
(6) different objection.
(7) MR. KELBER: That's fine.
(8) MR. GHOLZ: My continuing objection is
(9) still going, but this time we're not offering him as
(10) an expert witness on patent law.
(11) BY MR. KELBER:
(12) Q. You can answer the question.
(13) A. The question was whether the claims should have
(14) anything to do with the examples?
(15) Q. Well, it's a little broader than my phraseology. My
(16) question to you is should the claims be understood to
(17) be confined to the subject matter of the examples, the
(18) claims --
(19) A. It doesn't necessarily have to be confined to that
(20) subject matter, no.
(21) Q. Okay. So the fact that there is not an example of a
(22) procaryote that is modified by homologous
(23) recombination in the 071 patent, is that sufficient to
(24) persuade you that procaryotes are simply not relevant
(25) to the teaching of the 071 patent?

### Page 39

(1) A. Based on prior art, I would say that procaryotes would
(2) not be patentable based on prior E. coli's experience
(3) or --
(4) Q. If the art was silent, the prior art was silent, would
(5) this not work with procaryotes, this 071 patent
(6) manipulation?
(7) A. Yes, but it would be obvious.
(8) Q. Oh, okay. When you modify a cell, do you have to
(9) modify all the cells of that cell line or do you
(10) pick -- let me leave it at that, I don't want to leave
(11) you with one of those when did you stop beating your
(12) wife questions -- do you have to modify all the cells
(13) of the cell line?
(14) A. For what purpose?
(15) Q. To do whatever is specified by claim 2 of the 071
(16) patent.
(17) A. It only talks about a cell, you know, modify the
(18) characteristics of expression by changing the genome
(19) of a cell line.
(20) Q. To do that do you have to modify every member of the
(21) cell line, that is, however many -- let me put it into
(22) specific context for you.
(23) There's lots of different DHFR deficient
(24) CHO cell lines, right?
(25) A. That's true.

### Page 40

(1) Q. Pick one strain, to crack -- this claim 2 would be
(2) applicable to DHFR deficient CHO cells -- cell lines,
(3) right?
(4) A. Yeah, I don't understand how this relates to the
(5) question that you just asked me.
(6) Q. Well, I'm going to try and build up to it --
(7) A. Okay.
(8) Q. -- okay?
(9) So claim 2 is a method that I could -- that
(10) one skilled in the art could apply to DHFR deficient
(11) CHO cell lines, right?
(12) A. That's right.
(13) Q. Okay. Now, pick any strain, in order to practice
(14) claim 2, do I have to modify every cell of that strain
(15) in existence?
(16) A. What strain?
(17) Q. Whatever DHFR deficient CHO cell strain you've
(18) selected.
(19) A. You mean CHO cell line?
(20) Q. Yeah.
(21) A. Yeah. Would -- what was the question again, sorry?
(22) Q. Let me try it a different way. Isn't it true to
(23) practice this I obtain candidates, that is, cells out
(24) of the -- that have as their heritage the cell line of
(25) interest, modify those cells and if I get a successful

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

BSA XMAX(11/11)

RANDAL KAUFMAN, Ph.D. - 9/30/03

VS. CELL GENSYS, INC.

### Page 41

(1) homologous recombinant that otherwise meets my needs,
(2) I generate progeny from that successful recombinant?
(3) A. Yes.
(4) Q. So we do it a discreet number of cells at a time. You
(5) don't have to modify every cell of the cell line to
(6) create the homologous recombinant, right?
(7) A. You want a homogenous population --
(8) Q. Right.
(9) A. -- at the end of the day.
(10) Q. And so you take some, you modify them, transform them,
(11) if that's an acceptable word, using homologous
(12) recombination, and then you grow the successful
(13) recombinants up, right?
(14) A. Right.
(15) Q. Okay.
(16) A. You have to identify the successful recombinants.
(17) Q. And one way of doing that is with a selectable marker,
(18) right?
(19) A. Yeah, that's one way.
(20) Q. Okay. You said a minute ago, I think, that it would
(21) have been obvious to use this technique with
(22) procaryotes, this technique, I mean the technique of
(23) claim 2 of the 071 patent, right, in 1989?
(24) A. Yes, there's a lot of prior art I believe in bacteria
(25) systems of homologous recombination prior to 1989.

### Page 42

(1) Q. Okay. And I think we looked at the claims, and other
(2) than possibly claim 16, we couldn't find a claim of
(3) the 071 patent that includes a recitation, a
(4) requirement, if you will, that would be different for
(5) eucaryotic as opposed to procaryotic cells, right?
(6) A. They just -- there are all these subclaims specified in
(7) a eucaryotic cell or plant cell, whatever.
(8) Q. Aside from those?
(9) A. Yeah.
(10) Q. So as of 1989 couldn't you do the same thing with --
(11) to CHO cells that you would do according to the patent
(12) to E. coli?
(13) A. No, I don't think so. For many years people tried to
(14) get homologous recombination to go in animal cells and
(15) it was not possible. A lot of it was because that
(16) wasn't possible to detect those rare events.
(17) Q. The recombination event is too rare to detect?
(18) A. It's probably 1,000 times more infrequent.
(19) Q. Does the 071 patent contain specific teachings that
(20) allow you to detect the successful recombination event
(21) at a frequency above that which was encountered in the
(22) prior art you just referred to?
(23) MR. GHOLZ: I want to point out that my
(24) continuing objection continues.
(25) MR. KELBER: All right. I assumed it did.

### Page 43

(1) MR. GHOLZ: Okay. It's just been a long
(2) time.
(3) A. There are enough differences between eucaryotes and
(4) procaryotes that because there is prior art for
(5) homologous recombination in procaryotes, there was no
(6) evidence that similar processes might even occur in
(7) eucaryotes.
(8) BY MR. KELBER:
(9) Q. Okay. But that wasn't quite my question. My question
(10) to you -- and I'll try and rephrase it because,
(11) obviously, it didn't come across -- the question to
(12) you is does the 071 patent contain specific teachings
(13) that would allow you to increase the frequency of
(14) successful recombination such that this problem that
(15) you described of very low, maybe undetectable,
(16) successful recombination in the prior art in
(17) eucaryotes could be overcome?
(18) A. No, it doesn't. Well, other than the couple things
(19) about a selected marker but --
(20) Q. Okay. Now, HSV TK is a negative selectable marker,
(21) that was well-known prior to 1989, for all kinds of
(22) transformation events, right?
(23) A. Yes.
(24) Q. Okay.
(25) A. In eucaryotes, also.

### Page 44

(1) Q. Okay. So other than -- scratch that, scratch that,
(2) sorry.
(3) So you can use -- again, I'm sorry to
(4) recapitulate your testimony, you've been patient with
(5) me, but I need to go back here to start myself over.
(6) You can use homologous recombination in microorganisms
(7) in -- scratch that.
(8) You can use it in E. coli, you can use it
(9) in embryonic stem cells and you can use it -- and you
(10) can use it in myeloma cells, right?
(11) A. Yeah. As of today, we know that, yes.
(12) Q. Can you use it in just embryonic stem cells?
(13) A. You can use it in other cells also. You can use it in
(14) CHO cells, you can use it in myeloma cells, it's a
(15) matter of frequency.
(16) Q. So just like this chocolate, vanilla, strawberry
(17) example, if you're told that the ice cream flavors
(18) that are available are chocolate, vanilla and
(19) strawberry, that doesn't mean you have to eat all
(20) three, right?
(21) A. No, no, you choose one.
(22) Q. Okay.
(23) A. Assuming that you don't have an allergy to one or the
(24) others.
(25) Q. Good point, thank you. What's an essential limitation

## Page 45

(1) of a claim, Doctor?

(2)         We'll see, I think your standing objection

(3) should be over?

(4)         MR. GHOLZ: Wait. I don't --

(5)         MR. KELBER: I can point you to that exact

(6) language.

(7)         MR. GHOLZ: Would you, please?

(8)         MR. KELBER: Sure.

(9)         MR. GHOLZ: Okay, because I don't remember.

(10) We have an interruption.

(11)         MS. MITCHELL: Lunch is already here.

(12)         MR. GHOLZ: Good Lord. It's better when

(13) it's hot.

(14)         MR. KELBER: Okay. My salad probably

(15) shouldn't be hot, but that's fine.

(16)         MR. GHOLZ: Well, my sandwich --

(17)         MR. KELBER: This is a good time for the

(18) lunch break if it's good for the witness.

(19)         VIDEO TECHNICIAN: Okay. We're going off

(20) the record. The time is 11:24 and 5 seconds a.m.

(21)         (Recess taken at 11:24 a.m.)

(22)         (Back on the record at 11:58 a.m.)

(23)         VIDEO TECHNICIAN: We are back on the

(24) record. The time is 11:58 and 42 seconds a.m.

(25) BY MR. KELBER:

## Page 46

(1) Q.  Good morning, still, Dr. Kaufman.

(2) A.  Good afternoon, yes.

(3) Q.  Would you pick up the 071 patent if you don't have it

(4)     in front of you and take a look at claim 1. Is it

(5)     accurate to characterize claim 1 as directed to a

(6)     method of modifying a cell so that a gene that's found

(7)     in the genome of the cell which is not typically

(8)     expressed is subsequent to the homologous

(9)     recombination event expressed?

(10) A.  Yes.

(11) Q.  What do you mean by expression or express?

(12) A.  There's no definition in here in terms of expression.

(13) Q.  Is there a definition that one of ordinary skill in

(14)     the art would immediately assign to the term

(15)     expression?

(16) A.  In 1989?

(17) Q.  Yes, sir.

(18) A.  It would be something that is detectable at a

(19)     significant level above a background value of whatever

(20)     assay you're using.

(21) Q.  Take a look at the very last claim, claim 58 of the

(22)     071 patent. Do you see that the method calls for

(23)     permitting expression of the gene product?

(24) A.  Yep.

(25) Q.  Does that mean, in words we used earlier today,

## Page 47

(1)     synthesize the protein encoded by that gene?

(2) A.  Yeah, permitting the expression, that's --

(3) Q.  Permitting the gene to do its thing?

(4) A.  Yes.

(5) Q.  Synthesize the --

(6) A.  The protein is being synthesized, yeah.

(7) Q.  And then it calls for collecting the gene product; do

(8)     you see that?

(9) A.  That's right.

(10) Q.  How do you collect the gene product?

(11) A.  It -- there are a number of ways to do it. Typically,

(12)     for a pharmaceutical purpose, the protein is released

(13)     from the cell and you would recover it from the growth

(14)     media.

(15) Q.  If the protein is -- you say it's released from the

(16)     cell, is that another way of saying secreted?

(17) A.  Yes.

(18) Q.  If the protein is not secreted -- synthesized by the

(19)     cell but not secreted, can you collect it?

(20) A.  You can break the cell open and then isolate it from

(21)     the intact cell.

(22) Q.  And those -- both those kind of techniques, collecting

(23)     it from the media or lysing it from the cell and

(24)     collecting it, both of those were known by 1989; is

(25)     that right?

## Page 48

(1) A.  That's right.

(2) Q.  Does the 071 patent describe collection -- describe an

(3)     example of expression of the gene product and

(4)     collection of the gene product?

(5) A.  As an example?

(6) A.  Uh-huh.

(7) A.  You're asking if there's an example?

(8) Q.  Uh-huh.

(9) A.  What I recall is there is an example, offhand you want

(10)     to know what the example is?

(11) Q.  Yeah, if you could direct me to a column line type

(12)     reference?

(13)         MR. KELBER: Can you print more carefully?

(14) A.  Okay. So they're measuring RNA expression, which is

(15)     not the protein, but it's generally assumed that the

(16)     RNA is expressed -- it's likely the protein would be

(17)     expressed.

(18) BY MR. KELBER:

(19) Q.  Let me hand you a document that's been previously

(20)     marked as Exhibit 3001 and ask if you recognize that

(21)     document?

(22)         MR. GHOLZ: Do you have a copy for us,

(23)     Counsel?

(24)         MR. KELBER: Jim has it.

(25)         MR. GHOLZ: Oh, sorry.

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

BSA XMAX(13/13)

RANDAL KAUFMAN, Ph.D. - 9/30/03

VS. CELL GENSYS, INC.

## Page 49

(1) A. It looks familiar, but I'm not sure, where does it
(2)    come from?
(3) BY MR. KELBER:
(4) Q. Well, take a look at your declaration, which I think
(5)    is still in front of you, see if you can find the
(6)    first reference. Specifically, Dr. Kaufman, take a
(7)    look at page 2 of your declaration. Do you see about
(8)    the middle of the page you reference U.S. patent
(9)    application 08/102,390, middle of page 2?
(10) A. Yes.
(11) Q. Can you determine today whether there's a relationship
(12)    between the exhibit that's been marked 3001 and U.S.
(13)    patent application 08/102,390?
(14) A. Yeah, that's the 390 application.
(15) Q. Okay. Now, in your testimony with respect to this
(16)    application, even though the application clearly
(17)    indicates that the RNA is amplified and -- I'm sorry,
(18)    the DNA is amplified in DNA that is ordinarily
(19)    expressed, you found the fact that there was no
(20)    detection of the expression product of the gene fairly
(21)    important, right?
(22) A. That's right.
(23)    MR. GHOLZ: I think that you have stopped
(24)    asking the questions to which I objected and that
(25)    we're now to questions, at least the last question,

## Page 50

(1)    that I'm not objecting to.
(2)    MR. KELBER: Okay, fair enough.
(3)    MR. GHOLZ: So my co-counsel --
(4)    MR. KELBER: Appreciate the observation.
(5)    MR. GHOLZ: -- has asked me to turn off my
(6)    objections, so I hereby turn off my continuing
(7)    objection.
(8) BY MR. KELBER:
(9) Q. Why would amplification of DNA ordinarily expressed by
(10)    a cell result in cessation of expression of that
(11)    DNA -- I'm sorry, scratch that.
(12)    Why would amplification of a gene that is
(13)    ordinarily expressed by a cell in that cell be likely
(14)    to end expression of that gene?
(15) A. Why would the expression be unstable?
(16) Q. Well, why would you --
(17) A. It would lose the expression.
(18) Q. Why a subsequent amplification; your testimony is that
(19)    the 390 application fails to teach -- fails to detect
(20)    expression of the gene of interest after insertion of
(21)    the DNA construct, right?
(22) A. That's right.
(23) Q. And you found that of some importance in analyzing the
(24)    claims --
(25) A. Yes.

## Page 51

(1) Q. -- of the 390 application, right?
(2) A. That's right.
(3) Q. And, in fact, you found that to be one of the
(4)    essential elements of the claims, right?
(5) A. That's right.
(6) Q. So you must have come to the conclusion that -- well,
(7)    maybe you didn't.
(8)    Are the genes that are exemplified in the
(9)    390 patent ordinarily expressed in mammalian
(10)    proteins -- I'm sorry, 390 application -- thank you,
(11)    Counsel -- are the genes that are identified as
(12)    exemplary in Exhibit 3001, are they ordinarily
(13)    expressed in mammalian cells in which they're found?
(14) A. We're talking about two genes. Specifically, it's
(15)    erythropoietin (phonetic), and the other one was --
(16)    was TPA.
(17) Q. Are those genes ordinarily expressed in skin
(18)    fibroblasts?
(19) A. TPA, I believe, is -- yeah, that's expressed in skin
(20)    fibroblasts. Erythropoietin, I don't know of any data
(21)    to support that it is.
(22) Q. Fair enough. Let's take TPA first. To amplify the
(23)    TPA gene in a skin fibroblast substantially, as taught
(24)    in the 390 application, would you expect the cell to
(25)    stop expressing TPA?

## Page 52

(1) A. There's no way to predict. You -- it may turn it off,
(2)    it may not turn it off. It depends upon really the
(3)    properties of that protein and whether or not there's
(4)    any potential toxic effects of that protein on the
(5)    cell, if the cell would be at an advantage if it
(6)    turned the expression off.
(7) Q. Well, we're not talking in general terms, we're
(8)    talking TPA and skin fibroblasts. Would you expect
(9)    TPA to be toxic to the cell?
(10) A. Yes.
(11) Q. Okay. So that the cell would die before it could
(12)    express the TPA?
(13) A. If the cell was making too much TPA, it wouldn't
(14)    survive.
(15) Q. Okay. But you would detect the expression product
(16)    until it died, right?
(17) A. Well, it depends when you looked.
(18) Q. Okay. Now, we've got a situation, I think you've
(19)    testified, that the cell normally makes TPA in some
(20)    amount. I don't want to call it small or large, those
(21)    are relative terms, but --
(22) A. Very small.
(23) Q. And let's call that amount X, okay? The risks that
(24)    you identified of shutting down gene expression is
(25)    that at some amount, X plus some fraction, the TPA

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

BSA XMAX(14/14)

RANDAL KAUFMAN, Ph.D. - 9/30/03

VS. CELL GENSYS, INC.

### Page 53

(1) will be toxic to the skin fibroblast, right?

(2) A. That's right.

(3) Q. However much is necessary to get to the level, the

(4) cell will express that protein, right; I mean, in

(5) order to die due to TPA toxicity, the cell first has

(6) to express the TPA, right?

(7) A. We're talking about a population of cells --

(8) Q. Uh-huh.

(9) A. -- and if there's a selective advantage for any cell

(10) to not make TPA, that is to not make it, that cell

(11) will outgrow the population.

(12) Q. That wasn't my question, Doctor. I appreciate that,

(13) though.

(14) My question to you is that the poor cell

(15) that may have a selective disadvantage because it's

(16) been amplified, the gene -- the TPA gene has been

(17) amplified, and if, in fact, TPA toxicity is fatal to

(18) that cell, in order to succumb to that fate, that is,

(19) TPA toxicity, it must first express the gene of

(20) interest, in this case TPA, right?

(21) A. Well, you've given me the assumption that they start

(22) to make it T -- at day 1, they're making TPA before

(23) the gene amplification.

(24) Q. Now, if you amplify the gene, what if two copies of

(25) the gene is toxic?

### Page 54

(1) A. They'll still make the --

(2) Q. It's not the gene that's toxic, right, it's the

(3) expression --

(4) A. The gene product --

(5) Q. -- product?

(6) A. Yeah, the gene product.

(7) Q. So in order to die of that toxicity, they must,

(8) nonetheless, make that product, right, in whatever

(9) amount is toxic?

(10) A. They make the product and then they die.

(11) Q. Okay. Is it your understanding that the 390 patent

(12) teaches that the gene insert -- well, let me start

(13) back a little bit.

(14) Would you agree that the 390 patent

(15) provides a teaching that the expression, the goal of

(16) the invention is altering the expression of genes in

(17) human cells using homologous recombination?

(18) A. Human cells?

(19) Q. Human cells. We can step back one and say mammalian

(20) cells if you're more comfortable with that?

(21) A. Yeah, mammalian cells I agree with.

(22) Q. Okay. Just -- just to satisfy my own aperient

(23) curiosity, if you turn to page 4 of Exhibit 3001, do

(24) you see down there about line 34 it identifies human

(25) cells as especially preferred?

### Page 55

(1) A. It doesn't say especially preferred.

(2) Q. Well, it uses the words more particularly primate

(3) cells and especially human cells --

(4) A. Yes.

(5) Q. -- do you see that language?

(6) A. Yes.

(7) Q. So there's at least a teaching here that one of the

(8) things that the inventor of the 390 application might

(9) have had in mind is modifying the expression level in

(10) a human cell of a gene of interest using homologous

(11) recombination, right?

(12) A. No.

(13) Q. No? What about that --

(14) A. But the purpose of the --

(15) Q. Okay.

(16) A. -- the goal in this was to produce the protein in CHO

(17) cells.

(18) Q. To spec -- is it limited to CHO cells?

(19) A. I don't know if it's limited, in terms of the example

(20) that's provided, and the --

(21) Q. Okay.

(22) A. -- experiments and the description.

(23) Q. Okay.

(24) A. It's -- the goal was to produce the protein in the

(25) cell line that I presume is amenable to manufacturing

### Page 56

(1) purposes.

(2) Q. So they just teach the incorporation of a gene through

(3) any system into a cell line that produces the protein

(4) of interest?

(5) A. No, the advantage of using the human cells is that

(6) then you have a human gene but you're not

(7) manufacturing the protein in the human cells.

(8) Q. Okay. In fact, the goal here is to produce large

(9) amounts of the expression product of the target gene,

(10) right?

(11) A. Of the human target gene, yeah.

(12) Q. And one of the ways of doing that that's described

(13) here is inserting an amplifiable gene in proximity to

(14) the target gene and then amplifying the resulting

(15) cell, right?

(16) A. There's -- there are two different cells we're talking

(17) about here, there's a primary cell and a secondary

(18) cell.

(19) Q. Okay. Let's talk about the primary cell.

(20) A. I don't see any indication that there's amplification

(21) in the primary cell.

(22) Q. You didn't see that anywhere in the application; is

(23) that right?

(24) A. No.

(25) Q. Did you read this closely, Exhibit 3001?

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.    BSA XMAX(15/15)                          VS. CELL GENSYS, INC.
RANDAL KAUFMAN, Ph.D. - 9/30/03

**Page 57**

(1) A. A while ago, I read it pretty close, yes.
(2) Q. When was the last time you saw this document, that is
(3) Exhibit 3001?
(4) A. The last time I studied it.
(5) Q. I don't know what study means to you, but the last
(6) time you reviewed it, yeah, not saw it in your
(7) briefcase but actually looked at the words in it?
(8) A. It's been a while. It was -- it would be when I was
(9) preparing my declaration.
(10) Q. Okay. And at the time that you prepared your
(11) declaration, if you recall, Doctor, did you review it
(12) to determine whether or not it indicated that
(13) amplification could occur in the primary cell, as
(14) you've characterized it?
(15) A. In terms of the experimental procedures described,
(16) as -- as I recall, there was no demonstration or
(17) discussion about amplification in the primary cell.
(18) Q. You say experimental procedures provided, are you
(19) confining your comments to the experimental section
(20) that begins on page 12?
(21) A. The -- the examples.
(22) Q. Okay. Was -- are the comments in your declaration
(23) based on consideration of the same portion of the 390
(24) application?
(25) A. Okay. The question, pardon me?

**Page 58**

(1) Q. The comments in your declaration with regard to the
(2) 390 application and the teaching regarding
(3) amplification, is that also based on your scrutiny of
(4) the experimental procedures beginning at about page 12
(5) of the -- of Exhibit 3001?
(6) A. That is -- we're talking about gene amplification --
(7) Q. Uh-huh.
(8) A. -- in the dihydrofolate reductase deficient cells?
(9) Q. No, I didn't say anything about the dihydrofolate
(10) reductase deficient cells, Doctor. I asked you does
(11) the reference teach the amplification, the amplifiable
(12) gene and the gene of interest in the homologous
(13) recombination, and I think your answer was you didn't
(14) see any teaching of that amplification, it was not
(15) until the secondary cells, right?
(16) A. That's right.
(17) Q. Okay. And when I asked you in some more detail you
(18) said well, in particular that's not provided for in
(19) the experimental procedures, and when I asked you what
(20) part of the 390 application you were referring to, you
(21) said well, beginning about page 12, the examples?
(22) A. Yeah, yes.
(23) Q. My question to you is, in offering your testimony in
(24) your declaration with respect to the absence of a
(25) teaching of amplification in anything but the, what

**Page 59**

(1) you've called, secondary cells, did you take into
(2) account other parts of the application, that is the
(3) 390 application, besides the experimental procedures?
(4) A. There is no description in here of amplification in
(5) the primary cell, as I recall.
(6) Q. Would you take a look at page 10, beginning about line
(7) 34, and there's two sentences, the second one crosses
(8) over to page 11. If you'd read those to yourself. In
(9) particular I'm interested in the language,
(10) amplification may be performed at this time by
(11) stressing the primary cells. Just -- just take a look
(12) at those sentence, and then I'll have a couple of
(13) questions.
(14) A. Okay, yes.
(15) Q. Did you consider this teaching in coming to the
(16) conclusion that amplification of the gene of interest
(17) in the primary cell is not taught in the 390
(18) application?
(19) A. I don't believe that it's taught because the
(20) understanding is that the amplifiable gene here,
(21) again, is dihydrofolate reductase which would be
(22) limited to the dihydrofolate reductase cells, and the
(23) human cells are not that -- or the primary cells are
(24) not dihydrofolate reductase deficient.
(25) Q. Is it your testimony that DHFR, if I can refer to it

**Page 60**

(1) for the convenience of the reporter at least, DHFR is
(2) not amplifiable in a human cell, is that your
(3) testimony?
(4) A. No.
(5) Q. It's not your testimony or it's not amplifiable? I'm
(6) sorry, my fault, Doctor, I apologize. Is it
(7) correct -- strike that.
(8) Is it your testimony that the DHFR gene is
(9) not amplifiable in human cells?
(10) A. What human cells?
(11) Q. Skin fibroblasts.
(12) A. The endogenous dihydrofolate reductase, DHFR gene, the
(13) gene that is present in those cells or are we talking
(14) about a transfected gene?
(15) Q. Let's talk about what the 390 application teaches.
(16) Now, let me backtrack a little bit and make sure we're
(17) on the same playing field. Would you agree that the
(18) 390 application that is Exhibit 3001 teaches to insert
(19) in the vicinity of a target gene an amplifiable gene
(20) such as DHFR?
(21) A. That's correct.
(22) Q. And it teaches among other gene -- sorry -- teaches
(23) among other cells that may be selected, human skin
(24) fibroblasts, right?
(25) A. Yes, but it does not describe the amplification in

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

BSA XMAX(16/16)

RANDAL KAUFMAN, Ph.D. - 9/30/03

VS. CELL GENSYS, INC.

### Page 61

(1) human skin fibroblasts.
(2) **Q.** What do you mean, amplification?
(3) **A.** The selection for expression of the DHFR gene.
(4) **Q.** Well, if you had another selection marker present in
(5) your amplification, couldn't you use that selection
(6) marker instead of the DHF --
(7) **A.** That's what they describe here is to use a secondary
(8) or selectable marker.
(9) **Q.** In fact, they use something that's familiar to us from
(10) today, they use -- they teach the use of HSV TK,
(11) right?
(12) **A.** That's right.
(13) **Q.** So if you insert HSV TK, you could use that as the
(14) selectable marker, right, just the way it's taught in
(15) the 071 patent?
(16) **A.** In cells that are TK deficient.
(17) **Q.** Okay.
(18) **A.** Yeah, yes.
(19) **Q.** And so if you have a -- a -- sorry, I lost my train of
(20) thought.
(21) If you have a selectable marker other than
(22) the -- scratch that.
(23) Whether or not you can detect it, does the
(24) 390 application teach the amplification step be
(25) performed in the primary cell?

### Page 62

(1) **A.** It doesn't teach that.
(2) **Q.** So what is intended by the words, in your opinion,
(3) amplification may be performed at this time by
(4) stressing the primary cells with the appropriate
(5) amplifying reagent so that multi copies of the
(6) targeted gene are obtained, and I'm reading from page
(7) 10, lines 34 to 37 of Exhibit 3001?
(8) **A.** The -- the problem is that these -- this -- the
(9) primary cells being used as an example here have their
(10) own DHFR gene --
(11) **Q.** Okay.
(12) **A.** -- and that when you select that for amplification, it
(13) does not mean that you will amplify the gene that has
(14) been inserted, but it -- you might amplify the
(15) endogenous DHFR gene.
(16) **Q.** You'd expect to amplify both, wouldn't you, Doctor?
(17) **A.** No.
(18) **Q.** So the cell will selectively amplify only its
(19) endogenous DHFR gene even if a DHFR gene has been
(20) inserted by homologous recombination?
(21) **A.** There's -- I don't think you can predict which one
(22) would amplify.
(23) **Q.** It's your testimony that only one will amplify; is
(24) that right?
(25) **A.** It's very unusual -- I don't know of an example where

### Page 63

(1) both -- an example where two different genes on
(2) different chromosomes are both amplified upon
(3) selection like that.
(4) **Q.** Do you know of an example where only one was amplified
(5) and one -- the same amplifiable gene was inserted in a
(6) genome that already had that gene present, and upon
(7) amplification only the endogenous one was amplified
(8) after confirmation of successful homologous
(9) recombination, I mean, I'm not really interested in
(10) the situation where the homologous recombination is
(11) attempted but failed?
(12) What I'm asking you is subsequent to
(13) homologous recombination, are you aware of a situation
(14) reported in the literature where what you have
(15) testified with respect to occurred, that is, you took
(16) a cell, you altered it by -- by homologous
(17) recombination to introduce an amplifiable gene, there
(18) was already a natural or endogenous copy of that
(19) amplifiable gene present in the genome after
(20) successful homologous recombination, you went to
(21) amplify it and you only got amplification of the
(22) endogenous gene?
(23) **A.** Yeah -- no, I don't know of an example because there
(24) are very few examples in the literature of homologous
(25) integration of an amplifiable gene.

### Page 64

(1) **Q.** Is that true by 1989?
(2) **A.** There aren't many examples. There may be a couple.
(3) **Q.** What were the examples of amplification of a -- I'm
(4) sorry -- what were the examples of homologous
(5) recombination of an amplifiable gene by 1989, if you
(6) can think of any?
(7) **A.** I believe that we published on one is my recollection.
(8) **Q.** Inserted through homologous recombination?
(9) **A.** It's many year ago.
(10) **Q.** It is, and I apologize for the nature of this beast.
(11) Do you recall the journal I might find that in?
(12) **A.** I -- again, I'm recollecting from things that are 20
(13) years old, but as -- I believe there was an example in
(14) the Journal of Immunology, a reference, the first
(15) author was Wood.
(16) **Q.** I'm sorry, the first author?
(17) **A.** Wood.
(18) **Q.** And are you listed as a coauthor on that?
(19) **A.** Yes.
(20) **Q.** Any other examples that you're aware of prior to --
(21) let's take it all the way through '89, so prior to
(22) '89?
(23) **A.** Nothing comes to hand -- mind at hand. You know what
(24) I meant.
(25) **Q.** Yes. Did you look for such publications in the course



APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.
BSA XMAX(17/17)
RANDAL KAUFMAN, Ph.D. - 9/30/03
VS. CELL GENSYS, INC.

### Page 65

(1) of your work in connection with this interference?
(2) A. No.
(3) Q. Okay. Is it your pattern today to keep reasonably
(4) abreast on the literature involving homologous
(5) recombination?
(6) A. We use it routinely in the lab, so I think it's -- I
(7) follow the literature.
(8) Q. Was that your practice in 1989; do you know?
(9) A. We use it more today probably than what we used it in
(10) 1989.
(11) Q. So you might not have focused on the literature as
(12) much back in 1989?
(13) A. We were working more with DNA transfection as opposed
(14) to homologous integration.
(15) Q. Take a look at page 5 of Exhibit 39 -- I'm sorry,
(16) Exhibit 3001. That's the 390 application. My page,
(17) the 5 has been omitted by copying but it starts at the
(18) top, cells or other somatic cells?
(19) A. That's right.
(20) Q. There's a list at about lines 14 through 17 of
(21) amplifiable genes; do you see that?
(22) A. That's right.
(23) Q. Is it your testimony that none of those genes could be
(24) amplified upon introduction into a skin fibroblast
(25) using the appropriate amplifying reagent?

### Page 66

(1) A. No, a couple of those I know can be used.
(2) Q. Okay. I'm sorry, bear with me one second.
(3) If you would look at page 27 of your
(4) declaration, that is Exhibit 3002?
(5) A. Okay.
(6) Q. On page 27 you can find the text of claims 110, 111
(7) and 112; do you see that?
(8) A. That's right.
(9) Q. Is it your testimony that those claims require as part
(10) of their recitation that the gene of interest, the
(11) gene not normally expressed in claim 110, the gene at
(12) higher levels in claim 111, that that gene must be
(13) expressed in the cell in which it is -- in the cell
(14) having the genome that's recited in those claims? Do
(15) you understand that question? I didn't.
(16) A. No.
(17) Q. Let me try it again. Is it your understanding that
(18) claims 110 and 111 require expression of the gene in
(19) the cell referred to in the claim?
(20) A. That they require -- may I have the question one more
(21) time, please?
(22) Q. Sure. Is it your claim that claims 110 and 111 --
(23) A. Yeah.
(24) Q. -- require that the gene of interest be expressed in
(25) the cell that is referred to?

### Page 67

(1) A. Prior to the --
(2) Q. No, subsequent to whatever's being done to them in
(3) this claim.
(4) A. Subsequent to the gene transfer experiment?
(5) Q. Yes, sir.
(6) A. Yeah. That's what they're talking about, yes.
(7) Q. Okay. Is it your understanding -- if you would look
(8) at claim 1 of the 071 patent, that's Exhibit 2001?
(9) A. Yeah.
(10) Q. Is it your understanding that claim 1 requires
(11) expression of what is referred to as the predetermined
(12) normally transcriptionally silent gene in the cell
(13) undergoing transformation subsequent to the homologous
(14) recombination event described?
(15) A. That's talking about a gene that's being silent that
(16) gets activated.
(17) Q. Uh-huh. Does it require expression of the gene in
(18) that cell?
(19) A. After it's activated? That's what --
(20) Q. After the --
(21) A. Yes.
(22) Q. I don't see the term activated, I see an activating,
(23) so I don't want to mislead you, sir, with -- there is
(24) described in that claim a method of -- of
(25) incorporating DNA by homologous recombination, right?

### Page 68

(1) A. Yeah, but what is claimed is a method of activating a
(2) normally silent gene.
(3) Q. Uh-huh. So -- okay, go ahead.
(4) A. And that should be expressed if that's activated.
(5) Q. Should be expressed, does the claim require it to be
(6) expressed?
(7) A. No. Well, just a minute.
(8) Q. Honest to God, take your time. Your -- your time to
(9) think is more important than getting to the next
(10) question.
(11) A. What's encompassed in the claim is the method of
(12) activating the gene, and which means that it would be
(13) expressed.
(14) Q. So the claim does require expression?
(15) A. Yeah, after the homologous integration.
(16) Q. And is there a specific recitation in the claim that
(17) introduces that requirement?
(18) A. It's the method of activating a gene, so --
(19) Q. Would it be correct --
(20) A. If the gene was not activated, it would not have been
(21) expressed.
(22) Q. Okay. If the gene is activated, must it be expressed?
(23) A. Unless it was shut off.
(24) Q. Okay. So would it be correct to characterize that
(25) phrase, the method of activating a predetermined,

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.    BSA XMAX(18/18)    VS. CELL GENSYS, INC.
RANDAL KAUFMAN, Ph.D. - 9/30/03

### Page 69

(1) normally transcriptionally silent gene, as the
(2) intended result of the process steps recited?
(3) A. Yeah, I think that that's the intention of the -- of
(4) the process.
(5) Q. Okay.
(6) VIDEO TECHNICIAN: Mr. Kelber, I need to
(7) change tapes.
(8) MR. KELBER: Sure, let's take a short
(9) break.
(10) VIDEO TECHNICIAN: Okay. We're going off
(11) the record. The time is 12:39 and 14 seconds p.m.
(12) (Recess taken at 12:39 p.m.)
(13) (Back on the record at 12:48 p.m.)
(14) VIDEO TECHNICIAN: We're back on the
(15) record. This is the beginning of tape 2. The time is
(16) 12:48 and 24 seconds p.m.
(17) BY MR. KELBER:
(18) Q. Dr. Kaufman, if you would turn to page 19 of your
(19) declaration, which has paragraphs 64 and 65 in it.
(20) With respect to paragraph 64, you offer the testimony
(21) that certain things were well-known in either the 1989
(22) or 1990 time frame; do you see that?
(23) A. Uh-huh.
(24) Q. Do you cite any literature reference to support your
(25) conclusion as to what was well-known in this

### Page 70

(1) declaration?
(2) A. Well, in -- with respect to specific references --
(3) Q. Yeah.
(4) A. -- or textbooks?
(5) Q. Anything.
(6) A. The definition of a stem cell is a cell that can give
(7) rise to multi -- multi different types of
(8) differentiating cells.
(9) Q. Uh-huh.
(10) A. That's basically what a stem cell is.
(11) Q. Well, all I asked -- oh, I'm sorry.
(12) A. And that differentiated cells express different
(13) subsets of the genes in total.
(14) Q. That's fine. All I really wanted to know is did you
(15) cite in your declaration -- excuse me -- any
(16) references to literature at all?
(17) A. No.
(18) Q. When you prepared the declaration that is Exhibit
(19) 3002, did you review any documents -- and if you want
(20) to look at the table of contents, it makes it a little
(21) easier to follow -- did you review any documents other
(22) than the 390 -- other than -- did you review any
(23) documents other than the 390 application, the 071
(24) patent, the Ralbaud, R-a-i-b-a-u-d, publication, the
(25) Kaufman publication and the JP 280 publication?

### Page 71

(1) A. Those are all the documents that I reviewed.
(2) Q. So in the course of preparing your declaration you
(3) didn't review any other documents?
(4) A. I don't recall any others.
(5) Q. Okay.
(6) MR. KELBER: I realize that this seems
(7) self-evident from the document. Well, scratch that.
(8) I would object to those portions of the
(9) declaration that assert things that -- assertions of
(10) fact that are unsupported by citation to a specific
(11) document.
(12) BY MR. KELBER:
(13) Q. In the context of your declaration, what do you mean
(14) by the expression essential element, maybe you use a
(15) different word -- essential element of an invention,
(16) and you can look at page 12 as one example as to where
(17) that term appears?
(18) MR. GHOLZ: Paragraph number?
(19) MR. KELBER: It's in the bold.
(20) MR. GHOLZ: Ah, okay.
(21) A. So the -- in all of the descriptions that are in the
(22) patent, there is an amplifiable gene --
(23) BY MR. KELBER:
(24) Q. Uh-huh.
(25) A. -- and that's the component of the discovery.

### Page 72

(1) Q. What I -- what I really was interested in is what do
(2) you mean when you say essential element, how do you
(3) recognize an essential element from one that's
(4) nonessential?
(5) A. That's part of the discovery is to use that element.
(6) Q. Okay. Is there a way to distinguish essential
(7) elements from nonessential elements of the invention?
(8) A. Well, the invention involves amplifying the gene, so
(9) you need to have an amplifiable selectable marker, so
(10) that would be an essential part of that discovery.
(11) Q. Okay. Are there any other essential elements of the
(12) invention that's described in the 390 application?
(13) A. Regions of homology for integration, yeah.
(14) Q. Okay. All right. Let me try something a little bit
(15) different but the same -- looking again at the same
(16) language. In your own words, what is the invention
(17) described in the 390 application? I use that
(18) language, Doctor, only because your declaration refers
(19) to the invention described in the 390 application --
(20) A. Yeah.
(21) Q. -- so...
(22) A. You were asking me what I view the discovery or...
(23) Q. I think so. What I'm asking you is --
(24) A. What my opinion of the discovery is?
(25) Q. Well, I'm sure I know -- no, I mean, all I'm asking

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

BSA XMAX(19/19)

RANDAL KAUFMAN, Ph.D. - 9/30/03

VS. CELL GENSYS, INC.

## Page 73

(1) you is you make reference on page 12 and elsewhere in
(2) your declaration to the invention described in the
(3) application that is the 390 application that we've
(4) looked at a little bit?
(5) A. Uh-huh.
(6) Q. What's the invention?
(7) A. I look at this invention as -- as being a way to
(8) produce higher levels of a protein without the need
(9) for isolating the gene.
(10) Q. So because homologous recombination is used you don't
(11) need to isolate the gene; is that right?
(12) A. Other than the fact that knowing the sequence
(13) boundaries of the gene, you only need to -- you don't
(14) have to isolate the gene intact.
(15) Q. Okay.
(16) A. You're putting -- you're using an amplifiable marker
(17) to increase the copy number of the gene.
(18) Q. You used the words amplifiable marker, and we've
(19) talked about this a little bit before. Does the 390
(20) application assert that the amplifiable gene must be
(21) suitable for use as a -- as a marker?
(22) A. In terms of the claims or the examples?
(23) Q. Of the invention, the invention that you say is
(24) described in that application.
(25) A. The -- the marker does not have to be amplifiable.

## Page 74

(1) Q. Does the amplifiable gene have to be a marker
(2) according to the invention described in the 390
(3) application, I want to be clear?
(4) A. You want to define marker?
(5) Q. Well, whatever you meant when you said -- you used the
(6) word amplifiable marker in the context of what the
(7) invention described in the 390 application is. One of
(8) the things that struck me is I don't think that the
(9) word amplifiable marker, that -- I'm sorry, that's two
(10) words -- that phrase appears in the 390 application,
(11) maybe it does, but I'm asking you now is it your
(12) understanding that the 390 application teaches that
(13) the amplifiable gene that is used must be a marker?
(14) A. The term marker would refer to the fact that it is
(15) selectable so that a cell that has that -- that has
(16) multiple copies of that gene can be identified.
(17) Q. Uh-huh. Does the 390 application teach the
(18) amplifiable gene used must be a marker?
(19) A. Probably not.
(20) Q. Okay. You used the term Skoultchi, who's the inventor
(21) of the 390 application, you used the phrase had
(22) possession of the invention or did not have possession
(23) of the invention. What do you mean by that?
(24) A. On what page, where are we?
(25) Q. Well, it appears variously, but if you'd take a look

## Page 75

(1) at page 20, do you see the words -- the next to last
(2) sentence in paragraph 67 which actually starts the
(3) page before page 19 -- the fact that this was not
(4) mentioned leads me to conclude Skoultchi not -- I
(5) assume that is was not -- in possession of this
(6) concept at the time the 3 -- the application, 390
(7) application, was originally filed. Typos happen to
(8) everybody, I think that that's supposed to read the
(9) fact that this was not mentioned leads me to conclude
(10) Skoultchi was not in possession of this concept at the
(11) time the 390 application was originally filed?
(12) A. That's correct.
(13) Q. What do you mean by not in possession of the concept?
(14) A. That was -- -- that was not something that he had
(15) thought about.
(16) Q. Okay. What do you mean by the word primary thrust of
(17) the 390 application -- again, that's a phrase, that's a
(18) word -- what do you mean by the words primary thrust?
(19) A. Where is that?
(20) Q. It's all over but you can find it on the same page at
(21) paragraph 69 and on the following pages, paragraph 72.
(22) I don't mean to restrict you to those, but those are
(23) examples.
(24) A. Again, I view that this -- this am -- this application
(25) or this patent is a method to produce high levels of

## Page 76

(1) protein by the procedure of amplifying a gene copy of
(2) a desired gene, and that's the primary thrust. That's
(3) the purpose of the -- that's the -- what is useful
(4) about this patent, if there is...
(5) Q. Is that also the intention of the 071 patent, to
(6) produce higher amounts of proteins of interest?
(7) A. That's what would make these technologies useful, yes,
(8) or valuable.
(9) Q. If you would turn to page 107 of your declaration, and
(10) this section that begins at 107, ARS's claims, and
(11) then it continues on with sections 2, 3, 4, 5 and 6,
(12) through page 110, you discuss a variety of claims of
(13) 071 patent. Do you see that?
(14) A. Yeah.
(15) Q. Leaving aside the cell line limitation for the moment,
(16) beginning at page 2 -- I'm sorry, at page 108, section
(17) 2, section 3, section 4, and then continuing at
(18) section 5 and 6 on page 110, you discuss certain
(19) claims specifically but not others. Do you see that?
(20) A. Yes.
(21) Q. Is it a proper inference to draw, Doctor, that if --
(22) other than the cell line limitation that there are no
(23) other differences between the claims you do not
(24) discuss in the Raibaud article?
(25) A. Oh, I'd have to go back and look at the Raibaud

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.

BSA XMAX(20/20)

RANDAL KAUFMAN, Ph.D. - 9/30/03

VS. CELL GENSYS, INC.

**Page 77**

(1)       article.
(2)  Q.  Well, let me ask it a different way. Why did you
(3)       select these particular claims in sections 2 through 6
(4)       on pages 108 through 110?
(5)  A.  Those were the major claims that I recall.
(6)  Q.  What do you mean by a major claim?
(7)  A.  Those are what are -- those -- those are not the
(8)       supporting claims but the dominant claims, or whatever
(9)       you call them.
(10) Q.  I'm sorry, the claim helped to --
(11) A.  Those are the main claims.
(12) Q.  Okay.
(13) A.  I mean the dominant claims, what did you call them?
(14) Q.  Well, I don't think -- and if I did call them
(15)      something --
(16) A.  Yeah.
(17) Q.  -- I certainly didn't mean to, Doctor.
(18)      I'm asking you why -- what was the criteria
(19)      that led you to select those claims and not discuss in
(20)      your declaration other claims other than with respect
(21)      to the cell line limitation?
(22) A.  The cell line limitation was the main point here, I
(23)      think.
(24) Q.  Okay. Hypothetically, if the cell line modified in
(25)      Raibaud was a eucaryotic cell line modified to

**Page 78**

(1)       incorporate a promoter to express an endogenous gene,
(2)       would there be a distinction between Raibaud and claim
(3)       1 of the 071 patent? I'm sorry, Doctor, I beg your
(4)       pardon, would there be a distinction between claim --
(5)       between that and claim 2 of the 071 patent? I
(6)       apologize.
(7)  A.  I can't think of a distinction if it was -- yes, a
(8)       eucaryotic cell.
(9)  Q.  Okay. What's a count?
(10) A.  I have a vague idea of what a count is.
(11) Q.  Best of your ability, tell me what a count is?
(12) A.  A claim that is in dispute.
(13) Q.  How do you determine whether a claim corresponds to a
(14)      count?
(15) A.  I wouldn't ask myself that.
(16) Q.  I'm sorry?
(17) A.  I don't know.
(18) Q.  Okay. Would you bear with me a second, we can go off
(19)      the record if you want for a couple minutes? I think
(20)      we're done but I want to make sure.
(21)      MR. GHOLZ:  Okay.
(22)      Off the record.
(23)      VIDEO TECHNICIAN:  We're going off the
(24)      record. The time is 1:06 and 59 seconds p.m.
(25)      (Recess taken at 1:06 p.m.)

**Page 79**

(1)       (Back on the record at 1:15 p.m.)
(2)       VIDEO TECHNICIAN:  We are back on the
(3)       record. The time is 1:15 and 45 seconds p.m.
(4)  BY MR. KELBER:
(5)  Q.  Dr. Kaufman, I'm going to hand you a document that's
(6)       been previously marked as Exhibit 2046. I don't know
(7)       if you've seen this before, it is the 071 patent, but
(8)       as you leaf through it you'll note that portions of it
(9)       have been highlighted in yellow. For instance, the
(10)      figures after figure 4, so figure 5 through figure
(11)      14 -- oops, sorry, figure 15 are highlighted in
(12)      yellow. The entire example, if you will, is
(13)      highlighted in yellow. There are some other things,
(14)      but the only other significant highlighting is at the
(15)      portion bridging columns 5 and 6.
(16) A.  Right.
(17) Q.  My question to you is if the information that is
(18)      highlighted in yellow were not present in the 071
(19)      patent, so, in particular, the figures, the example,
(20)      and that paragraph from columns 5 to column 6 that we
(21)      looked at, the other portions, would one of skill in
(22)      the art have a harder time of practicing the entire
(23)      breadth of claim 2 of the 071 patent?
(24)      MR. GHOLZ:  This is going to take a little
(25)      while, and I have put my legal pad down.

**Page 80**

(1)       MR. KELBER:  I'm sorry, Chico.
(2)       MR. GHOLZ:  So while he's looking at the --
(3)       MR. KELBER:  Jim has it.
(4)       MR. GHOLZ:  Ah, thank you, thank you.
(5)  BY MR. KELBER:
(6)  Q.  And feel free to take your time, Doctor, but I want to
(7)       make sure you understand the question.
(8)  A.  So the question is if those pieces were omitted --
(9)  Q.  Uh-huh.
(10) A.  -- whether or not it would be enabled?
(11) Q.  Well, I don't know what you mean by enabled. I don't
(12)      like to use legal terms. Would it be possible to
(13)      practice everything that's embraced within claim 2 of
(14)      the 071 patent? As of 1989, sorry.
(15) A.  It -- for its specific gene or --
(16) Q.  For all genes.
(17) A.  Just generically?
(18) Q.  Generically.
(19)      MR. GHOLZ:  Any gene?
(20)      MR. KELBER:  Any gene.
(21) A.  So the -- basically, what is being taken out, the way
(22)      I see this, are references to amplifiable, yeah, and
(23)      as I mentioned earlier, if this invention was about
(24)      amplifying the gene, then that's a major part of the
(25)      invention is taken away.

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.    BSA XMAX(21/21)    VS. CELL GENSYS, INC.
RANDAL KAUFMAN, Ph.D. - 9/30/03

## Page 81

(1) BY MR. KELBER:
(2) Q.  But it also takes away the example, right, that's
(3)      another thing --
(4) A.  Well, the example is not there, yeah, yeah.
(5) Q.  Is the example important to understanding the patent?
(6) A.  I look at the example as being a crucial part of it
(7)      because that demonstrates, you know, the feasibility.
(8)      MR. KELBER:  I have nothing further.
(9)      MR. GHOLZ:  We have a few questions.  We'll
(10)     go on from this side of the table since --
(11)     MR. KELBER:  Yeah, that's fine.
(12)     MR. GHOLZ:  -- he's looking at the
(13)     videotape.
(14)         EXAMINATION
(15) BY MR. GHOLZ:
(16) Q.  I'm going back over a couple of things that Steve
(17)     asked you questions about.  At one point he asked you
(18)     a series of questions with respect to the ARS patent
(19)     focusing on the example and the experimental work.
(20)     Did you in fact read that Exhibit 3001 from beginning
(21)     to end while preparing your declaration?
(22) A.  3001?
(23)     MR. KELBER:  Actually, the one we have on
(24)     the table is 2001.
(25) A.  Is that the 071?

## Page 82

(1) BY MR. GHOLZ:
(2) Q.  Yeah, the 071 patent.
(3) A.  Yes.
(4) Q.  Okay.  Did you study it from beginning to end?  2001,
(5)     I said 3001, didn't I?  Sorry.
(6)     MR. KELBER:  Yours, I think, is probably
(7)     3001.
(8)     MR. GHOLZ:  Could be.
(9) BY MR. GHOLZ:
(10) Q.  In any event, did you study it from beginning to end,
(11)     the Chappel patent?
(12) A.  Yes, I did.
(13) Q.  Mr. Kelber asked you what you reviewed in connection
(14)     with the preparation of your declaration, and you and
(15)     he agreed upon a short list, Raibaud, Japanese, our
(16)     patent, the Chappel patent and a few other things.
(17)     There were some things that I expected you to say you
(18)     didn't.  Did you review -- well, first off, I will
(19)     show you in your declaration that you have in front of
(20)     you, 2002, paragraph 2.  Would you read paragraph 2 to
(21)     yourself?  Paragraph 2, it's on page 1.
(22)     All right.  First question is do you think
(23)     that's a truthful statement?
(24) A.  In preparation of the declaration --
(25) Q.  Yeah.

## Page 83

(1) A.  Okay.  I'm talking about what -- in preparing for
(2)     today as in the last day or two.
(3) Q.  Well, I suggest to you that, and what Steve asked
(4)     you --
(5)     MR. KELBER:  Counsel, Counsel, Counsel,
(6)     objection, leading, objection, characterizing the
(7)     testimony.  Ask him the questions, don't -- don't
(8)     testify.
(9) BY MR. GHOLZ:
(10) Q.  Did you read each document referred to in your
(11)     declaration while you were in the process of preparing
(12)     your declaration?
(13) A.  Yes.
(14) Q.  Okay.  Now, specifically did you read the Chappel
(15)     parent application -- the application that matured
(16)     into the Chappel patent?  If you will look at the
(17)     front of the Chappel patent, you will see that it --
(18)     under the heading related U.S. application data, it
(19)     lists one application, okay, and then higher up, next
(20)     to bracket 21, closed bracket, it lists another
(21)     application.  Do you recall reading both of those
(22)     applications?
(23) A.  Yes, I -- I believe I read both of those.
(24) Q.  Well --
(25) A.  I'd have to have them both in front of me but --

## Page 84

(1) Q.  Would you look at page 137, section 9 of your
(2)     declaration, and in particular -- well, skim read that
(3)     entire section.  I think that's the easiest way to do
(4)     it.
(5)     MR. KELBER:  Which section?
(6)     MR. GHOLZ:  The 102-F section, it starts on
(7)     page 137.  Or I should say the first of the 633 A-F
(8)     sections.
(9) BY MR. GHOLZ:
(10) Q.  Paragraph 472 starts off the relationship of claim 2
(11)     of the 071 patent, okay?
(12) A.  Yes.
(13) Q.  The 071 patent we've been talking about --
(14) A.  Yeah.
(15) Q.  -- i.e., the first alternative is count 1 to original.
(16)     claim 21 of the 783 application is as follows, and
(17)     then we go on.
(18)     So what I'm trying to get at is do you
(19)     recall reading the 783 application?
(20)     MR. KELBER:  Objection, leading.
(21) A.  Yes.
(22) BY MR. GHOLZ:
(23) Q.  Okay.  Are yeasts microorganisms?
(24) A.  Yes.
(25)     MR. GHOLZ:  I think that's it.  That's it.

APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.                    BSA XMAX(22/22)                    VS. CELL GENSYS, INC.
RANDAL KAUFMAN, Ph.D. - 9/30/03

### Page 85

(1)          MR. KELBER:  I do have a question,
(2)      follow-up.
(3)          RE-EXAMINATION
(4)  BY MR. KELBER:
(5)  Q.   In paragraph 472 on page 139 --
(6)  A.   Yeah.
(7)  Q.   -- of your declaration, do you refer to anything but
(8)      the claim, original claim 21 of the 783 application?
(9)  A.   I refer to claim 2 of the 071 --
(10)  Q.   Okay.  But as -- with respect to the 783, do you refer
(11)      to any portion of the 783 other than claim 21?
(12)  A.   It's just talking about claim 21.
(13)          MR. KELBER:  Nothing further.
(14)          MR. GHOLZ:  I think that's it.
(15)          MR. KELBER:  Thank you very much, Dr.
(16)      Kaufman.  You're -- you've been patient, and I
(17)      appreciate that.
(18)          MR. GHOLZ:  Okay.
(19)          VIDEO TECHNICIAN:  We are ending this
(20)      deposition.  The time is 1:27 and 35 seconds p.m.
(21)      (Deposition concluded at 1:27 p.m.
(22)      Signature of the witness was requested.)
(23)
(24)
(25)

### Page 86

(1)  APPLIED RESEARCH SYSTEMS ARS HOLDING, N.V.
(2)      Junior Party,
(3)      (Patent 5,272,071)
(4)      v.
(5)      CELL GENESYS, INC.,
(6)      Junior Party.
(7)      (Application 08/102,390)
(8)      Interference No. 105,114
(9)
(10)      VERIFICATION OF DEPONENT
(11)
(12)      I, having read the foregoing deposition
(13)  consisting of my testimony at the aforementioned time
(14)  and place, do hereby attest to the correctness and
(15)  truthfulness of the transcript.
(16)
(17)
(18)
(19)
(20)      RANDAL KAUFMAN, Ph.D.
(21)      Dated:
(22)
(23)
(24)
(25)

### Page 87

(1)          CERTIFICATE OF NOTARY
(2)  STATE OF MICHIGAN  )
(3)                     ) SS '
(4)  COUNTY OF MONROE  )
(5)
(6)      I, LEISA M. PASTOR, a Notary Public in and for
(7)  the above county and state, do hereby certify that the
(8)  above deposition was taken before me at the time and
(9)  place hereinbefore set forth; that the witness was by
(10)  me first duly sworn to testify to the truth, and
(11)  nothing but the truth; that the foregoing questions
(12)  asked and answers made by the witness were duly
(13)  recorded by me stenographically and reduced to
(14)  computer transcription; that this is a true, full and
(15)  correct transcript of my stenographic notes so taken;
(16)  and that I am not related to, nor of counsel to either
(17)  party nor interested in the event of this cause.
(18)
(19)
(20)
(21)
(22)          Leisa M. Pastor, CSR-3500, CRR
(23)          Notary Public,
(24)          Monroe County, Michigan
(25)  My Commission expires: 9/7/06

### Page 88

(1)          INDEX TO EXAMINATIONS
(2)
(3)  Witness                                      Page
(4)  RANDAL KAUFMAN, Ph.D.
(5)
(6)  EXAMINATION
(7)  BY MR. KELBER:............................... 4
(8)      EXAMINATION
(9)  BY MR. GHOLZ: .............................. 81
(10)      RE-EXAMINATION
(11)  BY MR. KELBER: ............................. 85
(12)
(13)          INDEX TO EXHIBITS
(14)
(15)  Exhibit                                      Page
(16)  (Exhibits not offered.)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)