# Exhibit A, Part 3

Interference 105,114

comprising a DNA regulatory segment unnaturally located in the genome which is operatively linked with a predetermined naturally occurring gene.  Genesys has not shown that the neo gene and associated promoter within the neo-Hprt⁻ insert which replaces the endogenous Hprt gene is operably linked with the predetermined naturally occurring Hprt gene or any other gene naturally occurring in the genome of the cell line, as Claim 17 of ARS's '071 patent requires.

On the other hand, Thomas describes, or reasonably would have suggested, a mammalian host cell (mouse ES cells) that expresses a neo structural gene not normally expressed within the genome of the cell line operatively associated with a heterologous HSV-tk promoter as a pMC1Neo insert within Hprt. While the Hprt-inactive neo-Hprt insert replaces the active Hprt gene, the exogenous structural neo gene insert is active in the cell line operably associated with the exogenous HSV-tk promoter. Thus, Thomas describes, or reasonably would have suggested, subject matter encompassed by Claim 105 of Genesys's Application 08/102,390.

Thomas does not describe, and reasonably would not have suggested, a mammalian cell expressing a gene "of that cell's genome" encoding a protein not normally produced, or produced at

-73-

Interference 105,114

levels higher than normal, as Claims 107-109 of Genesys's Application 08/102,390 require.

Thomas does not describe, and reasonably would not have suggested, the transformed human 293 embryonal kidney cell defined by Claim 106 of Genesys's Application 08/102,390.

However, Thomas describes mammallian cells with an heterologous HSV-tk promoter inserted in the cell's genome though homologous recombination in the vicinity of, and operably linked to express a structural neo gene, i.e., a mammalian cell line having pMC1Neo neo gene within Hprt inserted into mouse ES cells by homologous recombination.  The subject matter Thomas describes, or reasonably would have suggested, is encompassed by Claims 110-112 of Genesys's Application 08/102,390.

Therefore:

Claims 105 and 110-112 of Genesys's Application 08/102,390 are unpatentable under 35 U.S.C. § 102(b) over subject matter described by Thomas, or under 35 U.S.C. § 103 in view of the teaching of Thomas.

(7)  Japan 1-215280 (Exh. 3010; Exh. 2016)

Japan's teachings

Our study of Japan's teachings relies on, and refers to, the certified English translations of Japanese Patent publication No. 1-215280, published August 29, 1989, of record; one submitted

-74-

Interference 105,114

by ARS (Exh. 3010) and the other submitted by GENESYS

(Exh. 2016).  Japan generally describes its invention as follows:

> The present inventors . . . discovered that a
> microorganism capable of efficiently producing a specific
> target substance is obtained by introducing a powerful
> promoter capable of enhancing the expression of a gene
> concerned in the production of the target substance in
> the chromosome of a microorganism already containing
> the gene.  The present invention has been perfected as
> a result.

(Exh. 3010, p. 5, para. 3);

> [T]he inventors discovered that by introducing powerful
> promoters that could increase the expression of genes
> related to the production of specific desired substances
> into microbial chromosomes already containing said genes,
> microbes capable of producing the desired substances
> efficiently were obtained, thus completing the invention.

(Exh. 2016, p. 4, para. 1);

> This invention . . . is aimed at providing an improved
> microorganism which has an expression regulatory sequence
> for a gene concerned in the production of a target substance
> introduced in the chromosome of a microorganism possessing
> the chromosome containing the gene at a position and in a
> direction such that the expression of the gene is enabled to
> be controlled[;] a method for the production of the
> microorganisms; and a method for the production of a useful
> substance, characterized by culturing the organism[,]
> thereby yielding a product concerned in the gene and
> collecting the product.

(Exh. 3010, p. 5, para. 4);

> [T]his inventions presents: improved microbes that have
> chromosomes containing genes related to the production of
> desired substances wherein expression-controlling sequences
> for said genes have been introduced into said microbial
> chromosomes at positions and in directions that enable the
> control of expression of said genes; methods for producing
> said microbes; as well as methods for producing useful
> substances characterized by the fact that said microbes are

-75-

Interference 105,114

> cultured to produce products related to said genes, and said
> products are harvested.

(Exh. 2016, p. 4, para. 2).

> More specifically, Japan discloses:

>> This invention can be applied to a microorganism
>> which already possesses a gene concerned in the production
>> of a target substance in the chromosome thereof and
>> exhibits the ability to produce the target substance and
>> to a microorganism which already possesses a gene concerned
>> in the production of a target substance in the chromosome
>> thereof and nevertheless fails to produce substantially
>> the target substance and derives an ability to produce
>> the target substance from externally introducing anew an
>> expression regulatory gene.

(Exh. 3010, p. 6, para. 1).

>> This invention can be used either on microbes that
>> have chromosomes containing genes related to the production
>> of desired substances on their chromosomes and can produce
>> said desired substances, or on microbes that already have
>> genes related to the production of desired substances on
>> their chromosomes although practically speaking, cannot
>> produce said desired substances, but become able to produce
>> said desired substances by newly introducing exogenous
>> expression-controlling genes.

(Exh. 2016, p. 4, third para.).

According to Japan, the target genes may encode, and be made

to express, enzymes such as protease, amylase, glucose isomerase,

cellulase, and tryptophan synthetase; hormones such as insulin,

growth hormones, encephalin, and somatostatin; antigens for

hepatitis, polio, and herpes; and lymphokines such as interferon

and interleucine (Exh. 3010, p. 6, para. 2; Exh. 2016, p. 4,

para. 4). As does Genesys (Exh. 2047, p. 5, l. 24-25), Japan

-76-

Interference 105,114

appears to broadly define a target gene as any gene of interest.

In that regard, Japan states:

> The gene which is concerned in the production of such target substance may be <u>a gene which inherently exists in the chromosome of a host microorganism or a gene which has been artificially inserted in advance in the chromosome of a host microorganism</u>.  The former gene possesses an expression regulatory series naturally attendant on the gene and, on being furnished with an additional, expression regulatory sequence to be inserted therein by the method of this invention, acquires an ability to enhance the production of the substance by a host.  It is otherwise capable of conferring an ability to produce the target substance [by] a host which has been inherently incapable of producing substantially, the target substance.  The latter gene in most cases possesses an expression regulatory domain attendant on the structural gene thereof and, on being furnished with a powerful expression regulatory sequence to be introduced by the method of this invention, acquired such effect as mentioned above.

(Exh. 3010, pp. 6-7, bridging para.; emphasis added);

> <u>Genes related to the production of such desired substances can be genes that naturally exist on the chromosome of the host microbe or can be genes that have been inserted artificially into the host microbe chromosome beforehand</u>.  The former genes have expression-controlling sequences that are attached to these genes naturally.  By inserting additional expression-controlling sequences in addition to these, production of the desired substance by the host can be increased or the ability to produce the desired substance can be given to hosts that essentially did not produce the desired substance naturally.  In the latter case as well, there are often expression-controlling regions attached to the structural genes, and by introducing the powerful expression-controlling sequences of the methods of this invention, effects like those mentioned above can be obtained.

(Exh. 2016, pp. 4-5, bridging para.; emphasis added).

Interference 105,114

Japan's "expression regulatory sequences" (Exh. 3010, p. 7,
last complete sentence) or "expression-controlling sequences"
(Exh. 2016, p. 5, first full para., first sentence thereof) may
be promoters, terminators, SD sequences or operators.  The means
for inserting the expression regulatory or expression-controlling
sequences is described as follows:

> Generally, the expression regulatory domain to be
> inserted is introduced either by a plasmid capable of
> being amplified in a host microorganism or in the form
> of a cyclic or linear DNA incapable of being amplified
> in the host microorganism.

(Exh. 3010, p. 8, first full para.);

> The expression-controlling region to be inserted is
> normally inserted using plasmids that can be amplified in
> the host microbe or as a cyclic or linear DNA that cannot
> be amplified in the host microbe.

(Exh. 2016, p. 5, second full para.).

Most importantly, Japan teaches that the expression
regulating or expression-controlling sequences are inserted by
homologous recombination:

> As a means for integrating an expression regulating
> sequence such as a promoter with the chromosome of a host
> microorganism, the so-called homologous crossing-over is
> adopted.  For this purpose, the regulatory sequence to
> be inserted is preferred to be furnished at one terminal
> or both terminals thereof with a DNA sequence which is
> homologous with the DNA sequence of a gene already existing
> in the relevant chromosome and concerned in the formation
> of the target product.

(Exh. 3010, p. 8, second full para.; emphasis added);

-78-

Interference 105,114

So-called <u>homologous exchange</u> is commonly used as the
method for integrating expression-controlling sequences such
as promoters into host microbe chromosomes.  For this
reason, it is preferable that controlling sequences to be
inserted have, at one or both ends, DNA sequences that are
homologous to the DNA sequences of the genes related to
production of the desired products already present on the
chromosomes.

(Exh. 2016, pp. 5-6, bridging para.).

In its examples, Japan targets genes encoding tryptophan and

utilizes promoters derived from <u>Bacillus amyloliquefaciens</u> or the

SPO2 phage which infects <u>Bacillus subtilis</u> (Exh. 3010, pp. 8-9,

bridging para.; Exh. 2016, pp. 8-9, bridging para.), and marker

genes imparting resistance to chloramphenicol, ampicillin, and

tetracycline (Exhs. 3010 and 2016, Examples 1-3).  Japan also

employs radioactive markers (Exhs. 3010 and 2016, Example 6).

<u>Findings based on Japan's teachings</u>

Having concluded that a "cell line" of Claims 1, 2, 3, 17,

18, 19, 26, and 27 of ARS's patent reads on microorganisms, we

find that Japan describes an invention of Claims 1, 2, 5, 17, 18,

19, 20, 22, 26, 28, 52, 53, 54, and 56 of ARS's '071 patent,

and/or conclude that an invention of Claims 1, 2, 5-7, 13-20, 22,

23, 26, 28-30, 36-39, 52-54, 56 and 57 of ARS's '071 patent

reasonably would have been obvious to persons having ordinary

skill in the art in light of Japan's teachings.

Furthermore, we find that Japan describes an invention of

Claims 110-112 of Genesys's Application 08/102,390 and/or

-79-

Interference 105,114

conclude that an invention of Claims 110-112 of Genesys's
Application 08/102,390 reasonably would have been obvious to
persons having ordinary skill in the art in light of Japan's
teachings.

### The parties' claims directed to eukaryotic cell lines

Claims 105 and 107-109 of Genesys Application 08/102,390 and
Claims 9-12, 25, and 32-35 of ARS's '071 patent differ from the
inventions described by, or obvious in view of, Japan itself in
the eukaryotic cell line.  Compare the cell lines of, and the
related genomes, DNA constructs and methods encompassed by, the
parties' claims relative to the cell lines of Japan's claims:

| Cell line | Genesys | ARS | Japan |
|-----------|---------|-----|-------|
| Prokaryotic | yes | yes | yes |
| bacteria | yes | yes | yes |
| Eukaryotes | yes | yes | no |
| yeast | yes | yes | no |
| plants | yes | yes | no |
| mammals | yes | yes | no |

The significant issue for our consideration is whether
persons having ordinary skill in the art would have been led by
the methods described in Japan (for activating a prokaryotic
microorganism to express a gene of its genome encoding a protein
not normally expressed by said prokaryotic microorganism,
and/or for increasing the level of expression of a gene of a
prokaryotic microorganism's genome encoding a protein normally
expressed by said prokaryotic microorganism) to activate an

-80-

Interference 105,114

eukaryotic cell line to express a gene of its genome encoding a
protein not normally expressed by said eukaryotic cell line,
and/or for increasing the level of expression of a gene of a
eukaryotic cell line's genome encoding a protein normally
expressed by said eukaryotic cell line, with reasonable
expectation of success.  More specifically, would persons having
ordinary skill in the art have been led by the methods described
by Japan (for activating a prokaryote to express a gene of its
genome encoding a protein not normally expressed by said
prokaryote, and/or for increasing the level of expression of a
gene of a prokaryote's genome encoding a protein normally
expressed by said prokaryote) to use the same type of procedure
to activate an eukaryotic cell line, most especially a
differentiated mammalian cell line, to express a gene of its
genome encoding a protein not normally expressed by said
eukaryotic or differentiated mammalian cell line, and/or increase
the level of expression of a gene of an eukaryotic or
differentiated mammalian cell line's genome encoding a protein
normally expressed by said eukaryotic or differentiated mammalian
cell line, with reasonable expectation of success.  We look to
all the evidence of record for the answers.

    We consider first the prior art cited by the parties as
evidence of the state of the art at the time the parties first

-81-

Interference 105,114

filed their patent applications. We find this pre-litigation evidence to be the most credible characterization of the knowledge and skill in the art at the pertinent time; far more credible than the subsequent views of persons said to be skilled in the art which were entered of record in this interference a decade later.

First, Japan is not only concerned with stimulating or enhancing expression of target genes endogenous to the genome of prokaryotes but also instructs that expression of target genes exogenous to the genome of prokaryotes which encode foreign proteins can be stimulated or enhanced by inserting exogenous expression regulatory sequences in operable proximity to the exogenous target gene inserts by homologous recombination (Exh. 3010, pp. 6-7, bridging para.). As examples of target genes, Japan names target genes which encode both plant and animal proteins, including human proteins (Exh. 3010, p. 6, second para.):

> The target substances which are produced by the method of this invention can be proteins or polypeptides such as, for example, varying species of enzymes such as, for example, protease, amylase, glucose isomerase, cellulase, tryptophan synthetase which are products of direct expression of genes; various species of peptide-like hormones such as, for example, insulin, growth hormones, encephalin, and somatostatin; various species of antigens such as, for example, hepatitis vaccine, polio vaccine, and Herpes vaccine; and various species of lymphokine such as, for example, interferon and interleucine.

-82-

Interference 105,114

In that light, we recall the teaching of Kaufman I
(Exh. 3007; Exh. 2014), cited by both parties in support of
their preliminary motions under 37 CFR § 1.633(a)(Paper No. 63,
pp. 1, 7-8 and 10-14). Kaufman I teaches (Exh. 3007; Exh. 2014):

> [I]t should now be possible to synthesize large
> quantities of these proteins in surrogate cell systems.
> For a variety of reasons, including the glycosylation
> patterns and the secondary structures of some of these
> proteins, synthesis in a mammalian cell expression
> system is highly preferable.

Kaufman II (Exh. 3015, cited by ARS to demonstrate that
"[e]ukaryotic cells have the ability to synthesize and secrete
proteins that are folded properly, modified, and biologically
active" (ARS's Motion 4 (Paper No. 48), p. 9, para. (35)),
further explains (Exh. 3015, p. 155):

> Although a variety of eukaryotic and prokaryotic host
> systems is available for the expression of a particular
> gene, the focus of this chapter is on the various
> approaches to the high level expression of heterologous
> genes in mammalian.
>
> The advantages of using mammalian cells as a host for
> the expression of a gene obtained from a higher eukaryote
> stem from experience that the signals for synthesis,
> processing, and secretion of these proteins are usually
> properly and efficiently recognized in mammalian cells.
> It has been found that:  1) proteins can be readily
> synthesized and secreted into the growth medium;
> 2) protein folding and disulfide bond formation are
> usually like that of the natural protein, and therefore,
> the proteins are usually produced in a functional form
> resistant to degradation;  3) glycosylation, both N- and
> O-linked, often occurs at normal positions;  4) other
> post-translational modifications can occur, e.g., the
> proteolytic processing of propeptides, the gamma-
> caboxylation of glutamic acid residues, and the sulfation

-83-

Interference 105,114

of tyrosine residues; and  5) multimeric proteins can be correctly assembled.

Japan and Kaufman I/II together provide ample motivation for persons having ordinary skill in the art to insert a DNA construct comprising an exogenous promoter or other expression regulating sequence capable of stimulating or enhancing the expression of an endogenous or exogenous target mammalian or other eukaryotic gene within flanking sequences homologous to a region of the genome of a host mammalian or other eukaryotic cell line in the vicinity of the target gene into the genome of the host mammalian or other eukaryotic cell line by homologous recombination in order to stimulate or enhance expression of the target gene and production of the protein the target gene encodes by the host mammalian or other eukaryotic cell line.  However, there remains the question whether persons having ordinary skill in the art reasonably would have expected success in so doing. We look to the teachings of Thomas (Exh. 2011) and Smithies (Exh. 2010) for that answer.

Thomas (Exh. 2011) was published November 6, 1987.  In its Introduction (Exh. 2011, p. 503, col. 1, para. 1, and cols. 1-2, bridging para.), Thomas positively states:

> Gene targeting-the homologous recombination of DNA sequences residing in the chromosome with newly introduced DNA sequences-provides a means for systematically altering the mammalian genome (Smithies et al., 1985[Exh. 2010]; Thomas et al., 1986; Thomas and Capecchi, 1986).  A desired

-84-

Interference 105,114

alteration would first be introduced into a cloned DNA sequence, and the gene targeting would then transfer the alteration into the genome. Gene targeting should be equally effective for correcting or mutating the desired chromosomal locus.

. . . The transfer of information by homologous recombination allows one to mutate or correct the desired chromosomal locus in a defined manner. . . . .

Thomas evaluated the level of success which could be expected using mammalian stem cells (Exh. 2011, pp. 503-504, bridging para.):

Under optimal conditions, we find that 1/1000 cells transformed by exogenous DNA can undergo a gene-targeting event. The advantage of . . . gene targeting compared with random mutagenic methods such as chemical mutagenesis or retroviral DNA insertion is twofold. First, the nature of the mutant allele is at the discretion of the experimenter, and second, unlike random mutagenic events, the frequence of the targeting events is efficiently high to make the procedure applicable to non-detectable genes.

Thomas concludes (Exh. 2011, pp. 510, col. 2, Conclusion):

We have . . . shown that ES [(mouse embryo-derived stem)] cells are a suitable host for gene-targeting experiments. It is hoped that this combination of using ES cells as the recipient cell line and site-specific mutagenesis achieved by gene targeting will provide the means for generating mice of any desired genotype.

Smithies, cited in Thomas as "Smithies et al., 1985," anticipated the frequency of success in transforming mammalian stem cells that Thomas would later predict (Exh. 2010, p. 230, col. 1, para. 2):

The series of experiments reported here shows that homologous recombination between exogenous DNA and a chromosomal gene does occur in cultured mammalian cells

-85-

Interference 105,114

> and can allow the stable insertion of defined DNA
> sequences into the human β-globin locus in a predictable
> fashion.  Although the frequency of success (~$10^{-3}$ of the
> transformed cells) is at present modest, the data show
> unequivocally that the planned modification of a specific
> human gene is possible in vivo.

Moreover, Smithies indicates that much of the rationale employed

in applying homologous recombination techniques to host mammalian

cells is "derived from experiments in yeast in Hinnen et al.

showing that recombination between incoming DNA sequences and

homologous sequences within the genome can direct the exogenous

DNA to the desired locus (Exh. 2010, p. 230, col. 1, para. 4;

citation omitted).  Smithies concluded in 1985 that (Exh. 2010,

p. 234, col. 1-2):

> The experiments reported here establish that the planned
> modification of a specific human gene can be accomplished
> in mammalian cells by homologous recombination without
> detectably affecting other parts of the genome. . . .
> [I]t is evident that extensions of the principles we have
> used here to other genes in complex eukaryotes should
> permit new approaches to many problems in molecular
> genetics.

Based on the aforementioned prior art teachings, we find

that persons having ordinary skill in the art would have been

motivated to make and use inventions encompassed by Claims 1, 2,

5-7, 9-20, 22, 23, 25, 26, 28-30, 32-39, 52-54, 56 and 57 of

ARS's '071 patent and Claims 105 and 107-112 of Genesys's

Application 08/102,390 with reasonable expectation of success.

Therefore, we conclude that subject matter defined by Claims 1,

-86-

Interference 105,114

2, 5-7, 9-20, 22, 23, 25, 26, 28-30, 32-39, 52-54, 56 and 57 of

ARS's '071 patent and Claims 105 and 107-112 of Genesys's

Application 08/102,390 <u>prima facie</u> would have been obvious to

persons having ordinary skill in the art and unpatentable under

35 U.S.C. § 103 in view of the combined teachings of Japan,

Kaufman I, Thomas and Smithies, optionally further in view of

Kaufman II.[5]

---

[5]    We have considered ARS'S REQUEST FOR A TELECONFERENCE
TO DISCUSS FILING A 37 CFR 1.635 MOTION FOR PERMISSION TO FILE A
POST-HEARING MEMORANDUM CONCERNING NEW ISSUE RAISED AT HEARING
(Paper No. 170).  Genesys is said to oppose ARS's request (Paper
No. 170, p. 2, para. 5).  ARS's request is <u>DENIED</u>.  ARS argued:

> During the hearing, the panel inquired whether the
> claims of ARS's patent are obvious over a combination of
> Kaufman, Exhibit 3015, and JP '280, Exhibit 3010 (English
> translation).
> Inasmuch as the panel's sua sponte inquiries during
> the oral hearing were directed to a new issue that had not
> previously appeared in the record, ARS would like to be
> given a fair opportunity to respond to those specific
> questions.
> ARS's memorandum will clearly explain why ARS believes
> that the Kaufman 3015 reference cannot be properly combined
> with the JP '280 reference because it does not state what
> it was asserted to state during the oral hearing.

On this record, ARS first cited Kaufman II (Exh. 3015) to
demonstrate that "[e]ukaryotic cells have the ability to
synthesize and secrete proteins that are folded properly,
modified, and biologically active" (ARS's Motion 4 (Paper
No. 48), p. 9, para. (35)).  Kaufman II is ARS's own reference.
ARS cannot have been surprised by its teaching.  It is not unfair
to ARS to rely upon the disclosure of a reference ARS brought
to the Board's attention.  Moreover, though less comprehensive,
a like disclosure by Kaufman I was relied upon by both ARS
(Exh. 3007) and Genesys (Exh. 2014) as basis for rejecting and
responding to proposed rejections of the claims before us.

-87-

Interference 105,114

### Genesys's rebuttal and/or showing

Even presuming Japan to be prior art under 35 U.S.C.
§ 102(a) with respect to the subject matter of Claims 105-112 of
Genesys's Application 08/102,390, we nevertheless conclude that
the combined teachings of Japan, Kaufman I, Thomas and Smithies,
optionally further in view of Kaufman II, do not establish a
prima facie case of obvious under 35 U.S.C. § 103 for the
invention of Genesys's Claim 106. We agree with Genesys's view
that "Claim 106 . . . recites specific provisions that are
nowhere found in the prior art" (Paper No. 63, p. 23, para. 1).

While "Claims 105, 107, 108 and 109 are directed to methods
of treatment of mammalian cells, by incorporation, through
homologous recombination, of an amplifiable gene into proximity
of the target gene to be expressed" and "Claims 110-112 are
directed to the cell that results from the homologous
recombination process of Claims 105 and 107-109" (Paper No. 63,
p. 23, para. 1), Genesys does not deny that subject matter
encompassed by Claims 105 and 107-112 of Genesys's Application
08/102,390 would have been obvious in view of the combined prior
art teachings including Japan. Note Genesys's Preliminary
Motion 2 regarding the patentability of claims directed to the
same patentable invention in ARS's '071 patent (Paper No. 63,

-88-

Interference 105,114

pp. 12-14 and 21-22). More specifically, Genesys argues that

Japan (Paper No.63, p. 21):

> . . . advised those skilled in the art that foreign
> regulatory elements, promoters, amplifiable genes and
> the like, could be inserted into a genome through
> homologous recombination to enhance expression in native
> genes. While the specific example was a microorganism,
> E. coli, all but a handful of the '071 patent claims
> embrace this teaching. The only claims that are not
> anticipated thereby are Claims 9-12, 32-35 and 44-47.
> These claims escape specific anticipation because the
> Kokai suggest [sic], but does not provide an example,
> that the techniques taught therein could be applied to
> eukaryotes, including mammals, plants and the like. Yet,
> the art from 1980 to 1989 had demonstrated the power of
> homologous recombination was applicable to any genome, using
> regulatory elements, independent of the identity of the
> genome. While not every gene in every call [sic-cell]
> could be activated this way, the art had clearly taught
> that the teachings of the Kokai were equally applicable
> to plants, animals and in particular, mammals.

Throughout its Preliminary Motion 2, Genesys cites the

Declaration of Nickoloff (Exh. 2029) in support of its arguments

(Paper No. 63, pp. 2-16). Our own analysis of the same prior

art teachings led to the conclusion that not only ARS's claims

but also corresponding Claims 105 and 107-112 of Genesys's

involved application are unpatentable under 35 U.S.C. § 103.

Rather than deny the obviousness of Genesys's Claims 105 and

107-112, presumably drawn to the same patentable invention as

Claims 1-58 of ARS's '071 patent, Genesys submitted evidence of

record in support of its argument that Japan is not available as

prior art over which the patentability of the subject matter

-89-

Interference 105,114

Genesys's claims may be rejected.  Genesys argues first that it

is entitled to benefit under 35 U.S.C. § 120 of the November 6,

1989, filing date of its parent Application 07/432,069.  Thus,

Genesys claims to antedate Japan.  To that end, it is said that

the Declaration of Bertram I. Rowland (Exh. 2054) and supporting

evidence (Exh. 2054, Exhibits A-E) under 37 CFR § 1.131(a) remove

Japan as prior art available against its claims.  Cell Genesys's

Preliminary Motion 2 explains (Paper No. 63, p. 24, para. 1):

> CGI recognizes that the filing date of November,
> 1989 is not sufficient to antedate Exhibit 2016, the
> Japanese Kokai.  CGI relies on the Declaration of Rowland,
> Exhibit 2054, to demonstrate possession of the invention
> in advance of the publication date of Exhibit 2016, the
> Japanese Kokai.  Specifically, Rowland provides testimony,
> independent of the inventor Skoultchi, that Skoultchi had
> possession of the invention no later than July 24, 1989,
> as reflected by contemporaneous documents.  Exhibit 2054,
> ¶2, which refers to Exhibit A, which is Exhibit 2040.
> There can be no question that CGI did anything but to
> pursue the invention diligently, and take action to make
> it available to the public, by preparing and filing a
> parent application.  The application was worked on
> throughout August, September and October of 1989, Exhibit
> 2054, ¶¶ 3 and 4, Exhibits 2042 and 2043, leading to the
> filing on November 6, 1989, Exhibit 2054, ¶5, and Exhibit
> 2044.  As Exhibit 2016 is art available against CGI only
> under 35 U.S.C. § 102(a), and CGI demonstrates possession
> of the invention prior to August, 1989, neither the '313
> patent, nor the Japanese Kokai is applicable to CGI's
> claims.  The rest of the prior art . . . [provides] no
> teaching that directs one skilled in the art to use the
> many techniques and observations arrived at to insert,
> through homologous recombination, an amplifiable gene
> into a mammalian cell for the purpose of enhancing
> expression.

Interference 105,114

Moreover, in its reply to ARS's Preliminary Motion 5 (Paper
No. 49), Genesys explained:

> Cell Genesys, Inc. (hereafter "CGI") opposes
> herewith ARS Preliminary Motion 5 seeking entry of
> judgment that Claims 110-112 of CGI are unpatentable
> as anticipated by Japanese Patent Publication
> HIE. 1-215280(JP280).  CGI opposes on the grounds
> that the reference is not prior art as to CGI.

(Paper No. 99, p. 1, para. 1);

> CGI does not disagree that JP280 is a potent
> reference, teaching much of the subject matter embraced
> in Claims 110-112 of the CGI '390 application.  Indeed,
> CGI maintains in its Preliminary Motion 2 that in fact
> JP280 is art that renders the '071 patent claims
> unpatentable under 35 U.S.C. §102 or §103.  Instead,
> CGI . . . submits that it is entitled to the benefit of
> its '069 priority case of November, 1989, less than a
> year subsequent to the publication of JP280, and has
> demonstrated possession of the invention in advance of
> the publication date of the JP280.  Simply, it is not
> prior art with respect to CGI.

(Paper No. 99, pp. 6-7, bridging para.);

> Having removed JP280 as prior art under 35 U.S.C.
> §102(b), it is incumbent on CGI to demonstrate prior
> possession of the invention.  This CGI does, with the
> Declaration testimony of a corroborator, Rowland.

(Paper No. 99, p. 7, last full para.); and

> ARS Preliminary Motion 5 assumes . . . that JP280
> is §102(b) prior art against the '390 application.  In
> fact, it is art available under 35 U.S.C. §102(a).  GCI
> has presented compelling evidence, against the total
> absence of evidence to the contrary, that it had possession
> of the invention well prior to the publication date of
> JP280, and moved diligently to the preparation and filing
> of the application that is a constructive reduction to
> practice of the Count.  Under these circumstances, the
> reference is not applicable against CGI Claims 110-112.

Interference 105,114

In response to ARS's preliminary motion for judgment under 37 CFR § 1.633(a) that its claims are unpatentable under 35 U.S.C. § 102 and/or § 103 based on prior art under 35 U.S.C. § 102(a), Genesys could have elected either to (1) ask the Board defer the opponent's Rule 633(a) motion to the priority phase of the proceedings or (2) antedate the § 102(a) reference, here Japan, under 37 CFR § 1.131.  See LeVeen v. Edwards, 57 USPQ2d 1416, 1420-21 (Bd. Pat. App. & Int. 2000)(footnotes omitted):

> When (1) a preliminary motion for judgment under 37 CFR § 1.633(a) against an opponent relies on a § 102(a) or § 102(e) reference and (2) the opponent alleges in its preliminary statement a date of invention prior to the prior art dates of the reference, the opponent will be given two choices.
>
> A first choice will be for the opponent to call attention to its preliminary statement and ask that a decision on the preliminary motion be deferred to the priority phase of the interference. . . . .
>
> A second choice is for the opponent to present proofs under 37 CFR § 1.131 together with its opposition.
>
> Each choice has advantages and disadvantages. . . . .
>
>                . . . . .
>
>        . . . Our decision leaves the opponent to sort out the advantages and disadvantages in a particular case and for the opponent to make an election.  If the opponent elects to present a Rule 131 showing, and it is not successful, its claims may be held to be unpatentable and any necessary adjustment to the count will be made. Whether the opponent with no patentable claims should then be allowed to put on a priority case to defeat the moving party, and what the count should be for that purpose, are matters which we leave for another day.

-92-

Interference 105,114

Genesys elected to antedate Japan by presenting the Declaration Bertram I Rowland and supporting evidence under 37 CFR § 1.131.  Rule 131 reads, in pertinent part:

§ 1.131  Affidavit or declaration of prior invention.

(a) When any claim of an application . . . is rejected, the inventor of the subject matter of the rejected claim . . . may submit an appropriate oath or declaration to establish invention of the subject matter of the rejected claim prior to the effective date of the reference or activity on which the rejection is based. . . . .

(b) The showing of facts shall be such, in character and weight, as to establish reduction to practice prior to the effective date of the reference, or conception of the invention prior to the effective date of the reference coupled with due diligence from prior to said date to a subsequent reduction to practice or to the filing of the application.  Original exhibits of drawings or records, or photocopies thereof, must accompany and form part of the affidavit or declaration or their absence satisfactorily explained.

We shall presume that the Rowland Declaration and accompanying exhibits constitute "an appropriate oath or declaration" to establish invention of the subject matter of the rejected claim prior to the August 29, 1989, publication date of Japan. Accordingly, we shall proceed to consider the merits of Genesys's showing.

First, we find of record, and all the panel members have viewed, the VHS video labeled:

Bertrand Roland // Tape 1
October 1st, 2003
TRT: 43 min[.]

-93-

Interference 105,114

Based on Rowland's Rule 131 declaration (Exh. 2054), including
video-cross-examination, Exhibits A-E attached to Rowland's Rule
131 declaration, and the Transcription of the Testimony of
Bertram Rowland, dated October 1, 2003 (Exh. 2055), we find
generally that Rowland's testimony is not particularly credible.

The Declaration of Bertram Irwin Rowland dated August 12,
2003, and attached Exhibits A-E (Exh. 2054), constitute Genesys's
direct showing under Rule 131. Rowland declared that he was a
patent attorney providing legal services to Cell Genesys, Inc.
(Genesys) "during the period June of 1989 - February of 1990"
(Exh. 2054, page 2, para. 1). Because Rowland's testimony is
critical to its case, we quote from that testimony rather than
paraphrase it. Rowland declared (Exh. 2054, pp. 2-3, para. 2):

> I have a current recollection of a meeting I attended
> at Cell Genesys, Inc. on or about July 24, 1989. The
> meeting was attended by Dr. Arthur Skoultchi and others
> of Cell Genesys, Inc. ("CGI" herein). Attached hereto
> as Exhibit A is a copy of notes of that meeting, which
> reflect three issues or areas of concern being addressed
> at CGI. Among the issues discussed at the meeting, later
> identified as issue or matter 3, was the problem that CGI,
> then in a start-up phase, wanted to work with a variety
> of proteins the recombinant forms of which and the isolated
> nucleic acids encoding them, were already patented. There
> were discussions of various proteins of interest, together
> with a discussion of how the patents of third parties
> might be avoided. Arthur Skoultchi ("Skoultchi" herein)
> suggested that the third party patents might be avoided
> if homologous recombination were used to alter cells to
> enhance expression of wild-type proteins encoded by the
> cells or to express genes that were not normally expressed.
> I observed that most of the patents I was familiar with
> would not cover such a process, or the product of the

-94-

Interference 105,114

     resulting gene expression.  Skoultchi noted that the
easiest way to produce more product was to introduce an
amplifiable gene through homologous recombination in the
proper location with respect to the gene the expression
of which was desired.  When the amplifiable gene was
amplified, the gene of interest would be as well,
generating multiple copies and increased expression.
A decision was made to move forward and file a parent
application on two alternative forms of the idea of
Skoultchi, including expressing a gene in the cells that
had received the amplifiable gene through homologous
recombination and the transfer of the amplified gene
to secondary expression host cells and expressing the
amplified gene in such secondary host cells.

While we will assume that the Declaration of Bertram I.

Rowland and attached exhibits constitute "an appropriate oath or

declaration" to establish invention of the subject matter of the

rejected claim prior to the August 29, 1989, publication date of

Japan, we cannot help but note that paragraph 2 of Rowland's

declaration, quoted above, is replete with references to inventor

Skoultchi's ideas, suggestions and statements.  There is no

testimony by Dr. Skoultchi of record.  Nor is there any

explanation why Dr. Skoultchi could not have testified.  In this

respect, Rule 131 indicates that inventor testimony is necessary.

Nevertheless, Exhibit A, not Rowland's declaration, appears to be

the main course of Genesys's showing.

     Exhibit A to Rowland's declaration carries the heading

(Exh. 2054, Exhibit A, p. 1):

              CELL GENESYS, INC.
             Minutes, SAB Meeting
           July 24 and 25, 1989[.]

-95-

Interference 105,114

At Oral Hearing on February 26, 2004, we asked Genesys's counsel

to point to those specific portions of Exhibit A which establish

the inventor's conception of the invention of the subject matter

defined by Claims 105-112 of Genesys's Application 08/102,390,

dated prior to August 29, 1989 (TP (Paper No. 171), p. 43, l. 7,

to p. 47, l. 8). Counsel directed our attention (TP, p. 47,

l. 9, to p. 50, l. 15) to the following information for meeting

held on "July 24" (Exh. 2054, Exhibit A, pp. 5-6) and "July 25"

(Exh. 2054, Exhibit A, p. 8):

<u>(Exh. 2054, Exhibit A, pp. 5-6 ("July 24"))</u>

REVIEW MHC

1.  Short bridge to market

2.  UD - <u>high profile financing clinic</u>
      other people's technology

3.  Promoter for:  dystrophin - superdystrophin

4.  <u>Replica culture</u> - preserve cell doubling

5.  Do fibroblasts fuse?  (could express dystrophin?)

MORE DATA

   HR efficiency is problem $2^{20}$ used

   Law, Partridge, Worton

A.  Call Hillman re:  MyoGenica

   Go into more detail with H. Blau

<u>Ron Worton</u>

<u>TRANSGENICS</u>

-96-

Interference 105,114

<u>Art</u>  HR - substitute another protein for lactoglobulin

Can you do HR in germ-line of other species

E.S. isolation is key  (mouse)  only
                               (hamster)

Something like secretory factor in nursing mother's milk
for IgA or ? other proteins.

Not now - think about collaboration.

Counsel for Genesys argued at oral hearing that the term

"HR" in the portion of Exhibit A reproduced above meant

"homologous recombination" (TP p. 47, l. 9-12).  Even if we

accept Genesys's argument, we find no statement of an invention

encompassed by Claims 105-112 of Genesys's Application 08/102,390

on pages 5-6 of Exhibit A to Rowland's declaration (Exh. 2054,

Exhibit A, pp. 5-6).

<u>(Exh. 2054, Exhibit A, p. 8 ("July 25"))</u>

At oral hearing, counsel for Genesys directed the Board's

attention (TP (Paper No. 171), p. 47, l. 21, to p. 50, l. 15)

to page 8 of Exhibit A to Rowland's declaration (Exh. 2054,

Exhibit A, p. 8), particularly the copy of handwriting in

association with what is said to be a hand drawn genetic map of a

plasmid, which indicate potential sites for insertion of DNA

segments.  Both the handwriting and hand drawn genetic map of

what is said to be a plasmid appear on page 8 of Exhibit A under

the heading "<u>Art</u>" (<u>Art</u> presumably referring to inventor Arthur

-97-

Interference 105,114

Skoultchi). We shall attempt to translate the plasmid map and the indicated sites for potential inserts without redrawing the original at the top of page 8 of Exhibit A.

Above the hand drawn genetic map indicated to be a "plasmid" there is handwritten the following:

>     Protein production in mammalian cells. S cloning tPA gene.
>        (Focus:  Known Therapeutic Proteins
>           Key:  Sidesteps Patents) < <u>Burt</u>
>                                     case by c
>                                     <u>CAN</u> DO

The "plasmid" depicted appears to include a dihydrofolate reductase mutant (DHFR$^{mut}$) gene segment with a neo gene segment and tk promoter segment upstream of the DHFR$^{mut}$ gene segment. Downstream of the DHFR$^{mut}$ gene segment there is depicted a human tissue-type plasminogen activator (tPA) gene segment from human diploid fibroblasts. There is an arrow from the term "eNh" pointing to an area between the neo gene segment and the tk promoter of the "plasmid". An arrow pointing toward the term "eNh" leads the phrase "Can Put eNhancer here. for ^ expression". To the lower-right of the "plasmid" there is handwritten "Vector To go upstream or downstream from tPA gene". There is an arrow leading from the "plasmid" toward the lower-left where the is handwritten "Transfer into CHO (Chinese Hamster Ovary)" and another arrow leading further from the "plasmid" toward the lower-left where there is written:

-98-

Interference 105,114

                    Methotrexate
                    ^conc => amplification of
                    DHFR (and nearby tPA gene)[.]

At the bottom of the handwriting and hand drawing, there is

written:  "Need To Know upstream or downstream sequences".

    At oral hearing, counsel for Genesys argued (TP (Paper

No. 171), p. 48, l. 15, to p. 49, l. 12) that persons skilled in

the art would not have needed to know upstream and downstream

sequences unless they intended, as inventor Skoultchi is said to

have intended, to insert DNA sequences into the genome of CHO

cells by homologous recombination.  Moreover, the references to

"HR" on pages 5-6 of Exhibit A to Rowland's declaration are said

to be consistent with Genesys's argument.

    In our view, Exhibit A to Rowland's declaration, with or

without the corroboration and explanation provided by Mr.

Rowland's declaration, does not establish that Genesys conceived

of an invention within the scope of any one of Claims 105-112 of

Genesys's Application 08/102,390, not to mention the full scope

of the subject matter claimed, prior to the August 29, 1989,

publication date of Japan.  Nowhere in Exhibit A to Rowland's

declaration (Exh. 2054) is "HR" defined.  Even if "HR" would

have been understood to mean homologous recombination, the

relationship between the references to "HR" on page 6 of

Exhibit A to Rowland's declaration showing the minutes of a

-99-

Interference 105,114

meeting on July 24, 1989, and the handwritten and hand drawn

portion on page 8 of Exhibit A to Rowland's declaration showing

the minutes of a meeting on July 25, 1989, is unclear.  There

appears to be no connection between page 6 of the minutes of Cell

Genesys, Inc.'s SAB Meeting on July 24 and the handwriting and

hand drawings on page 8 of the minutes of the meeting dated

July 25 (Exhibit A, p. 1 (July 24); p. 7 (July 25)).

On the other hand, Genesys urged that the handwritten and

hand drawn portions of the minutes of the July 25 meeting

presented on page 8 of Exhibit A inherently portray a method of

enhancing production of a target protein such as t-PA in mammals

by inserting an amplification sequence or a DNA expression

enhancer such as DHFR into the genome of a mammal cell line in

the vicinity of the gene encoding the target protein by

homologous recombination (TP (Paper No. 171), p. 48, l. 15,

to p. 49, l. 12).  In our view, the evidence does not establish

that insertion of foreign DNA by homologous recombination is

inherently described in the minutes of the July 25 meeting.  We

find that persons skilled in the art could interpret the

handwritten and hand drawn portions of page 8 of Exhibit A as a

method for inserting foreign DNA into the genome of the cell line

by techniques other than homologous recombination, e.g., by

random recombination or by point specific insertion techniques.

-100-

Interference 105,114

If knowledge of sequences upstream or downstream of the target
DNA segment in the genome of the cell line or upstream or
downstream of any other exogenous or endogenous DNA sequence
described in the handwritten and hand drawn portions of page 8 of
Exhibit A is, or may be, needed to insert a foreign DNA
amplification or expression enhancer sequence into the genome of
CHO cell line in operable vicinity of the target gene by
techniques other than homologous recombination, then the
handwritten and hand drawn portions of page 8 of Exhibit A to
Rowland's declaration would not necessarily, and accordingly,
does not inherently describe a method for inserting foreign DNA
into the genome of a cell line in operable vicinity of a target
gene by homologous recombination.  See Langer v. Kaufman,
465 F.2d 915, 918, 175 USPQ 172, 174 (CCPA 1972):

> To prove inherency, the burden is . . . to show that
> the "necessary and only reasonable construction to be
> given the disclosure by one skilled in the art is one
> which will lend clear support to . . . [this] positive
> limitation in the interference count." . . . (quoting
> Binstead v. Littmann, 242 F.2d 766, 770, 113 USPQ 279,
> 282 (CCPA 1957).

See also Kennecott Corp. v. Kyocera Intl., Inc., 835 F.2d 1419,
1423, 5 USPQ2d 1194, 1198 (Fed. Cir. 1987).

Of record in this interference, we find Kaufman, R., et al.
(Kaufman I), "Coamplification and Coexpression of Human Tissue-
Type Plasminogen Activator and Murine Dihydrofolate Reductase

-101-

Interference 105,114

Sequences in Chinese Hamster Ovary Cells," <u>Molecular and Cellular</u>

<u>Biology</u>, Vol. 5, No. 7, pp. 1750-1759 (July 1985)(Exh. 3007;

Exh. 2014). Kaufman I teaches (Exh. 2014, p. 1757-58,

Discussion; emphasis added; citations omitted):

> [A] <u>cotransfection method was used which yields cells</u>
> <u>containing the t-PA sequences closely linked to the</u>
> <u>DHFR sequences</u>. . . . The DHFR transcription unit was
> constructed without an enhancer element. As a result,
> transformation of DHFR-deficient CHO cells to a DHFR$^+$
> phenotype was inefficient with this DNA alone. However,
> cotransfection of the DHFR unit with a t-PA transcription
> unit containing an enhancer dramatically increased the
> efficiency of DHFR transformation. This appeared to
> occur by in vivo ligation of the two separate transcription
> units, resulting in the enhancement of DHFR expression
> by the t-PA-associated enhancer element. Efficient DHFR
> expression was thus dependent on continued association
> with the enhance from the t-PA transcription unit.
>
>      . . . These results are consistent with the existence
> of a gradient of DNA amplification . . . . Under this
> hypothesis, transfected DNA sequences at the center of the
> gradient would be frequently amplified in all MTX-resistant
> clones, whereas more distal transfected DNA sequences would
> be less likely to be amplified.
>
>      . . . Since the continued presence of the enhancer
> element from the t-PA cDNA gene was necessary for efficient
> DHFR expression, a high percentage of this subset is
> expected to have coamplified t-PA sequences and to thus
> express t-PA at high levels. Our results are consistent
> with this scheme.
>
>      . . . CHO cells clearly have the capacity to
> accommodate the synthesis, glycosylation, and secretion of
> much larger quantities of protein than they do normally;
> this is substantiated by the fact that gene amplification
> has been used to obtain cell lines which express high
> levels of gamma interferon, beta interferon, hepatitis B
> surface antigen, and now human t-PA. . . . .

Interference 105,114

A limited analysis of the t-PA synthesized by CHO cells shows that it has approximately the same activity as native t-PA and is glycosylated in a similar but not identical manner. . . . . .

Comparing the cotransfection method described in Kaufman I to the method described by the handwritten and hand drawn information on page 8 of Exhibit A to Rowland's declaration (Exh. 2054; Exhibit A (Exh. 2040), p. 8), we find that the methods described in Rowland's Exhibit A do not exclude methods described by Kaufman I. Kaufman I appears to describe the method depicted on page 8 of Exhibit A to Rowland's declaration (Exh. 2054; Exhibit A (Exh. 2040), p. 8), including the "need to know upstream or downstream sequences" (Exh. 2054, Exhibit A, p. 8 (also Exh. 2040)); e.g., the t-PA cDNA sequence including the t-PA enhancer must be closely linked to the mutant DHFR sequence. Kaufman I shows that the method depicted on page 8 of Exhibit A to Rowland's declaration is not necessarily a method whereby foreign DNA was inserted into the genome of CHO cells by homologous recombination. We find, therefore, that the evidence to which Rowland points in support of his declaration, as a whole, does not establish that insertion by homologous recombination is the necessary and only reasonable construction one skilled in the art would have given to the method depicted on page 8 of Exhibit A of Rowland's declaration.

-103-

Interference 105,114

Genesys would have us consider Rowland's declaration
(Exh. 2054), testimony (Exh. 2055) and Video Tape 1 thereof in
conjunction with the original draft of its patent application
(Exhibit B to Rowland's declaration (Exh. 2054)) and debit notes
(Exhs. C, D and E) relating to the drafting and November 6,
1989, filing of Genesys's parent U.S. Application 07/432,069
(Exh. 2028). We proceed to do so. In paragraphs 3, 4-3, 4-4
and 5 of his declaration, Rowland declared (Exh. 2054, pp. 3-4,
para. 3-5):

> 3.   . . . I worked on the CGI matter number 3 during the
> month of August, and prepared an initial draft application
> for review by the inventor, and completion by CGI.
> Attached hereto as Exhibit B is a copy of a draft
> application so prepared. This application was forwarded
> to CGI for additional information and review.

> 4.   . . . Exhibit C is a copy of a debit note issued to
> CGI for the [monthly] period ending September 25, 1989.
> On page 3 the debit note reflects three entries in
> connection with the matter designated Cell-3, the
> application directed to the production of proteins
> using homologous recombination. The entries reflect
> that I drafted the application and claims in August,
> 1989, and that the application was reviewed and revised
> approximately a week later.

> 4.   . . . Exhibit D is a copy of a debit note issued to
> CGI for the [monthly] period ending October 25, 1989.
> On page 2 there is an item for "review and revise
> application" with the matter designated Cell-3, the
> application directed to the production of proteins using
> homologous recombination. The application had been drafted
> in August, 1989, following the July meeting, and the line
> item included reflects revision of that application.

-104-

Interference 105,114

    5.  Exhibit E is a copy of a debit note . . . for the
period ending November 25, 1989.  This debit note reflects
three entries in connection with the matter designated
Cell-3, the application directed to the production of
proteins using homologous recombination.  The entries
reflect that I reviewed and revised the application,
I spoke with inventor Skoultchi by telephone, and filed
the application on November 6, 1989.  That application
was given Serial Number 07/432,069. . . . The exhibits
hereto reflect a progression of about three months
from identification of invention to filing of a patent
application directed thereto, which is consistent with my
memory of my general working practices at the time period.
I worked on the application with due diligence and
attention, to the best of my recollection.

    Exhibit B to Rowland's declaration (Exh. 2054) consists

of two documents.  The first document is a hand-edited

and annotated, printed draft of an incomplete, non-final

specification for a patent application entitled "Production Of

Proteins Using Homologous Recombination" (Exhibit B, p. 1,

top-center) and claims identified as follows (Exhibit B, p. 1,

top-right):

27949/CELL-3
08/29/89:APP:slb[.]

The printed date "08/29/89" which is original to the document

does not establish that the printed subject matter thereof was

invented prior to the August 29, 1989, publication date of

Japanese Patent Publication 1-215280 (Exh. 3009; Exh. 3010; and

Exh. 2016).  Moreover, Rowland declared "that the [annotated and

edited copy of the] application was reviewed and revised

approximately a week later" (Exh. 2054, p. 3, para. 4).  The

-105-

Interference 105,114

second document is labeled "Experimental" and introduced by the

following handwritten identification (Exhibit B, last three

pages):

    Protein Patent    10/30/89        Nora   2309[.]

    Exhibit C to Rowland's declaration (Exh. 2054) is a copy of

INVOICE # 95853 from Leydig, Voit & Mayer, LTD. to Cell Genesys

dated September 25, 1989, "For Professional Services Rendered

Through September 25, 1989 In Connection With The Following

Matters -":

```
        MATTER NUMBER - 27949
              CELL-3
              U.S. Patent Application
              Production of Proteins Using Homologous Recombination
              Skoultchi

        8/25/89    BIR       Drafting application.
        8/29/89    BIR       Draft application and claims.
        9/06/89    BIR       Review and revise.

           PROFESSIONAL SERVICES              1,485.00

           MATTER TOTAL                       1,485.00[.]
```

    Exhibit D to Rowland's declaration (Exh. 2054) is a copy of

INVOICE # 717 from Leydig, Voit & Mayer, LTD. to Cell Genesys

dated October 25, 1989, "For Professional Services Rendered

Through October 25, 1989 In Connection With The Following

Matters -":

Interference 105,114

        MATTER NUMBER - 27949
            CELL-3
            U.S. Patent Application
            Production of Proteins Using Homologous Recombination
            Skoultchi et al

    9/05/89    ES        Review and revise application.

            PROFESSIONAL SERVICES            150.00

            MATTER TOTAL                     150.00[.]

    Exhibit E to Rowland's declaration (Exh. 2054) is a copy of

INVOICE # 5484 from Leydig, Voit & Mayer, LTD. to Cell Genesys

dated November 25, 1989, "For Professional Services Rendered

Through November 25, 1989 In Connection With The Following

Matters -":

        MATTER NUMBER - 27949
            CELL-3
            U.S. Patent Application
            Production of Proteins Using Homologous Recombination
            Skoultchi et al

    11/01/89   BIR        Review and revise.
    11/03/89   BIR        Telecon Skoultchi.
    11/06/89   BIR        Filing application.

            PROFESSIONAL SERVICES            385.00

            COSTS ADVANCED

            Postage                      11.05
            Photocopies                  25.00
            Patent and Trademark Office Fees 502.00

            TOTAL COSTS ADVANCED            538.05

            MATTER TOTAL                   923.05[.]

-107-

Interference 105,114

Having considered the Declaration of Bertram Irwin Rowland (Exh. 2054) and attached Exhibits A-E, we find that the evidence as a whole does not establish that Genesys either reduced to practice the invention of Claims 105-112 (to the extent they require insertion of heterologous DNA into the genome of a mammalian cell through homologous recombination) of Genesys's Application 08/102,390 prior to the August 29, 1989, publication date of Japan, or conceived of the invention of Claims 105-112 (to the extent they require insertion of heterologous DNA into the genome of a mammalian cell through homologous recombination) of Genesys's Application 08/102,390 prior to the August 29, 1989, publication date of Japan, coupled with due diligence from a time prior to said date to a subsequent reduction to practice or to the November 6, 1989, filing date of Genesys's Application 08/102,390. See In re Gosteli, 872 F.2d 1008, 1012, 10 USPQ2d 1614, 1617 (Fed. Cir. 1989)(emphasis omitted):

> Rule 131 requirements are quite specific. To antedate a prior art reference, the applicant submits an oath or declaration alleging acts that establish a completion of the invention . . . before the effective date of the prior art. 37 C.F.R. § 1.131(a).

We need not consider whether the same evidence (Exh. 2054) is sufficient to antedate Japan's August 29, 1989, publication date for the invention of Claims 105 and 110 to 112 (to the extent they do not require insertion of heterologous DNA into the

-108-